**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

In re:                              :    Chapter 11
                                   :

MODEL REORG ACQUISITION, LLC, et al., :    Case No. 17-11794 (___)
                                 :

                  Debtors.[1]     :    (Joint Administration Pending)
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF MICHAEL W. KATZ,
PRESIDENT AND CHIEF EXECUTIVE OFFICER,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

       I, Michael W. Katz, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

       1.     I am the President and Chief Executive Officer ("CEO") of Perfumania Holdings, Inc. ("Perfumania Holdings"), the ultimate parent of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") and certain other affiliates of the Debtors (the "Non-Debtor Affiliates" and, together with the Debtors, "Perfumania" or the "Company"). To enable the Debtors to minimize the adverse effects of these Chapter 11 Cases (as defined below) on their businesses and on the Company, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Perfumania Holdings, Inc. (7964); Perfumania, Inc. (6340); Magnifique Parfumes and Cosmetics, Inc. (6420); Ten Kesef II, Inc. (1253); Perfumania.com, Inc. (4688); Model Reorg Acquisition, LLC (0318); Northern Group, Inc. (3226); Perfumania Puerto Rico, Inc. (6787); Quality King Fragrance, Inc. (4939); Scents of Worth, Inc. (1732); Jacavi, LLC (6863); Distribution Concepts, LLC (8845); Flowing Velvet, Inc. (7294); Aladdin Fragrances, Inc. (4338); Niche Marketing Group, Inc. (1943); Northern Brands, Inc. (7186); Northern Amenities, Ltd. (5387); Global Duty Free Supply, Inc. (2686); and Perfumers Art, Inc. (6616). The address of the Debtors' corporate headquarters is 35 Sawgrass Drive, Suite 2, Bellport, New York 11713.

"First Day Pleadings").[2]  I submit this declaration in support of the Debtors' (a) voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")

and (b) First Day Pleadings.  I am authorized to submit this declaration (the "Declaration") on

behalf of the Debtors.

        2.      I joined Perfumania Holdings in 2004 as President and CEO and have

been a member of the Perfumania team for over 13 years.  I have served in various capacities at

Perfumania and its affiliated companies.  I am primarily responsible for overseeing

administration, finance, mergers and acquisitions. From 1994 until 1996 I was Senior Vice

President of Quality King Distributors, Inc. ("Quality King").[3]  Since 1996, I have served as

Executive Vice President and a Director of Model Reorg Acquisition, LLC ("Model Reorg") and

Executive Vice President of Quality King.

        3.      As a result of my position as President and CEO, my extensive tenure with

the Company, my review of relevant documents, and my discussions with other members of the

Debtors' management teams in the ordinary course of business, I am familiar with the Debtors'

day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I

have personal knowledge of the matters set forth herein and, if called as a witness, would testify

competently thereto.  Except as otherwise stated, all facts set forth in this Declaration are based

on my personal knowledge, my discussions with other members of the Debtors' senior

management, my review of relevant documents, or my opinion, based on my experience and

---

[2]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Plan or the relevant First Day Pleading, as applicable.

[3]    Quality King is not part of the Pefumania corporate family.  Quality King is a corporation owned by Stephen Nussdorf, the Executive Chairman of the Perfumania Holdings' Board of Directors, and his siblings, Glenn Nussdorf and Arlene Nussdorf.   The Nussdorfs are members of MJA Beauty LLC, which is the principal shareholder of Perfumania Holdings as of the Petition Date

knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my use in preparing this Declaration.

4.      This Declaration is divided into two parts.  Part I of this Declaration provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of these Chapter 11 Cases.  Part II sets forth the relevant facts in support of the balance of the First Day Pleadings.

## PART I
## BACKGROUND

### A.      Corporate History

5.      The Company was originally founded as a fragrance business by the Nussdorf Family in 1980 and has grown to become the largest specialty retailer and distributor of fragrances and related beauty products in the United States.

6.      Until August 8, 2008, Perfumania Holdings' corporate name was E Com Ventures, Inc.  ("E Com").  E Com was a specialty retailer and wholesale distributor of fragrances, doing business primarily through the Perfumania retail store chain and over the Internet though perfumania.com.  On August 11, 2008, Perfumania Holdings (formerly, E Com) acquired Model Reorg, Inc., a diversified wholesale and retail fragrance company, doing business through Quality King Fragrance, Inc. ("QFG"), Scents of Worth, Inc. ("SOW"), and Five Star Fragrance Company, Inc. ("Five Star").  In connection with the acquisition, Model Reorg, Inc. merged into Perfumania Holdings' wholly owned subsidiary, Model Reorg  (the "2008 Merger").  The 2008 Merger combined the retail, wholesale, consignment, and owned and licensed brand businesses under one umbrella.

7.     On April 18, 2012, Perfumania Holdings acquired all of the outstanding shares of Parlux Fragrances, Inc. ("Parlux Inc.") common stock (the "Parlux Acquisition").[4] Parlux Inc. was engaged in the business of creating, designing, manufacturing, distributing and selling prestige fragrances and beauty related products marketed primarily through specialty stores, national department stores and perfumeries on a worldwide basis.  The Parlux Acquisition created a larger, national, vertically integrated manufacturer, wholesale distributor and specialty retailer of fragrances and related products.

**B.     The Debtors' Business**

8.     Today, Perfumania is a national, vertically integrated wholesale distributor and specialty retailer of perfumes and fragrances.  The Company conducts business in the United States, Puerto Rico, Brazil and the US Virgin Islands through six wholly-owned subsidiaries; Perfumania, Inc., QFG, SOW, Perfumania.com, Inc. ("Perfumania.com"), Parlux Fragrances, LLC ("Parlux"), and Five Star.  The Company's executive offices are located in Bellport, New York.

9.     The Company operates in two industry segments, wholesale distribution and specialty retail sales of designer fragrances and related products.  The Company's businesses are highly seasonal with the most activity occurring from September to December each year.

(a)     Wholesale Distribution Business

10.     The Company's wholesale business includes QFG, Parlux, and Five Star. QFG distributes designer fragrances to mass market retailers, drug, and other chain stores, retail

---

[4]     PFI Merger Corp., a Delaware corporation and wholly owned subsidiary of Perfumania Holdings, acquired all of the outstanding shares of Parlux Inc. common stock via a merger of Parlux Inc. with PFI Merger Corp., with Parlux Inc. surviving the merger. Parlux Inc. was then merged into PFI Merger Sub I, LLC, which survived this second merger as a wholly owned subsidiary of Perfumania Holdings and changed its name to Parlux Fragrances, LLC.

wholesale clubs, traditional wholesalers, and other distributors throughout the United States. QFG buys designer fragrances principally from the brand owners and manufacturers, and sells principally to retailers like Burlington Coat Factory, CVS, Kohl's, Marshalls, Nordstrom Rack, Ross Stores, Sears, Target, Wal-Mart and Walgreens.

11.    Parlux and Five Star are the Company's manufacturing divisions, and they own and license designer and other fragrance brands that are sold to regional and national department stores, including Belk, Bon Ton, Boscovs, Dillards, Lord & Taylor, Macy's and Stage Stores, international distributors, and on military bases throughout the United States, through QFG, SOW's consignment business, and the Company's retail business (which is discussed below).  All manufacturing operations are outsourced to third-party manufacturers. Parlux and Five Star are Non-Debtor Affiliates.

(b)    Retail Business

12.    Perfumania is a specialty retailer of perfumes, fragrances and related products.  The retail business is conducted through three entities: Perfumania, Inc., Perfumania.com, and SOW.

13.    Perfumania, Inc. is a leading specialty retailer and distributor of a wide range of brand name and designer fragrances.  As of the Petition Date, Perfumania, Inc. operated a chain of 226 retail stores, specializing in the sale of fragrances and related products at discounted prices up to 75% below the manufacturers' suggested retail prices.  Each retail store generally offers approximately 2,000 different fragrance items for women, men and children. These stores stock brand name and designer brands such as Azzaro®, Burberry®, Bvlgari®, Calvin Klein®, Carolina Herrera®, Christian Dior®, Dolce & Gabbana®, Donna Karan®, Estee Lauder®, Giorgio Armani®, Givenchy®, Gucci®, Guess®, Hugo Boss®, Issey Miyake®, Jimmy

Choo®, Lacoste®, Mont Blanc®, Paco Rabanne®, Ralph Lauren/Polo®, Versace® and Yves Saint Laurent® as well as Parlux and Five Star brands.   Perfumania also exclusively carries a private label line of bath and body products under the name Jerome Privee®.  The retail business is principally operated through Magnifique Parfumes and Cosmetics, Inc., a subsidiary of Perfumania, and the stores operate under the name "Perfumania®."  Perfumania's retail stores are located in regional malls, manufacturers' outlet malls, lifestyle centers and suburban strip shopping centers.  All of Perfumania's retail stores are located in leased premises.

14.     Perfumania.com is an internet retailer that offers a selection of Perfumania stores' more popular products for sale online. The website enables Perfumania to reach a large group of customers from a central site and generates incremental sales and access to geographic markets where Perfumania does not have a physical store. The website is designed to complement the in-store experience and play a vital role in both Perfumania's omni-channel strategy and the customer experience, and provides for full omni-channel capabilities allowing customers to interact with Perfumania any way they want, including "ship-from-store," "order-in-store," "reserve-in-store" and "purchase-online-pickup-in-store."

15.     SOW operates the largest national designer fragrance consignment program, with contractual relationships to sell products on a consignment basis in approximately 1,100 stores, including more than 600 Kmart locations nationwide, as well as through customers such as Bealls, K&G, and Steinmart.  SOW ships inventory to such retailers on consignment and retains title to the inventory.  SOW determines the pricing and the products displayed in each of its retail consignment locations and pays a percentage of the sales proceeds to the retailer for its profit together with overhead applicable to these sales.  SOW purchases affiliated owned and

licensed brand inventory and other manufactured inventory from QFG.  QFG sells to SOW at cost, with no markup.

## C.    The Debtors' Corporate and Capital Structure

16.    Perfumania Holdings, a publicly-held Florida corporation, is a holding company and the ultimate parent of each of the Debtors in these Chapter 11 Cases, including Debtor Model Reorg , a Delaware limited liability company.  Perfumania Holdings is also the parent of its wholly-owned, non-Debtor subsidiaries Parlux and Five Star.  A corporate organization chart depicting the ownership structure of the Debtors and their Non-Debtor Affiliates is attached hereto as Exhibit A.

## D.    The Debtors Capital Structure

(a)    Common Stock.

17.    As of the Petition Date, there were 15,493,763 shares of common stock in Perfumania Holdings outstanding.  Prior to the Petition Date, Stephen L. Nussdorf, Glenn H. Nussdorf, Arlene Nussdorf, Lillian Ruth Nussdorf  (the "Nussdorf Family") and an Affiliate of Rene Garcia ("Garcia") established a Delaware limited liability company, MJA Beauty, LLC ("NewHoldCo").  The Nussdorf Family and Garcia contributed an aggregate of  8,352,032 shares of the Company's common stock to NewHoldCo totaling approximately 54% of the Company's outstanding common stock.

(b)    Principal Debt Obligations

18.    As of the Petition Date, Perfumania had long term debt of approximately $199 million  consisting of  $175 million senior credit facility of which approximate $18.78 million was drawn and outstanding and $125.4 million in principal in subordinated promissory notes, plus approximately $54.8 million in accrued but unpaid interest.

19.  <u>Senior Credit Facility</u>. On January 7, 2011, the Company entered into a revolving senior credit facility (the "<u>Senior Credit Facility</u>") pursuant to a certain Credit Agreement (as amended, amended and restated, modified, supplemented, or restated and in effect from time to time the "<u>Credit Agreement</u>")[5] among Perfumania Holdings and certain of its subsidiaries as Borrowers[6] and certain affiliates as Guarantors;[7] a syndicate of banks (the "<u>Senior Credit Facility Lenders</u>"); Wells Fargo Bank, National Association, as administrative agent, collateral agent and swing line lender ("<u>Wells Fargo</u>"), Regions Bank and RBS Business Capital, a division of RBS Asset Finance, Inc., as co-documentation agents ("<u>RBS</u>"), and Wells Fargo Capital Finance, LLC, as lead arranger and bookrunner.

20.  The Senior Credit Facility is used for the Company's general corporate purposes and those of its subsidiaries, including working capital and capital expenditures. The maximum borrowing amount under the Senior Credit Facility is $175 million and the termination date is April 2019. Under this facility, which does not require amortization of principal, revolving loans may be drawn, repaid and reborrowed up to the amount available under a borrowing base calculated with reference to specified percentages of the Company's eligible credit card and trade receivables and inventory, which availability may be reduced by the lender in its reasonable discretion. The Company must maintain availability under the facility of at least the greater of 10% of the aggregate amount that may be advanced against eligible credit card receivables, trade receivables and inventory or $10 million. As of the Petition Date, the

---

[5]  The Credit Agreement was amended twice: Amendment No. 1 to the Credit Agreement and Consent dated as of December 23, 2011 and Amendment No. 2 to the Credit Agreement, dated as of April 25, 2014.

[6]  Perfumania Holdings, collectively with QFG, SOW, Five Star, Northern Group, Inc., Perfumania, Inc., Magnifique Parfumes and Cosmetics, Inc., Ten Kesef II, Inc., Perfumania Puerto Rico, Inc., Perfumania.com, Inc., Parlux, and Parlux Ltd. (the "<u>Borrowers</u>").

[7]  Aladdin Fragrances, Inc., collectively with Niche Marketing Group, Inc., and Model Reorg (the "<u>Guarantors</u>").

Company had approximately $18.78 million outstanding under the Senior Credit Facility and approximately $88.45 million of net availability to borrow under the Senior Credit Facility.

21.     Interest under the Senior Credit Facility is at variable rates plus specified margins that are determined based upon the Company's excess availability from time to time. The Company is also required to pay monthly commitment fees based on the unused amount of the Senior Credit Facility and a monthly fee with respect to outstanding letters of credit.

22.     All obligations of the Company related to the Senior Credit Facility are secured by first priority perfected security interests in all personal and real property owned by the Company, including without limitation 100% (or, in the case of excluded foreign subsidiaries, 66%) of the outstanding equity interests in the subsidiaries. The Company is subject to customary limitations on its ability to, among other things, pay dividends and make distributions, make investments and enter into joint ventures, and dispose of assets. The Company was in compliance with all financial and operating covenants as of the Petition Date.

23.     Principal Unsecured Debt Obligations. In addition, the Company has the following unsecured notes payable outstanding to affiliates which in the aggregate total $125.4 million of principal plus approximately $54.8 million of accrued but unpaid interest and constitute the Company's main outstanding unsecured obligations for borrowed money:

i.  QKD Note. In connection with the 2008 Merger, Model Reorg, issued an unsecured subordinated promissory note, dated as of August 11, 2008 in the principal amount of $35 million to Quality King (the "QKD Note").[8]  The QKD Note provides for payment of principal in quarterly installments between July 31, 2019 and October 31, 2022, with a final installment on October 31, 2022 of the remaining balance, and payment of interest in quarterly installments commencing on January 31, 2011 at the then current senior debt rate, as defined in the Senior Credit Facility, plus 1% per annum;

ii.  <u>Nussdorf Trust Notes</u>. Promissory notes issued by Model Reorg in the aggregate principal amount of approximately $85.4 million held by six estate trusts established by Glenn, Stephen, and Arlene Nussdorf (the "<u>Nussdorf Trust Notes</u>"). The Nussdorf Trust Notes were originally issued at the closing of the 2008 Merger in the principal amount of $55.4 million, but were replaced by amended and restated notes reflecting an additional $30 million loaned by the trusts on April 18, 2012, in order to help finance the Parlux Acquisition. The Nussdorf Trust Notes provide for payment of the principal in full on July 31, 2019 and payments of interest in quarterly installments commencing on July 31, 2012 at the then current senior debt rate plus 2% per annum; and

iii.  <u>2004 Note</u>. On December 9, 2004, Perfumania, Inc. issued a subordinated convertible note to Glenn and Stephen Nussdorf in exchange for a $5 million subordinated demand loan made in March 2004 (the "<u>2004 Note</u>").

24.  The QKD Note, the Nussdorf Trust Notes, and the 2004 Note (collectively, the "<u>Nussdorf Family Debt</u>") are subordinated to the Senior Credit Facility. No principal may be paid on any of them until three months after the Senior Credit Facility terminates and is paid in full, and payment of interest is subject to satisfaction of certain conditions, including the Company's maintaining excess availability under the Senior Credit Facility of the greater of $17.5 million or 17.5% of the borrowing base certificate after giving effect to the payment, and a fixed charge coverage ratio, as defined in the credit agreement, of 1.1:1.0. No payments of principal or interest have ever been made on the QKD Note or the Nussdorf Trust Notes. On the 2004 Note, no payments of principal or interest have been made since October 2008. As of June 29, 2017, accrued interest payable on the Nussdorf Trust Notes, the QKD Note, and the 2004 Note was approximately $54.8 million.

25.  Shortly before and in anticipation of the filing of the petitions in these Chapter 11 Cases, the QKD Note, the Nussdorf Trust Notes and the 2004 Note were amended to waive existing defaults and extend their stated maturities until ninety days after the stated maturity date of the proposed Exit Facility.

**E.**     **Events Leading to the Chapter 11 Cases**

26.     A number of factors contributed to the Debtors' need to commence these chapter 11 cases.  In recent years, many retailers have filed for chapter 11 protection, including 14 retailers filing for chapter 11 through April 2017 alone.[9]  Perfumania faces many of the same macro-economic challenges plaguing the retail industry as a whole, including increasing consumer emphasis on internet-based retail, declining mall traffic, decreasing sales, changing trends, and expensive leases.  These factors strained the Debtors' businesses, ultimately necessitating these Chapter 11 Cases to effectuate a successful reorganization.

(a)     Pre-Petition Strategic Initiatives

27.     Since 2015 the Company has implemented a number of strategic initiatives to try to return to profitability including expanding its management team, reviewing and updating its sales strategy and aggressively managing its portfolio of stores.

28.     Because consumer shopping patterns are rapidly shifting out of traditional retail to e-commerce, the Company focused on  managing and reducing Perfumania's physical retail store portfolio, limiting the number of new Perfumania store openings, maximizing sales and store productivity and controlling expenses at existing stores by, among other things, aggressively seeking to renegotiate the terms of unprofitable store leases.  Perfumania also accelerated the closure of under-performing stores and stores where the Company anticipated declining mall traffic.  In fiscal years 2015 and 2016, Perfumania opened nine and four stores, respectively, excluding seasonal locations, and closed 16 stores and 30 stores, respectively,

---

[9]     Jim Elder, S&P Global Market Intelligence, *Risk Insight: 2017 Retail Bankruptcies Set Record Pace – Which Companies Are Most At Risk?* (April 20, 2017), available at http://marketintelligence.spglobal.com/blog/risk-insight-2017-retail-bankruptcies-set-record-pace-which-companies-are-most-at-risk.

excluding seasonal locations.  During the fiscal 2017 (through July 31, 2017) Perfumania closed
an additional 59 stores.

29.     Finally, to offset the challenges at the Company's brick and mortar
locations, the Company began actively implementing initiatives to gain added leverage from its
e-commerce platform and to improve utilization of social networking, mobile, and digital
applications to engage customers. Increasing sales volume through Perfumania's e-commerce
platform is one of the Company's key growth initiatives and the Company plans to strategically
allocate additional resources and focus on improving the overall online shopping experience.

30.     Despite these efforts,  the Company's operating results continued to
struggle in light of the challenging consumer environment and the Company lost $11.7 million in
fiscal 2015, $23.6 million in fiscal 2016, and the losses continued into 2017.

(b)     The Special Committee

31.     In December, 2016 the Board of Directors of Perfumania formed a
committee of independent directors (the "Independent Committee") consisting initially of Messrs.
Garfinkle, Bouhadana, Gopman and Angel (who shortly thereafter resigned because of conflicts
with his travel schedule).  The purpose of the Independent Committee was to direct and oversee
the investigation, formulation and evaluation of proposals ("Proposals") to improve the financial
condition of the Company with a view to maximizing the value of the Company.  Because the
Nussdorf Family controlled a majority of the Company's voting stock and was also the
Company's largest creditor, the Board of Directors believed it desirable that this process be
directed by outside directors independent of the Nussdorf Family and the Debtors' management.
It was recognized at the outset that such proposals would likely include an operational
restructuring of the Retail Business and could include a chapter 11 case involving all or part of

12

the Company, as well as a potential restructuring of some or all of the Company's senior and subordinated debt.

32.     The Independent Committee was authorized to retain, at the Company's expense, and on such terms as the Independent Committee determined were appropriate, independent financial advisors and legal counsel to assist in the formulation of Proposals.  The Independent Committee  retained the law firm of Carlton Fields as its independent counsel.  The Independent Committee also interviewed several investment banking firms which it believed had experience and expertise relevant to the Company's circumstances and selected Imperial Capital LLC ("Imperial").

33.     The Independent Committee directed Imperial to conduct a comprehensive review of the Company's operations and finances in order to obtain an independent valuation range of the Company's business with a view to maximizing the value available for each of the Company's constituencies.  The Independent Committee met in person and by telephone with representatives of Imperial on numerous occasions between January and May 2017.  While Imperial was preparing its evaluation, the Independent Committee was able to ask questions and suggest avenues for further investigation.  One avenue that was discussed, but not ultimately pursued by the Independent Committee was the potential sale of the Company as a going concern.  The Independent Committee believed that the Nussdorf Family had no interest in selling its controlling position in the Company.  In addition, based on the Company's lack of profitability and its substantial debt burden, the Independent Committee did not believe  that there would be sufficient interest from third parties without a significant debt restructuring.   The Independent Committee also considered and analyzed potential transactions which involved a restructuring of only the Retail Business while leaving the public structure of Perfumania intact,

recognizing that the Nussdorf Family Debt was currently in payment default with respect to interest payments and that principal payments would become due in 2019.

34.    After concluding its analysis, Imperial reported to the Independent Committee  that the Company's equity had no value either inside or outside of a chapter 11 case on a going concern basis.  Nor, based on Imperial's expertise and familiarity with the market did it believe that any third party prospective buyer of all or part of the Company's business would be prepared to purchase the Company at a price that would produce value to stockholders even assuming that the Nussdorf Family could be induced to participate in such a sale.  The issue facing the Company was that, absent a significant change, the Company would remain unprofitable, and continue to lose money which would render it unable to repay or refinance outstanding obligations without a foreseeable future benefit for shareholders.

35.    The Independent Committee's effort culminated in a letter to Stephen L. Nussdorf on May 22, 2017 which proposed that the Nussdorf Family potentially with co-investors of its choosing invest an amount sufficient to pay all other shareholders $2.00 in cash per share.  As a result, the Nussdorf Family and its co-investors would own 100% of the restructured Company which would continue as a private Company not subject to ongoing SEC reporting and compliance costs.  The Proposal did not specify the form of transaction or transactions to implement the distribution of value to unaffiliated shareholders and restructuring the Company's debt, but mentioned that the Independent Committee had explored, with the Company's counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), and Imperial, several forms of transaction that could be used and had authorized Skadden to discuss  those alternatives. Among other things, the Committee was aware that by virtue of its nearly 50% ownership of Perfumania Holdings, the Nussdorf Family ,together with another small investor

would be in a unique position to be able to preserve and utilize fully the Company's net operating losses ("NOLs") of nearly $42 million.

36.     In light of Imperial's conclusion that the Company's common shares had no value on a going concern basis, $2.00 per share as Releasing Stockholder Consideration represented a significant premium above the market value of the Company's shares in May 2017, prior to the Independent Committee 's making its Proposal.  At that time, Imperial and Skadden advised that, under such circumstances, any consideration made available to shareholders was in the nature of a "gift."  Nonetheless, the Independent Committee believed that the $2.00 cash per share represented by the Releasing Shareholder Consideration  was a fair and appropriate payment to public shareholders and conditioned its recommendation to the Board  of any transaction with the Nussdorf Family on that amount being made available to shareholders.

37.     Following receipt of the Proposal, the Nussdorf Family carefully evaluated whether it was willing to make the NewHoldCo Equity Infusion.  Among other things, the Nussdorf Family reevaluated the store closing program at the Retail Business, considered whether  to seek to impair lessors and other trade creditors, and explored with Rene Garcia whether he would be willing to join in the NewHoldCo Equity Infusion which would be necessary to preserve the full value of the NOLs.  On August 26, 2017, the Nussdorf Family and Garcia  agreed to go forward with the NewHoldCo Equity Infusion conditioned upon confirmation of the Plan and the extension of credit under the Exit Facility.

38.     After considering the Plan, the work of the Independent Committee, the Committee's recommendation that the Board approve the Plan, the advice of the Company's professional legal and financial advisors including an updated view on valuation from Imperial, the fact that all creditors would be paid in full ( subject, in the case of lessors to their receiving

the rejection damages provided by the Bankruptcy Code), and the fact that shareholders who wished to opt-in to the Stockholder Release would receive the $2.00 per share Releasing Stockholder Consideration, on August 26, 2017 the Company's Board of Directors approved the Plan, which it believed to be in the best interests of the Company and all its stakeholders, and the filing of these chapter 11 petitions to implement the Plan.

**F.    The Plan**

39.    Unlike many retailers who have filed for bankruptcy, Perfumania sees a viable path forward and remains confident in its prospects to successfully implement and leverage the various strategic initiatives they are undertaking to better stabilize and strengthen the business moving forward.  These Chapter 11 Cases will allow the Company to, among other things, close underperforming stores and renegotiate unfavorable lease terms to establish a foundation for sustainable long-term growth.  Closing under-performing locations will improve the overall returns from the Company's retail footprint going forward and allow the Company to better allocate its operating, marketing, merchandising and financial resources to the best locations, as well as free up additional resources to expand the Company's e-commerce business.

40.    To move toward that end as expeditiously as possible, concurrently with their petitions, the Debtors have filed  the *Prepackaged Joint Chapter 11 Plan of Reorganization of Model Reorg Acquisitions, LLC and Its Affiliated Debtors and Debtors in Possession* (the "Plan") and the *Debtors' Disclosure Statement for Prepackaged Plan of Reorganization*, dated August 26, 2017 (the "Disclosure Statement").

41.    The Debtors'  "pre-packaged" Plan provides for a comprehensive reorganization of the Debtors that will (i) leave all Allowed Claims Unimpaired, (ii) close underperforming stores and reject unfavorable lease terms to establish a foundation for sustainable long-term growth and to improve the overall returns from the Company's retail

footprint going forward, (iii) provide meaningful consideration to Perfumania Holdings'

stockholders who opt-in to a Stockholder Release, (iv) issue 100% of Reorganized Perfumania to

NewHoldCo in exchange for a $14,263,460 equity infusion and a release of all claims the

Company  might have against the Nussdorf Family, Rene Garcia and persons to whom the

Company might have indemnification obligations, and (v) obtain debtor-in-possession financing

that will convert to an exit credit facility upon emergence from chapter 11.

      42.    The Plan proposes recoveries to general unsecured creditors that are

remarkable in the context of the recent retail downturn.  All of the Debtors' general unsecured

creditors, such as trade vendors, employees, and landlords are Unimpaired under the plan.  The

Debtors will also reinstate the QKD Note, the Nussdorf Trust Notes, and the 2004 Note and

assume all other executory agreements not specifically rejected.

      43.    As set forth in the valuation prepared by Imperial and the liquidation

analysis prepared by Ankura, each attached as **Exhibit C** and **Exhibit D** to the Disclosure

Statement, under the Plan Perfumania's stockholders are not entitled to receive or retain any

property on account of their Interests in Perfumania because there is no equity value in

Perfumania to distribute to stockholders.  The Company's liabilities  exceed both the Company's

going concern value and any value that may be obtained by liquidating the Company's assets.

Moreover, in light of the current distressed retail environment, the Company and its advisors do

not believe that an alternative to the proposed restructuring exists that would yield a distribution

for the Company's stockholders.

      44.    However, the Plan does provide Perfumania Holdings' stockholders with

the opportunity to receive consideration in the amount of $2.00 per share (the "Releasing

Stockholder Consideration") in exchange for providing a Stockholder Release.[10]  Shortly after the hearing scheduled by the Court to consider the First Day Pleadings, the Debtors will distribute to eligible stockholders the Plan, the Disclosure Statement and the necessary forms required to opt-in to the Stockholder Release to receive the Releasing Stockholder Consideration. Stockholders who opt-in to the release on or before October 6, 2017 at 5:00 PM Prevailing Eastern Time (the "Release Opt-In Deadline"), will receive the Releasing Stockholder Consideration on the effective date of the Plan, or as soon as reasonably practicable thereafter. The Debtors will also provide stockholders with an additional opportunity to opt-in to the Stockholder Release and receive the Releasing Stockholder Consideration after the effective date of the Plan.   Stockholders will receive notice of such opportunity and instructions for participation after the effective date has occurred.

---

[10]     The Stockholder Release in contained in Article 9.5 of the Plan and provides:

**As of the Effective Date, each of the Releasing Stockholders, in consideration for the Releasing Stockholder Consideration, and other contracts, instruments, releases, agreements or documents executed and delivered in connection with this Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, purportedly asserted or assertable on behalf of the Debtors, the Reorganized Debtors, their Estates, and their Affiliates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual agreements between any Debtor, Reorganized Debtor, Estate or Affiliate and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the DIP Credit Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Exit Revolver Facility Credit Agreement, any other Plan Transaction Document, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or assumed by the Debtors.**

**G.      Funding of the Chapter 11 Cases, Plan, and Exit**

45.      The Debtors' proposed Plan draws on three main sources of funding: (i) the NewHoldCo Equity Infusion, (ii) the DIP Facility, and (iii) the Exit Revolver Facility (each as defined below).

(a)      The NewHoldCo Equity Infusion.

46.      The proposed restructuring is made possible in part by NewHoldCo's agreement to contribute new value to Perfumania Holdings.  Pursuant to an agreement by and between NewHoldCo, each individual member of NewHoldCo, and Perfumania Holdings, dated August 26, 2017 (the "NewHoldCo Investment Agreement"), NewHoldCo has agreed to invest $14,263,460 million in cash in Perfumania Holdings in exchange for 100% of the equity in Reorganized Perfumania (the "NewHoldCo Equity Infusion").  The NewHoldCo Equity Infusion will be used (i)  to fund the Releasing Stockholder Consideration; and (ii) to the extent that stockholders choose not to accept the Releasing Stockholder Consideration, to fund ongoing operations. In addition, the NewHoldCO Investment Agreement provides that NewHoldCo will execute  the Stockholder Release for no additional consideration. It is conditioned solely on (i) the confirmation of the Plan (which, among other things, contains a release by the Company of all claims against NewHoldCo and its members and any person to who the Company might have indemnification obligations) and (ii) the execution and effectiveness of the Exit Facility.

47.      I believe that the terms of the NewHoldCo Investment Agreement are fair, reasonable, and appropriate and are an integral part of the Plan which affords stockholders the opportunity  to elect  receive consideration under circumstances where they would otherwise be wiped out.  The NewHoldCo Equity Infusion will provide substantial consideration to stockholders in exchange for the Stockholder Release, and, to the extent that any stockholders

choose not to accept the Releasing Stockholder Consideration, provide additional funding for the Debtors' ongoing operations.

    (b)    <u>The Proposed DIP Financing</u>.

    48.    The Debtors negotiated and entered into a Ratification and Amendment Agreement (the "<u>DIP Amendment</u>" and the Credit Agreement, as amended and ratified by the DIP Amendment, the "<u>DIP Credit Agreement</u>") with Perfumania Holdings, the other Borrowers party thereto, the Guarantors party thereto, the Lenders (as defined therein) party thereto and Wells Fargo Bank, National Association, as Administrative Agent and Collateral Agent (in such capacities, the "Agent") for the Lenders under the Credit Agreement. The DIP Credit Agreement provides for, among other things, (i) a senior secured debtor-in-possession asset-based revolving facility in an aggregate principal amount of $83,750,000 (the "<u>DIP Facility</u>") to refinance the Senior Credit Facility and (ii) certain other amendments to the Credit Agreement. On the date hereof, the Debtors filed a motion seeking authority to obtain the DIP Facility on the terms set forth in the DIP Credit Agreement.

    49.    Subject to certain limitations, the DIP Facility will provide financing up to the lesser of (x) $83,750,000 or (y) a borrowing base calculated with reference to specified percentages of the eligible credit card and trade receivables and inventory of the Borrowers and Guarantors, which availability may be reduced by the lender in its reasonable discretion. Under the DIP Facility, which does not require amortization of principal, revolving loans may be drawn, repaid and re-borrowed up to such maximum borrowing amount. The DIP Facility also allows the Debtors to draw upon letters of credit with Wells Fargo up to $10,000,000 (so long as outstanding loans and letters of credit do not at any time exceed such maximum borrowing amount). In accordance with the terms of the DIP Credit Agreement, proceeds of the DIP

Facility will be used to refinance the Senior Credit Facility, fund general working capital needs and/or pay fees, expenses, and costs incurred in connection with the DIP Amendment and the Chapter 11 Cases. Capitalized terms used herein but not defined herein shall have the meanings assigned in the DIP Amendment or DIP Credit Agreement.

50.    The DIP Facility matures on December 31, 2017 or, if prior thereto, the earliest of, among other things, the effective date of a plan of reorganization, consummation of a sale of all or substantially all the assets of the Borrowers and Guarantors,  conversion of a Chapter 11 Case of any Debtor to a Chapter 7 case or forty five days after entry of the Interim Financing Order if the Permanent Financing Order has not been entered. Interest on outstanding loans under the DIP Facility is equal to a base rate plus a margin of 3.25%. The Borrowers are also required to pay monthly commitment fees based on the unused amount of the DIP Facility and a monthly fee with respect to outstanding letters of credit equal to 4.50%

51.    All obligations of each Debtor under the DIP Credit Agreement and related loan documents are secured by, subject to entry of the Financing Order and liens or encumbrances expressly permitted by the DIP Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order, first priority perfected security interests in all personal and real property (subject to customary exclusions) of such Debtor, including without limitation 100% (or, in the case of excluded foreign subsidiaries, 66%) of the outstanding equity interests in its directly owned subsidiaries (subject to customary exclusions). The Debtors are subject to customary limitations on its ability to, among other things, incur debt, pay dividends and make distributions, undergo fundamental changes, make investments and enter into joint ventures, dispose of assets and prepay debt or repay subordinated debt.  There are no financial covenants in the DIP Credit Agreement.

52.     The DIP Credit Agreement requires the Debtors to effect going-out-of-business sales ("GOB Sales") with respect to certain stores and requires that the Debtors hire a third party liquidator to manage and assist with such GOB Sales. The DIP Credit Agreement also requires that the Debtors achieve specified milestones with respect to such GOB Sales and the Chapter 11 Cases, including (among others): on the Petition Date filing a motion to conduct going out of business sales and retention of a third-party liquidator and conducting the GOB Sales with respect to specified stores; within five days thereof, filing this Disclosure Statement and Plan; within 30 days thereof, conducting GOB Sales for specified stores; within 60 days hereof thereof, obtaining approval of the same; within 90 days thereof, occurrence of effectiveness of the Plan of Reorganization.

53.     The DIP Credit Agreement provides, in addition to the existing Events of Default in the Credit Agreement, for certain additional Events of Default in connection with the Chapter 11 Cases.  Upon the occurrence and continuation of an Event of Default, the Agent may, among other things, terminate the DIP Facility.

54.     Absent adequate funding, the Debtors may be required to close their stores prematurely, reduce their order volume in advance of the holiday season, lose valuable wholesale accounts, otherwise cease operations, and liquidate on a piecemeal basis.  The DIP Facility will provide working capital, fund the costs of the Chapter 11 Cases, and satisfy operational needs while the Debtors pursue their fast-tracked reorganization.

55.     As more fully described in the Declaration of Robert Warshauer In Support of the DIP Motion (the "Warshauer Declaration"), the Debtors and their advisors explored various alternatives to the DIP Credit Agreement, but were unable to obtain any proposals for the DIP financing on more economically advantageous terms. After careful

consideration and extensive discussions with the Debtors' advisors, the Debtors determined that the DIP Facility represented the best available option for the Company and offers them the best chance for a cost-efficient, quick, and consensual restructuring.

(c)    The Exit Facility.

56.    On the Effective Date, the Company will enter into a senior secured asset-based revolving credit facility in an aggregate principal amount of up to $100 million (the "Exit Facility") pursuant to a certain Credit Agreement (as amended, amended and restated, modified, supplemented, or restated and in effect from time to time, the "Exit Credit Agreement") among Perfumania Holdings (or a parent entity thereof) and certain of its subsidiaries as Borrowers party thereto and certain affiliates as Guarantors party thereto, Wells Fargo Bank, National Association, as administrative agent, collateral agent and swing line lender ("Wells Fargo") and other parties thereto.

57.    The maximum borrowing amount under the Exit Facility is the lesser of $100 million and a borrowing base calculated with reference to specified percentages of the Company's eligible credit card, trade receivables and inventory, which availability may be reduced by certain reserves. The Exit Facility matures in five years from the date of the Exit Credit Agreement.  Under the Exit Facility, which does not require amortization of principal, revolving loans may be drawn, repaid and re-borrowed up to such maximum borrowing amount.  The Company must maintain availability under the facility of at least the greater of 10% of the aggregate amount that may be advanced against the borrowing base or $8 million.

58.    Interest under the Exit Facility is, at the Company's option, at LIBOR or a base rate plus specified margins that are determined based upon excess availability from time to

time. The Company is also required to pay monthly commitment fees based on the unused

amount of the Exit Facility and a monthly fee with respect to outstanding letters of credit.

59.     All obligations of the Company related to the Exit Facility are secured by

first priority perfected security interests in all personal and real property (subject to customary

exclusions) owned by the Company, including without limitation 100% (or, in the case of

excluded foreign subsidiaries, 66%) of the outstanding equity interests in its directly owned

subsidiaries (subject to customary exclusions). The Company is subject to customary limitations

on its ability to, among other things, incur debt, pay dividends and make distributions, undergo

fundamental changes, make investments and enter into joint ventures, dispose of assets and

prepay debt.

**H.      No Solicitation and the Need for Prompt Confirmation of the Debtors' Plan of Reorganization**

60.     It is my understanding, through conversations with the Debtors'

professionals and advisors, that the Debtors do not need to solicit votes on the acceptance or

rejection of the Plan because all holders of Claims against or Interests in the Debtors have either

(i) an unclassified Claim, (ii) a Claim or Interest that is Unimpaired, and are therefore deemed to

have accepted the Plan, or (iii) an Interest that does not entitle such holder to receive or retain

any property under the Plan, and are therefore deemed to have rejected the Plan.

61.     Accordingly, the Debtors have requested this Court to set a combined

hearing to approve the adequacy of the information contained in the Disclosure Statement and

confirm the Plan (the "Combined Hearing").  In addition, because the Debtors are not soliciting

votes on the Plan, the Debtors are requesting that the Court set only two hearings in these

Chapter 11 Cases: (i) the initial hearing to consider the relief requested in the First Day Pleadings,

as described more fully herein and (iii) the Combined Hearing at which the Court will also

consider all requests for final relief in connection with the First Day pleadings and consider approval of the Disclosure Statement and Plan confirmation.

62.    It is important that these matters be considered, and that the Debtors bring their formal restructuring to a successful conclusion quickly.  Unlike many retailers who have recently filed for chapter 11, the Company has an opportunity to effectuate a successful restructuring and provide full recoveries to all of its creditors.  However, for the proposed restructuring to work, it is imperative that the Debtors emerge from Chapter 11 as quickly and seamlessly as possible.  As noted above, the DIP Credit Agreement requires that the Debtors, among other things, complete the restructuring transactions in 90 days.  In addition to the milestones in the DIP Credit Agreement, the Company's business is highly seasonal, with the most significant activity occurring from September through December each year.  Wholesale sales are stronger during the months of September through November, since retailers need to receive merchandise well before the holiday season begins.  Retail revenues are the greatest in December as is typical for a retail operation.  As the Company approaches its busy season, it is critical that the Company's management be able to return its focus to the Company's ongoing operations, that the Company be able to retain its key employees and avoid any turnover among those employees at this crucial time, and that Customers be reassured that they can expect the same quality of service without disruption moving forward.

## PART II

## FIRST DAY PLEADINGS

63.     In furtherance of these objectives, the Debtors are filing concurrently herewith the First Day Pleadings,[11] and respectfully request that the Court consider entering the proposed orders granting such First Day Pleadings.  I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value, and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

## A.     Administrative Procedural Matters

64.     The Debtors have filed four "administrative" pleadings that seek (a) joint administration of the Debtors' Chapter 11 Cases for procedural purposes only, (b) to file a consolidated list of creditors in lieu of a submitting a separate mailing matrix for each Debtor, (c) a permanent waiver of the requirement to file the Schedules and Statements (defined below), and (d) to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent.

<u>Joint Administration</u>

65.     The Debtors are requesting that their Chapter 11 Cases be jointly administered only for procedural purposes.  Perfumania Holdings, Inc. is the direct or indirect parent company of each of the other Debtors.  I believe that joint administration of these Chapter

---

[11]     Any term not defined herein has the meaning ascribed to it in the specific First Day Pleading being described.

11 Cases will avoid the unnecessary time and expense of duplicative motions, applications, other pleadings, orders, and related notices, which would otherwise need to be filed in each separate case absent joint administration.  Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files.  Joint administration will also ease the burden on the Office of the United States Trustee in supervising these Chapter 11 Cases.  Accordingly, I believe that joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the United States Trustee, and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates.

Consolidated List of Creditors

66.    The Debtors seek authority to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor and (b) to redact certain personal identification information for individual creditors.

67.    I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be unnecessarily burdensome and would result in confusing and duplicative notices.  Moreover, I believe that cause exists to authorize them to redact address information of individual creditors because such information could be used to perpetrate identity theft.

Schedules and Statements

68.    The Debtors request (i) an extension of the time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") to fifteen (15) days after the current deadline imposed by Local Bankruptcy Rule 1007-1(b), which is September 25, 2017, to October 10, 2017, (ii) permanently waiving the

27

requirement to file the Schedules and Statements if the Plan is confirmed during the extension period, without prejudice to the Debtors' right to request additional time should it become necessary, and (iii) waiving the reporting requirements of Bankruptcy Rule 2015.3 (the "Rule 2015.3 Reports").  The Debtors are also requesting that the Court, under section 341(e) of the Bankruptcy Code, order the U.S. Trustee not convene a meeting of creditors or equity security holders in these Chapter 11 Cases.

69.    The request for a final waiver of the requirement to file the Schedules and Statements is appropriate in a prepackaged case.  It is my understanding that, in general, a debtor is required to file the Schedules and Statements in order to permit parties in interest to understand and assess the Debtors' assets and liabilities and thereafter negotiate and confirm a plan of reorganization.  In these Chapter 11 Cases, the Debtors have already negotiated and filed the Plan, pursuant to which all creditors are left unimpaired.  Accordingly, the primary justifications for requiring the filing of Schedules and Statements do not exist in this case.  Requiring the Schedules and Statements to be filed would impose an additional administrative burden on and expense to the Debtors' estate, without any corresponding benefit to parties in interest.

70.    In addition, much of the information that would be contained in the Schedules and Statements is already available in the Disclosure Statement.  I believe that to require the Debtors to file the Schedules and Statements would be impracticable, duplicative, and unnecessarily burdensome to the Debtors' estates.

71.    The Debtors are also requesting that the Court, order the Office of the U.S. Trustee not to convene a Section 341 Meeting.  It is my understanding that the purpose of a Section 341 Meeting is to provide parties in interest with a meaningful opportunity to examine

the debtor and obtain important information about the debtor. In these cases, however, the Plan provides full recoveries to all creditors. Therefore, I believe that parties are not likely to receive any significant benefit from a Section 341 Meeting. In addition, the notice and scheduling requirements associated with convening such a meeting during these chapter 11 cases may cause an unwarranted delay in consummating the Plan. As set forth above, no holders of claims or interests are entitled to vote to accept or reject the Plan. As there will be no solicitation during the Chapter 11 Cases, the Debtors intend to proceed expeditiously to confirm the Plan and emerge from chapter 11 as quickly as possible.

<u>Application to Appoint Epiq as Claims and Noticing Agent</u>

72.     It is my understanding that the Debtors are applying (the "<u>Section 156(c)</u> <u>Application</u>") for entry of an order appointing Epiq as Claims and Noticing Agent in these Chapter 11 Cases. The Debtors anticipate that there will be in excess of 10,000 entities to be noticed. In view of the number of anticipated claimants and complexity of the Debtors' businesses, I believe that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

73.     I am informed that Epiq has acted as the claims and noticing agent in numerous cases of comparable size, including several large bankruptcy cases pending in both this District and in other districts. Additionally, in compliance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of Delaware, the Debtors obtained and reviewed engagement engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. The Debtors submit, based on all engagement

proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given its quality of services and expertise.

74.     As more fully detailed in the Section 156(c) Application, I understand that Epiq will engage in certain claims administration and noticing services as necessary, including, but not limited to, the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Cases.  I am informed that the Section 156(c) Application pertains only to the work to be performed by Epiq under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c) and Local Bankruptcy Rule 2002-1(f).[12]

75.     I believe that by appointing Epiq as the Claims and Noticing Agent in these Chapter 11 Cases, the distribution of notices and the processing of claims will be expedited, and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims. Accordingly, I believe that retention of Epiq is in the best interests of the Debtors and their estates and creditors.

**B.     Payment of Critical Business Expenditures and Continued Business Operations of the Debtors**

Payment of Employee and Payroll Obligations and Certain Taxes

76.     I believe that in order to minimize the personal hardship employees will suffer if prepetition obligations are not honored, as well as the significant harm which would result to the Debtors if employee morale is not maintained, it is of critical importance that the Debtors pay prepetition wages, compensation, and amounts associated with employee benefits programs and continue such programs in the ordinary course.  The Debtors employ approximately 891 permanent full time Employees and 514 permanent part time Employees in

---

[12]     The Debtors are also concurrently filing an application to retain Epiq as administrative advisor in these Chapter 11 Cases pursuant to Bankruptcy Code section 327.

their corporate offices, retail stores, warehouses, and other facilities.  The Debtors also have nine (9) independent contractors (the "Contractors").   I understand that many of Company's Employees are employed on a full-time salaried basis, while others are employed on an hourly basis.  These Employees perform a wide array of vital tasks relating to the management and day-to-day operations of the Company, including the general administrative functions, marketing, finance, wholesale and retail sales of the Company's products, and warehousing.  I believe that retaining the Employees, whose skills and understanding of the Debtors' operations and infrastructure are essential to the effective operation and reorganization of the Debtors' businesses, is critical to the Debtors' ability to operate in chapter 11.   I believe that all of the Debtors' Employees are owed less than the priority cap and, I understand, may therefore have claims with respect to their accrued but unpaid prepetition wages or salaries that I am told are granted priority over other claims pursuant to the Bankruptcy Code.

77.   Wages and Salaries.  The Debtors' payroll obligations generally include base wages and salaries, commissions, and bonuses, as applicable.  As of the Petition Date, the Debtors estimate that approximately $1,559,448, including wages, salaries, commissions and bonuses, and related payroll taxes and withholdings, exists in accrued but unpaid payroll for Employees.

78.   Other Compensation:  Vacation, Holiday, Sick Time, and Business Expenses.  The Debtors offer their Employees other forms of compensation, including vacation time, overtime pay, paid holidays, other earned time off, and reimbursement of certain business expenses.

79.   The precise amount of paid vacation time, holiday time, and sick time depends on whether the Employee is full- or part-time and the Employee's position within the

management structure.  The Debtors anticipate that their Employees will utilize any accrued Vacation Time, Holiday Time, Personal Time, or Sick Time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

80.     Finally, the Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, ground transportation, meals, and miscellaneous business expenses (collectively, the "Reimbursable Expenses").  Employees who incur out-of-pocket Reimbursable Expenses seek reimbursement for their Reimbursable Expenses from the Debtors through the same internal processing and approval system.  Once an expense reimbursement report is processed and approved internally, Employees are reimbursed by the same method they use to receive regular paychecks.  As of the Petition Date, the Debtors estimate that their accrued and unpaid obligations for Reimbursable Expenses are approximately $17,822.

81.     These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees during the reorganization process.

82.     Employee Benefit Plans.  The Debtors offer a variety of benefit programs to meet the needs of their full-time Employees depending upon the location of their workplace.  In the ordinary course of business, the Debtors have established various standard and customary plans and policies to provide their Employees with health benefits, including medical, dental and vision benefits (collectively, the "Health Insurance Benefits").  The Debtors self-insure certain Employees for Employee medical benefits under the Company's group health plans.  Because the Debtors are self-insured, and due to a lag in the processing of claims, certain amounts may be accrued but not outstanding on account of the Health Insurance Benefits.  Such amounts are

difficult to estimate at this time.  As of the Petition Date, the Debtors estimate the total unpaid

benefits and administrative costs under the Health Insurance Benefits at approximately $305,000.

Each of these plans is important to the maintenance of Employee welfare and morale and is

therefore critical to the uninterrupted operation of the Debtors' business.

83.     The Debtors' Employees also have the option to purchase, and in some

cases the Debtors provide for Employees, life, accidental death and dismemberment,

supplemental life, long-term and short-term disability insurance, and related programs

(collectively, the "Life Insurance Plans") pursuant to policies issued by Lincoln Financial Group

("Lincoln").  The Life Insurance Plans are paid primarily through employer contributions, with

the Debtors bearing one hundred percent (100%) of the aggregate cost, excluding any amounts

that Employees may pay for supplemental coverage.   As of the Petition Date, the Debtors

believe there are no obligations outstanding under the Life Insurance Plans, inclusive of amounts

withheld from Employees.  The Debtors offer Employees the opportunity to use tax-advantaged

flexible spending accounts (the "FSA") to pay for unreimbursed medical, dental, vision, and day

care expenses using pre-tax dollars.  Similarly, the Debtors also offer Employees commuter

reimbursement accounts (the "CRA") to set aside pre-tax funds each month to pay for transit and

parking expenses.  The Debtors deduct Employee contributions from the participants' earnings

and hold the contributions in an account.  The account is then deducted weekly or monthly by

Ameriflex via ACH debits for incurred expenses made by participants in the prior week.  As of

the Petition Date, the Debtors estimate that account balances under the FSA and CRA (that are

not subject to any claims) will total approximately $27,229 in the aggregate.

84.     Savings and Retirement Plans.  The Debtors offer certain Employees a

savings and retirement plan through which they can accumulate savings administered by the

Principal Financial Group.    Specifically, eligible Employees may make contributions in varying

amounts from one percent (1%) to one hundred percent (100%) of total compensation, or the

maximum limits allowable under the Internal Revenue Code, whichever is less, in a 401(k)

savings and investment plan (the "401(k) Plan").    The Company, at its discretion, may match

such contributions in varying amounts, as specified by the 401(k) Plan, and the Company's

matching contributions vest over a one to four year period.    The Company did not match

contributions to the 401(k) Plan during fiscal 2016 and 2015.    The Company does not anticipate

matching contributions to the 401(k) Plan during fiscal 2017.    As of the Petition Date,

approximately $42,000 is outstanding under the 401(k) Plan.

85.    Other Employee Benefits.    The Debtors provide workers' compensation

benefits to all Employees.    These benefits are covered primarily under the Debtors' workers'

compensation insurance program (the "Workers' Compensation Insurance") administered jointly

by the Debtors and their insurance carrier, Zurich Insurance Group ("Zurich").    As of the Petition

Date, approximately seven (7) workers' compensation claims were pending against the Debtors,

and the Debtors had reserved approximately $95,685 for potential liability.

86.    Social Security, Income Taxes, and Other Withholding.    Finally, the

Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to

transmit to third parties.    Examples of such withholding include Social Security, FICA, federal

and state income taxes, federal and state unemployment insurance, garnishments, charitable

donations, health care payments, other insurance payments, 401(k) contributions, union dues,

and certain other voluntary payroll deductions.

87.    Continuation of Employee Programs.    The Debtors seek an order

authorizing the Debtors to continue their ordinary course Employee compensation (including,

without limitation, wages, salaries, commissions, and bonuses), paid time off, benefits (including, without limitation, insurance), expense reimbursement, workers compensation, and related programs during the postpetition reorganization process.  I believe the continuation of these programs is essential to the success of the Debtors' reorganization efforts.

88.    I believe the Debtors' ability to maximize value depends, in large part, upon the motivation of the Employees. Most of the Debtors' Employees (and their families) are dependent upon the wages, salaries, commissions, reimbursements and other benefits they receive from the Debtors. Any disruption from Employee resignations or lack of morale could have devastating effects on the Debtors' restructuring efforts. Accordingly, it is critical that the Debtors be authorized to honor their Prepetition Employee Obligations during and after the Interim Period, subject to the limitations described in the motion.

<u>Maintenance of Customer Programs and Payment of Customer Obligations</u>

89.    The Debtors have filed a motion (the "<u>Customer Programs Motion</u>") requesting relief authorizing the Debtors (i) to maintain and administer the Customer Programs and honor prepetition Customer Obligations related thereto in their sole discretion, in the ordinary course of business, and in a manner consistent with past practice and (ii) authorizing the Debtors to continue, replace, implement, modify and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further application to the Court.  In addition, the Customer Programs Motion requests entry of an order authorizing all applicable banks and other financial institutions, when requested by the Debtors in their sole discretion, to honor, process, and pay any and all checks, drafts, electronic fund transfers, and other forms of payment on account of the Debtors' prepetition and postpetition obligations under the Customer Programs.

90.    <u>Gift Cards</u>. In the ordinary course of business, the Debtors sell gift cards

to customers in their retail stores ("<u>Gift Cards</u>").  I understand that as of the Petition Date, the

Debtors estimate that they will have approximately $460,000 of Gift Card obligations

outstanding.

91.    <u>Refund, Exchange and Return Programs</u>.  The Debtors allow their retail

customers to return or exchange certain merchandise purchased in store or online within 30 days

from the date of purchase provided that the merchandise is unopened, unused, and in its original

condition  (the "<u>Refund and Exchange Program</u>").  I understand that because of uncertain nature

of the Refund and Exchange Program, the Debtors are unable to estimate the value of their

Customer Obligations related thereto with precise accuracy as of the Petition Date.  The Debtors,

however, do not expect the commencement of these Chapter 11 Cases to result in a significant

deviation in the volume of monthly returns and exchanges from that which they experienced

prepetition, which for fiscal year 2016 averaged $374,000 per month..

92.    <u>Sales Promotions and Related Programs</u>.  The Debtors offer various

promotional offers to their retail customers throughout the year (collectively, the "<u>Sales</u>

<u>Promotions</u>").  The Sales Promotions are aimed at driving sales and maintaining market

competitiveness.  The Debtors offer various in-store and online promotions that provide

discounts to customers, such as "percentage off," "buy-one-get-one-free," and "gift with

purchase" promotions.   The Sales Promotions are similar to those routinely offered in the retail

industry.  In addition, Perfumania and Perfumania.com offer a customer loyalty rewards program

which allows members to earn points and other benefits for qualifying purchases (the "<u>Perks</u>

<u>Program</u>").  Members earn points with every completed and final purchase made directly from

Perfumania stores or Perfumania.com.  Members can redeem points for a discount on purchases

at the conversion rate of 1% ( a $1 discount for every 100 points they earn).  Points cannot be used  (i) to purchase gift cards, (ii) to pay shipping or handling charges, or (iii) to pay any tax due with respect to any direct purchase.  The value of points accrued as of January 28, 2017 and January 30, 2016 was approximately $1.7 million and $0.3 million, respectively.

93.    <u>Wholesale and Consignment Allowances</u>.  Consistent with standard practice in the industry, the Debtors also offer their wholesale and consignment customers certain sales allowances through a variety of programs and arrangements (the "<u>Wholesale and Consignment Allowances</u>").  Typically, the Debtors negotiate a Promotion Commitment Agreement ("<u>PCA</u>") with each wholesale or consignment customer at the beginning of the year that sets the terms and conditions of various allowances for that customer.   Wholesale and Consignment Allowances come in many forms including, markdown allowances, damages and defect allowances, return allowances, promotional allowances, advertising allowances, slotting allowances, and display allowances.  The Debtors provided approximately $7,107,117.87 in Wholesale and Consignment Allowances in fiscal year 2016.  Failure to honor or to continue to offer Wholesale and Consignment Allowances would cause wholesale and consignment customers to cease doing business with the Debtors or greatly reduce the volume of such business.  These Wholesale and Consignment Allowances are similar to those routinely offered in the wholesale industry.  I understand that as of the Petition Date,  Debtors estimate that they have approximately $2,678,577 million in outstanding Customer Obligations on account of Wholesale and Consignment Allowances.

94.    <u>Credit Card and Other Payment Processors</u>.  In addition to cash, the Debtors accept several other methods of payment from retail customers at their point of sale: (i) Visa, MasterCard, Discover, or American Express credit cards, (ii) PayPal, and (iii) purchases

through Amazon.com.  Retail credit card transactions are processed by Vantiv, Inc. and First Data Merchant Services LLC.  For all methods of payment (other than a cash transaction), the Debtors receive the net customer purchase price less any chargebacks, returns, or processing fees charged.  The processing fees charged by each company vary, with a weighted average of 1.97%. I firmly believe the use of the credit cards and other payment mechanisms like PayPal and processing through Amazon.com is essential to the continuing operation of the Debtors' business because the vast majority of the Debtors' sales are made using these payment methods.

95.    The Debtors' Customer Programs described above are standard in the retail industry.  I believe that the Debtors' ability to continue their Customer Programs and honor their prepetition and pospetition obligations thereunder, in the ordinary course of business, is necessary to (i) retain the Debtors' reputation for reliability and quality, (ii) meet competitive market pressures, (iii) maintain positive retail and wholesale customer relationships, and (iv) ensure customer satisfaction, thereby retaining customers, attracting new ones, and, ultimately, enhancing revenue and value for the benefit of all the Debtors' stakeholders.

96.    For the foregoing reasons, I believe that the relief sought in the Customer Programs Motion is necessary and in the best interests of the Debtors and their estates.

<u>Motion to Continue Cash Management System</u>

97.    <u>Cash Management</u>.  The Debtors have filed a motion to continue their ordinary course cash management system, which is designed to, among other things, efficiently collect, concentrate and disburse the funds generated by the Debtors' business operations.  The Cash Management System also enables the Debtors to monitor the collection and disbursement of funds and control the administration of their Bank Accounts.

98.     The Cash Management System is composed of 54 Bank Accounts.  The majority of the Debtors central operating, receipt and disbursement accounts are with Wells Fargo Bank, N.A.

99.     Receipts.  Perfumania Holdings, Inc. ("Perfumania Holdings"), Parlux, Ltd.("Parlux"), and Magnifique Parfumes & Cosmetics, Inc. ("Magnifique") each maintain a receipts account at Wells Fargo ((Acct. # XXXXXX-XXX8236) (the "Perfumania Holdings Receipts Account"), (Acct. # XXX-XXX8666) (the "Parlux Receipts Account), (Acct. # XXXXXX-XXX8375) (the "Magnifique Receipts Account"), and together the "Receipts Accounts").  Each of the Receipts Accounts are automatically swept daily pursuant to control agreements entered into in connection with the Debtors' revolving credit facility (the "Senior Credit Facility") under which Wells Fargo is the administrative and collateral agent.  As such, these accounts only carry a minimal cash balance at the end of each business day.  Pursuant to the control agreements with Wells Fargo, the Debtors are not permitted to withdraw funds from the Receipts Accounts.

100.    The source of the Debtors cash receipts vary by business.  The Perfumania Holdings Receipts Account directly receives customer payment receipts from the Quality King Fragrance, Inc. ("Quality King"), Five Star Fragrance Company, Inc. ("Five Star"), and Scents of Worth, Inc. ("Scents of Worth") wholesale and consignment businesses.  The Parlux Receipts Account directly receives customer payment receipts from the Parlux manufacturing and distribution business.  The Magnifique Receipts Account receives, among other receipts, deposits from the Bank Accounts utilized by the Debtors' retail stores.  Specifically, Magnifique maintains a number of Bank Accounts that receive the cash receipts from the retail stores (the

"Retail Receipts Accounts").[13]  The Retail Receipts Accounts are manually swept each business

day into the Magnifique Receipts Account.  The amount of cash swept from the Retail Receipts

Accounts is based on an algorithm that takes into account the specific needs of the individual

retail locations.  The Retail Receipts Accounts collectively maintain an average monthly cash

balance post-sweep of approximately $262,000.  The Magnifique Receipts Account also directly

receives all credit card transaction receipts from the retail stores and certain other miscellaneous

receipts.

101.    Perfumania Holdings has a Master Operating Account (Acct. #

XXXXX0373) (the "Operating Account"), which funds each of the Debtors' disbursement

accounts.  In particular, the Operating Account is funded each business day on an as needed basis

from the Senior Credit Facility (subject to the terms and conditions thereof).  The Operating

Account in turn funds (i) the Disbursement Accounts (defined below), as needed, based on

known check clearings or known electronic payments to be made to trade vendors and other

parties, and in some instances, known payroll, and (ii) the Payroll Accounts (defined below), as

needed, based upon known payroll (direct debit, payroll card or check), payroll-related

withholding tax clearings and certain benefits payments.  Therefore, the Operating Account

generally maintains a minimal ending cash balance of approximately $80,000 at the end of the

business day.

102.    Finally, Quality King maintains a lockbox at Citizens Bank as a result of a

historical banking relationship (Acct. # XXXXXX2384) (the "Lockbox Account").  The

Lockbox Account is used to collect receipts from customers and is automatically swept daily

pursuant to a control agreement with Wells Fargo.

---

[13]     In addition, Perfumania Puerto Rico, Inc. also maintains a Retail Receipt Account.

103.    <u>Disbursements</u>.  The Debtors maintains various Bank Accounts with Wells Fargo in order to make disbursements, including payments to vendors and payroll.

104.    Magnifique, Quality King, Five Star Fragrance, and Parlux each maintain disbursement accounts ((Acct. # XXXXXX1608) (the "<u>Magnifique Disbursement Account</u>"), (Acct. # XXXXXX1616) (the "<u>Quality King Disbursement Account</u>"), (Acct. # XXXXXX1624) (the "<u>Five Star Fragrance Disbursement Account</u>"), (Acct. # XXXXXX1632) (the "<u>Parlux Disbursement Account</u>") and, together, the "<u>Disbursement Accounts</u>")), which are utilized for the purposes of making check and wire payments to trade vendors and other parties.  In addition, the Magnifique Disbursement Account is utilized in connection with certain direct-deposit payroll for the retail business, as well as certain employee benefit and union related payments.  The Disbursement Accounts are funded by the Operating Account based on known daily check clearings or wire transfers.  Therefore, the Disbursement Accounts generally do not maintain an ending cash balance at the end of the business day.

105.    In addition, Perfumania, Inc., Magnifique, Quality King, and Parlux each maintain payroll accounts ((Acct. # XXXXXX0381) (the "<u>Perfumania Payroll Account</u>") (Acct. # XXXXXX0399) (the "<u>Magnifique Payroll Account</u>"), (Acct. # XXXXXX6067) (the "<u>Quality King Payroll Account</u>"), (Acct. # XXXXXX0407) (the "<u>Parlux Payroll Account</u>" and together, the "<u>Payroll Accounts</u>").  The Payroll Accounts are funded by the Operating Account based on known weekly and bi-weekly direct deposit, payroll card or check clearings, in addition to payroll-related withholding tax payments.  Therefore, the Payroll Accounts generally do not maintain an ending cash balance at the end of each business day.  The Debtors transfer the required payroll-related funds, including tax withholding amounts into the Payroll Accounts or the Magnifique Disbursement Account, as applicable, one to two days prior to each payroll cycle.

Such funds are subsequently drawn from the Perfumania Payroll Account, the Quality King

Payroll Account, and the Parlux Payroll Account by Paychex, Inc. ("Paychex"), the Debtors'

third party payroll processor, for third party payroll services and taxes.  For the Magnifique

United States and Puerto Rico payroll, the Debtors transfer to Paychex the payroll direct deposit

amount from the Magnifique Disbursement Account by wire two days prior to the relevant pay

date and Paychex directly debits from the Magnifique Payroll Account the corresponding payroll

taxes.[14]  The Magnifique Payroll Account, Perfumania Payroll Account, and the Parlux Payroll

Account also disburse funds in connection with the administration of certain payroll-related

benefits, including certain of the Debtors' healthcare, 401K, and flexible benefits programs.

      106.    Additional Accounts.  In addition to the accounts described above, the

Parlux business maintains three additional accounts, one maintained at Wells Fargo by Parlux

(the "Parlux Canadian Account"), one maintained at Credit Lyonnais by Parlux SARL (the

"Parlux Paris Account") and one maintained at Banco Itau by PFI Distribuidora De Parfumes

Ltda (the "Parlux Brazil Account" and together with the Parlux Canadian Account and the Parlux

Paris Account, the "Additional Parlux Accounts").  The Additional Parlux Accounts were opened

for discrete purposes.  For example, the Parlux Brazil Account was set up as part of Parlux's

entry into the duty free market in Brazil.  This account is currently inactive.  The Parlux Paris

Account is used solely for the purposes of paying Parlux's international agent and is funded once

per year with approximately $1,000 for such purpose.  The Parlux Canadian Account was set up

as a courtesy to two Canadian customers of the Parlux business that requested that their

transactions be handled in Canadian dollars.  The Parlux Canadian Account receives receipts

---

[14]    From time to time, Paychex returns funds to the Company where Paychex discovers, after a reconciliation, that certain payroll amounts were overestimated.  In such a case, the excess amount, which is usually de minimis, is disbursed back to the Company by Paychex into the Operating Account.

from customers directly and disburses funds directly for any expenses in Canada.  The Parlux Canadian Account is not funded by the Operating Account and is manually swept from time to time into the Parlux Receipts Account.

107.    Intercompany Transactions and Intercompany Claims.  Before the Petition Date, in the ordinary course of business the Debtors and their non-Debtor affiliates engaged in intercompany transactions with each other (the "Intercompany Transactions").  Intercompany payables and receivables are created amongst the Debtors and their non-Debtor affiliates in a number of ways.  For example, through intercompany purchases of inventory or through the allocation of general corporate expenses that are paid by Quality King on behalf of the other entities.  In addition, intercompany payables and receivables are created in connection with the cash sweeps that pay down the Senior Credit Facility and the daily borrowing under the Senior Credit Facility.

108.    All Intercompany Transactions are reflected in the books and records of each individual entity.  Accordingly, the Company maintains records of all Intercompany Transactions and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors will continue to track Intercompany Transactions postpetition.

109.    The Debtors seek authority to continue the Intercompany Transactions postpetition. Failure to continue the Intercompany Transactions in the ordinary course of the Debtors' business would unnecessarily and severely hinder operations.  Specifically, the Debtors rely on the Intercompany Transactions to fund and engage in their day-to-day operations.  Accordingly, absent the continuation of such Intercompany Transactions, the Debtors' ability to operate their primary business during the Chapter 11 Cases would be severely prejudiced, and their ability to maximize value for creditors would be drastically reduced.  Avoiding such

potentially crippling hindrances by continuing the Intercompany Transactions is, therefore, in the best interests of the estates.  The Debtors therefore request that the Court authorize them to continue the Intercompany Transactions in the ordinary course of business.

110.   Business Forms.  In the ordinary course of business, the Debtors use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence (collectively, the "Business Forms"). Given that the Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession.  Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding the Chapter 11 Cases and the notice of commencement of the Chapter 11 Cases which has been or will soon be provided to parties in interest.  Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.

Taxes

111.   The Debtors have filed a motion (the "Tax Motion") to (i)  pay, in the ordinary course of business, certain prepetition taxes and related obligations and (ii) authorize and direct the Debtors' banks and financial institutions to receive, process, honor and pay all checks, drafts, transfers or other forms of payment drawn or issued on the Debtors' bank accounts prior to the Petition Date in respect of the foregoing.  As further set forth in the Tax Motion, the Debtors, in the ordinary course of their business, incur various tax liabilities, including sales and use taxes; income and franchise taxes; property taxes; gross receipts and business and occupation taxes; business license fees; annual report taxes and other taxes and fees;

and all other similar obligations, and have generally paid such tax liabilities as they become due. The Debtors' books and records reflect that, to the Debtors' knowledge, they are substantially current on all Taxes, not otherwise subject to dispute, which were due and owing prior to the Petition Date. However, certain Taxes attributable to the prepetition period have accrued and are not yet due and owing. Specifically, the Debtors estimate that certain Taxes relating to the prepetition period will become due and owing to the Taxing Authorities in the ordinary course of business following the Petition Date. As of the Petition Date, the Debtors estimate that approximately $915,853 in prepetition Taxes have accrued.

112.    The Debtors are subject to the following Taxes:

(1)    Sales and Use Taxes. In the normal course of business, the Debtors collect and remit to certain taxing authorities (the "Taxing Authorities") a variety of sales, local gross receipts and other similar taxes in connection with the sale of merchandise to their customers (collectively, the "Sales Taxes"). As retailers, the Debtors pay significant Sales Taxes in the ordinary course. The Debtors also incur and pay a variety of use taxes (the "Use Taxes" and, together with the Sales Taxes, the "Sales and Use Taxes"). The Debtors incur liability for Use Taxes when (i) the Debtors purchase of taxable fixed assets without sales tax and (ii) the Debtors purchase of taxable supplies or services without sales tax. Purchases without sales tax often occur when property or services are purchased from vendors that have no nexus to the resident state of the Debtors. Such vendors are not obligated to charge or remit sales taxes for sales to parties outside the state of the vendor's operations. Nevertheless, purchasers, such as the Debtors, are obligated to self-assess and pay Use Taxes, when applicable, to the states in which the purchasers operate. Jurisdictions differ with regard to frequency of payments of Use Taxes, with payments ranging from monthly to quarterly to annually. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Sales and Use Taxes is approximately $630,000.

(2)    Income and Franchise Taxes. The Debtors pay certain taxes based on their income (the "Income Taxes"). The Debtors typically pay Income Taxes annually in the ordinary course of business. The Debtors must also pay franchise taxes (the "Franchise Taxes" and, together with the Income Taxes, the "Income and Franchise Taxes") to certain of the Taxing Authorities so that the Debtors can operate

their business in the applicable taxing jurisdiction. Some states assess a flat Franchise Tax on all businesses and other states assess a Franchise Tax based upon some measure of income, gross receipts, net worth or other measure of value. The Franchise Taxes are typically paid annually to the applicable Taxing Authorities. The Debtors believe that as of the Petition Date, they do not have any accrued Income and Franchise Taxes.

(3)    Property Taxes. Various state and local governments in jurisdictions where the Debtors' operations are located have the authority to levy property taxes against the Debtors' leased and owned real and personal property (the "Property Taxes"). The timing of payment of the Property Taxes varies by jurisdiction, but in most jurisdictions the Debtors pay Property Taxes annually or bi-annually depending on how the relevant tax is assessed. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Property Taxes is approximately $215,853.

(4)    Gross Receipts and Business and Occupation Taxes. Several Taxing Authorities require that the Debtors pay a tax on total gross revenues (the "Gross Receipts Taxes"). In certain jurisdictions in which the Debtors operate, this form of tax is referred to as a business and occupation tax (the "Business and Occupation Taxes"). The frequency of payments differs by jurisdiction. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Business and Occupation Taxes is approximately $70,000.

(5)    Business License Fees, Annual Report Taxes, and Other Taxes and Fees. Some local governments require the Debtors to obtain a business license and pay fees associated with such license (the "Business License Fees"). The requirements for a company to obtain a business license and the manner in which the fees are computed vary according to the laws of the applicable jurisdiction. Various Taxing Authorities also require the Debtors to pay annual report taxes (the "Annual Report Taxes") in order to be in good standing for purposes of conducting business within the state. In addition to the Business License Fees and Annual Report Taxes, the Debtors also pay certain other taxes and fees, such as certain filing fees, in the ordinary course of business (the "Other Taxes and Fees"). The Debtors believe that as of the Petition Date, they do not have any accrued Business License Fees, Annual Report Taxes, and Other Taxes and Fees.

113.    It is my belief that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their

prospects for maximizing the value of their estates.  If such obligations are not timely paid, it is my understanding that the Debtors will be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws.  The Debtors desire to avoid unnecessary disputes with the Taxing Authorities – and expenditures of time and money resulting from such disputes – over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect taxes.  Accordingly, I believe that the Debtors could suffer irreparable harm if the prepetition Taxes are not paid when they become due and payable.

114.    Additionally, the Taxing Authorities may cause the Debtors to be audited if Taxes are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention away from their efforts to maximize value, including the conduct of their business and the sale process.  If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtors' licenses, suspend the Debtors' operations and pursue other remedies that will harm the estates.  In all cases, the Debtors' failure to pay Taxes could have a material adverse impact on their ability to operate in the ordinary course of business.

115.    I have also been advised that the federal government and many states in which the Debtors operate have laws providing that the Debtors' officers, directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes.  In such event, collection efforts by the Taxing Authorities would be extremely distracting for the Debtors and their directors and officers in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

<u>Insurance</u>

116.    In the ordinary course of business, the Debtors maintain various insurance policies providing coverage for, among other things, workers' compensation liability, directors and officers liability and product liability.  The Insurance Policies are essential to the preservation of the value of the Debtors' business, property and assets.  Not only are some of the Insurance Policies required by various regulations, laws, and contracts that govern the Debtors' commercial activities, but I have also been advised by counsel that section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.

117.    Moreover, I have been advised by counsel that the Operating Guidelines for Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee Guidelines") require the Debtor to maintain insurance coverage throughout the pendency of the Chapter 11 Cases.  For the policy period of 2016-2017, the total annual premiums under the Insurance Policies (including taxes and fees) was approximately $3,213,447, and the Debtors paid a broker fee of $191,478 to assist in placement of such Insurance Policies. I believe that the coverage types, levels and premiums for these Insurance Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtors, and they are similar to businesses of comparable size and type to those of the Debtors.

118.    In general, the Debtors' Insurance Policies require payment of the entire premium upfront and at inception and, as of the Petition Date, I believe the Debtors were substantially current on amounts owed under the Insurance Policies.  Nevertheless, for the reasons described herein and in the Insurance Motion, I believe it is necessary for the Debtors to

obtain authorization to make payments of Insurance Obligations (as defined below) attributable to the prepetition period, plus any unforeseen deductible payment amounts for prepetition claims.

119.     If the Debtors are unable to make any outstanding payments that may be owed on account of the Insurance Policies, I have been advised by counsel that the Debtors' Insurance Providers may seek relief from the automatic stay to terminate such Insurance Policies. If that were to happen, the Debtors would be required to obtain replacement insurance on an expedited basis and at a significant cost to the estates.  If the Debtors are required to obtain replacement insurance, this payment would be likely greater than what the Debtors currently pay. Even if the Debtors' Insurance Providers were not permitted to terminate the agreements, it is my opinion that any interruption of payment would have a severe, adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

120.     In light of the importance of maintaining insurance coverage with respect to its business activities and preserving liquidity by financing its insurance premiums, I believe it is in the best interest of the Debtors' estates to receive Court approval to honor the Debtors' obligations under the Insurance Policies and, as necessary, renew or enter into new such agreements.

121.     Additionally, I have been advised by counsel that under the laws of the various jurisdictions in which they operate, the Debtors' are required to maintain policies and programs to provide Employees with workers' compensation benefits.  The Debtors' primary workers' compensation policy is administered by Zurich Insurance Co. (the "WC Policy").  The WC Policy pays the total of all benefits, damages and expenses resulting from any accident or disease for which the Debtors are legally liable.  In connection with the WC Policy, the Debtors pay annual premiums to Zurich Insurance Co. of approximately $915,342.

122.    The Debtors maintain workers' compensation insurance policies in all jurisdictions where they operate.  I have been advised by counsel that failure to maintain workers' compensation insurance could result in administrative or legal proceedings against the Debtors and their officers and directors.  Accordingly, the Debtors seek authority to pay all workers' compensation obligations, including any outstanding insurance premiums and any other amounts related to prepetition workers' compensation claims as they become due in the ordinary course of business.  In addition, the Debtors seek to honor the workers' compensation benefits and continue the workers' compensation benefits in the ordinary course on a postpetition basis in accordance with prepetition practices.

123.    In sum, through the Insurance Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to (i) maintain existing Insurance Policies and to pay on an uninterrupted basis all premiums, deductibles and administration fees arising thereunder, and (ii) renew, revise, extend, supplement, change or enter into new insurance policies as needed in their business judgment.  The Debtors also request that the Court grant certain related relief.

124.    I believe that all of the relief requested in the Insurance Motion is in the best interest of the Debtors, their estates, creditors and other parties in interest, because it is necessary to preserve and enhance the value of the Debtors' estates for the benefit of all creditors, and that absent the relief sought in the Insurance Motion, a failure to pay any Insurance Obligations or to permit the Debtors to renew, revise, extend, supplement, change or enter into new insurance policies, as needed in their business judgment, will immediately threaten the continued operation of the Debtors and, consequently, the Debtors' estates.  As detailed above and in the Insurance Motion, for instance, the non-payment of the Insurance Obligations could

result in cancellation of the Insurance Policies.  In such an event, the Debtors would not only be in violation of the U.S. Trustee Guidelines, the laws of various states in which the Debtors operate and various contractual agreements, but also may be unable to find alternative insurance coverage and consulting services at a reasonable cost.  Therefore, it is my opinion that the potential harm and economic disadvantage that would stem from the cancellation of the Insurance Policies, and failure to renew the Insurance Policies or revise, extend, supplement, change or enter into new insurance arrangements as needed in their business judgment, are grossly disproportionate to the amount of the Insurance Obligations, and the costs to renew, revise, extend, supplement, change or enter into new insurance coverage.

Utilities

125.    In connection with the operation of their businesses and the management of their properties, the Debtors obtain electric, gas, water, waste, telecommunications, and other similar services from various utility companies.  The Debtors have filed a motion requesting that the Court approve the Debtors' proposed form of adequate assurance of postpetition payment to the Utility Companies, as that term is used in Bankruptcy Code section 366, approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance and prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors.

126.    The Utility Services provided to the Debtors by the Utility Companies are critical to the conduct of the Debtors' business, including their ability to operate their retail and wholesale stores and related facilities, the Debtors' primary source of revenue.

127.    I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations.  Such a result could potentially

jeopardize the Debtors' ability to operate their businesses and impair the Debtors' efforts to maximize the value of their estates and, ultimately, their ability to reorganize or sell their assets and business. In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases. I believe that the procedures the Debtors have proposed for the Utility Companies adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

128.    Moreover, I believe that the Utility Deposit, coupled with the Debtors' anticipated financial ability to pay for postpetition services provided by the Utility Companies, constitutes adequate assurance to the Utility Companies. Likewise, I believe that the Debtors' proposed Adequate Assurance Procedures provide the Utility Companies with a fair and orderly process for seeking modification of the Proposed Adequate Assurance while protecting the Debtors from being required to address additional assurance requests in a disorganized manner and at a time when the Debtors' efforts could be more productively focused on the seamless continuation of their operations in chapter 11.

<u>Motion to Pay Prepetition Claims in the Ordinary Course of Business</u>

129.    The Debtors are seeking authority, in their sole discretion, to pay allowed prepetition claims, that are in unimpaired classes under the Plan, of certain general unsecured creditors, priority creditors, and creditors whose claims may give rise to liens under certain state and federal laws in the ordinary course of business.[15]

---

[15]    The Debtors have filed separate motions concurrently herewith seeking authority to pay certain other prepetition claims. The relief requested in this motion only seeks authority to pay prepetition claims that are unimpaired under the Plan and that are not authorized pursuant to a separate order of this Court.

130.    The Debtors are proposing that the Court authorize aggregate payments in an amount of up to $18.5 million (the "Estimate"), subject to the Debtors' right to request authority to make additional payments.  The Estimate is based upon the Debtors' regular monthly accrued and outstanding accounts payable.  Therefore, I believe that the Estimate represents a reasonable estimate of amounts that would be payable in the ordinary course in just over one month, representing the majority of the anticipated duration of these Chapter 11 Cases.  Although the Estimate does not necessarily reflect the actual amount of outstanding prepetition claims as of the Petition Date, I believe that the Estimate is a reasonable proxy for such outstanding amount under the circumstances.  I believe that the Estimate includes postpetition claims that may be paid as administrative expenses in the ordinary course of business, and that the actual amount of outstanding prepetition claims as of the Petition Date could be significantly less than the Estimate.

131.    I believe that allowing for a seamless transition into and through bankruptcy will preserve the value upon which the Plan is based.  A fundamental aspect of the Debtors' ability to maximize value is to minimize disruption of their operations.  The Debtors' ability to minimize disruption turns on their ability to maintain their many relationships with their trade vendors and with suppliers of goods and services that are necessary for the Debtors' fragrance manufacturing, wholesale, and retail business lines.

132.    I believe that if the Creditors are not paid in a timely manner, some Creditors will be reluctant to continue doing business with the Debtors, and some will decline to provide the Debtors with acceptable postpetition credit terms.  In some cases, alternative providers may not be available.  In any case, delays associated with finding substitute vendors could result in significant lost revenues, irreparably harm the Debtors' operations, and threaten the

Debtors' ability to successfully implement the restructuring described in the Disclosure Statement, which would result in a lower reorganization value.

133.    Furthermore, the Creditors are to be paid in full under the terms of the Plan.  Thus, granting the relief requested herein will affect only the timing of payment to holders of such claims, and I don't believe any prejudice should be suffered by any other parties in interest in these Chapter 11 Cases on account of the payment of such claims.  Accordingly, I believe that the relief requested is reasonable and necessary, particularly under the circumstances of these Chapter 11 Cases, and that it is in the best interests of the Debtors' estates to pay these creditors and avoid the risk of business disruption.

**C.    Relief Related to Store Closing Sales**

134.    Before the Petition Date, the Debtors undertook efforts to cut costs, streamline operations, and increase profitability.  The Debtors' management, in consultation with their advisors, considered all possible strategies to alleviate their onerous lease obligations, including, among other things, seeking to renegotiate those leases (or terminate them on favorable terms).  Unfortunately, the Debtors' efforts to restructure their lease portfolio and reduce their significant rental obligations outside of the chapter 11 process ultimately proved unsuccessful.

135.    As noted above, these Chapter 11 Cases will allow the Company to, among other things, close underperforming stores and renegotiate unfavorable lease terms to establish a foundation for sustainable long-term growth.  To that end, the Debtors seek entry of the Interim Order and Final Order (i) authorizing the Debtors to assume the agency agreement, dated as of August 26, 2017 (the "Agency Agreement"), by and between Perfumania Holdings, Inc. and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent"); (ii) authorizing the Debtors to conduct the

Store Closing Sales at the Stores in accordance with the Sale Guidelines; (iii) authorizing the

Debtors to pay customary retention bonuses to the store-level and certain field employees at the

Stores; (iv) waiving compliance with Contractual Restrictions and Applicable Law Restrictions;

(v) authorizing the Debtors to abandon unsold property consisting of certain FF&E located at the

Closing Locations; and (vi) granting certain related relief.

<u>The Agency Agreement</u>

136.    The Debtors' management, with the assistance of their advisors, performed

a comprehensive review of the performance of each store and the market in which the Debtors

operate.  In particular, during the prepetition period, the Company started to close stores when

underperforming store leases came up for renewal or otherwise when there was an opportunity to

exit a lease early.  Furthermore, like many retail businesses, the Debtors determined that it was

necessary to close certain underperforming or unprofitable retail stores and sell their

Merchandise (defined below) and FF&E (together, the "<u>Store Closure Assets</u>").

137.    In order to maximize the value of the Store Closure Assets and to

efficiently and effectively liquidate such assets, the Debtors determined that it was in their best

interest to retain a professional liquidating agent.  In addition, as condition to the DIP Lenders

agreeing to provide postpetition financing, they required that the Debtors conduct going-out-of-

business sales with respect to certain stores and hire a third-party liquidator to manage and assist

with such sales. Thus, in June 2017, the Company, in consultation with its advisors, began

soliciting bids from four national liquidation firms: Hilco Merchant Resources, LLC, Great

American Group, LLC, Gordon Brothers Retail Partners, LLC, and Tiger Capital Group, LLC.

The bid solicitation was designed to ensure that all bidders had an equal and fair opportunity to

bid on the opportunity to sell the Debtors' inventory during the Store Closing Sales.  The

Company then evaluated the bids received and determined that proceeding with the Store

Closing Sales according to the terms of the Agency Agreement was in the best interests of its

stakeholders because it was the highest or otherwise best bid.

138.    In particular, the terms of the Agency Agreement provide for a guaranteed

return (with an additional increased potential shared recovery) to the estates, which minimizes

the Debtors' risk while at the same time motivating the Agent to maximize proceeds from the

Store Closing Sales.  Additionally, it is more cost effective for the Debtors to allow the Agent to

conduct the Store Closing Sales than for the Debtors to conduct such sales on their own because,

among other reasons, the Agent will reimburse the Debtors for expenses of the Store Closing

Sales.  These significant cost savings increase the overall recovery for creditors of the Debtor"

estates.  Accordingly, the Company and the Agent executed the Agency Agreement, and the

Agent began preparing for the Store Closing Sales (even prior to final execution of the Agency

Agreement).  On August 25, 2017, the Agent officially began the Store Closing Sales at the

Closing Locations.

139.    In sum, I believe that the terms of the Agency Agreement are typical,

customary, and reasonable under the circumstances in the exercise of their prudent business

judgments.  And, in light of the competitive bidding process, I believe the Agency Agreement

represents the highest and best offer for the Merchandise and FF&E.

### Continuing Store Closing Sales at the Stores

140.    Failure by the Debtors to continue performing pursuant to the Agency

Agreement at this point would in all likelihood lead only to unnecessary delay and expense that

would in turn derail the Debtors' restructuring timeline.  Notably, hiring a third party liquidator

to conduct the Store Closing Sales was required by the DIP Lender and is a condition precedent

under the DIP Facility.  A milestone under the DIP Credit Agreement, includes, among others, that the Debtors must obtain approval authorizing the retention of a third party liquidator by the third business day following the Petition Date.  Furthermore, among other things, the Debtors and their advisors would be compelled to suspend the Store Closing Sales and devote valuable time and effort, at considerable expense to the Debtors and their estates, to locating new agents and then recommencing the Store Closing Sales.  Any delay or disruption of the Store Closing Sales would seriously jeopardize the Debtors' ability to emerge from chapter 11 in the very near term.

141.    In contrast to the harm that any failure to perform under the Agency Agreement would likely cause the Debtors and their estates, I believe the Debtors receive significant benefits from performing under the Agency Agreement and allowing the Store Closing Sales to proceed pursuant to the Sale Guidelines under the guidance of the Agent.  In particular, the Merchandise and FF&E subject to the Store Closing Sales will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm like the Agent.  Further, many of the Stores fail to generate positive cash flow and therefore are a significant drain on liquidity.  The Agency Agreement allows the Debtors to reallocate a significant portion of the risks and costs of the Store Closing Sales to the Agent and realize an immediate benefit in terms of financial liquidity.  Notably, allowing the Store Closing Sales to continue will also allow the Debtors to more quickly vacate the Closing Locations, which are subject of the Lease Rejection Motion, and thereby avoid the accrual of unnecessary administrative lease obligations.

142.    For the reasons stated above, I believe the continuation of the Store Closing Sales pursuant to the Sale Guidelines is critical to the Debtors' reorganization efforts.

## Agent Fees

143.    The Debtors' ability to successfully reorganize will require the experience and knowledge of the Agent – including its experience with and knowledge of the Debtors' business – to continue the Store Closing Sales.  The Agent will commit significant energy and efforts to conduct the Store Closing Sales.  Any disruption to the Store Closing Sales during the interim period would cause significant and unnecessary delays to the process of selling the Store Closure Assets.  For the overall benefit to the Debtors' reorganization efforts, payment of the Agent Claims will ensure maximum value for all interested parties.  I believe that in order to avoid delays in its efforts to conduct the Store Closing Sales, it is critical that the Debtors be authorized, pending entry of a final order authorizing assumption of the Agency Agreement, to pay the Agent on account of the Agent Claims

## Store Closing Bonuses

144.    The Debtors are also requesting the authority, but not direction, to pay Store Closing Bonuses to store-level and certain field employees who are employed by the Debtors during the Store Closing Sales.  I believe that the Store Closing Bonuses will motivate employees during the Store Closing Sales and will enable the Debtors to retain those employees necessary to successfully complete the Store Closing Sales.  The amount of the Store Closing Bonuses will vary depending upon a number of factors, including the employee's position with the Debtors and length of service.  The total aggregate cost of the Store Closing Bonus program, however, will not exceed 10% of the base payroll, including payroll taxes, for all employees working at the Stores.

145.    Payment of the Store Closing Bonuses in connection with the Store Closing Sales will aid in maximizing the value of the Debtors' estates by inducing employees

who are needed to manage and complete the Store Closing Sales to remain in the employ of the Debtors and to maximize the returns from such Store Closing Sales.  Should the Debtors be unable to pay the Store Closing Bonuses, they would likely lose a number of their current employees at the Stores and would be required to hire additional employees, resulting in additional expense and delay, and such employees would not be as familiar with the Debtors' merchandise and operations, which may reduce the overall success and profitability of the Store Closing Sales.

<u>Waiver of Contractual Restrictions Restricting Store Closing Sales and Exemption From Laws Restricting Store Closing Sales</u>

146.     All the Stores are located on properties that are leased by the Debtors.  I understand that, in certain cases, the contemplated Store Closing Sales may be inconsistent with certain provisions of any such lease, sublease, license or other agreement relative to occupancy, including, but not limited to, those affecting or purporting to restrict the conduct of the Store Closing Sales, the rejection of leases or licenses, abandonment of assets, or "going dark" provisions (collectively, the "<u>Contractual Restrictions</u>").  Restrictions that may impair the Debtors' ability to close stores and conduct the Store Closing Sales.  I am advised that the Agent regularly works with and is able to resolve disputes with landlords over signage and other restrictive provisions found in leases.  Thus, the Debtors request that the Interim Order and the Final Order authorize the Agent and the landlords of the Stores to enter into agreements ("<u>Side Letters</u>") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords with respect to signage or other restrictive provisions found in the leases that might otherwise interfere with or restrict the Store Closing Sales.

147.    I understand that certain states in which the Stores are located have or may have permitting, licensing, and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local rules, laws, ordinances, and regulations related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws").  The Debtors request that the Court authorize the Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws.  The Store Closing Sales are a legitimate method by which the Debtors can maximize the return from the sale of the Merchandise and the FF&E for the benefit of their estates, their creditors, and their stakeholders.

Abandonment of Certain Property

148.    The Debtors are seeking to sell all FF&E remaining in the Stores. However, the Debtors may determine that the costs associated with holding or selling certain property or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

149.    To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining FF&E or other property located at any of the Stores without incurring liability to any person or entity.  The Debtors further request that the landlord of each Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

150.    Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

**D.    Plan-Related Relief Sought in the Confirmation Procedures Motion**

<u>Combined Hearing</u>

151.    As set forth above, the Debtors are not soliciting votes on the acceptance of the Plan.  Accordingly, the Debtors are requesting a combined hearing for approval of the Disclosure Statement and confirmation of the Plan, to be set on or about October 6, 2017, 41 days after the Petition Date, as well as deadlines associated with the requested combined hearing. I believe that such a combined hearing in these chapter 11 cases will minimize business disruption, reduce administrative costs, enhance outcome certainty, ensure prompt distributions to creditors, and generally promote an efficient and value-maximizing restructuring.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      August 26, 2017
            New York City, New York


                              By:      *Michael W. Katz*
                                       Name: Michael W. Katz
                                       Title:  President and Chief Executive Officer

## **EXHIBIT A**

**Corporate Organizational Chart**

# PERFUMANIA CORPORATE STRUCTURE

