## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                          :    Chapter 11
:
MODEL REORG ACQUISITION, LLC, et al.,           :    Case No. 17-11794 (___)
:
Debtors.[1]                        :    (Joint Administration Pending)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 364, 365, AND 554 AND BANKRUPTCY RULES 6003 AND 6004 (I) AUTHORIZING THE DEBTORS TO ASSUME THE AGENCY AGREEMENT; (II) AUTHORIZING THE DEBTORS TO SELL CERTAIN ASSETS THROUGH STORE CLOSING SALES; (III) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING BUSINESS LOCATIONS; (IV) WAIVING COMPLIANCE WITH CONTRACTUAL STORE CLOSING SALE RESTRICTIONS; (V) AUTHORIZING THE DEBTORS TO ABANDON CERTAIN UNSOLD PROPERTY; AND (VI) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"), hereby move (the "Motion") for entry of interim and final orders (the "Interim Order" and "Final Order," respectively) under sections 105(a), 363, 364 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving the Debtors' assumption of the agency agreement, dated as of August 26, 2017 (the "Agency Agreement"), by and between Perfumania Holdings, Inc.

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Perfumania Holdings, Inc. (7964); Perfumania, Inc. (6340); Magnifique Parfumes and Cosmetics, Inc. (6420); Ten Kesef II, Inc. (1253); Perfumania.com, Inc. (4688); Model Reorg Acquisition, LLC (0318); Northern Group, Inc. (3226); Perfumania Puerto Rico, Inc. (6787); Quality King Fragrance, Inc. (4939); Scents of Worth, Inc. (1732); Jacavi, LLC (6863); Distribution Concepts, LLC (8845); Flowing Velvet, Inc.  (7294); Aladdin Fragrances, Inc. (4338); Niche Marketing Group, Inc. (1943); Northern Brands, Inc. (7186); Northern Amenities, Ltd. (5387); Global Duty Free Supply, Inc. (2686); and Perfumers Art, Inc. (6616).  The address of the Debtors' corporate headquarters is 35 Sawgrass Drive, Suite 2, Bellport, New York 11713.

and a contractual joint venture composed of Hilco Merchant Resources, LLC[2] and Gordon

Brothers Retail Partners, LLC (together, the "Agent"), a copy of which is attached hereto as

Exhibit A; (ii) authorizing the Debtors to conduct store closing sales (collectively, the "Store

Closing Sales") at the locations subject to the Agency Agreement (the "Stores" or "Closing

Locations")[3] in accordance with the terms of the sale guidelines (the "Sale Guidelines" ),[4] with

such sales to be free and clear of all liens, claims, encumbrances, and interests (collectively, the

"Encumbrances"); (iii) authorizing, but not directing, the Debtors to pay customary retention

bonuses to the store-level and certain field employees at the Stores; (iv) waiving compliance with

contractual store closing sale restrictions (the "Contractual Restrictions") and laws restricting

store closing sales (the "Applicable Law Restrictions"); (v) authorizing the Debtors to abandon

unsold property consisting of certain furniture, fixtures and equipment (the "FF&E") located at

the Closing Locations; and (vi) granting certain related relief.  In support of the Motion, the

Debtors rely upon and incorporate by reference the Declaration of Michael W. Katz in Support

of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), filed with the

Court concurrently herewith.[5]  In further support of the Motion, the Debtors, by and through their

undersigned counsel, respectfully represent:

---

[2]    Hilco Valuation Services, LLC, a subsidiary of Hilco Merchant Resources, LLC's ultimate parent company, Hilco Trading, LLC, was engaged to perform an appraisal for the Company pre-petition.

[3]    A list of Closing Locations is attached to the Agency Agreement as Exhibit 1.

[4]    The Sale Guidelines are attached to the Interim Order as Exhibit 2 and to the Agency Agreement as Exhibit 8.1.

[5]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration or Agency Agreement.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 365, and 554 and Bankruptcy Rules 6004 and 6006.

3. Pursuant to Bankruptcy Rule 7008 and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

### A. The Chapter 11 Cases

4. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has been appointed by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), nor has a trustee or examiner been appointed in the Chapter 11 Cases.

### B. Background and Current Business Operations

6. Perfumania is an independent, national, vertically integrated wholesale distributor and specialty retailer of perfumes and fragrances.  The Company's wholesale business

3

distributes designer fragrances to mass market retailers, drug, and other chain stores, retail wholesale clubs, traditional wholesalers, and other distributors throughout the United States.   The Company's retail business is operated  through a chain of retail stores that specialize in the sale of fragrances and related products at discounted prices up to 75% below the manufacturers' suggested retail prices and a Company-owned website that offers a selection of the Company's more popular products for sale online.

        7.      Contemporaneous with the commencement of the Chapter 11 Cases, the Debtors filed their prepackaged joint plan of reorganization (the "Plan").  The Plan provides for a comprehensive reorganization of the Debtors that will allow the Company to close underperforming stores and reject unfavorable lease terms to establish a foundation for sustainable long-term growth and to improve the overall returns from the Company's retail footprint going forward.  All Allowed Claims are Unimpaired under the Plan, including the Debtors' general unsecured creditors, such as trade vendors, employees, and landlords.  The Debtors will not solicit votes on the acceptance or rejection of the Plan because all holders of Claims against, or Interests in, the Debtors hold either (i) an unclassified Claim, (ii) a Claim or Interest that is Unimpaired, and are therefore deemed to have accepted the Plan, or (iii) an Interest that does not entitle such holder to receive or retain any property under the Plan, and are therefore deemed to have rejected the Plan.

        8.      Additional factual background regarding the Debtors, including their business operations, their capital structure, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## RELIEF REQUESTED

        9.      By this Motion, the Debtors seek entry of the Interim Order and Final Order (i) authorizing the Debtors to assume the Agency Agreement; (ii) authorizing the Debtors

to conduct the Store Closing Sales at the Stores in accordance with the Sale Guidelines;
(iii) authorizing the Debtors to pay customary retention bonuses to the store-level and certain
field employees at the Stores; (iv) waiving compliance with Contractual Restrictions and
Applicable Law Restrictions; (v) authorizing the Debtors to abandon unsold property consisting
of certain FF&E located at the Closing Locations; and (vi) granting certain related relief.

10.    The Debtors propose to serve a copy of any Interim Order granting this
Motion within three business days after entry thereof to the notice parties identified below.  The
Debtors further request that the Court (a) set a deadline for filing objections to the Motion and
entry of the Final Order; (b) set a final hearing on the Motion; and (c) enter the Final Order on
this Motion at or after such final hearing.

11.    For the reasons set forth herein, the Debtors submit that the relief
requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and
other parties in interest, and therefore, should be granted.

**BASIS FOR RELIEF**

12.    Before the Petition Date, the Debtors undertook efforts to cut costs,
streamline operations, and increase profitability.  The Debtors' management, in consultation with
their advisors, considered all possible strategies to alleviate their onerous lease obligations,
including, among other things, seeking to renegotiate those leases (or terminate them on
favorable terms).  Unfortunately, the Debtors' efforts to restructure their lease portfolio and
reduce their significant rental obligations outside of the chapter 11 process ultimately proved
unsuccessful.

13.    However, unlike many retailers who have filed for bankruptcy, the
Company sees a viable path forward and remains confident in its prospects to successfully
implement and leverage the various strategic initiatives they are undertaking to better stabilize

and strengthen the business moving forward.  These Chapter 11 Cases will allow the Company to, among other things, close underperforming stores and renegotiate unfavorable lease terms to establish a foundation for sustainable long-term growth. Closing under-performing locations will improve the overall returns from the Company's retail footprint going forward and allow the Company to better allocate its operating, marketing, merchandising and financial resources to the best locations, as well as free up additional resources to expand the Company's e-commerce business.

14.    The Debtors' management, with the assistance of their advisors, performed a comprehensive review of the performance of each store and the market in which the Debtors operate.  In particular, during the prepetition period, the Company started to close stores when underperforming store leases came up for renewal or otherwise when there was an opportunity to exit a lease early.  Furthermore, like many retail businesses, the Debtors determined that it was necessary to close certain underperforming or unprofitable retail stores and sell their Merchandise (defined below) and FF&E (together, the "Store Closure Assets").

15.    In order to maximize the value of the Store Closure Assets and to efficiently and effectively liquidate such assets, the Debtors determined that it was in their best interest to retain a professional liquidating agent.  In addition, as condition to the DIP Lenders agreeing to provide postpetition financing, they required that the Debtors conduct going-out-of-business sales with respect to certain stores and hire a third-party liquidator to manage and assist with such sales. Thus, in June 2017, the Company, in consultation with its advisors, began soliciting offers from potential liquidation firms to conduct store closing sales.  To that end, the Company solicited bids from four national liquidation firms: Hilco Merchant Resources, LLC, Great American Group, LLC, Gordon Brothers Retail Partners, LLC, and Tiger Capital Group,

LLC.  The Company then evaluated the bids received and determined that proceeding with the Store Closing Sales according to the terms of the Agency Agreement was in the best interests of its stakeholders because it was the highest or otherwise best bid.

16.    In particular, the terms of the Agency Agreement provide for a guaranteed return (with an additional increased potential shared recovery) to the estates, which minimizes the Debtors' risk while at the same time motivating the Agent to maximize proceeds from the Store Closing Sales.  Additionally, it is more cost effective for the Debtors to allow the Agent to conduct the Store Closing Sales than for the Debtors to conduct such sales on their own because, among other reasons, the Agent will reimburse the Debtors for expenses of the Store Closing Sales.  These significant cost savings increase the overall recovery for creditors of the Debtor" estates.  Accordingly, the Company and the Agent executed the Agency Agreement, and the Agent began preparing for the Store Closing Sales (even prior to final execution of the Agency Agreement).  On August 25, 2017, the Agent officially began the Store Closing Sales at the Closing Locations.  A list of the 64 Store Closing Locations is set forth on Exhibit 1 to the Agency Agreement.

17.    The pertinent terms of the Agency Agreement are set forth below for summary purposes only.  The Debtors believe that the terms of the Agency Agreement are typical, customary, and reasonable under the circumstances in the exercise of their prudent business judgments.  To the extent any description below is inconsistent with the Agency Agreement, the Agency Agreement controls.[6]

---

[6]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Agency Agreement or this Motion.

| Term | Agency Agreement |
|---|---|
| Merchandise | "Merchandise" means all (i) new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date and included as Merchandise subject to Gross Rings, and (ii) Defective Merchandise.  "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Merchant's Consignment Goods; and (5) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property or improvements to real property. |
| Guaranteed Amount | As a guaranty of the Agent's performance under the Agency Agreement, in addition to payment of the Expenses, Agent will guarantee that the Merchant shall receive 68.3% (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), subject to certain inventory level and cost factor adjustments.  The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being not less than $4,500,000 and not more than $4,700,000 (the "Merchandise Threshold") as of the Sale Commencement Date and the Cost Factor Threshold being equal to 29.6%. |
| Sale of FF&E | Agent shall sell all FF&E at the Stores owned by Merchant pursuant to a commission structure whereby Agent shall be entitled to receive a commission equal to 17.5% of the gross proceeds (net only of sales taxes) from the sale of any FF&E. |
| Sale Term | The Sale commenced on August 25, 2017 (the "Sale Commencement Date") and shall conclude at each Store no later than September 30, 2017 (the "Sale Termination Date," and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  The Agent may, in its discretion, extend the Sale Termination Date to no later than October 31, 2017 at up to fifteen (15) Stores upon not less than eight (8) days' prior written notice before the initial Sale Termination Date. |
| Agent Compensation | After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: First, to Agent in an amount equal to 5.0% of the aggregate Cost Value of the Merchandise ("Agent's Fee"); and thereafter 50.0% to Agent and 50.0% to Merchant ("Sharing Amount"). |

| Term | Agency Agreement |
|------|------------------|
| **Expenses of Sale** | The Agent shall be responsible for all Expenses, subject to certain limitations and payment procedures, in accordance with Section 4.1 and 4.2 of the Agency Agreement. |
| **Merchant Indemnification** | The Merchant shall indemnify the Agent Indemnified Parties from liabilities (including reasonable attorney's fees) arising from or related to, the following, among other things: gross negligence or willful misconduct of the Merchant, among others; material breach; product liability claims; and claims asserted by store employees. |
| **Agent Indemnification** | The Agent shall indemnify Merchant and its officers, directors, employees, agents and representatives from liabilities (including reasonable attorney's fees) arising from or related to, the following, among other things: gross negligence or willful misconduct; material breach; and liability claims made by any party engaged by the Agent as an employee or independent contractor. |
| **Security Interests** | To secure the full payment and performance of all obligations of Merchant to Agent, Merchant grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) all Proceeds (including, without limitation, credit card Proceeds); (iii) the commission regarding the sale or other disposition of Merchant's Consignment Goods; (iv) the commission regarding the sale or other disposition of FF&E; (v) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount; and (vi) all "proceeds" (as defined in the Uniform Commercial Code), of each of the foregoing (all of which are collectively referred to as the "Agent Collateral.")  The Agent's security interest is junior and subordinated, however, to the DIP Lender's lien in the Agent Collateral until and unless the Initial Guaranteed Amount is paid. |
| **Merchandise Returns** | Agent shall accept returns of goods sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date. |
| **Gift Cards** | During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation.  Agent shall not sell any Gift Certificates. |

18.     In order for the Debtors to conclude the Store Closing Sales as quickly and efficiently as possible, and thereby minimize any unnecessary administrative expenses, including rent and related costs, it is essential that the Debtors be permitted to continue performing pursuant to the Agency Agreement and Sale Guidelines.  Importantly, as the Store Closing Sales are completed, the Debtors will reject the leases at the Closing Locations pursuant to the contemporaneously filed *Debtors' Omnibus Motion For Order Pursuant To Bankruptcy Code Sections 105(a), 365(a), And 554 And Bankruptcy Rules 6006 And 9014 Authorizing (I) Rejection Of Certain Unexpired Leases Of Nonresidential Real Property And (II) Abandonment Of Personal Property* (the "Lease Rejection Motion").

19.     Failure by the Debtors to continue performing pursuant to the Agency Agreement at this point would in all likelihood lead only to unnecessary delay and expense that would in turn derail the Debtors' restructuring timeline.  Notably, hiring a third party liquidator to conduct the Store Closing Sales was required by the DIP Lender and is a condition precedent under the DIP Facility.  A milestone under the DIP Credit Agreement, includes, among others, that the Debtors must obtain approval authorizing the retention of a third party liquidator by the third business day following the Petition Date.  Furthermore, among other things, the Debtors and their advisors would be compelled to suspend the Store Closing Sales and devote valuable time and effort, at considerable expense to the Debtors and their estates, to locating new agents and then recommencing the Store Closing Sales.  Any delay or disruption of the Store Closing Sales would seriously jeopardize the Debtors' ability to emerge from chapter 11 in the very near term.  The Debtors are seeking a combined hearing on their Disclosure Statement and Plan and aim to emerge from chapter 11 in the next 45 days.  Thus, failing to perform under the Agency

Agreement would lead to a material loss of value and delay the Debtors' emergence from chapter 11 to the detriment of all stakeholders.

20.    In contrast to the harm that any failure to perform under the Agency Agreement would likely cause the Debtors and their estates, the Debtors believe that they will receive significant benefits from performing under the Agency Agreement and allowing the Store Closing Sales to proceed pursuant to the Sale Guidelines under the guidance of the Agent. In particular, the Merchandise and FF&E subject to the Store Closing Sales will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm like the Agent.  Further, many of the Stores fail to generate positive cash flow and therefore are a significant drain on liquidity and the Agency Agreement allows the Debtors to reallocate a significant portion of the risks and costs of the Store Closing Sales from the Debtors to the Agent.  As such, the Debtors will realize an immediate benefit in terms of financial liquidity as the Store Closing Sales continue pursuant to the Sale Guidelines and operations at the Stores are terminated.  Notably, allowing the Store Closing Sales to continue will also allow the Debtors to more quickly vacate the Closing Locations, which are subject of the Lease Rejection Motion, and thereby avoid the accrual of unnecessary administrative lease obligations.  Accordingly, the relief requested herein is warranted and the Motion should be granted.

## APPLICABLE AUTHORITY

## I.    ASSUMPTION OF THE AGREEMENT IS WARRANTED UNDER BANKRUPTCY CODE SECTION 365.

21.    Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).  A debtor's determination to assume or reject an executory contract is governed by the

"business judgment" standard.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511

(Bankr. D. Del. 2003) (stating that debtor's rejection of executory contract is governed by

business judgment standard and can only be overturned if decision was product of bad faith,

whim, or caprice).  In applying the "business judgment" standard, courts show great deference to

the debtor's decision to assume or reject.  See Summit Land Co. v. Allen (In re Summit Land

Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court

approval of debtor's decision to assume or reject executory contract "should be granted as a

matter of course").  Once a debtor articulates a valid business justification, "[t]he business

judgment rule 'is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the

best interests of the company.'"  Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van

Gorkom, 488 A.2d 858, 872 (Del. 1985)).

       22.     The business judgment rule applies in chapter 11 cases.  See Integrated

Res., 147 B.R. at 656 (noting that "Delaware business judgment rule principles have 'vitality by

analogy' in Chapter 11"); see also Comm. of Asbestos-Related Litigants and/or Creditors v.

Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)

("[T]he Code favors the continued operation of a business by a debtor and a presumption of

reasonableness attaches to a Debtor's management decisions.").

       23.     Here, the Debtors have exercised their reasonable business judgment in

seeking to assume the Agency Agreement because the Store Closing Sales are an integral

component of the Debtors' overall restructuring efforts.  The Debtors' decision to assume the

Agency Agreement is grounded in sound business justifications.  In addition to hiring a third

party liquidator being required by the DIP Credit Agreement, the assumption of the Agency Agreement will also allow the Debtors to continue to close unprofitable stores and maximize their recovery on inventory, both of which directly benefit the Debtors' estates. Conducting the store closings pursuant to the Agency Agreement is a significant component of the Debtors' restructuring because it allows the Debtors to immediately and expeditiously continue the store-closing process and increase overall profitability.

24.    Indeed, as noted above, time is of the essence and without the assistance of the Agent – an experienced, nationally recognized liquidator – to conduct the Store Closing Sales, it would severely impact the Debtors ability to emerge from chapter 11 in the next 45 days. To that end, the Agent has already taken significant actions with respect to the sales, including, without limitation, engaging and mobilizing Supervisors to the Stores to assist with the sales, designing, ordering and delivering store closing and other sale signs, placards and advertisements to the Stores, and, as of the hearing on this Motion, meeting with and advising Stores employees on the strategy and process for the store closing sales. Attempting to redo the efforts already taken by the Agent pursuant to the Agency Agreement would result in significant expense and delay to the Debtors' estates.

25.    Moreover, the Agent has agreed to a Guaranteed Amount of 68.3% of the Cost Value of the Merchandise to be sold which is based on the amount of the inventory. Given the Merchandise Threshold of $4.5 to $4.7 million, the sooner the Debtors are able to assume the Agency Agreement, the larger the Guaranteed Amount will be payable to the Debtors by the Agent. Moreover, the competitive bidding process engaged in by the Company ensured that the Agent was chosen in good faith and that the terms and conditions of the Agency Agreement are fair and reasonable, and represents the highest and best offer for the Merchandise and FF&E.

Accordingly, the Debtors submit that sound business justifications exist for assuming the Agency

Agreement.[7]

## II.    CONTINUING THE STORE CLOSING SALES PURSUANT TO THE SALE GUIDELINES IS AUTHORIZED PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 363(b).

26.     Bankruptcy Code section 105(a) provides, in pertinent part, that "[t]he

court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a).  In turn, section 363(b) of the Bankruptcy Code

permits a debtor to use, sell, or lease, estate property "other than in the ordinary course of

business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Courts have authorized relief under

section 363(b) where a debtor demonstrates a sound business justification for such relief.  See

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir.

1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find

from the evidence presented before him at the hearing a good business reason to grant such an

application."); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1985) ("[T]he

debtor must articulate some business justification, other than mere appeasement of major

creditors.").

27.     Once a debtor has articulated a valid business justification, "[t]he business

judgment rule 'is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the

---

[7]    As noted above, pursuant to this Motion, the Debtors seek, on an interim basis, an order that confirms that the Agency Agreement is operative and effective.  See, e.g., In re Wet Seal, LLC, No. 17-10229 (CSS) (Bankr. D. Del. Feb. 3, 2017) (ordering that the consulting agreement was "operative and effective on an interim basis"); In re Quiksilver Inc., No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015) (same);  In re Radioshack Corporation, No. 15-10197 at 4 (BLS) (Bankr. D. Del. Feb 6, 2015) (same).  On a final basis, the Debtors seek authority to assume the Agency Agreement; similar relief has been granted in this jurisdiction.  See In re Wet Seal, LLC, No. 17-10229 (CSS) (Bankr. D. Del. Mar. 3, 2017) (authorizing on a final basis, assumption of the consulting agreement); In re Quiksilver Inc., No. 15-11880 (BLS) (Bankr. D. Del. Oct. 7, 2015) (same); In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015) (same).

best interests of the company.'" In re Integrated Res., 147 B.R. at 656 (quoting Smith, 488 A.2d at 872); see also Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (authorizing sale of debtor's assets pursuant to section 363 "when a sound business purpose dictates such action"); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (stating that, with respect to sales pursuant to section 363, "under normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification").

28.     The business judgment rule applies in chapter 11 cases. See Integrated Res., 147 B.R. at 656 (noting that "Delaware business judgment rule principles have 'vitality by analogy' in Chapter 11"); see also In re Johns-Manville Corp., 60 B.R. at 615-16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.").

29.     Disposition of a debtor's inventory by a liquidator acting as a debtor's agent pursuant to store closing and liquidation procedures like those proposed herein is an accepted method for the sale of assets in chapter 11 cases involving retail debtors. See, e.g., In re Wet Seal, LLC, No. 17-10229 (CSS) (Bankr. D. Del. Feb. 3, 2017); In re Quiksilver Inc., No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015); In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015); In re Coldwater Creek Inc., No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014); In re Namco, LLC, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013); In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011); In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011).[8]  In particular, the Sale Guidelines, protections, and dispute resolution procedures proposed herein and contained in the Interim Order and Final Order are consistent with those used in recent cases in this and other

---

[8]     Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available on request.

districts. See, e.g., In re Wet Seal, LLC, No. 17-10229 (CSS) (Bankr. D. Del. Feb. 3, 2017); In re Quiksilver Inc., No. 15-11880 (BLS) (Bankr. D. De. Sept. 10, 2015); In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015); In re dELiA*s, Inc., No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 24, 2014); In re Coldwater Creek Inc., No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014).[9]

30.      As discussed above, the Debtors have determined, in the sound exercise of their business judgment, that the continuation of the Store Closing Sales pursuant to the Sale Guidelines is critical to their reorganization efforts.  As stated above, to obtain postpetition financing, the Debtors were required to hire a third party liquidator to conduct the Store Closing Sales and obtain such approval early on in these Chapter 11 Cases.  Additionally, among other things, the failure to hire the Agent and continue the Store Closing Sales could have adverse impacts for the Debtors' recovery on the Store Closure Assets through the Store Closing Sales and, by extension, their efforts to complete an expeditious restructuring that maximizes value for all stakeholders.  The maximization of returns on the Store Closure Assets and avoiding the costs and delays that would result from starting over provides a sufficient business justifications for authorization to continue the Store Closing Sales pursuant to the Sale Guidelines.  Accordingly, continuing the sales under section 363(b) is appropriate and warranted.

## III.    SALE OF THE STORE CLOSURE ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES IS AUTHORIZED UNDER BANKRUPTCY CODE SECTION 363.

31.      The Debtors request approval to sell the Store Closure Assets subject to the Agency Agreement on a final "as is" basis, free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in

---

[9]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available on request.

possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is a *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

32.    Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward a "broader interpretation which includes other obligations that may flow from ownership of the property." Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 258-59 (3d Cir. 2000).  As the Fourth Circuit held in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996) (cited with approval by the Third Circuit in Folger Adam), the scope of section 363(f) is not limited to in rem interests in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute.  Folger Adam, 209 F.3d at 258.

33.    As an initial matter, the DIP Lender has consented to the Store Closing Sales, and particularly, to the sale of the Store Closure Assets free and clear of any Encumbrances,.  The DIP Lender's agreement is subject in all respects to the terms of the

Agency Agreement.  Likewise, the Debtors submit that it is appropriate to sell the Store Closure

Assets free and clear of any Encumbrances in accordance with section 363(f) of the Bankruptcy

Code because one or more of the tests of section 363(f) are satisfied.  In particular, the Debtors

believe that at least section 363(f)(2) of the Bankruptcy Code will be met because the Debtors'

sole prepetition secured lender, which is also DIP Lender, has a security interest in, among other

things, the Store Closure Assets, and has consented to the sale of the Store Closure Assets.

          34.     With respect to any other party asserting a lien, claim, or encumbrance

against the Store Closure Assets, the Debtors anticipate that they will be able to satisfy one or

more of the conditions set forth in section 363(f).  Parties in interest will have received notice of

the Motion and will be given sufficient opportunity to object to the relief requested. Any such

entity that does not object to the sale will be deemed to have consented.  See Hargrave v.

Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bank. D.N.J. 1994) (finding

that failure to object to sale after receiving notice of such sale constitutes consent and satisfies

section 363(f)); see also In re Enron Corp., No. 01-16034, 2003 WL 21755006, at *2 (Bankr.

S.D.N.Y. July 28, 2003) (order deeming all parties who did not object to proposed sale to have

consented under section 363(f)(2)).  As such, to the extent that no party holding a lien objects to

the relief requested by this Motion, the sale of the purchased assets free and clear of all liens,

claims, and encumbrances satisfies section 363(f)(2) of the Bankruptcy Code.  In any event, the

Debtors propose that any such liens, claims, and encumbrances be transferred to and attach to the

amounts payable to the Debtors (or the DIP Lenders) under the Agency Agreement, including

the Guaranteed Amount, in the same order of priority and subject to the rights, claims, defenses,

and objections, if any, of all parties with respect thereto.

35.     Accordingly, the Debtors submit that, to the extent applicable, the Court should authorize the Debtors to sell the Store Closure Assets free and clear of any Encumbrances or other interests that may exist, pursuant to Bankruptcy Cody section 363(f), with any of the same to be transferred and attached to the amounts payable to the Debtors (or the DIP Lender) under the Agency Agreement, including the Guaranteed Amount, with the same validity and priority that such liens, claims, encumbrances, or interests had against the assets.

## IV.     PAYMENT OF THE AGENT CLAIMS IS AUTHORIZED UNDER BANKRUPTCY CODE SECTION 363.

36.     The Debtors request authorization, on an interim basis, to pay any amounts owed under the Agency Agreement to the Agent (the "Agent Claims").  Under section 363 of the Bankruptcy Code, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business.  See 11 U.S.C. § 363.  In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. See In re Ionosphere Clubs, 98 B.R. at 176.

37.     As discussed above, the Debtors have determined, in the sound exercise of their business judgment, that they will receive significant benefits from performing under the Agency Agreement and allowing the Store Closing Sales to proceed during the interim period under the guidance of the Agent.  In particular, the assets subject to the Store Closing Sales will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm like the Agent.

38.     The Debtors' ability to successfully organize depends in large part upon its ability to continue using the experience and knowledge of the Agent – including its experience with and knowledge of the Debtors' business – to continue the Store Closing Sales.  The Agent

will be required to commit significant energy and efforts to conduct the Store Closing Sales.

Any disruption to the Store Closing Sales during the interim period would cause significant and

unnecessary delays to the process of selling the Store Closure Assets.  For the overall benefit to

the Debtors' reorganization efforts, payment of the Agent Claims will ensure maximum value for

all interested parties.  The Debtors believe that in order to avoid delays in its efforts to conduct

the Store Closing Sales, it is critical that they be authorized, pending entry of a final order

authorizing assumption of the Agency Agreement, to pay the Agent on account of the Agent

Claims.  Accordingly, this Court should grant the requested relief under section 363 of the

Bankruptcy Code.

## V.    PROTECTION OF THE AGENT PURSUANT TO BANKRUPTCY CODE SECTIONS 363(m) AND 364(e) IS WARRANTED.

39.    As described above, entry into the Agency Agreement was the result of

arm's-length transactions between the Debtors and the Agent.  Indeed, prepetition bid solicitation

was designed to and did ensure that all bidders had an equal and fair opportunity to bid on the

opportunity to sell the Debtors' inventory during the Store Closing Sales.  Thus, the Debtors

respectfully request that this Court find that the Agent acted in good faith within the meaning of

Bankruptcy Code section 363(m).

40.    Specifically, Bankruptcy Code section 363(m) provides that:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

41.    While the Bankruptcy Code does not define "good faith," the Third Circuit

has "turned to traditional equitable principles, holding that the phrase encompasses one who

purchases in 'good faith' and for 'value.'" <u>In re Abbotts Diaries of Pennsylvania, Inc.</u>, 788 F.2d 143, 147 (3d Cir. 1986).

42.     Because of the manner in which the prepetition bid solicitation process was conducted, the Agent was not able to exert any undue influence over the Debtors.  Furthermore, the assets that will be sold as part of the Sale will not be sold to the Debtors' insiders.  Thus, the Store Closing Sales will not unfairly benefit insiders or any particular constituency in these cases. There is no fraud or collusion or any attempt to take unfair advantage of another through the Agency Agreement of Store Closing Sales.

43.     The Debtors also submit, and will demonstrate at the hearing, that the Agency Agreement is the result of good-faith arms'-length negotiations and the good faith extension of credit by the Agent, as well as the other financial accommodations, as set forth in the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, as such, the reversal or modification on appeal of the Court's authorization to consummate the transactions contemplated by the Agency Agreement, and the security granted thereunder, should not affect the validity of such transactions unless such authorization has been stayed pending appeal.  The Debtors further believe that the consideration provided in the Agency Agreement is fair and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and other applicable Federal and State laws, if any.

44.     Based on the foregoing and under the circumstances, this Court should find that (i) entry into the Agency Agreement was the result of good faith arm's-length transactions and (ii) the Agent is entitled to all of the protections of Bankruptcy Code sections 363(m) and 364(e) as requested herein..

## VI.    AUTHORIZATION OF PAYMENT OF STORE CLOSING BONUSES IS WARRANTED.

45.    Through this Motion, the Debtors are requesting the authority, but not direction, to pay store closing bonuses (the "Store Closing Bonuses") to store-level and certain field employees who are employed by the Debtors during the Store Closing Sales.  The Debtors believe that the Store Closing Bonuses will motivate employees during the Store Closing Sales and will enable the Debtors to retain those employees necessary to successfully complete the Store Closing Sales.  The amount of the Store Closing Bonuses will vary depending upon a number of factors, including the employee's position with the Debtors and length of service.  The total aggregate cost of the Store Closing Bonus program, however, will not exceed 10% of the base payroll, including payroll taxes, for all employees working at the Stores.

46.    This Court has the authority, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to authorize the Debtors to pay the Store Closing Bonuses.  Store Closing Bonuses are a typical practice in many store liquidations, and courts in this jurisdiction have also approved such payments when debtors choose to enter into an agency agreement with liquidators. See, e.g., In re Quiksilver Inc., No. 15-11880 (BLS) (Bankr. D. De. Sept. 10, 2015); In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015); In re Ultimate Acquisition Partners, LP, Case No. 11-10245 (MFW) (Bankr. D. Del. Feb. 11, 2011).[10]  In addition, the bonuses are not barred by section 503(c) of the Bankruptcy Code.  [The individuals who are receiving the bonuses are not insiders as that term is defined in section 101(31) of the Bankruptcy Code,] and the bonuses are justified by the facts and circumstances of these cases.

---

[10]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available on request.

47.     In this case, payment of the Store Closing Bonuses in connection with the Store Closing Sales will aid in maximizing the value of the Debtors' estates by inducing employees who are needed to manage and complete the Store Closing Sales to remain in the employ of the Debtors and to maximize the returns from such Store Closing Sales.  Should the Debtors be unable to pay the Store Closing Bonuses, they would likely lose a number of their current employees at the Stores and would be required to hire additional employees, resulting in additional expense and delay, and such employees would not be as familiar with the Debtors' merchandise and operations, which may reduce the overall success and profitability of the Store Closing Sales.  Therefore, the bonuses are justified and authorization to pay such bonuses, subject to the Agency Agreement and subject to the limitations set forth herein, should be approved.

## VII.    WAVIER OF CONTRACTUAL RESTRICTIONS RESTRICTING STORE CLOSING SALES IS AUTHORIZED, AND EXEMPTION FROM LAWS RESTRICTING STORE CLOSING SALES IS WARRANTED.

48.     The Debtors respectfully request waiver of certain contractual or applicable law restrictions that could otherwise inhibit the Debtors' ability to maximize recoveries through the Store Closing Sales, and which are customarily waived in sales such as these.  To be clear, however, the requested waiver is narrowly tailored to facilitate the successful conduct of the Store Closing Sales.  Importantly, the Debtors are not seeking a general waiver of all state and local laws, but only those specifically governing liquidation or similarly themed sales.  The Debtors, and the Agent, fully intend to comply with applicable state and local environmental, tax, employment, public health and safety laws, and consumer protection laws, except as explicitly set forth in this Motion.

**A.    Wavier of Contractual Restrictions Restricting Store Closing Sales is Authorized.**

49.    All the Stores are located on properties that are leased by the Debtors.  In certain cases, the contemplated Store Closing Sales may be inconsistent with certain provisions of any such lease, sublease, license or other agreement relative to occupancy, including, but not limited to, those affecting or purporting to restrict the conduct of the Store Closing Sales, the rejection of leases or licenses, abandonment of assets, or "going dark" provisions (collectively, the "Contractual Restrictions").

50.    The Debtors request that the Court override or invalidate any Contractual Restrictions that may impair the Debtors' ability to close stores and conduct the Store Closing Sales.  Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors.  Such sales are consistently approved by courts despite provisions of recorded documents or agreements purporting to forbid such sales.  See In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding restrictive lease provision unenforceable against debtor that sought to conduct going-out-of-business sale "because it conflicts with the Debtor's fiduciary duty to maximize estate assets"); In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (finding that "to enforce the anti-[going out-of-business] sale clause of the [l]ease would contravene overriding federal policy requiring Debtor[s] to maximize estate assets by imposing additional constraints never envisioned by Congress"); see also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-going-out-of-business sales clause in lease unenforceable).

51.    Other such restrictive provisions in contracts have been deemed unenforceable in other chapter 11 cases in this and other districts.  See, e.g., In re Wet Seal, No. 17-10229 (CSS) (Bankr. D. Del. Feb. 3, 2017); In re Quiksilver Inc., No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015); In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D.

Del. Feb 20, 2015); <u>In re Coldwater Creek Inc.</u>, No. 14-10867 (BLS) (Bankr. D. Del. May 7,

2014); <u>In re Namco, LLC</u>, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013); <u>In re Borders</u>

<u>Grp., Inc.</u>, No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011); <u>In re  Blockbuster Inc.</u>, No. 10-

14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011); <u>In re Finlay Enters., Inc.</u>, No. 09-14873 (JMP)

(Bankr. S.D.N.Y. Sept. 25, 2009); <u>In re Goody's LLC</u>, No. 09-10124 (Bankr. D. Del. Jan. 15,

2009).[11]

> 52.    Subject to and without limiting the foregoing, the Debtors are advised that
the Agent regularly works with and is able to resolve disputes with landlords over signage and
other restrictive provisions found in leases.  Thus, the Debtors request that the Interim Order and
the Final Order authorize the Agent and the landlords of the Stores to enter into agreements
("<u>Side Letters</u>") between themselves modifying the Sale Guidelines without further order of the
Court, and such Side Letters shall be binding as among the Agent and any such landlords with
respect to signage or other restrictive provisions found in the leases that might otherwise
interfere with or restrict the Store Closing Sales.

**B.    Exemption from Laws Restricting Store Closing Sales is Warranted.**

> 53.    Certain states in which the Stores are located have or may have permitting,
licensing, and other requirements governing the conduct of store closing, liquidation, or other
inventory clearance sales, including (but not limited to) state and local rules, laws, ordinances,
and regulations related to store closing and liquidation sales, establishing licensing, permitting,
or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation
limitations that would otherwise apply to the Store Closing Sales, or consumer fraud laws, with
the exception of deceptive advertising laws (the "<u>Liquidation Sale Laws</u>").  Typical statutes and

---

[11]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of
these orders, however, are available on request.

regulations provide that if a liquidation or bankruptcy sale is court authorized, however, then a company need not comply with these Liquidation Sale Laws.

54.     The Debtors request that the Court authorize the Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws.  Because the Debtors and their assets are subject to this Court's jurisdiction, see 28 U.S.C. § 1334, this Court will be able to supervise the Store Closing Sales. The Store Closing Sales are a legitimate method by which the Debtors can maximize the return from the sale of the Merchandise and the FF&E for the benefit of their estates, their creditors, and their stakeholders.  Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

55.     Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution.  To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code.  In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  See, e.g., Aloe v. Shenango Inc. (In re Shenango Grp., Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . .[A] state statute. . . . cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), aff'd sub nom Belcufine v. Aloe, 112 F. 3d 633 (3d Cir. 1997).

56.     While the Debtors recognize that preemption of state law is not always appropriate, as when the protection of public health and safety is involved, see Baker & Drake, Inc. v. Public Service Commission of Nevada (In re Baker & Drake, Inc.), 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption of public safety measure), it is appropriate when, as here, the implicated state laws concern economic regulation.  Id. at 1353 (finding that "federal bankruptcy preemption is more likely. . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); see also In re Anchor Blue Retail Grp., No. 09-11770 (PJW) (Bankr. D. Del. June 18, 2009) (authorizing store closing sale conducted in accordance with sale guidelines).

57.     Here, section 363 of the Bankruptcy Code, which requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Sale Laws because full compliance with the Liquidation Sale Laws could constrain the Debtors' ability to maximize the value of the estates.  The relief requested herein is commonly granted in this District and other jurisdictions. See, e.g., In re Wet Seal, No. 17-10229 (CSS) (Bankr. D. Del. Feb. 3, 2017); In re Quiksilver Inc., No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015); In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015); In re Coldwater Creek Inc., No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014); In re Namco, LLC, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013); In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011); In re Borders Grp.,  Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011); In re Blockbuster Inc., No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011); In re Finlay Enters., Inc., No. 09¬14873

(JMP) (Bankr. S.D.N.Y. Sept. 25, 2009); In re Goody's LLC, No. 09-10124 (Bankr. D. Del. Jan. 15, 2009).[12]

58.    Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales.  The Debtors only request that this Court authorize the Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the Store Closing Sales as store closings or similar type sales.  The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

59.    The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion of the Store Closing Sales, in the manner set forth in the Interim Order and Final Order.[13]

60.    Notwithstanding such requests, the Debtors propose to serve, within two (2) business days of the entry of the Interim Order, copies of such order and the Sale Guidelines attached thereto, by email, facsimile, or regular mail on the following parties: (a) the Attorney General's office for each state in which the Debtors operate a retail location; (b) the county

---

[12]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available on request.

[13]    Notwithstanding the relief requested herein, the Debtors will serve the Notice Parties (defined below), which includes various governmental units, copies of this Motion, Interim Order, and Final Order.  By this Motion, the Debtors are seeking approval of certain protections and dispute resolution procedures contained in the Interim Order and Final Order in the event any governmental unit, as defined under section 101(27) of the Bankruptcy Code, may assert a dispute related, among other things, to any Liquidation Sale Laws.

consumer protection agency or similar agency for each county in which the Debtors operate a retail location; and (c) the division of consumer protection for each state in which the Debtors operate a retail location;  (collectively, clauses (a) through (c), the "Applicable Governmental Units"); and (d) the applicable landlord for each Store (collectively, the "Landlords").

61.    The Debtors further propose that any governmental unit (as defined in section 101(27) of the Bankruptcy Code) (each a "Governmental Unit") may assert a dispute related to any Liquidation Laws (such dispute, a "Liquidation Dispute") by sending a notice (a "Dispute Notice") explaining the nature of the dispute to (i) proposed counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036-6522 (Attn: Lisa Laukitis, Esq.), (ii) counsel to the DIP Lender, Otterbourg, P.C., 230 Park Avenue, New York, NY 10169 (Attn: Daniel F. Fiorillo, Esq.), (iii) the Agent, Gordon Brothers Retail Partners, LLC, Prudential Tower, 800 Boylston Street, Boston, MA 02119 (Attn: Mackenzie Shea, mshea@gordonbrothers.com)**,** Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062 (Attn: Ian Fredericks, ifredericks@hilcoglobal.com) and counsel to the Agent, Pepper Hamilton LLP, 1313 N. Market Street, Suite 5100, Wilmington, DE 19801 (Attn: Doug Herrmann, herrmannd@pepperlaw.com), (iv) the affected Landlord, and (v) counsel to any statutory committee, no later than fourteen (14) days following the service of the Interim Order. If the Debtors, the Agent, and the Governmental Unit are unable to resolve the Liquidation Dispute within fourteen (14) days of service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting consideration and resolution of the Liquidation Dispute (a "Dispute Resolution Motion").  The Debtors request that the Court retain exclusive jurisdiction to resolve any Liquidation Disputes, and that the Court resolve any Dispute Resolution Motions at the next available omnibus hearing.  The proposed dispute resolution procedures related to the

Liquidation Laws discussed in this paragraph and in the Proposed Orders are referred to herein as the "Resolution Procedures."

## VIII.    ABANDONMENT OF CERTAIN PROPERTY IN CONNECTION WITH THE STORE CLOSING SALES IS WARRANTED UNDER BANKRUPTCY CODE SECTION 554.

62.    After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. §554(a); see also Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

63.    The Debtors are seeking to sell all FF&E remaining in the Stores. However, the Debtors may determine that the costs associated with holding or selling certain property or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

64.    To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining FF&E or other property located at any of the Stores without incurring liability to any person or entity.  The Debtors further request that the landlord of each Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

65.    Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or

debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

IX. **APPOINTMENT OF A CONSUMER PRIVACY OMBUDSMAN IS NOT REQUIRED BY BANKRUPTCY CODE SECTIONS 363(B)(1) OR SECTION 332.**

66.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or lease personally identifiable information unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  Under the Agency Agreement, the Debtors are not selling or leasing personally identifiable information in the course of the Store Closing Sales, and indeed, intend to scrub all FF&E which may contain personally identifiable information before selling or abandoning such assets.  The Agent will be granted, however, a limited right to use customer lists, mailing lists, email lists, and web and social networking sites only in a manner consistent with the Debtors' existing privacy policy and applicable laws governing the use of confidential consumer information and for the sole purpose of conducting the Store Closing Sales in accordance with the terms of the Agency Agreement.  In light of the foregoing, appointment of a consumer privacy ombudsman is unnecessary under the circumstances.

**IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM**

67.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ."  Fed. R. Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by

final relief on the merits and for which money damages cannot provide adequate compensation. See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 F. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)).  Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

68.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As discussed above, the Agent requires the ability to commence the Store Closing Sales right aware.  The Debtors face severe prejudice each day that the Closing Stores continue to operate, as those locations are unprofitable and drain liquidity.  Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

69.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) except with respect to the Agency Agreement, an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; (e) otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to this Motion; and

(f) impair the Debtors' ability to contest or object to any claims, including Agent Claims, asserted against the Debtors on any ground permitted by applicable law.

## NOTICE

70.     Notice of this Motion shall be given to the following notice parties (the "Notice Parties"): (a) the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) Otterbourg, counsel to the agent for the Debtors' Senior Credit Facility; (d) Wells Fargo Bank, National Association, as agent for the Debtors' Senior Credit Facility; (e) the Landlords; (f) all known parties asserting a security interest or lien in the Store Closure Assets; (g) All applicable Governmental Units; and (i) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided

## NO PRIOR REQUEST

71.     No previous request for the relief sought herein has been made to this Court or any other court.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter orders, substantially in the forms annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:    Wilmington, Delaware
          August 26, 2017

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Anthony W. Clark
Anthony W. Clark (I.D. No. 2051)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

J. Gregory Milmoe (*pro hac vice admission pending*)
Raquelle L. Kaye (*pro hac vice admission pending*)
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Fax: (617) 573-4822

- and -

Lisa Laukitis (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel for Debtors and Debtors in Possession*

# EXHIBIT A

**Agency Agreement**

## AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of August 25, 2017, by and between Perfumania Holdings, Inc. ("Merchant") and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent").

Section 1.  Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's sixty-five (65) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") by means of a "store closing", "sale on everything", "everything must go", or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E (as defined below) in the Stores.

WHEREAS, Merchant is contemplating filing a chapter 11 case in the United States Bankruptcy Court for the District of Delaware (such case, the "Bankruptcy Case" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agrees as follows:

Section 2.  Appointment of Agent/Approval Order.

(a)     Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.  As soon as practical upon the filing of the Bankruptcy Case, and in any event, no later than the earlier of (i) the date of filing of Merchant's "first day" pleadings or (ii) two (2) days after commencement of the Bankruptcy Case, Merchant agrees to seek entry of an interim and final order from the Bankruptcy Court assuming this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement, the form of which shall be reasonably acceptable to the Merchant and the Agent (the "Approval Order").  During the pendency of the Chapter 11 Cases, Merchant's performance under this Agreement shall be subject in all respects to the Approval Order.

(b)     The Approval Order shall provide, in a form reasonably satisfactory to Merchant and Agent, *inter alia,* that: (i) this Agreement is in the best interest of the Merchant, Merchant's estate, creditors, and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) subject to Agent's payment of the Initial Guaranty Payment (as defined below) and delivery of the Letter of Credit (as defined below), Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds (as defined below) thereof attaching only to the Guaranteed Amount (as defined below) and other amounts to be received by Merchant under this Agreement; (v) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale as a "store closing", "sale on everything", "everything must go", or similar themed sale,

in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, e-mail lists, customer lists, e-commerce sites (including (without limitation) websites and social media sites such as Facebook, and Twitter) relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, conducting and advertising the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) subject to Agent having satisfied its payment obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in the Bankruptcy Case pursuant to section 364(c) of Title 11, United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") senior to all other superpriority claims, other than the superpriority claims of the Lender (as defined below); (xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 15 hereof (without the necessity of filing financing statements to perfect the security interests); (xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and in proceeding with the Sale at the Stores uninterrupted and that Merchant would suffer immediate and irreparable harm if this Agreement were not assumed on an interim basis pursuant to Bankruptcy Rule 6003; (xv) the Bankruptcy Court finds that Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of Merchant, its estate, its creditors, and other parties in interest and any transfers by Merchant to Agent prior to the commencement of the Bankruptcy Case (including without limitation of any Proceeds hereunder) are not subject to avoidance and the Sale Expense Advance (as defined below) shall be replenished by Merchant as provided for in Section 16 below; (xvi) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvii) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amount under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is released of any liability for its actions taken pursuant to this Agreement pre-petition and is entitled the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xviii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)     The Approval Order shall further provide that Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed

2

by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and the Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.   Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Subject to (i) Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement, and (ii) entry of the Approval Order in compliance with the Approval Order Deadlines (as defined below) and in the form and substance required by Section 2 hereof, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive sixty-eight and three tenths percent (68.3%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. Agent shall pay to Lender, for application against the obligations owing by Merchant to Lender, the Guaranteed Amount and the Sharing Amount (as defined below) due to Merchant (if any) in the manner and at the times specified in Section 3.3.  The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by Gross Rings during the Sale Term and any other adjustments to Cost Value as expressly contemplated by this Agreement.

(b)    The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being not less than Four Million Five Hundred Thousand Dollars ($4,500,000) and not more than Four Million Seven Hundred Thousand Dollars ($4,700,000) (the "Merchandise Threshold") as of the Sale Commencement Date.  To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

(c)    The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale, such percentage being twenty nine and six-tenths percent (29.6%) (the "Cost Factor Threshold").  To the extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

(d)    The adjustments to the Guaranty Percentage contemplated by Sections 3.1(b) and 3.1(c) shall be independent and cumulative.

3.2    Compensation to Agent, Sharing:

(a)    After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses (as defined below), all remaining Proceeds (as defined below) shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to five percent (5.0%) of the aggregate Cost Value of the Merchandise ("Agent's Fee"); and THEREAFTER: fifty percent (50.0%) to Agent and fifty percent (50.0%) to Merchant ("Sharing Amount").

(b)    To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances, and Agent shall use commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise.  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.  The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3    Proceeds; Time of Payments; Control of Proceeds.

(a)    For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement, in each case during the Sale Term and exclusive of Sales Taxes, (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term, and (c) any and all proceeds received by Agent from the disposition of Remaining Merchandise.  For the avoidance of doubt, proceeds from the sale of Owned FF&E shall not be "Proceeds".

(b)    On the second business day following the entry of the final Approval Order (the "Payment Date"), Agent shall pay to Lender, for application against the obligations owing by Merchant to Lender in accordance with the financing arrangements, an amount equal to seventy percent (70.0%) of the estimated Guaranteed Amount of the Cost Value of Merchandise calculated based on Gross Rings from the Sale Commencement Date through the date immediately preceding the Payment Date (the "Initial Guaranty Payment"), less any amounts previously paid on account thereof pursuant to section 3.3(c)(iv) below, by wire transfer to an account designated in writing by Merchant and approved by Lender ("Merchant's Account").  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to Merchant's Account on or before the Final Reconciliation (as defined below).  To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation.

(c)    All Proceeds shall be controlled by Agent in the manner provided for below:

(i)    [Intentionally Omitted].

(ii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.  Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(iii)    All Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository account designated by, and owned and in the name of, Merchant for the Stores

and subject to the control of Lender, which account shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Account"). The Designated Deposit Account shall be a cash collateral account, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such account being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a security interest in the Designated Deposit Account and all Proceeds in such account from and after the Sale Commencement Date. Merchant shall obtain Lender's agreement to consent to the granting of such security interests to Agent (and Agent's perfection thereof) and to subordinate its security interest in such account and Proceeds subject to the terms contained in Section 15. If requested by Agent following the payment by Agent of the Initial Guaranty Payment in accordance with the terms hereunder, the account shall be subject to an agreement between and among Agent, Merchant and the subject bank, providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of Merchant (a "Control Agreement"). Lender shall impose a reserve, on a weekly basis, upon Merchant's availability under its borrowing base in the amount of the funds in the Designated Deposit Account until the Payment Date, after which time, such reserve may be released by Lender.

(iv)    The funds in the Designated Deposit Account shall be disbursed as follows: first to reimburse Merchant for any Expenses paid by Merchant, second to repay the Initial Guaranty Amount, third to any other Expenses, and fourth, to Agent in accordance with the terms of this Agreement. From and after payment in full of the Initial Guaranty Amount, on each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Account (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Account without any offset or netting of Expenses or other amounts that may be due to Merchant. Agent shall notify Merchant and Wells Fargo Bank, N.A. ("Lender") of any shortfall in such payment within ten (10) days of Agent's knowledge of such shortfall, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall. For the avoidance of doubt, Merchant shall remit into the Designated Deposit Account any credit card Proceeds no later than one (1) business day after receipt

(d)    In the event that Agent funds or pays all or any portion of Merchant's obligations under this Agreement, if such funding or payment cannot be recovered by Agent under Section 3.3(e) below by means of an offset, and, as a result of such funding or payment, Merchant (or Lender) received more value than Merchant would have otherwise received under this Agreement had Agent not funded or paid such obligations, Merchant shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's request.

(e)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)    In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis, which shall

5

be reconciled and paid upon the first Weekly Reconciliation to occur after commencement of the Bankruptcy Case.

        3.4    Security.  In order to secure Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the earlier of (i) two (2) days immediately following the date of entry of the Approval Order on an interim basis and (ii) close of business on September 1, 2017, Agent shall furnish to Lender, as Merchant's designee, an irrevocable standby Letter of Credit naming Lender as sole beneficiary ("Beneficiary") in the aggregate original face amount equal to the sum of: (a) thirty percent (30.0%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of Exhibit 3.4 hereof (the "Letter of Credit").   The Letter of Credit shall have an expiry date of no earlier than seventy five (75) days after the Sale Termination Date.    Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Beneficiary shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If the Beneficiary fail to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then the Beneficiary shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, the Beneficiary may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute.

        Section 4.  Expenses of the Sale.

        4.1    Expenses.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

        (a)    actual payroll with respect to all Retained Employees (as defined below) used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term, as well as payroll for any temporary labor engaged for the Sale;

        (b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits (as defined below)) for Retained Employees used in the Sale, in an amount not to exceed eighteen percent (18.0%) of the base payroll for each Retained Employee in the Stores (the "Payroll Benefits Cap");

        (c)    the actual Occupancy Expenses categorized on Exhibit 4.1(c)  in all cases limited on a per Store, per category, and per diem basis not to exceed the respective categories and amounts shown on Exhibit 4.1(c);

        (d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

        (e)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(g)    bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)    costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(i)    all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)    Store cash theft and other store cash shortfalls in the registers;

(k)    all costs and expenses associated with Agent's on-site supervision of the Stores, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)    postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)    Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(n)    Agent's reasonable and documented out-of-pocket costs and expenses associated with this Agreement, the Sale, or the transactions contemplated by this Agreement, including, but not limited to, reasonable and documented legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale;

(o)    third party payroll processing expenses associated with the Sale;

(p)    costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of Section 8.1(e); and

(q)    the actual reasonable and documented costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)    "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email

preparation and distribution, information technology and e-commerce site updates and maintenance, and accounting (collectively, "Central Services").

(ii)　　　"Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)　　　"Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(iv)　　　"Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant.

(v)　　　Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses; (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or Merchant's warehouse/distribution centers (collectively, the "Distribution Centers"), including (without limitation) the Distribution Center Expenses (as defined below); and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2　　Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts, subject to entry of the final Approval Order, if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (i.e. Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation (as defined below); provided, however, (i) until commencement of daily wire transfers to Agent from the Designated Deposit Account as provided in Section 3.3(c)(iv) above and entry of the final Approval Order, Agent shall not be required to pay or reimburse Merchant for any Expenses and instead Proceeds may be used to pay such Expenses in accordance with the waterfall set forth therein; and (ii) in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

4.3　　Distribution Center Expenses

4874485.2

All costs and expenses of operating the Distribution Centers, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations (the "Distribution Center Expenses") shall remain the sole obligation of Merchant.

Section 5.  Gross Rings; Merchandise.

5.1    Gross Rings.

At each Store, during the Sale Term, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store. For the avoidance of doubt, Register receipts refers to the accounting of sales at the register and not receipts presented to customers at the time of sale. Register receipts shall show for each item sold the Cost Value and Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of one hundred and one percent (101.0%) of the aggregate Cost Value of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2    Merchandise Subject to This Agreement.

(a)    For purposes of this Agreement, "Merchandise" shall mean all (i) new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date and included as Merchandise subject to Gross Rings, and (ii) Defective Merchandise (as defined below).  "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise (as defined below); (4) Merchant's Consignment Goods (as defined below); and (5) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property (collectively, "FF&E") or improvements to real property; provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course.  Examples of Defective Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), out of season, missing pieces, mismatched, mismated, parts, items typically sold as a set which are incomplete.

"Excluded Defective Merchandise" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Cost Value; (ii) obsolete or discontinued goods or goods that have been marked out of stock or have received a similar designation; or (iii) promotional items, including, without limitation, gifts with purchase, store testers, vials, and loyalty program reward refills, or similar items; and (iv) non-merchandise styles, including, without limitation, coupons such as Shutterfly photobook coupons.

"Merchandise File" shall mean Merchant's "1.1_1.5 Inventory by SKU 8.16.17.xlsx" file

4874485.2

5.3     Valuation.

(a)     For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (i) the average cost of such item as reflected in the Merchandise File and (ii) the Retail Price.

(b)     For purposes of this Agreement, "Retail Price" shall mean with respect to each item of Merchandise, the lower of the lowest ticketed, marked, shelf, stickered, hang-tag, Merchandise File, point of sale, or other file price as reflected in Merchant's books and records for such item.

(c)     Notwithstanding the provisions of Section 5.3(a), with respect to each item of Defective Merchandise, the parties shall mutually agree upon the Cost Value (and if Agent and Merchant are unable to mutually agree on the Cost Value of any one or more items of Defective Merchandise, such items shall be deemed Excluded Defective Merchandise).

5.4     Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods").  Agent shall retain fifteen (15.0%) of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive eighty-five (85.0%) of the receipts (net of Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell goods not included as Merchandise or Merchant and Agent are unable to agree upon prices, then all such items will be removed by Merchant from the Stores at Merchant's expense as soon as practicable.  Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1     Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on August 25, 2017 (the "Sale Commencement Date"); provided, however, that Agent shall not post signs stating "store closing" or otherwise advertise the Sale as a "store closing" themed sale until the commencement of the Bankruptcy Case.  Except as provided below in this section 6.1, Agent shall complete the Sale at each Store no later than September 30, 2017 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis upon not less than five (5) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date for such Store.  Agent may, in its discretion, extend the Sale Termination Date to no later than October 31, 2017 at up to fifteen (15) Stores upon not less than eight (8) days' prior written notice before the initial Sale Termination Date (an "Extension Notice") to Merchant; provided, it being understood that Agent may thereafter earlier terminate the Sale at any Store subject to an Extension Notice by delivering a Vacate Notice; provided, however, that Agent shall be obligated to pay rent for such Stores for the entire month of October regardless of any earlier Vacate Date.  For the avoidance of doubt, delivery of an Extension Notice may result in the Vacate Date at a particular Store extending beyond the effective date of any chapter 11 plan in Merchant's Bankruptcy Case, and Merchant shall obtain the requisite consent of the landlord of any such Store to the foregoing.

6.2     <u>Vacating the Store</u>.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store.

Section 7.  <u>FF&E</u>.

7.1     <u>Owned FF&E</u>.  Agent shall sell all FF&E at the Stores owned by Merchant (the "<u>Owned FF&E</u>") pursuant to a commission structure whereby Agent shall be entitled to receive a commission equal to seventeen and one-half percent (17.5%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; <u>provided</u>, <u>however</u>, that Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between the Merchant and Agent following execution of this Agreement.

7.2     <u>Abandonment of FF&E</u>.  Agent shall be authorized to abandon any and all sold and unsold Owned FF&E in place without any cost or liability to any party.

Section 8.  <u>Conduct of the Sale</u>.

8.1     <u>Rights of Agent</u>.  In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "everything must go", or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws; <u>provided</u>, <u>however</u>, that Agent shall not post signs stating "store closing" or otherwise advertise the Sale as a "store closing" themed sale until the commencement of the Bankruptcy Case.  Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "<u>Sale Guidelines</u>").  In addition to any other rights granted to Agent hereunder in conducting the Sale, Agent, in the exercise of its reasonable discretion, shall have the right:

(a)     to establish Sale prices and discounts and Store hours;

(b)     except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(c)     (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d)     to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "everything must go", or similar themed sale including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers; provided, however, that Agent shall not post signs stating "store closing" or otherwise advertise the Sale as a "store closing" themed sale until the commencement of the Bankruptcy Case; and

(e)     to transfer Merchandise between and among the Stores at Agent's expense.

8.2     Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.   Agent shall accept and honor coupons during the Sale Term, including but not limited to, Merchant's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.  Merchant shall reimburse Agent in cash for all amounts related to coupons, including, but not limited to, Merchant's membership programs as well as Merchant's employee discount terms, during each Weekly Sale Reconciliation provided for in Section 8.7.

8.3     Sales Taxes.

(a)     During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to Merchant, any taxing authority, or any other party, and Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

12

8.4     Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor.

8.5     Returns of Merchandise.  Agent shall accept returns of goods sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date.  If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its Cost Value and Retail Price, multiplied by the inverse of the then prevailing Sale discount on the date of the return.  The aggregate Cost Value of the Merchandise shall be increased by the adjusted Cost Value of any Returned Merchandise included in the Merchandise (determined in accordance with this Section 8.5).  In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during each Weekly Sale Reconciliation provided for in Section 8.7.  Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6     Gift Certificates; Membership Program.

(a)     During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7.  Agent shall not sell any Gift Certificates.

(b)     During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects an applicable Merchant Discount, then Merchant shall reimburse Agent in cash during the Weekly Sale Reconciliation for the value/differential between the applicable Merchant Discount and the then-prevailing Sale discounts being offered by Agent.

8.7     Sale Reconciliation.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, Sharing Amount, and Owned FF&E, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation"), provided, however, the first Weekly Sale Reconciliation shall not occur until the first Wednesday after commencement of the Bankruptcy Case.  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order).  During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, (i) Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to

13

the Sale (including, but not limited to, Cost Value, Retail Price, Merchandise, Expenses, and Proceeds) to review and audit such records; and (ii) the Bankruptcy Court shall retain exclusive jurisdiction, including without limitation from and after the effective date of any chapter 11 plan in Merchant's Bankruptcy Case, over any disputes that may arise hereunder.

   8.8 <u>Force Majeure</u>.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds by an amount equal to the Cost Value of such Merchandise, and Merchant shall within five business (5) days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

   8.9 <u>Right to Monitor</u>.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

   8.10 <u>Communication with Lender</u>.  Agent shall share with Lender all records, reports and other information regarding the Sale prepared by Merchant or in the possession of Agent from Merchant including any such information provided by Merchant as to the (i) amount of sales at each Store, (ii) the amount of Gross Rings at each Store, (iii) the amount and type of Merchandise remaining in each Store, and (iv) such other information as Lender may reasonably request.

   8.11 <u>Collective Bargaining Agreements; Leases</u>.  Merchant does not have any collective bargaining agreements applicable to the Stores or the Retained Employees.  Notwithstanding the foregoing, Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements or leases/occupancy agreements; except as provided for in Sections 4.1(a) and 4.1(c) herein.

   Section 9.  <u>Employee Matters</u>.

   9.1 <u>Merchant's Employees</u>.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "<u>Retained Employee</u>").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("<u>WARN Act</u>") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date.  Merchant shall not

14

transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

9.2     Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

9.3     Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4     Employee Retention Bonuses.  Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion.  Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.  Conditions Precedent and Subsequent.

(a)     The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(i)     All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)     Lender has executed this Agreement (with all Exhibits attached hereto).

(iii)     Merchant shall have commenced the Bankruptcy Case by August 28, 2017;

(iv)     The Bankruptcy Court shall have entered the Approval Order, on an interim basis by August 30, 2017, and on a final basis by October 6, 2017, or such later dates as mutually agreed upon by Merchant and the Agent (the "Approval Order Deadlines").

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(i)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)    Lender has executed this Agreement (with all Exhibits attached hereto) and has consented to the granting and perfection of Agent's security interests provided for herein and to Merchant's remittance of Proceeds to Agent hereunder.

Section 11.    <u>Representations, Warranties and Covenants</u>.

11.1    <u>Merchant's Representations, Warranties and Covenants</u>.    Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)    Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of Florida; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder, and will, subject to entry of the Approval Order, continue to have such authority from and after commencement of its Bankruptcy Case.  Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder (except from and after commencement of the Bankruptcy Case, subject to entry of the Approval Order).  Each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)    Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of all security interests, liens, claims and encumbrances of any nature (other than the security interests and liens of the Agent hereunder and Lender).  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds).

(d)    Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all

16

pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)    Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since July 26, 2017, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)    Since July 26, 2017, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the date hereof.

(g)    To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)    Throughout the Sale Term, (including without limitation during any portion thereof that extends past the effective date of any chapter 11 plan in Merchant's Bankruptcy Case), Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores and to advertise the Sale in the manner provided for in Section 8.1.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stored.  Except as otherwise restricted by the Bankruptcy Code from and after filing of the Bankruptcy Case or as provided herein and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale.

(i)    Merchant has paid, and will, subject to approval of the Bankruptcy Court, continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)    Since July 26, 2017, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)    Since July 26, 2017, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code from and after filing of the Bankruptcy Case or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the

17

Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; and (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; provided, however, that Merchant has not been replenishing certain of the Stores in the ordinary course of business since July 26, 2017 and will not replenish the Stores during the Sale Term.

(l)    Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(m)    Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(n)    To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)    On and as of the Sale Commencement Date, the level of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix set forth in the Merchandise File.

(p)    Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale.

(q)    Other than as set forth in Exhibit 11.1(q), Merchant has not since July 26, 2017, shipped any Excluded Defective Merchandise from the Distribution Centers to the Stores.  Merchant will not ship any Merchandise or Excluded Defective Merchandise from the date of this Agreement from the Distribution Centers to the Stores.

(r)    Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(s)    Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at Merchant's retail locations (other than the Stores), except as detailed on Exhibit 11.1(s).

11.2    Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)    Each entity comprising Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated

18

hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Sale shall be conducted in compliance with this Agreement, the Sale Guidelines, the Approval Order (upon entry) and Applicable General Laws (but excluding Liquidation Sale Laws).

(e)     Absent prior consent by Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

Section 12.   Insurance.

12.1   Merchant's Liability Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and Merchant shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent

contractors or agents. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2     Merchant's Casualty Insurance. Subject to approval by the Bankruptcy Court, Merchant shall provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof. From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear). In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder. Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3     Agent's Insurance. Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as an additional insured with respect to such policies. Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors). Agent shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4     Worker's Compensation Insurance. Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.     Indemnification.

13.1     Merchant's Indemnification. Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its  employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN

Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; (vi) any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term; and (vii) the gross negligence (including omissions) or willful misconduct of the Merchant, its officers, directors, employees, agents (other than Agent) or representatives.

       13.2    <u>Agent Indemnification</u>.  Agent shall indemnify and hold the Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (iv) as set forth in section 8.3 above; and (v) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

       Section 14.  <u>Defaults</u>.  The following shall constitute "<u>Events of Default</u>" hereunder:

       (a)    The Merchant or Agent shall fail to perform any material obligation hereunder (including without limitation failure to satisfy the milestones in Sections 10.1(a)(iii) and (a)(iv)) if such failure remains uncured two (2) days after receipt of written notice thereof;

       (b)    Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party;

       (c)    The filing of a motion by any party to covert the Bankruptcy Case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint a chapter 11 trustee; or

       (d)    The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) or (d) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.  If an Event of Default under (d) above occurs prior to the commencement of the Bankruptcy Case as a result of Agent being unable to have peaceful and quiet possession of the Stores and/or to advertise the Sale at the Stores in the manner provided for herein, Agent may in its discretion elect to terminate this Agreement and the parties may enter into an alternative transaction, on terms and conditions mutually agreeable to Merchant and Agent.

       Section 15.  <u>Agent's Security Interest</u>.  Merchant hereby grants to Agent a security interests in and liens upon: (i) the Merchandise; (ii) all Proceeds (including, without limitation, credit card Proceeds); (iii) the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 hereof; (iv) the commission regarding the sale or other disposition of Owned FF&E under Section 7 hereof; (v) the portion of the Sharing Amount due to Agent under Section 3.2(a) hereof; and (vi) all

"proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  The security interests and liens granted to Agent hereunder (a) may, at Agent's election, be perfected prior to commencement of the Bankruptcy Case, and in any event, shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation upon entry of the Approval Order; and (b) shall be first priority, senior security interests subject to the terms of subsection (a) of this Section 15 below.

(a)     Without any further act by or on behalf of Agent or any other party (including (without limitation) the Lender and Merchant), Agent's security interests in and liens upon the Agent Collateral created hereunder are (i) validly created, and (ii) senior to all other liens and security interests, provided, however, that (i) the security interest and lien granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests and lien of Lender in the Agent Collateral in all respects until the Initial Guaranty Payment is made to Lender, and thereafter to the extent and amount of the unpaid portion of the Guaranteed Amount and all other amounts owed by Agent to Merchant hereunder and (ii) upon payment in full of  the Guaranteed Amount, any security interest or lien of Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interests and liens of Agent in the Agent Collateral.  Merchant shall cooperate with Agent with respect to all filings (including (without limitation) UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(b)     Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any lien or encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender other than as provided for in the financing order(s) approving the financing arrangements between Merchant and Lender.

(c)      In the event of an occurrence of an Event of Default by Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)     "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

Section 16.  Sale Expense Advance and Back-up Fee Agreement.

(a)     In consideration of Agent commencing the Sale in advance of the filing of the Bankruptcy Case and entry of the Approval Order, and as a condition to Agent's obligations under this Agreement, Merchant shall pay by wire transfer to Agent a non-refundable advance of One Hundred and Seventy Thousand Dollars ($170,000) (the "Sale Expense Advance") upon execution of this Agreement, which Sale Expense Advance is estimated to be approximately the amount of Agent's initial Expenses related to advertising, signage, supervision and travel for the first two (2) weeks of the Sale.  Until entry of the final Approval Order, Merchant shall replenish the Sale Expense Advance, as and when requested by Agent, such that Agent shall always be holding an amount sufficient to cover its Expenses.  Agent may apply the Sale Expense Advance to any unpaid obligation owing by Merchant to Agent under this Agreement.

(b)     Upon entry of the final Approval Order by the Bankruptcy Court, the Sale Expense Advance shall be treated as an Expense hereunder and Agent shall reimburse Merchant for such amount as part of the Final Reconciliation.  In the event the Approval Order is not entered and this Agreement is terminated pursuant to Section 14 hereof, the Sale Expense Advance shall be deemed non-refundable and shall be retained and applied by Agent in its sole discretion.  Further, if such an event

were to occur, Merchant and Agent shall enter into a consulting agreement, on terms and conditions mutually agreeable to Merchant and Agent (subject to Bankruptcy Court approval), whereby Agent shall serve as Merchant's exclusive agent to sell the Merchandise on a fee for service basis, nunc pro tunc to the Sale Commencement Date.

Section 17.  Miscellaneous.

17.1    Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

|  |  |
|---|---|
| If to Agent: | HILCO MERCHANT RESOURCES, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attention: Ian S. Fredericks<br>Tel: (847) 418-2075<br>Fax: (847) 897-0859<br>Email: ifredericks@hilcotrading.com |
|  | GORDON BROTHERS RETAIL PARTNERS, LLC<br>Prudential Tower<br>800 Boylston Street<br>Boston, MA 02119<br>Attn:    Mackenzie Shea<br>Tel:      617.422.6519<br>Email: mshea@gordonbrothers.com |
| If to Merchant: | PERFUMANIA HOLDINGS, INC.<br>35 Sawgrass Drive, Suite 2<br>Bellport, NY 11713<br>Attention: Michael W. Katz<br>Attention: Fred Paliani<br>Email: MikeK@perfhld.com<br>Email: fpaliani@qkd.com |
|  | With a copy to: |
|  | Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036-6522<br>Attention: Lisa Laukitis<br>Tel. 212.735.3000<br>Email. lisa.laukitis@skadden.com |
| If to Lender: | Wells Fargo Bank, National Association<br>One Boston Place, 18th Floor<br>Boston, MA 02108<br>Attn: Lauren Murphy<br>E-Mail: lauren.murphy@wellsfargo.com |

23

With a copy to:

Otterbourg P.C.
230 Park Avenue
New York, NY 10169
Attn: Daniel F. Fiorillo
E-:Mail: dfiorillo@otterbourg.com

17.2    Governing Law/Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

17.3    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

17.4    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5    Currency.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

17.7    Execution in Counterparts.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

17.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

24

17.9    <u>Wiring of Funds</u>.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

17.10    <u>Nature of Remedies</u>.  Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under sections 3.1(b), 3.1(c), 3.4 and 11.1(o) shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

17.11    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

4874485.2

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____

Print Name and Title: RYAN LAWLOR
                      VP & A&C, Managing Member

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____

Print Name and Title:

**PERFUMANIA HOLDINGS, INC.**

By:_____

Print Name and Title:

**ACKNOWLEDGED AND AGREED** as to Sections 3.1(a), 3.3(b) and (c)(iii), 3.4, 8.10, 15, 16(a), and 17:

**Wells Fargo Bank, N.A.**

By: _____

Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 8.1 – Sale Guidelines
Exhibit 11.1(q)- Shipment of Merchandise and Excluded Merchandise
Exhibit 11.1(s)-Promotional Calendar

26

4873640.3

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By: _____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____
Print Name and Title: Rick Edwards, Co-President, Retail

**PERFUMANIA HOLDINGS, INC.**

By: _____
Print Name and Title:

**ACKNOWLEDGED AND AGREED as to Sections 3.1(a), 3.3(b) and (c)(iii), 3.4, 8.10, 15, 16(a), and 17:**

**Wells Fargo Bank, N.A.**

By: _____
Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 8.1 – Sale Guidelines
Exhibit 11.1(q)- Shipment of Merchandise and Excluded Merchandise
Exhibit 11.1(s)-Promotional Calendar

26

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Print Name and Title:

**PERFUMANIA HOLDINGS, INC.**

By:_____
Print Name and Title:

*MICHAEL W. KATZ*
*President + CEO*

**ACKNOWLEDGED AND AGREED as to Sections
3.1(a), 3.3(b) and (c)(iii), 3.4, 8.10, 15, 16(a), and 17:**

**Wells Fargo Bank, N.A.**

By: _____
Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 8.1 – Sale Guidelines
Exhibit 11.1(q)- Shipment of Merchandise and Excluded Merchandise
Exhibit 11.1(s)-Promotional Calendar

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Print Name and Title:

**PERFUMANIA HOLDINGS, INC.**

By:_____
Print Name and Title:

**ACKNOWLEDGED AND AGREED as to Sections 3.1(a), 3.3(b) and (c)(iii), 3.4, 8.10, 15, 16(a), and 17:**

**Wells Fargo Bank, N.A.**

By:_____
Print Name and Title: *Lauren Murphy*
                      *Vice President*

### List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 8.1 – Sale Guidelines
Exhibit 11.1(q)- Shipment of Merchandise and Excluded Merchandise
Exhibit 11.1(s)-Promotional Calendar

4873640.3

**Perfumania**
Exhibit 1

| Store List |
|---|

| Store # | Location Type | Name | Address | City | State | Zip | Landlord | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 21 | Regional | Serramonte Center | 36-A Serramonte Drive | Daly City | CA | 94015 | Equity One | 885 |
| 63 | Outlet | Kittery Premium Outlets | 345 US Route 1 | Kittery | ME | 03904 | Simon Property Group/Premium | 1,280 |
| 65 | Outlet | Lighthouse Place Premium Outlets | 909 Lighthouse Place | Michigan City | IN | 46360 | Simon Property Group/Premium | 1,427 |
| 105 | Regional | Pheasant Lane Mall | 310 Daniel Webster Hwy. | Nashua | NH | 03060 | Simon Property Group | 1,357 |
| 120 | Outlet | Calhoun Premium Outlets | 455 Belwood Road | Calhoun | GA | 30701 | Simon Property Group/Premium | 1,500 |
| 166 | Regional | Outlet Collection - Seattle | 1101 Outlet Collection Way | Auburn | WA | 98001 | WP Glimcher | 1,500 |
| 167 | Outlet | Grove City Premium Outlets | 1191 Leesburg Grove City Road | Grove City | PA | 16127 | Simon Property Group/Premium | 1,632 |
| 204 | Outlet | Williamsburg Premium Outlets | 5699 Richmond Road | Williamsburg | VA | 23188 | Simon Property Group/Premium | 1,600 |
| 209 | Outlet | Tanger Outlet Center | 36484 Seaside Outlet Drive | Rehoboth Beach | DE | 19971 | Tanger Outlet Centers | 1,200 |
| 213 | Outlet | Vero Beach Outlets | 1876 94th Drive | Vero Beach | FL | 32966 | EB Development | 1,440 |
| 250 | Outlet | The Outlets at Lake George | 1415 State Route 9 | Lake George | NY | 12845 | Sobert Realty Corp. | 1,608 |
| 275 | Outlet | Rockvale Outlets | 35 S. Willowdale Drive | Lancaster | PA | 17602 | FSH Associates LP | 1,550 |
| 300 | Outlet | Fashion Outlet of Las Vegas | 32100 Las Vegas Blvd. | Primm | NV | 89019 | Talisman Companies | 1,248 |
| 302 | Outlet | Tuscola Outlets | 400 Tuscola Boulevard | Tuscola | IL | 61953 | Avison Young | 1,200 |
| 305 | Regional | Riverchase Galleria | 2000 Riverchase Galleria | Hoover | AL | 35244 | General Growth Properties | 1,024 |
| 316 | Regional | Tucson Mall | 4500 N. Oracle Road | Tucson | AZ | 85705 | General Growth Properties | 714 |
| 321 | Regional | Plaza Carolina Mall | Avenida Fragoso Villa Fontana | Carolina | PR | 00983 | Simon Property Group | 1,265 |
| 327 | Regional | Plaza del Sol | 725 Avenida West Main | Bayamon | PR | 00961 | Developers Diversified Realty | 1,540 |
| 331 | Regional | Las Catalinas Mall | Carretera Estatal PR-52 | Caguas | PR | 00725 | Vornado Realty | 1,916 |
| 346 | Outlet | Las Americas Premium Outlets | 4125 Camino de la Plaza | San Diego | CA | 92173 | Simon Property Group/Premium | 2,000 |
| 355 | Outlet | Hagerstown Premium Outlets | 495 Premium Outlets Boulevard | Hagerstown | MD | 21740 | Simon Property Group/Premium | 1,610 |
| 360 | Outlet | The Outlets at Orange | 20 City Blvd. W. Bldg. B. | Orange | CA | 92868 | Simon Property Group/Mills | 1,400 |
| 366 | Regional | Plaza del Caribe | Ponce Bypass | Ponce | PR | 00731 | Empresas Fonalledas | 1,767 |
| 372 | Outlet | Outlets at San Clemente | 101 West Avenida Vista Hermosa | San Clemente | CA | 92672 | Craig Realty Group | 1,270 |
| 387 | Outlet | Valley River Center | 293 Valley River Center | Eugene | OR | 97401 | Macerich | 1,003 |
| 391 | Outlet | Tanger Outlet Center | 104 N. Michigan Avenue | Atlantic City | NJ | 08401 | Tanger Outlet Centers | 1,242 |
| 402 | Strip Center | Trenton Crossing | 7600 North 10th Street | McAllen | TX | 78504 | Weingarten Realty Investors | 2,200 |
| 429 | Regional | Arbor Place Mall | 6700 Douglas Boulevard | Douglasville | GA | 30135 | CBL & Associates | 932 |
| 459 | Lifestyle | Town Square | 6587 Las Vegas Boulevard | Las Vegas | NV | 89119 | Forest City Enterprises | 1,100 |
| 542 | Outlet | Opry Mills Mall | 101 Opry Mills Drive | Nashville | TN | 37214 | Simon Property Group/Mills | 1,091 |
| 549 | Outlet | Tanger Outlet Center | 4000 Arrowhead Boulevard | Mebane | NC | 27302 | Tanger Outlet Centers | 995 |
| 569 | Regional | The Oaks Mall | 222 W. Hillcrest Drive | Thousand Oaks | CA | 91360 | Macerich | 1,095 |
| 578 | Regional | Paradise Valley Mall | 4568 E. Cactus Road | Phoenix | AZ | 85032 | Macerich | 1,282 |
| 586 | Outlet | Camarillo Promenade | 540 West Ventura Boulevard | Camarillo | CA | 93010 | Simon Property Group/Premium | 2,000 |
| 587 | Regional | Westgate Mall | 7701 Interstate 40 | Amarillo | TX | 79121 | Jones Lang LaSalle | 1,115 |
| 589 | Regional | Dadeland Mall | 7335 N. Kendall Drive | Miami | FL | 33156 | Simon Property Group | 1,495 |
| 591 | Regional | Plaza West Covina | 112 Plaza Drive | West Covina | CA | 91790 | Starwood Capital Group | 1,342 |
| 595 | Outlet | Cincinnati Premium Outlets | 400 Premium Outlets Drive | Monroe | OH | 45050 | Simon Property Group/Premium | 1,171 |
| 596 | Regional | Victoria Mall | 7800 North Navarro | Victoria | TX | 77904 | Hull Storey Gibson Companies, LLC | 1,600 |
| 597 | Regional | Destiny USA | One Destiny USA Drive | Syracuse | NY | 13290 | Pyramid Company | 1,112 |
| 611 | Regional | Anchorage 5th Avenue Mall | 320 West 5th Avenue | Anchorage | AK | 99501 | Simon Property Group | 944 |
| 640 | Outlet | Desert Hills Premium Outlets | 48400 Seminole Drive | Cabazon | CA | 92230 | Simon Property Group/Premium | 1,512 |
| 641 | Outlet | Gilroy Premium Outlets | 681 Leavesley Road | Gilroy | CA | 95020 | Simon Property Group/Premium | 1,600 |
| 642 | Outlet | Columbia Gorge Outlets | 450 NW 257th Way | Troutdale | OR | 97060 | Woodmont Company | 2,667 |
| 667 | Regional | Plaza Carolina Mall | Avenida Fragoso Villa Fontana | Carolina | PR | 00983 | Simon Property Group | 912 |
| 670 | Regional | Chandler Fashion Center | 3111 W Chandler Boulevard | Chandler | AZ | 85226 | Macerich | 969 |
| 676 | Street | Yacht Haven Grande | 5316 Yacht Haven Grande | St. Thomas | USVI | 00802 | Yacht Haven USVI LLC | 1,773 |
| 681 | Regional | Westfield Palm Desert | 72840 Highway 111 | Palm Desert | CA | 92260 | Westfield Corporation | 1,305 |
| 689 | Regional | Florida Mall III | 8001 S. Orange Blossom Trail | Orlando | FL | 32809 | Simon Property Group | 1,045 |
| 696 | Strip Center | Plaza Isabela | PR 2 & PR 4494 | Isabela | PR | 00662 | Developers Diversified Realty | 1,300 |
| 749 | Regional | Plaza Rio Hondo | Hwy. 22 & Rt. 167 | Bayamon | PR | 00961 | Developers Diversified Realty | 1,445 |

**Perfumania**
Exhibit 1

| Store List |
|---|

| Store # | Location Type | Name | Address | City | State | Zip | Landlord | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 758 | Outlet | Tanger Outlet Center | 4840 Tanger Outlet Boulevard | N. Charleston | SC | 29418 | Tanger Outlet Centers | 1,344 |
| 763 | Outlet | Fashion Outlets of Niagara | 1951 Fashion Outlet Boulevard | Niagara Falls | NY | 14304 | Macerich | 1,327 |
| 764 | Outlet | Twin Cities Premium Outlets | 3925 Eagan Outlets Parkway | Eagan | MN | 55122 | Simon Property Group/Premium | 1,160 |
| 765 | Regional | Westfield San Francisco Centre | 865 Market Street | San Francisco | CA | 94103 | Westfield Corporation | 1,510 |
| 766 | Outlet | The Outlet Shoppes of Bluegrass | 1155 Buck Creek Road | Simpsonville | KY | 40067 | Horizon Group Properties | 1,100 |
| 767 | Outlet | Downtown Summerlin | 2025 Festival Plaza Drive, Suite 120 | Las Vegas | NV | 89135 | The Howard Hughes Corporation | 904 |
| 768 | Lifestyle | Station Park | 910 West Forbush Place | Farmington | UT | 84025 | Centercal Properties | 1,435 |
| 771 | Outlet | Gloucester Premium Outlets | 100 Premium Outlets Drive | Blackwood | NJ | 08012 | Simon Property Group/Premium | 1,182 |
| 772 | Outlet | Tanger Outlet Center | 400 South Wilson Road | Sunbury | OH | 43074 | Tanger Outlet Centers | 1,200 |
| 774 | Outlet | Tanger Outlet Center | 350 84th Street SW | Byron Center | MI | 49315 | Tanger Outlet Centers | 1,034 |
| 776 | Outlet | Albertville Premium Outlets | 6415 Labeaux Ave NE | Albertville | MN | 55301 | Simon Property Group/Premium | 1,600 |
| 781 | Regional | Ala Moana Center | 1450 Ala Moana Boulevard | Honolulu | HI | 96814 | General Growth Properties | 906 |
| 787 | Outlet | Tucson Premium Outlets | 6401 West Marana Center Boulevard | Tucson | AZ | 85742 | Simon Property Group/Premium | 1,185 |
| 789 | Regional | Chula Vista Center | 555 Broadway | Chula Vista | CA | 91910 | Rouse Properties | 1,198 |
| **65** | | | | | | | *Average Sq. Ft.* | **1,343** |

**Perfumania**
**Exhibit 3.1(b)**

| Merchandise Threshold Schedule | | |
| --- | --- | --- |
| Cost Value | Adjustment Points | Adjusted Guaranty |
| 4,950,000 | 0.42% | 64.30% |
| 4,925,000 | 0.42% | 64.72% |
| 4,900,000 | 0.42% | 65.14% |
| 4,875,000 | 0.40% | 65.56% |
| 4,850,000 | 0.40% | 65.96% |
| 4,825,000 | 0.40% | 66.36% |
| 4,800,000 | 0.40% | 66.76% |
| 4,775,000 | 0.38% | 67.16% |
| 4,750,000 | 0.38% | 67.54% |
| 4,725,000 | 0.38% | 67.92% |
| 4,700,000 | | 68.30% |
| 4,500,000 | | 68.30% |
| 4,475,000 | 0.33% | 67.97% |
| 4,450,000 | 0.33% | 67.64% |
| 4,425,000 | 0.33% | 67.31% |
| 4,400,000 | 0.35% | 66.96% |
| 4,375,000 | 0.35% | 66.61% |
| 4,350,000 | 0.35% | 66.26% |
| 4,325,000 | 0.37% | 65.89% |
| 4,300,000 | 0.37% | 65.52% |
| 4,275,000 | 0.37% | 65.15% |
| 4,250,000 | 0.37% | 64.78% |

Note(s):
1. Adjustments between the increments shall be on a prorata basis.
2. In the event that the Cost value of the Merchandise is greater than $4,950,000, each $25,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.46%.

3. In the event that the Cost value of the Merchandise is less than $4,250,000, each $25,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.41%.

**Perfumania**
**Exhibit 3.1(c)**

| Cost Factor | | |
|---|---|---|
| **Cost Factor** | **Adjustment Points** | **Adjusted Guaranty** |
| **29.60%** | | **68.30%** |
| 29.65% | 0.30% | 68.00% |
| 29.70% | 0.25% | 67.75% |
| 29.75% | 0.25% | 67.50% |
| 29.80% | 0.25% | 67.25% |
| 29.85% | 0.25% | 67.00% |
| 29.90% | 0.25% | 66.75% |
| 29.95% | 0.25% | 66.50% |
| 30.00% | 0.25% | 66.25% |
| 30.05% | 0.25% | 66.00% |
| 30.10% | 0.25% | 65.75% |

Notes:
1. Adjustments between the increments shall be on a prorata basis.
2. In the event that the Cost Factor of Merchandise is greater than 30.10%, each 0.05% (or pro rata portion thereof) increment shall decrease the Guaranty by 0.26%.

## **FORM OF AGENT LETTER OF CREDIT**

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2017

Irrevocable Standby Letter of Credit Number: _____

ADVISING BANK:
WELLS FARGO BANK, N.A
ATTN: SBLC DEPARTMENT
401 N. RESEARCH PKWY, MAC D4004-017
WINSTON-SALEM, NC  27101
PNBPUS33SLC

BENEFICIARY:    _____
_____
_____
_____

Credit No.:  _____

Gentlemen:

BY ORDER OF:    _____

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of _____ ,with a principal place of business located at _____ (the "Applicant") for a sum or sums not exceeding a total of _____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS, [SWIFT Information to be provided by Issuing Bank] on December 31, 2018, or such earlier date on which the Beneficiary shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by an officer of _____ (the "Beneficiary").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the Beneficiary in the form attached as **Exhibit B**.

If a drawing is received by _____ at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiary, as directed below, in immediately available funds on the next Business Day.  If however, a drawing is received by _____ after 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms with the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiary in immediately available funds on the second succeeding Business Day. We hereby acknowledge that OUR obligations arising under this Letter of Credit shall not be affected by the filing of a petition for relief under the United States Bankruptcy Code by Perfumania Holdings, Inc. or any of its subsidiaries in any manner whatsoever.

As used in this Letter of Credit, "Business Day" shall mean any day other than Saturday, Sunday or a day on which banking institutions in _____ are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause, "Drawn under Letter of Credit No. _____, dated _____, 20[   ] of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the International Standby Practices (ISP98), I.C.C. Publication No. 590.

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned issuing bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,

Authorized official

## EXHIBIT A

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:    Drawing for Amounts Due to:

_____

_____

_____

_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "Letter of Credit"). Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officer of _____, in their capacity as Beneficiary of the Letter of Credit hereby certifies to you that:

    (i)    The amount to be drawn is $_____ (the "Amount Owing").

    (ii)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof.

    (iii)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

    (iv)    In accordance with the terms of the Letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account:

[_____]

[_____]

[_____]

Further Credit to: [Account Title]

[Account No. _____]

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this _____ day of _____, 20[  ].

        By: _____

        Name: _____

        Title: _____

## **EXHIBIT B**

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:    Reduction of Face Amount

_____

_____

_____

_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "Letter of Credit"). Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officer of _____, in their capacity as Beneficiary of the Letter of Credit hereby confirms to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this \_\_\_\_\_ day of _____, 20[  ].

By: _____

Name: _____

Title: _____

**Perfumania**

**Exhibit 4.1 (c)**

**Occupancy**

| Store # | Store Name | Per Diem | | | | | | | | | | | | | | | Total Occupancy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | RENT STORES | OTHER RENT STORES | COMMON AREA MAINTENANC | ALARM | ELECTRICITY | EQUIPMENT LEASES | FILING FEES & LICENSES | GUARD SERVICES | INSURANCES | INVENTORY EQUIPMENT EXPENSE | PROPERTY TAXES | REAL ESTATE TAXES | REPAIRS & MAINTENANCE | TELEPHONE | UTILITIES | |
| 21 | Serramonte Center | 211 | 5 | 57 | 1 | 13 | - | 3 | - | 12 | 0 | 7 | 17 | 11 | 15 | 4 | 357 |
| 63 | Kittery Premium Outlets | 228 | - | 51 | 1 | 15 | - | 0 | - | 8 | 0 | 1 | 15 | 8 | 11 | 9 | 348 |
| 65 | Lighthouse Place Premium Outlets | 334 | 6 | 48 | 1 | 10 | - | - | - | 8 | 1 | 2 | 20 | 5 | 12 | 8 | 456 |
| 105 | Pheasant Lane Mall | 203 | - | 116 | 1 | 21 | - | - | - | 8 | 1 | - | 50 | 3 | 13 | 8 | 425 |
| 120 | Calhoun Premium Outlets | 197 | - | 52 | 1 | 20 | - | 1 | - | 10 | 0 | 3 | 2 | 16 | 20 | 3 | 325 |
| 166 | Outlet Collection - Seattle | 194 | 7 | 75 | 1 | 17 | - | 7 | - | 11 | 0 | 0 | 7 | 4 | 13 | 4 | 342 |
| 167 | Grove City Premium Outlets | 291 | - | 60 | 1 | 13 | - | - | - | 11 | 0 | - | 18 | 11 | 15 | 7 | 428 |
| 204 | Williamsburg Premium Outlets | 285 | - | 66 | 1 | 8 | - | 2 | - | 10 | 0 | 1 | 10 | 4 | 13 | 8 | 408 |
| 209 | Tanger Outlet Center | 220 | 21 | 47 | 1 | 10 | - | 1 | - | 8 | 0 | - | 2 | 6 | 15 | 4 | 336 |
| 213 | Vero Beach Outlets | 85 | - | 36 | 1 | 9 | - | 0 | - | 8 | 0 | - | - | 5 | 13 | 3 | 161 |
| 250 | The Outlets at Lake George | 154 | 6 | 34 | 1 | 33 | - | - | - | 14 | 0 | - | 9 | 6 | 12 | 4 | 274 |
| 275 | Rockvale Outlets | 110 | - | 35 | 1 | 14 | - | - | - | 8 | 0 | - | - | 9 | 11 | 2 | 193 |
| 300 | Fashion Outlet of Las Vegas | 257 | - | 67 | 1 | 17 | - | 1 | 6 | 8 | 0 | 0 | 5 | 3 | 14 | 4 | 384 |
| 302 | Tuscola Outlets | 69 | - | - | 1 | 8 | - | - | - | 8 | 1 | - | - | 5 | 20 | 3 | 115 |
| 305 | Riverchase Galleria | 200 | - | 133 | 1 | 39 | - | 1 | - | 8 | 2 | 1 | - | 10 | 10 | 8 | 415 |
| 316 | Tucson Mall | 133 | 5 | 52 | 1 | 24 | - | 1 | - | 8 | 0 | 5 | 7 | 6 | 12 | 3 | 256 |
| 321 | Plaza Carolina Mall | 465 | - | 149 | 1 | 21 | - | - | - | 19 | 0 | - | 18 | 7 | 29 | 7 | 715 |
| 327 | Plaza del Sol | 424 | - | 101 | 1 | 19 | - | - | - | 26 | 0 | - | 10 | 6 | 29 | 10 | 627 |
| 331 | Las Catalinas Mall | 743 | - | 126 | 1 | 28 | - | 0 | 6 | 19 | 0 | - | 10 | 11 | 32 | 0 | 975 |
| 346 | Las Americas Premium Outlets | 209 | - | 49 | 1 | 22 | - | 1 | - | 8 | 0 | 3 | 33 | 14 | 18 | 5 | 364 |
| 355 | Hagerstown Premium Outlets | 238 | - | 55 | 1 | 10 | - | 1 | - | 10 | 0 | 1 | 15 | 5 | 12 | 1 | 350 |
| 360 | The Outlets at Orange | 398 | 28 | 95 | 1 | - | - | - | - | 8 | 1 | 4 | 11 | 11 | 15 | 4 | 578 |
| 366 | Plaza del Caribe | 571 | - | 116 | 1 | 54 | - | 8 | 4 | 27 | 0 | - | 18 | 8 | 42 | 8 | 858 |
| 372 | Outlets at San Clemente | 222 | - | 49 | 1 | 4 | - | 1 | - | 15 | 0 | 2 | 19 | 8 | 12 | 2 | 332 |
| 387 | Valley River Center | 201 | - | 55 | 1 | 8 | - | - | - | 8 | 0 | 1 | 30 | 7 | 12 | 2 | 326 |
| 391 | Tanger Outlet Center | 206 | 7 | 63 | 1 | 26 | - | 1 | 32 | 8 | 0 | - | - | 18 | 14 | 2 | 378 |
| 402 | Trenton Crossing | 164 | 2 | 10 | 1 | 11 | - | 0 | - | 8 | 0 | 6 | 17 | 7 | 8 | 3 | 239 |
| 429 | Arbor Place Mall | 190 | 9 | - | 1 | 20 | - | 2 | - | 8 | 0 | 1 | - | 19 | 18 | 5 | 280 |
| 459 | Town Square | 185 | - | - | 1 | 16 | - | 1 | - | 8 | 0 | 1 | - | 11 | 12 | 5 | 240 |
| 542 | Opry Mills Mall | 216 | - | 76 | 1 | 4 | - | 2 | - | 8 | 1 | 1 | 18 | 11 | 14 | 4 | 356 |
| 549 | Tanger Outlet Center | 98 | - | 37 | 1 | 10 | - | - | - | 8 | 0 | 4 | 4 | 16 | 14 | 2 | 194 |
| 569 | The Oaks Mall | 303 | - | 93 | 1 | 11 | - | 1 | - | 8 | 0 | 5 | 33 | 11 | 12 | 5 | 483 |
| 578 | Paradise Valley Mall | 180 | 9 | 40 | 1 | 46 | - | 0 | - | 8 | 0 | 3 | 21 | 2 | 12 | 3 | 325 |
| 586 | Camarillo Promenade | 508 | - | 90 | 1 | 15 | - | 1 | - | 8 | 0 | 2 | 26 | 13 | 13 | 11 | 692 |
| 587 | Westgate Mall | 110 | - | 48 | 1 | 9 | - | - | - | 8 | 0 | 10 | 17 | 8 | 13 | 0 | 224 |
| 589 | Dadeland Mall | 495 | - | 222 | 1 | 15 | - | 1 | 3 | 8 | 0 | - | 76 | 18 | 13 | 6 | 858 |
| 591 | Plaza West Covina | 192 | 4 | - | 1 | - | - | - | - | 8 | 0 | 2 | 27 | 21 | 12 | 4 | 272 |
| 595 | Cincinnati Premium Outlets | 196 | - | 49 | 1 | 10 | - | 3 | - | 8 | 0 | - | 11 | 5 | 21 | 5 | 311 |
| 596 | Victoria Mall | 126 | - | 7 | 1 | 18 | - | 0 | - | 8 | 2 | 8 | 8 | 5 | 13 | 9 | 206 |
| 597 | Destiny USA | 127 | - | 91 | 1 | 14 | - | 0 | - | 12 | 0 | - | 137 | 2 | 13 | 7 | 404 |
| 611 | Anchorage 5th Avenue Mall | 182 | - | 72 | 1 | 13 | - | 0 | - | 8 | 1 | 3 | 8 | 11 | 12 | 2 | 314 |
| 640 | Desert Hills Premium Outlets | 763 | - | 78 | 1 | 12 | - | 1 | - | 8 | 0 | 6 | 22 | 13 | 36 | 7 | 948 |
| 641 | Gilroy Premium Outlets | 432 | - | 59 | 1 | 14 | - | 3 | - | 8 | 0 | 5 | 21 | 12 | 34 | 8 | 599 |
| 642 | Columbia Gorge Outlets | 232 | - | 93 | 1 | 11 | - | 0 | - | 8 | 0 | 2 | 18 | 10 | 15 | 4 | 396 |
| 667 | Plaza Carolina Mall | 462 | - | 80 | 1 | 16 | - | - | - | 19 | 0 | - | 11 | 8 | 28 | 7 | 633 |
| 670 | Chandler Fashion Center | 218 | - | 64 | 1 | 18 | - | 0 | - | 8 | 0 | - | 23 | 0 | 12 | 2 | 346 |
| 676 | Yacht Haven Grande | 211 | - | 0 | 1 | 33 | - | 82 | 13 | 8 | 1 | - | - | 13 | 9 | 2 | 373 |
| 681 | Westfield Palm Desert | 122 | - | 129 | 1 | 20 | - | 1 | - | 8 | 0 | 4 | 43 | 3 | 13 | 7 | 352 |
| 689 | Florida Mall III | 381 | 12 | 120 | 1 | 9 | - | 0 | 16 | 8 | 0 | 2 | 26 | 13 | 17 | 5 | 611 |
| 696 | Plaza Isabela | 176 | - | 42 | 1 | 34 | - | - | 4 | 22 | 0 | - | 4 | 8 | 46 | 9 | 347 |
| 749 | Plaza Rio Hondo | 274 | 9 | 83 | 1 | 17 | - | - | 6 | 26 | 0 | - | - | 7 | 27 | 9 | 467 |
| 758 | Tanger Outlet Center | 141 | 1 | 54 | 1 | 13 | - | 1 | - | 8 | 0 | 3 | 19 | 19 | 7 | 4 | 272 |
| 763 | Fashion Outlets of Niagara | 277 | - | 61 | 3 | 9 | - | - | - | 8 | 1 | - | 27 | 9 | 14 | 3 | 411 |
| 764 | Twin Cities Premium Outlets | 218 | 7 | 45 | 1 | 13 | - | - | 3 | 10 | 0 | - | 31 | 15 | 11 | 5 | 361 |
| 765 | Westfield San Francisco Centre | - | - | 267 | 1 | 28 | - | 1 | 6 | 8 | 2 | 4 | 101 | 20 | 20 | 14 | 473 |
| 766 | The Outlet Shoppes of Bluegrass | 145 | 12 | 34 | 1 | 7 | - | - | - | 11 | 1 | 6 | 5 | 6 | 11 | 6 | 245 |
| 767 | Downtown Summerlin | 208 | 9 | 45 | 1 | - | - | 1 | - | 8 | 0 | 2 | 10 | 14 | 12 | 6 | 318 |
| 768 | Station Park | 119 | - | 62 | 1 | 7 | - | - | - | 8 | 0 | 3 | 22 | 6 | 11 | 9 | 249 |
| 771 | Gloucester Premium Outlets | 199 | 14 | 43 | 1 | 28 | - | 0 | - | 8 | 1 | - | - | 11 | 16 | 13 | 336 |
| 772 | Tanger Outlet Center | 185 | 42 | 40 | 1 | 10 | - | 1 | 9 | 8 | 1 | - | 15 | 10 | 8 | 4 | 335 |
| 772 | Tanger Outlet Center | 125 | 13 | 37 | 1 | 5 | - | - | - | 8 | 0 | - | - | 13 | 17 | 5 | 233 |
| 776 | Albertville Premium Outlets | 230 | 14 | 56 | 1 | 10 | - | - | - | 8 | 1 | - | 25 | 8 | 12 | 7 | 373 |
| 781 | Ala Moana Center | 342 | 24 | 195 | 1 | 51 | - | 0 | - | 8 | 0 | - | 35 | 15 | 13 | 4 | 688 |
| 787 | Tucson Premium Outlets | 222 | 11 | 48 | 1 | 19 | - | 0 | - | 8 | 0 | 5 | 9 | 8 | 16 | 8 | 357 |
| - | Chula Vista Center | 87 | - | 50 | 1 | 11 | - | - | 1 | 8 | 0 | - | 4 | 14 | 5 | 5 | 162 |
| **65** | **Total** | 15,889 | 277 | 4,406 | 75 | 1,085 | - | 136 | 107 | 674 | 40 | 132 | 1,225 | 605 | 1,044 | 343 | 26,038 |
| | **Per Week** | 111,221 | 1,940 | 30,840 | 524 | 7,595 | - | 955 | 750 | 4,715 | 281 | 925 | 8,572 | 4,237 | 7,310 | 2,402 | 182,268 |
| | **Per Store Week** | 1,711 | 30 | 474 | 8 | 117 | - | 15 | 12 | 73 | 4 | 14 | 132 | 65 | 112 | 37 | 2,804 |

# SALE GUIDELINES

A.      The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.      On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.      At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 7 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.      . The Merchant and the Agent may advertise the Sale as a "store closing" "sale on everything", "everything must go", or similar themed sale.

F.      Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.      Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.      The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.      The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores. The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

L.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.  Agent shall have no responsibility therefor.

M.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

N.      If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

If to the Merchant:

Lisa Laukitis
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522
Attention: Lisa Laukitis
Tel. 212.735.3000
Email. lisa.laukitis@skadden.com

If to the Agent:

Douglas D. Herrmann, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
T. 302.777.6552
E. herrmannd@pepperlaw.com

| STORE 781 | | | | |
|---|---|---|---|---|
| SKU | DESCRIPTION | RETAIL | COST | UNITS SENT |
| 146888 | G.ARMANI ARMANI CODE W EDP/S S.TESTER | $  0.01 | $   0.01 | 1 |
| 147725 | BURBERRY THE BEAT W EDP/S S.TESTER | $  0.01 | $  11.38 | 1 |
| 150587 | E.LAUDER BEAUTIFUL W EDP/S S.TESTER | $  0.01 | $   0.01 | 1 |
| 190594 | BVLGARI OMNIA AMETHYSTE W EDT/S S.TESTER | $  0.01 | $    - | 1 |
| 191331 | LANCOME MIRACLE W EDP/S S.TESTER | $  0.01 | $   0.01 | 1 |
| 192910 | G.ARMANI ACQUA DI GIOIA W EDP/S S.TESTER | $  0.01 | $   0.01 | 1 |
| 199503 | S.FERRAGAMO INCANTO AMITY W EDT/S S.TESTER | $  0.01 | $   4.93 | 1 |
| 200409 | R.COPENHAGEN 1775 RIVAL M EDT/S S.TESTER | $  0.01 | $   5.76 | 1 |
| 200600 | REALM INTENSE W EDT/S S.TESTER | $  0.01 | $   4.50 | 1 |
| 200693 | SOFIA VERGARA W EDP/S S.TESTER | $  0.01 | $   5.00 | 1 |
| 202185 | P.HILTON GOLD RUSH W EDP/S S.TESTER | $  0.01 | $   3.79 | 1 |
| 202290 | R.COPENHAGEN 1775 IMPERIAL M EDT/S S.TESTER | $  0.01 | $   5.70 | 1 |
| 200411 | R.COPENHAGEN 1775 VALOR M EDT/S S.TESTER | $  0.01 | $   6.29 | 1 |
| 193396 | GUCCI FLORA W EDT/S S.TESTER | $  0.01 | $    - | 1 |
| 158723 | MICHAEL KORS W EDP/S S.TESTER | $  0.01 | $   0.45 | 1 |
| 190730 | LANCOME TRESOR W EDP/S S.TESTER | $  0.01 | $    - | 1 |
| 194900 | P.RABANNE LADY MILLION W EDP/S S.TESTER | $  0.01 | $    - | 1 |
| 202898 | RIHANNA RIRI KISS COSMETIC BAG GWP | $ 25.00 | $   2.50 | 6 |

| STORE 640 | | | | |
|---|---|---|---|---|
| SKU | DESCRIPTION | RETAIL | COST | UNITS SENT |
| 202508 | JAY-Z GOLD M TRAVEL BAG SPRING 2016 GWP | $ 25.00 | $   5.00 | 6 |
| 203314 | P.HILTON ROSE RUSH W BACKPACK GWP | $ 75.00 | $   4.50 | 12 |
| 203279 | PARIS HILTON BLING CLUTCH GWP | $ 50.00 | $   2.40 | 6 |
| 201966 | WORLD OF POLO M 2016 DUFFLE BAG GWP | $ 50.00 | $    - | 6 |
| 201308 | J.CHOO MAN M EDT/S S.TESTER | $  0.01 | $  12.00 | 1 |
| 203002 | Y.S.LAURENT MON PARIS W EDP/S S.TESTER | $  0.01 | $    - | 1 |
| 193396 | GUCCI FLORA W EDT/S S.TESTER | $  0.01 | $    - | 1 |
| 200954 | S.JOHN 3AM M EDT/S S.TESTER | $  0.01 | $   4.57 | 1 |
| 202399 | S.VERGARA TEMPTING W EDP/S S.TESTER | $  0.01 | $   5.00 | 1 |
| 200300 | M.JACOBS DAISY DREAM W EDT/S S.TESTER | $  0.01 | $    - | 1 |
| 201445 | S.FERRAGAMO SIGNORINA W EDT/S S.TESTER | $  0.01 | $   7.49 | 1 |
| 201490 | D&G INTENSO M EDP/S S.TESTER | $  0.01 | $    - | 1 |
| 194609 | GUCCI GUILTY W EDT/S S.TESTER | $  0.01 | $    - | 1 |
| 197269 | GUCCI BY GUCCI M EDT/S S.TESTER | $  0.01 | $    - | 1 |
| 202178 | T.BAHAMA MARITIME M EDC/S S.TESTER | $  0.01 | $   5.62 | 1 |
| 145456 | HANAE MORI M EDT/P/S S.TESTER | $  0.01 | $   0.01 | 1 |
| 202163 | V.CAMUTO CAPRI W EDP/S S.TESTER | $  0.01 | $   5.86 | 1 |
| 147604 | Y.S.LAURENT L'HOMME M EDT/S S.TESTER | $  0.01 | $   0.03 | 1 |
| 191892 | H.BOSS BOSS #6 M EDT/S S.TESTER | $  0.01 | $    - | 1 |
| 193366 | BURBERRY SPORT W EDT/S S.TESTER | $  0.01 | $   6.71 | 1 |
| 198350 | GUCCI GUILTY BLACK W EDT/S S.TESTER | $  0.01 | $    - | 1 |
| 200692 | S.VERGARA LOVE W EDP/S S.TESTER | $  0.01 | $   6.90 | 1 |

**Exhibit 11.1(s) Promotional Calendar**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                        :    Chapter 11
:
MODEL REORG ACQUISITION, LLC, et al.,      :    Case No. 17-11794 (___)
:
Debtors.[1]                             :    (Joint Administration Pending)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    **Related Doc. No. __**

### INTERIM ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 365, AND 554 AND BANKRUPTCY RULES 6003 AND 6004 (I) AUTHORIZING THE DEBTORS TO ASSUME THE AGENCY AGREEMENT; (II) AUTHORIZING THE DEBTORS TO SELL CERTAIN ASSETS THROUGH STORE CLOSING SALES; (III) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING BUSINESS LOCATIONS; (IV) WAIVING COMPLIANCE WITH CONTRACTUAL STORE CLOSING SALE RESTRICTIONS; (V) AUTHORIZING THE DEBTORS TO ABANDON CERTAIN UNSOLD PROPERTY; AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for Interim and Final Orders, pursuant to sections 105, 363, 365, and 554 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving the Debtors' assumption of the agency agreement, dated as of August 26, 2017, (the "Agency Agreement"), by and between Perfumania Holdings, Inc. and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Perfumania Holdings, Inc. (7964); Perfumania, Inc. (6340); Magnifique Parfumes and Cosmetics, Inc. (6420); Ten Kesef II, Inc. (1253); Perfumania.com, Inc. (4688); Model Reorg Acquisition, LLC (0318); Northern Group, Inc. (3226); Perfumania Puerto Rico, Inc. (6787); Quality King Fragrance, Inc. (4939); Scents of Worth, Inc. (1732); Jacavi, LLC (6863); Distribution Concepts, LLC (8845); Flowing Velvet, Inc. (7294); Aladdin Fragrances, Inc. (4338); Niche Marketing Group, Inc. (1943); Northern Brands, Inc. (7186); Northern Amenities, Ltd. (5387); Global Duty Free Supply, Inc. (2686); and Perfumers Art, Inc. (6616). The address of the Debtors' corporate headquarters is 35 Sawgrass Drive, Suite 2, Bellport, New York 11713.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or Agency Agreement.

Brothers Retail Partners, LLC (together, the "Agent")[3], a copy of which is attached hereto as

Exhibit A; (ii) authorizing the Debtors to conduct store closing sales (collectively, the "Sale" or

"Store Closing Sales") at the locations subject to the Agency Agreement (the "Stores" or

"Closing Locations")[4] in accordance with the terms of the sale guidelines (the "Sale

Guidelines"),[5] with such sales to be free and clear of all Encumbrances (as defined below); (iii)

authorizing, but not directing, the Debtors to pay customary retention bonuses to the store-level

and certain field employees at the Stores; (iv) waiving compliance with contractual store closing

sale restrictions (the "Contractual Restrictions") and laws restricting store closing sales (the

"Applicable Law Restrictions"); (v) authorizing the Debtors to abandon unsold property

consisting of certain furniture, fixtures and equipment (the "FF&E") located at the Closing

Locations; and (vi) granting certain related relief, on an interim basis (collectively, the "Store

Closing Relief"); and upon the Declarations; and due and sufficient notice of the Motion having

been given under the particular circumstances; and it appearing that no other or further notice

need be provided; and it appearing that the relief requested by the Motion is in the best interests

of the Debtors, their estates, their creditors, their stakeholders, and other parties in interest; and

after due deliberation thereon, and sufficient cause appearing therefor, it is hereby

## FOUND, CONCLUDED AND DETERMINED that:[6]

---

[3]  This proposed Interim Order remains subject to further review and comment in all respects by the Agent and the DIP Lender.

[4]  A list of Closing Locations is attached to the Agency Agreement as Exhibit 1.

[5]  The Sale Guidelines are attached to the Interim Order and Final Order as Exhibit 2 and to the Agency Agreement as Exhibit 8.1.

[6]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A.    **Business Judgment.**  The Debtors' decision to (i) enter into the Agency Agreement, and (ii) perform under and make payments required by the Agency Agreement, is a reasonable exercise of the Debtors' sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

B.    **Arms-length Sales.**  The consideration to be paid by the Agent under the Agency Agreement was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the Store Closure Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the laws of the United States, any state, territory, possession thereof or the District of Columbia.  The terms and conditions set forth in the Agency Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtor or its creditors under any applicable laws.

C.    **Good faith.**  The Debtors, their management and their board of directors, and the Agent, its members and its officers, directors, employees, agents and representatives, actively participated in the bidding process and acted in good faith.  The Agency Agreement between the Agent and the Debtors was negotiated and entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.  The Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.  The Debtors were free to deal with any other party interested in buying or selling on behalf of the Debtors' estate some or all of the Store Closure Assets.  Neither the Debtors nor the Agent has engaged in any conduct that would cause or permit the Sales, the Agency Agreement, or any

related action or the transactions contemplated thereby to be avoided under section 363(n) of the

Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the

Bankruptcy Code. The Agent has not violated section 363(n) of the Bankruptcy Code by any

action or inaction. The Agent's prospective performance and payment of amounts owing under

the Agency Agreement are in good faith and for valid business purposes and uses.

        D. **Time is of the Essence.** Time is of the essence in effectuating the Agency

Agreement and continuing with the Sales contemplated therein without interruption. The

conduct of the Sales will provide an efficient means for the Debtors to dispose of the Store

Closure Assets. The Sales under the Agency Agreement must be permitted to continue to

maximize the value that the Agent may realize from the Sales and the value that the Debtors may

realize from assuming into the Agency Agreement. Accordingly, the relief set forth herein is

necessary to avoid immediate and irreparable harm to the Debtors and their estates and the

Debtors have demonstrated good, sufficient, and sound business purposes and justifications for

the relief approved herein.

        E. **Insider Status.** The Agent is not an "insider" as that term is defined in

section 101(31) of the Bankruptcy Code. No common identity of directors or controlling

stockholders exists between the Agent and the Debtors.

        F. **Sales Free and Clear.** A sale of the Store Closure Assets other than one

free and clear of liens, claims, encumbrances, defenses (including, without limitation, rights of

setoff and recoupment) and interests, including, without limitation, security interests of whatever

kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust,

hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits,

licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or

domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances") and without the protections of this Order would hinder the Debtors' ability to obtain the consideration provided for in the Agency Agreement and, thus, would impact materially and adversely the value that the Debtors' estates would be able to obtain for the sale of such Store Closure Assets.  But for the protections afforded to the Agent under the Bankruptcy Code and this Order, the Agent would not have offered to pay the consideration contemplated in the Agency Agreement.  In addition, each entity with an Encumbrance upon the Store Closure Assets, (i) has consented to the Sales or is deemed to have consented to the Sales, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Therefore, approval of the Agency Agreement and the consummation of the Sales free and clear of

Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, their creditors and other parties in interest.

       G.    **No Successor Liability.**  No sale, transfer or other disposition of the Store Closure Assets pursuant to the Agency Agreement or entry into the Agency Agreement will subject the Agent to any liability for claims, obligations or Encumbrances asserted against the Debtors or the Debtors' interests in such Store Closure Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories.  The Agent is not a successor to the Debtors or their respective estates.

       H.    **Personally Identifiable Information.**  The transactions contemplated by the Agency Agreement do not include the sale or lease of personally identifiable information, as defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information").

       I.    **Security Interests.**  The liens provided for in the Agency Agreement and this Order to secure the obligations of the Debtors under the Agency Agreement to the Agent are necessary to induce the Agent to agree to terms for the Agency Agreement that maximize value for the Debtors' estates.  The absence of such protections would impact materially and adversely the value available to the Debtors in the liquidation of their stores in partnership with a liquidation agent.  But for the protections afforded to the Agent under the Bankruptcy Code, this Order, and the Agency Agreement, the Agent would not have agreed to pay the Debtors the compensation provided for under the Agency Agreement.  In addition, the DIP Lenders and Prepetition Lenders, which hold a security interest in the property to which the Agent's security

interests attach, have consented to the security interests provided for in the Agency Agreement, subject to the satisfaction of the conditions set forth in the Agency Agreement and this Order.

    J.  **Best Interest.** The Sales are in the best interest of the Debtors' estates. The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby.

**ORDERED, ADJUDGED AND DECREED THAT:**

    1.  The Motion is GRANTED to the extent set forth herein on an interim basis.

    2.  The Final Hearing, if necessary, on the Motion is scheduled for _____, 2017 at _____ (prevailing Eastern time), and any objections or responses to the Motion (each, an "Objection") shall be filed and served upon the Notice Parties so that the Objection is actually received by 4:00 p.m. (prevailing Eastern time) on _____, 2017.

    3.  If no Objections are filed to the Motion, the Court may enter the Final Order without further notice or hearing.

    4.  The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Interim Order.  The failure to include specifically any particular provision of the Agency Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agency Agreement and all of its provisions, payments and transactions, be authorized and hereby approved as and to the extent provided for in this Interim Order.

    5.  To the extent of any conflict between this Interim Order, the Sales Guidelines, and the Agency Agreement, the terms of this Interim Order shall control over all other documents, and the Sales Guidelines shall control over the Agency Agreement.

7

6.      The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

7.      The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

8.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

## A.      Effectiveness of Agreement

9.      The Agency Agreement, a copy of which is attached to this Interim Order as Exhibit 1, is operative and effective on an interim basis during the Interim Period.  The Debtors are authorized to act and perform in accordance with the terms of the Agency Agreement, including, making payments required by the Agency Agreement to the Agent without the need for any application of the Agent or a further order of the Court.

10.     Subject to the restrictions set forth in this Interim Order and the Sales Guidelines, the Debtors and the Agent hereby are authorized to take any and all actions as may be necessary or desirable to implement the Agency Agreement and the Sales; and each of the transactions contemplated by the Agency Agreement, and any actions taken by the Debtors and the Agent necessary or desirable to implement the Agency Agreement and/or the Sales prior to the date of this Interim Order, hereby are approved and ratified.

## B.      Authority To Engage In Sales

11.     The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct the Sales at the Stores in accordance with this Interim Order, the Sales Guidelines, and the Agency Agreement.

12.     The Sales Guidelines are approved in their entirety on an interim basis.

13.     The Debtors are authorized to discontinue operations at the Stores in accordance with this Interim Order, the Sales Guidelines, and the Agency Agreement.

14.     All entities that are presently in possession of some or all of the Store Closure Assets in which the Debtors hold an interest that are or may be subject to the Agency Agreement or this Interim Order hereby are directed to surrender possession of such Store Closure Assets to the Debtors or the Agent.

15.     Subject to the provisions herein in paragraphs 21, 22, 24, and 36, neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)), landlord, or licensor, to conduct the Sales and to take the related actions authorized herein.

**C.     Order Binding**

16.     This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Store Closure Assets.

17.     This Order and the terms and provisions of the Agency Agreement shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, the Agent, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting an interest in the Store Closure Assets, notwithstanding

9

any subsequent appointment of any trustee, party, entity or other fiduciary under any section of

the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or

other fiduciary, such terms and provisions likewise shall be binding.  The provisions of this

Order and the terms and provisions of the Agency Agreement, and any actions taken pursuant

hereto or thereto shall survive the entry of any order which may be entered confirming or

consummating any plan(s) of the Debtors or converting the Debtors' cases from chapter 11 to

chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and

interests granted pursuant to this Order and the Agency Agreement, shall continue in these or any

superseding cases and shall be binding upon the Debtors, the Agent and their respective

successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as

a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any

trustee appointed in this case shall be and hereby is authorized to operate the business of the

Debtors to the fullest extent necessary to permit compliance with the terms of this Order and the

Agency Agreement, and Agent and the trustee shall be and hereby are authorized to perform

under the Agency Agreement upon the appointment of the trustee without the need for further

order of this Court.

**D.    Conduct Of The Sales**

18.    Except as otherwise provided in the Agency Agreement, pursuant to

section 363(f) of the Bankruptcy Code, the Agent shall be authorized to sell all the Store Closure

Assets to be sold pursuant to the Agency Agreement free and clear of any and all Encumbrances,

including, without limitation, the liens and security interests, as the same may have been

amended from time to time, of the DIP Agent and the DIP Lenders whether arising by agreement,

any statute or otherwise and whether arising before, on or after the date on which these chapter

11 cases were commenced, with any presently existing liens encumbering all or any portion of

the Store Closure Assets or the Proceeds thereof (including, but not limited to, the first-priority security interest of the DIP Agent and the DIP Lenders) attaching only to the Guaranteed Amount and, subject to the Agent's liens granted pursuant to the Agency Agreement and this Order, other amounts payable to the Debtors under the Agency Agreement, with the same validity, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist.  For the sake of clarity, however, nothing in this paragraph is intended to diminish the liens in favor of the Agent, as reflected in the Agency Agreement and this Order, that attach to, among other things, the Proceeds of the Sales.

19.     If any person or entity that has filed financing statements, mortgages, construction or mechanic's liens, lis pendens or other documents or agreement evidencing liens on or interests in the Store Closure Assets shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of any Encumbrances which the person or entity has with respect to the Store Closure Assets, each such person or entity is hereby directed to deliver all such statements, instruments and releases and the Debtors and the Agent are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity asserting the same and the Agent is authorized to file a copy of this Order which, upon filing, shall be conclusive evidence of the release and termination of such interest.  Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Sales and related transactions.

20.     Unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sales may be advertised and all landlords and licensors, as

applicable, of the Stores are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Agent to conduct the Sales and the sale of Store Closure Assets pursuant to the Agency Agreement, including, without limitation, to conduct and advertise the sale of the Store Closure Assets in the manner contemplated by and in accordance with this Interim Order, the Sales Guidelines, and the Agency Agreement.

21.     Nothing in this Interim Order or the Agency Agreement releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order or in the Agency Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation.  Moreover, the sale of the Store Closure Assets shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Interim Order shall alter or affect the Debtors' and Agent's obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Interim Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the Agent's right to assert in that

forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise, pursuant to paragraph 36 hereunder.  Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

22.    Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Interim Order, during the Interim Period, the Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the sale without necessity of further order of this Court as provided in the Agency Agreement or the Sales Guidelines, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area), use of signwalkers and street signage.

23.    Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Store Closure Assets, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtors and the Agent are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these

provisions.  Such hearing will, to the extent practicable, be scheduled initially no later than the

earlier of (i) the Final Hearing or (ii) within two (2) business days of such request.  This

scheduling shall not be deemed to preclude additional hearings for the presentation of evidence

or arguments as necessary.

24.     Except as expressly provided in the Agency Agreement, the sale of the

Store Closure Assets shall be conducted by the Debtors and the Agent notwithstanding any

restrictive provision of any lease, sublease, short-term license, or other agreement relative to

occupancy affecting or purporting to restrict the conduct of the Sales, the rejection of leases or

licenses, abandonment of assets, or "going dark" provisions.  The Agent, along with landlords

and licensors, as applicable, of the Stores are authorized to enter into agreements ("Side Letters")

between themselves modifying the Sales Guidelines without further order of the Court, and such

Side Letters shall be binding as among the Agent and any such landlords or licensors, as

applicable, of the Stores, provided that nothing in such Side Letters affects the provisions of

paragraphs 22, 23 and 35 of this Interim Order.  In the event of any conflict between the Sales

Guidelines and any Side Letter, the terms of such Side Letter shall control.

25.     Except as expressly provided for herein or in the Sales Guidelines, and

except with respect to any Governmental Unit (as to which paragraphs 21, 23, 24 and 35 of this

Interim Order shall apply), no person or entity, including, but not limited to, any landlord,

licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly

prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of

Merchandise or FF&E, or the advertising and promotion (including the posting of signs and

exterior banners or the use of signwalkers) of such sales, and all such parties and persons of

every nature and description, including, but  not limited to, any landlord, licensor, service

14

providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Sales and/or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords or licensors, as applicable, at the Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Store Closure Assets or other liquidation sales at the Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

26.    In accordance with and subject to the terms and conditions of the Agency Agreement, the Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sales Guidelines and this Interim Order and subject to paragraphs 21, 23, 24, and 35 of this Interim Order.

27.    The Agent shall accept the Debtors' validly-issued Gift Cards (as defined in the Customer Programs Motion[7]) that were issued by the Debtors prior to the applicable Sales Commencement Date (as defined in the Agency Agreement) in accordance with the Debtors' Gift Card policies and procedures as they existed on the Petition Date, as described in the Customer Programs Motion, and accept returns of merchandise sold by the Debtors prior to the applicable Sales Commencement Date, provided that such return is otherwise in compliance with the

---

[7]    As used herein, the "Customer Programs Motion" shall mean the Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105(a) And 363(a) And Bankruptcy Rules 6003 And 6004 Authorizing The Debtors To (I) Maintain Customer Programs And (II) Honor Or Pay Related Prepetition Obligations, filed concurrently herewith.

Refund and Exchange Program (as defined in the Customer Programs Motion) as they existed on the Petition Date, as described in the Customer Programs Motion.

28.    All sales of Store Closure Assets shall be "as is" and final.  However all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales." Further, the Debtors and/or the Agent shall accept return of any goods purchased during the Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.

29.    Except as expressly provided for in the Agency Agreement, nothing in this Order or the Agency Agreement, and none of the Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of the Debtors' obligations relating to any of the Debtors' employees.  Moreover, the Agent shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

30.    The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor

or any other party, other than the applicable Governmental Unit for which the sales taxes are

collected.  The Agent shall collect, remit to the Debtors and account for sales taxes as and to the

extent provided in the Agency Agreement.  This Interim Order does not enjoin, suspend or

restrain the assessment, levy or collection of any tax under state law, and does not constitute a

declaratory judgment with respect to any party's liability for taxes under state law.

31.    The Debtors and/or the Agent (as the case may be) are authorized and

empowered to transfer Store Closure Assets among the Stores.

32.    Nothing in this Order shall (a) alter or affect the Debtors' obligations to

comply with section 365(d)(3) of the Bankruptcy Code or (b) alter or modify the rights of any

lessor or other counterparty to a lease with the Debtors to file an appropriate motion or otherwise

seek appropriate relief if the Debtor fails to comply with section 365(d)(3) of the Bankruptcy

Code; provided that the conduct of the Sale in accordance with the Sale Guidelines, as may have

been modified by Side Letter, shall not be a violation of section 365(d)(3) of the Bankruptcy

Code.

33.    Pursuant to section 554(a) of the Bankruptcy Code, the Debtors and the

Agent, as applicable, are permitted to abandon property of the Debtors' estates in accordance

with the terms and provisions of the Agency Agreement, without incurring liability to any person

or entity; provided, however, that, unless the Agent otherwise consents, the Debtors may only

abandon property located in any Store on or after the applicable Sales Termination Date.  In the

event of any such abandonment, following the rejection of the lease for the affected Store, all

applicable landlords shall be authorized to dispose of such property without any liability to any

individual or entity that may claim an interest in such abandoned property.

34.    Before any sale, abandonment or other disposition of the Debtors'

computers (including software) and/or cash registers and any other point of sale FF&E located at the Stores (collectively, "POS Equipment") that may contain customer lists, Personally Identifiable Information, and/or confidential information about the Debtors' employees and/or customers, or credit card numbers ("Confidential Information") takes effect, the Debtors shall remove or cause to be removed the Confidential Information from the POS Equipment.

35.    During the Sales Term, the Agent shall be granted a limited license and right to use the trade names, logos and customer, mailing and e-mail lists, websites and social media relating to and used in connection with the operation of the stores as identified in the Agency Agreement, solely for the purpose of advertising the Sales in accordance with the terms of the Agency Agreement; provided, however, that the Agent shall not receive Personally Identifiable Information from the Debtors.

**E.    Dispute Resolution Procedures With Governmental Units**

36.    To the extent that the sale of the Store Closure Assets is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "GOB Law," and collectively, the "GOB Laws"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of assets during the Interim Period (collectively, with the GOB Laws, the "Liquidation Sales Laws"), the dispute resolution procedures in this section shall apply.

37.    Provided that the Sales is conducted in accordance with the terms of this Order, the Agency Agreement and the Sales Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors

shall be presumed to be in compliance with any Liquidation Sales Laws and, subject to

paragraphs 21, 23, 24, and 35 herein, are authorized to conduct the Sales in accordance with the

terms of this Interim Order and the Sales Guidelines without the necessity of further showing

compliance with any such Liquidation Sales Laws.

38.    Within three (3) business days of entry of this Interim Order, the Debtors

shall serve copies of this Interim Order, the Agency Agreement and the Sales Guidelines via e-

mail, facsimile or regular mail, on: (a) the U.S. Trustee; (b) the holders of the 20 largest

unsecured claims against the Debtors (on a consolidated basis); (c) Otterbourg, counsel to the

agent for the Debtors' Senior Credit Facility; (d) Wells Fargo Bank, National Association, as

agent for the Debtors' Senior Credit Facility; (e) the landlords for each of the Stores; (f) all

known parties asserting a security interest or lien in the Store Closure Assets; (g) the chief legal

counsel for the local jurisdiction; (h) all applicable county and state consumer protection

agencies; (i) all applicable state attorneys general; and (j) any such other party entitled to notice

pursuant to Local Bankruptcy Rule 9013-1(m).

39.    To the extent that between the Petition Date and the date of the Final

Hearing there is a dispute arising from or relating to the Sales, this Interim Order, the Agency

Agreement, or the Sales Guidelines, which dispute relates to any Liquidation Sales Laws (a

"Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute

which such Reserved Dispute will be heard at the Final Hearing, absent a party obtaining

expedited relief.  Nothing in this Interim Order shall constitute a ruling with respect to any issues

to be raised with respect to a Reserved Dispute.   Any Governmental Unit may assert a Reserved

Dispute and shall send a notice (the "Dispute Notice") explaining the nature of the dispute to: (i)

Skadden Arps Slate Meagher & Flom LLP, Four Times Square, New York, NY 10036 (Attn:

Lisa Laukitis), lisa.laukitis@skadden.com; and (ii) Skadden Arps Slate Meagher & Flom LLP, 500 Boylston St., Boston, MA 02116 (Attn: Greg Milmoe & Raquelle Kaye), greg.milmoe@skadden.com and raquelle.kaye@skadden.com; and (ii) counsel to the Agent, Pepper Hamilton LLP, 1313 N. Market Street, Suite 5100, Wilmington, DE 19801 (Attn: Doug Herrmann, herrmannd@pepperlaw.com).  Such notice shall be promptly delivered by the Debtors to the affected landlord, and to the extent known, such landlord's counsel of record.

40.      If the Debtors, the Agent and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Sales pursuant to this Order and the Agency Agreement, absent further order of this Court.  The Court grants authority for the Debtors and the Agent to conduct the Sales pursuant to the terms of this Order, the Agency Agreement, and/or the GOB Sales Guidelines attached hereto and to take all actions reasonably related thereto or arising in connection therewith.

**F.      Liens Grant to Agent**

41.      Debtors grant to Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth in the Agency Agreement) in the Agent Collateral.  Upon entry of this Order and payment of the Initial Guaranty Payment to the DIP Agent, the security interest granted to the Agent in the Agent Collateral shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

42.      Without any further act by or on behalf of the Agent or any other party (including, without limitation, Debtors, the DIP Agent, and the DIP Lenders), the Agent's

security interests and liens in the Agent Collateral are (i) validly created, (ii) effective upon entry of this Order, perfected, and (iii) senior to all other liens and security interests, provided, however, that (x) until the DIP Agent receives payment in full of the Guaranteed Amount, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of the DIP Agent and the DIP Lenders in the Agent Collateral, but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, and (y) upon payment in full of the Guaranteed Amount, any security interest or lien of the DIP Agent and the DIP Lenders in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral.  Debtors shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under the Agreement.

**G.    Store Closing Bonuses**

43.    On an interim basis and pending the Final Hearing, the Debtors shall have the authority, but not the obligation, to pay store closing bonuses (the "Store Closing Bonuses") to store-level and certain field employees who remain in the employ of the Debtors during the Sales.  The Agent shall have the authority to determine the individual amounts of each Store Closing Bonus, except that the total aggregate cost of the Store Closing Bonus program will not exceed 10% of the base payroll, including taxes and typical benefits, for all employees working at the Stores.

**H.    Section 363(m)**

44.    Entry into the Agency Agreement is undertaken by the parties thereto in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this

Order is reversed or modified on appeal.  The reversal or modification on appeal of the authorization provided herein to enter into the Agency Agreement and consummate the transactions contemplated thereby shall not affect the validity of such transactions, unless such authorization is duly stayed pending such appeal.  The Agent is entitled to all of the benefits and protections afforded by sections 363(m) and 364(e) of the Bankruptcy Code.  The transactions contemplated by the Agency Agreement are not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

## I.    Other Provisions

45.    Nothing in this Interim Order or the Motion shall be deemed to constitute postpetition assumption or adoption of any agreement under Bankruptcy Code section 365.

46.    The Agency Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, provided that the DIP Lenders, the Prepetition Agent and the Prepetition Lenders consent, which consent shall not be unreasonably withheld or delayed.

47.    Nothing contained in any plan confirmed in these Chapter 11 Cases or any order of this Court confirming such plan or in any other order in these Chapter 11 Cases (including any order entered after any conversion of this case to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agency Agreement or the terms of this Order.

48.    The Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agency Agreement.  The Agent shall have no successor liability whatsoever with respect to any Encumbrances or claims of any nature that may exist against the Debtors, including, without limitation, the Agent shall not be, or to be deemed to be: (i) a successor in

22

interest or within the meaning of any law, including any revenue, successor liability, pension, labor, ERISA, bulk-transfer, products liability, tax or environmental law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories; or (ii) a joint employer, co-employer or successor employer with the Debtors, and the Agent shall have no obligation to pay the Debtors' wages, bonuses, severance pay, vacation pay, WARN act claims (if any), benefits or any other payments to employees of the Debtors, including pursuant to any collective bargaining agreement, employee pension plan, or otherwise, except as expressly set forth in the Agency Agreement.

49.     Except with respect to any Governmental Unit (as to which the provisions of paragraphs 21, 23, 24, and 35 of this Interim Order shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes arising from or relating to the implementation, interpretation, or enforcement of this Interim Order or the Agency Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords, the licensors and/or the Agent for protection from interference with the Sales, (iii) any other disputes related to the Sales, and (iv) to protect the Debtors and/or the Agent against any assertions of Encumbrances. No such parties or person shall take any action against the Debtors, the Agent, the landlords, the licensors, or the Sales until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: Wilmington, Delaware

           _____, 2017

                                        _____

                                        UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT 1**

**Agency Agreement**

## AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of August 25, 2017, by and between Perfumania Holdings, Inc. ("Merchant") and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent").

Section 1.  Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's sixty-five (65) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") by means of a "store closing", "sale on everything", "everything must go", or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E (as defined below) in the Stores.

WHEREAS, Merchant is contemplating filing a chapter 11 case in the United States Bankruptcy Court for the District of Delaware (such case, the "Bankruptcy Case" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agrees as follows:

Section 2.  Appointment of Agent/Approval Order.

(a)    Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.  As soon as practical upon the filing of the Bankruptcy Case, and in any event, no later than the earlier of (i) the date of filing of Merchant's "first day" pleadings or (ii) two (2) days after commencement of the Bankruptcy Case, Merchant agrees to seek entry of an interim and final order from the Bankruptcy Court assuming this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement, the form of which shall be reasonably acceptable to the Merchant and the Agent (the "Approval Order").  During the pendency of the Chapter 11 Cases, Merchant's performance under this Agreement shall be subject in all respects to the Approval Order.

(b)    The Approval Order shall provide, in a form reasonably satisfactory to Merchant and Agent, *inter alia,* that: (i) this Agreement is in the best interest of the Merchant, Merchant's estate, creditors, and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) subject to Agent's payment of the Initial Guaranty Payment (as defined below) and delivery of the Letter of Credit (as defined below), Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds (as defined below) thereof attaching only to the Guaranteed Amount (as defined below) and other amounts to be received by Merchant under this Agreement; (v) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale as a "store closing", "sale on everything", "everything must go", or similar themed sale,

in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, e-mail lists, customer lists, e-commerce sites (including (without limitation) websites and social media sites such as Facebook, and Twitter) relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, conducting and advertising the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) subject to Agent having satisfied its payment obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in the Bankruptcy Case pursuant to section 364(c) of Title 11, United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") senior to all other superpriority claims, other than the superpriority claims of the Lender (as defined below); (xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 15 hereof (without the necessity of filing financing statements to perfect the security interests); (xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and in proceeding with the Sale at the Stores uninterrupted and that Merchant would suffer immediate and irreparable harm if this Agreement were not assumed on an interim basis pursuant to Bankruptcy Rule 6003; (xv) the Bankruptcy Court finds that Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of Merchant, its estate, its creditors, and other parties in interest and any transfers by Merchant to Agent prior to the commencement of the Bankruptcy Case (including without limitation of any Proceeds hereunder) are not subject to avoidance and the Sale Expense Advance (as defined below) shall be replenished by Merchant as provided for in Section 16 below; (xvi) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvii) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amount under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is released of any liability for its actions taken pursuant to this Agreement pre-petition and is entitled the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xviii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

   (c)  The Approval Order shall further provide that Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed

2

by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and the Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.    Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Subject to (i) Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement, and (ii) entry of the Approval Order in compliance with the Approval Order Deadlines (as defined below) and in the form and substance required by Section 2 hereof, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive sixty-eight and three tenths percent (68.3%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. Agent shall pay to Lender, for application against the obligations owing by Merchant to Lender, the Guaranteed Amount and the Sharing Amount (as defined below) due to Merchant (if any) in the manner and at the times specified in Section 3.3. The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by Gross Rings during the Sale Term and any other adjustments to Cost Value as expressly contemplated by this Agreement.

(b)    The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being not less than Four Million Five Hundred Thousand Dollars ($4,500,000) and not more than Four Million Seven Hundred Thousand Dollars ($4,700,000) (the "Merchandise Threshold") as of the Sale Commencement Date. To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

(c)    The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale, such percentage being twenty nine and six-tenths percent (29.6%) (the "Cost Factor Threshold"). To the extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

(d)    The adjustments to the Guaranty Percentage contemplated by Sections 3.1(b) and 3.1(c) shall be independent and cumulative.

3.2    Compensation to Agent, Sharing:

(a)    After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses (as defined below), all remaining Proceeds (as defined below) shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to five percent (5.0%) of the aggregate Cost Value of the Merchandise ("Agent's Fee"); and THEREAFTER: fifty percent (50.0%) to Agent and fifty percent (50.0%) to Merchant ("Sharing Amount").

4874485.2

(b)    To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances, and Agent shall use commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise. Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo. The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3    Proceeds; Time of Payments; Control of Proceeds.

(a)    For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement, in each case during the Sale Term and exclusive of Sales Taxes, (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term, and (c) any and all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt, proceeds from the sale of Owned FF&E shall not be "Proceeds".

(b)    On the second business day following the entry of the final Approval Order (the "Payment Date"), Agent shall pay to Lender, for application against the obligations owing by Merchant to Lender in accordance with the financing arrangements, an amount equal to seventy percent (70.0%) of the estimated Guaranteed Amount of the Cost Value of Merchandise calculated based on Gross Rings from the Sale Commencement Date through the date immediately preceding the Payment Date (the "Initial Guaranty Payment"), less any amounts previously paid on account thereof pursuant to section 3.3(c)(iv) below, by wire transfer to an account designated in writing by Merchant and approved by Lender ("Merchant's Account"). The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to Merchant's Account on or before the Final Reconciliation (as defined below). To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation.

(c)    All Proceeds shall be controlled by Agent in the manner provided for below:

(i)    [Intentionally Omitted].

(ii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(iii)    All Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository account designated by, and owned and in the name of, Merchant for the Stores

and subject to the control of Lender, which account shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Account").  The Designated Deposit Account shall be a cash collateral account, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such account being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a security interest in the Designated Deposit Account and all Proceeds in such account from and after the Sale Commencement Date.  Merchant shall obtain Lender's agreement to consent to the granting of such security interests to Agent (and Agent's perfection thereof) and to subordinate its security interest in such account and Proceeds subject to the terms contained in Section 15.  If requested by Agent following the payment by Agent of the Initial Guaranty Payment in accordance with the terms hereunder, the account shall be subject to an agreement between and among Agent, Merchant and the subject bank, providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of Merchant (a "Control Agreement").  Lender shall impose a reserve, on a weekly basis, upon Merchant's availability under its borrowing base in the amount of the funds in the Designated Deposit Account until the Payment Date, after which time, such reserve may be released by Lender.

(iv)    The funds in the Designated Deposit Account shall be disbursed as follows: first to reimburse Merchant for any Expenses paid by Merchant, second to repay the Initial Guaranty Amount, third to any other Expenses, and fourth, to Agent in accordance with the terms of this Agreement.  From and after payment in full of the Initial Guaranty Amount, on each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Account (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Account without any offset or netting of Expenses or other amounts that may be due to Merchant.  Agent shall notify Merchant and Wells Fargo Bank, N.A. ("Lender") of any shortfall in such payment within ten (10) days of Agent's knowledge of such shortfall, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall.  For the avoidance of doubt, Merchant shall remit into the Designated Deposit Account any credit card Proceeds no later than one (1) business day after receipt

(d)    In the event that Agent funds or pays all or any portion of Merchant's obligations under this Agreement, if such funding or payment cannot be recovered by Agent under Section 3.3(e) below by means of an offset, and, as a result of such funding or payment, Merchant (or Lender) received more value than Merchant would have otherwise received under this Agreement had Agent not funded or paid such obligations, Merchant shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's request.

(e)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)    In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis, which shall

5

be reconciled and paid upon the first Weekly Reconciliation to occur after commencement of the Bankruptcy Case.

3.4    Security.  In order to secure Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the earlier of (i) two (2) days immediately following the date of entry of the Approval Order on an interim basis and (ii) close of business on September 1, 2017, Agent shall furnish to Lender, as Merchant's designee, an irrevocable standby Letter of Credit naming Lender as sole beneficiary ("Beneficiary") in the aggregate original face amount equal to the sum of: (a) thirty percent (30.0%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of Exhibit 3.4 hereof (the "Letter of Credit").  The Letter of Credit shall have an expiry date of no earlier than seventy five (75) days after the Sale Termination Date.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Beneficiary shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If the Beneficiary fail to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then the Beneficiary shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, the Beneficiary may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute.

Section 4.  Expenses of the Sale.

4.1    Expenses.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)    actual payroll with respect to all Retained Employees (as defined below) used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term, as well as payroll for any temporary labor engaged for the Sale;

(b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits (as defined below)) for Retained Employees used in the Sale, in an amount not to exceed eighteen percent (18.0%) of the base payroll for each Retained Employee in the Stores (the "Payroll Benefits Cap");

(c)    the actual Occupancy Expenses categorized on Exhibit 4.1(c)  in all cases limited on a per Store, per category, and per diem basis not to exceed the respective categories and amounts shown on Exhibit 4.1(c);

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)     credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(g)     bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)     costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(i)     all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)     Store cash theft and other store cash shortfalls in the registers;

(k)     all costs and expenses associated with Agent's on-site supervision of the Stores, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)     postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)     Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(n)     Agent's reasonable and documented out-of-pocket costs and expenses associated with this Agreement, the Sale, or the transactions contemplated by this Agreement, including, but not limited to, reasonable and documented legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale;

(o)     third party payroll processing expenses associated with the Sale;

(p)     costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of Section 8.1(e); and

(q)     the actual reasonable and documented costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)     "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email

preparation and distribution, information technology and e-commerce site updates and maintenance, and accounting (collectively, "Central Services").

(ii)    "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)    "Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(iv)    "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant.

(v)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses; (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or Merchant's warehouse/distribution centers (collectively, the "Distribution Centers"), including (without limitation) the Distribution Center Expenses (as defined below); and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2    Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts, subject to entry of the final Approval Order, if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (i.e. Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation (as defined below); provided, however, (i) until commencement of daily wire transfers to Agent from the Designated Deposit Account as provided in Section 3.3(c)(iv) above and entry of the final Approval Order, Agent shall not be required to pay or reimburse Merchant for any Expenses and instead Proceeds may be used to pay such Expenses in accordance with the waterfall set forth therein; and (ii) in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

4.3    Distribution Center Expenses

4874485.2

All costs and expenses of operating the Distribution Centers, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations (the "Distribution Center Expenses") shall remain the sole obligation of Merchant.

Section 5.  Gross Rings; Merchandise.

5.1     Gross Rings.

At each Store, during the Sale Term, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store.  For the avoidance of doubt, Register receipts refers to the accounting of sales at the register and not receipts presented to customers at the time of sale.  Register receipts shall show for each item sold the Cost Value and Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of one hundred and one percent (101.0%) of the aggregate Cost Value of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2     Merchandise Subject to This Agreement.

(a)     For purposes of this Agreement, "Merchandise" shall mean all (i) new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date and included as Merchandise subject to Gross Rings, and (ii) Defective Merchandise (as defined below).  "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise (as defined below); (4) Merchant's Consignment Goods (as defined below); and (5) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property (collectively, "FF&E") or improvements to real property; provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below.

(b)     As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course.  Examples of Defective Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), out of season, missing pieces, mismatched, mismated, parts, items typically sold as a set which are incomplete.

"Excluded Defective Merchandise" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Cost Value; (ii) obsolete or discontinued goods or goods that have been marked out of stock or have received a similar designation; or (iii) promotional items, including, without limitation, gifts with purchase, store testers, vials, and loyalty program reward refills, or similar items; and (iv) non-merchandise styles, including, without limitation, coupons such as Shutterfly photobook coupons.

"Merchandise File" shall mean Merchant's "1.1_1.5 Inventory by SKU 8.16.17.xlsx" file

5.3     Valuation.

(a)     For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (i) the average cost of such item as reflected in the Merchandise File and (ii) the Retail Price.

(b)     For purposes of this Agreement, "Retail Price" shall mean with respect to each item of Merchandise, the lower of the lowest ticketed, marked, shelf, stickered, hang-tag, Merchandise File, point of sale, or other file price as reflected in Merchant's books and records for such item.

(c)     Notwithstanding the provisions of Section 5.3(a), with respect to each item of Defective Merchandise, the parties shall mutually agree upon the Cost Value (and if Agent and Merchant are unable to mutually agree on the Cost Value of any one or more items of Defective Merchandise, such items shall be deemed Excluded Defective Merchandise).

5.4     Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods").  Agent shall retain fifteen (15.0%) of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive eighty-five (85.0%) of the receipts (net of Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell goods not included as Merchandise or Merchant and Agent are unable to agree upon prices, then all such items will be removed by Merchant from the Stores at Merchant's expense as soon as practicable.  Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1     Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on August 25, 2017 (the "Sale Commencement Date"); provided, however, that Agent shall not post signs stating "store closing" or otherwise advertise the Sale as a "store closing" themed sale until the commencement of the Bankruptcy Case.  Except as provided below in this section 6.1, Agent shall complete the Sale at each Store no later than September 30, 2017 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis upon not less than five (5) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date for such Store.  Agent may, in its discretion, extend the Sale Termination Date to no later than October 31, 2017 at up to fifteen (15) Stores upon not less than eight (8) days' prior written notice before the initial Sale Termination Date (an "Extension Notice") to Merchant; provided, it being understood that Agent may thereafter earlier terminate the Sale at any Store subject to an Extension Notice by delivering a Vacate Notice; provided, however, that Agent shall be obligated to pay rent for such Stores for the entire month of October regardless of any earlier Vacate Date.  For the avoidance of doubt, delivery of an Extension Notice may result in the Vacate Date at a particular Store extending beyond the effective date of any chapter 11 plan in Merchant's Bankruptcy Case, and Merchant shall obtain the requisite consent of the landlord of any such Store to the foregoing.

6.2    <u>Vacating the Store</u>.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store.

Section 7.  <u>FF&E</u>.

7.1    <u>Owned FF&E</u>.  Agent shall sell all FF&E at the Stores owned by Merchant (the "<u>Owned FF&E</u>") pursuant to a commission structure whereby Agent shall be entitled to receive a commission equal to seventeen and one-half percent (17.5%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; <u>provided</u>, <u>however</u>, that Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between the Merchant and Agent following execution of this Agreement.

7.2    <u>Abandonment of FF&E</u>.  Agent shall be authorized to abandon any and all sold and unsold Owned FF&E in place without any cost or liability to any party.

Section 8.  <u>Conduct of the Sale</u>.

8.1    <u>Rights of Agent</u>.  In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "everything must go", or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws; <u>provided</u>, <u>however</u>, that Agent shall not post signs stating "store closing" or otherwise advertise the Sale as a "store closing" themed sale until the commencement of the Bankruptcy Case.  Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "<u>Sale Guidelines</u>").  In addition to any other rights granted to Agent hereunder in conducting the Sale, Agent, in the exercise of its reasonable discretion, shall have the right:

(a)    to establish Sale prices and discounts and Store hours;

(b)    except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(c)    (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

11

(d)    to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "everything must go", or similar themed sale including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers; provided, however, that Agent shall not post signs stating "store closing" or otherwise advertise the Sale as a "store closing" themed sale until the commencement of the Bankruptcy Case; and

(e)    to transfer Merchandise between and among the Stores at Agent's expense.

8.2    Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.   Agent shall accept and honor coupons during the Sale Term, including but not limited to, Merchant's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.  Merchant shall reimburse Agent in cash for all amounts related to coupons, including, but not limited to, Merchant's membership programs as well as Merchant's employee discount terms, during each Weekly Sale Reconciliation provided for in Section 8.7.

8.3    Sales Taxes.

(a)    During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account.  Merchant shall be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to Merchant, any taxing authority, or any other party, and Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor.

8.5     Returns of Merchandise.  Agent shall accept returns of goods sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date.  If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its Cost Value and Retail Price, multiplied by the inverse of the then prevailing Sale discount on the date of the return.  The aggregate Cost Value of the Merchandise shall be increased by the adjusted Cost Value of any Returned Merchandise included in the Merchandise (determined in accordance with this Section 8.5).  In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during each Weekly Sale Reconciliation provided for in Section 8.7.  Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6     Gift Certificates; Membership Program.

(a)     During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7.  Agent shall not sell any Gift Certificates.

(b)     During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects an applicable Merchant Discount, then Merchant shall reimburse Agent in cash during the Weekly Sale Reconciliation for the value/differential between the applicable Merchant Discount and the then-prevailing Sale discounts being offered by Agent.

8.7     Sale Reconciliation.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, Sharing Amount, and Owned FF&E, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation"), provided, however, the first Weekly Sale Reconciliation shall not occur until the first Wednesday after commencement of the Bankruptcy Case.  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order).  During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, (i) Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to

13

the Sale (including, but not limited to, Cost Value, Retail Price, Merchandise, Expenses, and Proceeds) to review and audit such records; and (ii) the Bankruptcy Court shall retain exclusive jurisdiction, including without limitation from and after the effective date of any chapter 11 plan in Merchant's Bankruptcy Case, over any disputes that may arise hereunder.

8.8    Force Majeure.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds by an amount equal to the Cost Value of such Merchandise, and Merchant shall within five business (5) days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.9    Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10    Communication with Lender.  Agent shall share with Lender all records, reports and other information regarding the Sale prepared by Merchant or in the possession of Agent from Merchant including any such information provided by Merchant as to the (i) amount of sales at each Store, (ii) the amount of Gross Rings at each Store, (iii) the amount and type of Merchandise remaining in each Store, and (iv) such other information as Lender may reasonably request.

8.11    Collective Bargaining Agreements; Leases.  Merchant does not have any collective bargaining agreements applicable to the Stores or the Retained Employees.  Notwithstanding the foregoing, Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements or leases/occupancy agreements; except as provided for in Sections 4.1(a) and 4.1(c) herein.

Section 9.  Employee Matters.

9.1    Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date.  Merchant shall not

14

transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

        9.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

        9.3    Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

        9.4    Employee Retention Bonuses.  Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion.  Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

        Section 10.  Conditions Precedent and Subsequent.

        (a)    The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

        (i)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

        (ii)    Lender has executed this Agreement (with all Exhibits attached hereto).

        (iii)    Merchant shall have commenced the Bankruptcy Case by August 28, 2017;

        (iv)    The Bankruptcy Court shall have entered the Approval Order, on an interim basis by August 30, 2017, and on a final basis by October 6, 2017, or such later dates as mutually agreed upon by Merchant and the Agent (the "Approval Order Deadlines").

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(i)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)    Lender has executed this Agreement (with all Exhibits attached hereto) and has consented to the granting and perfection of Agent's security interests provided for herein and to Merchant's remittance of Proceeds to Agent hereunder.

Section 11.    Representations, Warranties and Covenants.

11.1    Merchant's Representations, Warranties and Covenants.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)    Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of Florida; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder, and will, subject to entry of the Approval Order, continue to have such authority from and after commencement of its Bankruptcy Case.  Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder (except from and after commencement of the Bankruptcy Case, subject to entry of the Approval Order).  Each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)    Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of all security interests, liens, claims and encumbrances of any nature (other than the security interests and liens of the Agent hereunder and Lender).  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds).

(d)    Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all

16

pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since July 26, 2017, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     Since July 26, 2017, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the date hereof.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Throughout the Sale Term, (including without limitation during any portion thereof that extends past the effective date of any chapter 11 plan in Merchant's Bankruptcy Case), Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores and to advertise the Sale in the manner provided for in Section 8.1.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stored.  Except as otherwise restricted by the Bankruptcy Code from and after filing of the Bankruptcy Case or as provided herein and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale.

(i)     Merchant has paid, and will, subject to approval of the Bankruptcy Court, continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Since July 26, 2017, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)     Since July 26, 2017, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code from and after filing of the Bankruptcy Case or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the

17

Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; and (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; provided, however, that Merchant has not been replenishing certain of the Stores in the ordinary course of business since July 26, 2017 and will not replenish the Stores during the Sale Term.

(l)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(m)     Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(n)     To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)     On and as of the Sale Commencement Date, the level of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix set forth in the Merchandise File.

(p)     Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale.

(q)     Other than as set forth in Exhibit 11.1(q), Merchant has not since July 26, 2017, shipped any Excluded Defective Merchandise from the Distribution Centers to the Stores.  Merchant will not ship any Merchandise or Excluded Defective Merchandise from the date of this Agreement from the Distribution Centers to the Stores.

(r)     Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(s)     Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at Merchant's retail locations (other than the Stores), except as detailed on Exhibit 11.1(s).

11.2     Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Each entity comprising Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated

18

hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Sale shall be conducted in compliance with this Agreement, the Sale Guidelines, the Approval Order (upon entry) and Applicable General Laws (but excluding Liquidation Sale Laws).

(e)     Absent prior consent by Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

Section 12.  Insurance.

12.1     Merchant's Liability Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and Merchant shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent

19

contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2    Merchant's Casualty Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3    Agent's Insurance.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as an additional insured with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    Worker's Compensation Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.    Indemnification.

13.1    Merchant's Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its  employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN

Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; (vi) any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term; and (vii) the gross negligence (including omissions) or willful misconduct of the Merchant, its officers, directors, employees, agents (other than Agent) or representatives.

13.2    Agent Indemnification.  Agent shall indemnify and hold the Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (iv) as set forth in section 8.3 above; and (v) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.  Defaults.  The following shall constitute "Events of Default" hereunder:

(a)    The Merchant or Agent shall fail to perform any material obligation hereunder (including without limitation failure to satisfy the milestones in Sections 10.1(a)(iii) and (a)(iv)) if such failure remains uncured two (2) days after receipt of written notice thereof;

(b)    Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party;

(c)    The filing of a motion by any party to covert the Bankruptcy Case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint a chapter 11 trustee; or

(d)    The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) or (d) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.  If an Event of Default under (d) above occurs prior to the commencement of the Bankruptcy Case as a result of Agent being unable to have peaceful and quiet possession of the Stores and/or to advertise the Sale at the Stores in the manner provided for herein, Agent may in its discretion elect to terminate this Agreement and the parties may enter into an alternative transaction, on terms and conditions mutually agreeable to Merchant and Agent.

Section 15.  Agent's Security Interest.  Merchant hereby grants to Agent a security interests in and liens upon: (i) the Merchandise; (ii) all Proceeds (including, without limitation, credit card Proceeds); (iii) the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 hereof; (iv) the commission regarding the sale or other disposition of Owned FF&E under Section 7 hereof; (v) the portion of the Sharing Amount due to Agent under Section 3.2(a) hereof; and (vi) all

21

"proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  The security interests and liens granted to Agent hereunder (a) may, at Agent's election, be perfected prior to commencement of the Bankruptcy Case, and in any event, shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation upon entry of the Approval Order; and (b) shall be first priority, senior security interests subject to the terms of subsection (a) of this Section 15 below.

    (a)  Without any further act by or on behalf of Agent or any other party (including (without limitation) the Lender and Merchant), Agent's security interests in and liens upon the Agent Collateral created hereunder are (i) validly created, and (ii) senior to all other liens and security interests, provided, however, that (i) the security interest and lien granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests and lien of Lender in the Agent Collateral in all respects until the Initial Guaranty Payment is made to Lender, and thereafter to the extent and amount of the unpaid portion of the Guaranteed Amount and all other amounts owed by Agent to Merchant hereunder and (ii) upon payment in full of  the Guaranteed Amount, any security interest or lien of Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interests and liens of Agent in the Agent Collateral.  Merchant shall cooperate with Agent with respect to all filings (including (without limitation) UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

    (b)  Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any lien or encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender other than as provided for in the financing order(s) approving the financing arrangements between Merchant and Lender.

    (c)  In the event of an occurrence of an Event of Default by Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

    (d)  "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

  Section 16.  Sale Expense Advance and Back-up Fee Agreement.

    (a)  In consideration of Agent commencing the Sale in advance of the filing of the Bankruptcy Case and entry of the Approval Order, and as a condition to Agent's obligations under this Agreement, Merchant shall pay by wire transfer to Agent a non-refundable advance of One Hundred and Seventy Thousand Dollars ($170,000) (the "Sale Expense Advance") upon execution of this Agreement, which Sale Expense Advance is estimated to be approximately the amount of Agent's initial Expenses related to advertising, signage, supervision and travel for the first two (2) weeks of the Sale.  Until entry of the final Approval Order, Merchant shall replenish the Sale Expense Advance, as and when requested by Agent, such that Agent shall always be holding an amount sufficient to cover its Expenses.  Agent may apply the Sale Expense Advance to any unpaid obligation owing by Merchant to Agent under this Agreement.

    (b)  Upon entry of the final Approval Order by the Bankruptcy Court, the Sale Expense Advance shall be treated as an Expense hereunder and Agent shall reimburse Merchant for such amount as part of the Final Reconciliation.  In the event the Approval Order is not entered and this Agreement is terminated pursuant to Section 14 hereof, the Sale Expense Advance shall be deemed non-refundable and shall be retained and applied by Agent in its sole discretion.  Further, if such an event

22

were to occur, Merchant and Agent shall enter into a consulting agreement, on terms and conditions mutually agreeable to Merchant and Agent (subject to Bankruptcy Court approval), whereby Agent shall serve as Merchant's exclusive agent to sell the Merchandise on a fee for service basis, nunc pro tunc to the Sale Commencement Date.

Section 17.  Miscellaneous.

17.1    Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

|  |  |
|---|---|
| If to Agent: | HILCO MERCHANT RESOURCES, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attention: Ian S. Fredericks<br>Tel: (847) 418-2075<br>Fax: (847) 897-0859<br>Email: ifredericks@hilcotrading.com |
|  | GORDON BROTHERS RETAIL PARTNERS, LLC<br>Prudential Tower<br>800 Boylston Street<br>Boston, MA 02119<br>Attn:    Mackenzie Shea<br>Tel:     617.422.6519<br>Email: mshea@gordonbrothers.com |
| If to Merchant: | PERFUMANIA HOLDINGS, INC.<br>35 Sawgrass Drive, Suite 2<br>Bellport, NY 11713<br>Attention: Michael W. Katz<br>Attention: Fred Paliani<br>Email: MikeK@perfhld.com<br>Email: fpaliani@qkd.com |
|  | With a copy to: |
|  | Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036-6522<br>Attention: Lisa Laukitis<br>Tel. 212.735.3000<br>Email. lisa.laukitis@skadden.com |
| If to Lender: | Wells Fargo Bank, National Association<br>One Boston Place, 18th Floor<br>Boston, MA 02108<br>Attn: Lauren Murphy<br>E-Mail: lauren.murphy@wellsfargo.com |

23

With a copy to:

Otterbourg P.C.
230 Park Avenue
New York, NY 10169
Attn: Daniel F. Fiorillo
E-:Mail: dfiorillo@otterbourg.com

17.2    <u>Governing Law/Exclusive Jurisdiction</u>.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

17.3    <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

17.4    <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5    <u>Currency</u>.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

17.7    <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

17.8    <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

17.9    <u>Wiring of Funds</u>.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

17.10    <u>Nature of Remedies</u>.  Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under sections 3.1(b), 3.1(c), 3.4 and 11.1(o) shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

17.11    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

25

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____

Print Name and Title: RYAN LAWLOR

VP & ALC, Managing Member

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____

Print Name and Title:

**PERFUMANIA HOLDINGS, INC.**

By:_____

Print Name and Title:

**ACKNOWLEDGED AND AGREED as to Sections 3.1(a), 3.3(b) and (c)(iii), 3.4, 8.10, 15, 16(a), and 17:**

**Wells Fargo Bank, N.A.**

By: _____

Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.

Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.

Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule

Exhibit 3.4 – Form of Letter of Credit.

Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.

Exhibit 8.1 – Sale Guidelines

Exhibit 11.1(q)- Shipment of Merchandise and Excluded Merchandise

Exhibit 11.1(s)-Promotional Calendar

26

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By: _____

Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

Print Name and Title:  Rick Edwards, Co-President, Retail

**PERFUMANIA HOLDINGS, INC.**

By: _____

Print Name and Title:

**ACKNOWLEDGED AND AGREED as to Sections 3.1(a), 3.3(b) and (c)(iii), 3.4, 8.10, 15, 16(a), and 17:**

**Wells Fargo Bank, N.A.**

By: _____

Print Name and Title:

## List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 8.1 – Sale Guidelines
Exhibit 11.1(q)- Shipment of Merchandise and Excluded Merchandise
Exhibit 11.1(s)-Promotional Calendar

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Print Name and Title:

**PERFUMANIA HOLDINGS, INC.**

By:_____
Print Name and Title:

*MICHAEL W. KATZ*
*President & CEO*

**ACKNOWLEDGED AND AGREED as to Sections 3.1(a), 3.3(b) and (c)(iii), 3.4, 8.10, 15, 16(a), and 17:**

**Wells Fargo Bank, N.A.**

By: _____
Print Name and Title:

### List of Exhibits

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 8.1 – Sale Guidelines
Exhibit 11.1(q)- Shipment of Merchandise and Excluded Merchandise
Exhibit 11.1(s)-Promotional Calendar

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Print Name and Title:

**PERFUMANIA HOLDINGS, INC.**

By:_____
Print Name and Title:

**ACKNOWLEDGED AND AGREED as to Sections
3.1(a), 3.3(b) and (c)(iii), 3.4, 8.10, 15, 16(a), and 17:**

**Wells Fargo Bank, N.A.**

By:_____
Print Name and Title: *Lauren Murphy*
*Vice President*

**List of Exhibits**

Exhibit 1 – Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 8.1 – Sale Guidelines
Exhibit 11.1(q)- Shipment of Merchandise and Excluded Merchandise
Exhibit 11.1(s)-Promotional Calendar

4873640.3

**Perfumania**
**Exhibit 1**

| Store List | | | | | | | |
|---|---|---|---|---|---|---|---|

| Store # | Location Type | Name | Address | City | State | Zip | Landlord | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 21 | Regional | Serramonte Center | 36-A Serramonte Drive | Daly City | CA | 94015 | Equity One | 885 |
| 63 | Outlet | Kittery Premium Outlets | 345 US Route 1 | Kittery | ME | 03904 | Simon Property Group/Premium | 1,280 |
| 65 | Outlet | Lighthouse Place Premium Outlets | 909 Lighthouse Place | Michigan City | IN | 46360 | Simon Property Group/Premium | 1,427 |
| 105 | Regional | Pheasant Lane Mall | 310 Daniel Webster Hwy. | Nashua | NH | 03060 | Simon Property Group | 1,357 |
| 120 | Outlet | Calhoun Premium Outlets | 455 Belwood Road | Calhoun | GA | 30701 | Simon Property Group/Premium | 1,500 |
| 166 | Regional | Outlet Collection - Seattle | 1101 Outlet Collection Way | Auburn | WA | 98001 | WP Glimcher | 1,500 |
| 167 | Outlet | Grove City Premium Outlets | 1191 Leesburg Grove City Road | Grove City | PA | 16127 | Simon Property Group/Premium | 1,632 |
| 204 | Outlet | Williamsburg Premium Outlets | 5699 Richmond Road | Williamsburg | VA | 23188 | Simon Property Group/Premium | 1,600 |
| 209 | Outlet | Tanger Outlet Center | 36484 Seaside Outlet Drive | Rehoboth Beach | DE | 19971 | Tanger Outlet Centers | 1,200 |
| 213 | Outlet | Vero Beach Outlets | 1876 94th Drive | Vero Beach | FL | 32966 | EB Development | 1,440 |
| 250 | Outlet | The Outlets at Lake George | 1415 State Route 9 | Lake George | NY | 12845 | Sobert Realty Corp. | 1,608 |
| 275 | Outlet | Rockvale Outlets | 35 S. Willowdale Drive | Lancaster | PA | 17602 | FSH Associates LP | 1,550 |
| 300 | Outlet | Fashion Outlet of Las Vegas | 32100 Las Vegas Blvd. | Primm | NV | 89019 | Talisman Companies | 1,248 |
| 302 | Outlet | Tuscola Outlets | 400 Tuscola Boulevard | Tuscola | IL | 61953 | Avison Young | 1,200 |
| 305 | Regional | Riverchase Galleria | 2000 Riverchase Galleria | Hoover | AL | 35244 | General Growth Properties | 1,024 |
| 316 | Regional | Tucson Mall | 4500 N. Oracle Road | Tucson | AZ | 85705 | General Growth Properties | 714 |
| 321 | Regional | Plaza Carolina Mall | Avenida Fragoso Villa Fontana | Carolina | PR | 00983 | Simon Property Group | 1,265 |
| 327 | Regional | Plaza del Sol | 725 Avenida West Main | Bayamon | PR | 00961 | Developers Diversified Realty | 1,540 |
| 331 | Regional | Las Catalinas Mall | Carretera Estatal PR-52 | Caguas | PR | 00725 | Vornado Realty | 1,916 |
| 346 | Outlet | Las Americas Premium Outlets | 4125 Camino de la Plaza | San Diego | CA | 92173 | Simon Property Group/Premium | 2,000 |
| 355 | Outlet | Hagerstown Premium Outlets | 495 Premium Outlets Boulevard | Hagerstown | MD | 21740 | Simon Property Group/Premium | 1,610 |
| 360 | Outlet | The Outlets at Orange | 20 City Blvd. W. Bldg. B. | Orange | CA | 92868 | Simon Property Group/Mills | 1,400 |
| 366 | Regional | Plaza del Caribe | Ponce Bypass | Ponce | PR | 00731 | Empresas Fonalledas | 1,767 |
| 372 | Regional | Outlets at San Clemente | 101 West Avenida Vista Hermosa | San Clemente | CA | 92672 | Craig Realty Group | 1,270 |
| 387 | Outlet | Valley River Center | 293 Valley River Center | Eugene | OR | 97401 | Macerich | 1,003 |
| 391 | Outlet | Tanger Outlet Center | 104 N. Michigan Avenue | Atlantic City | NJ | 08401 | Tanger Outlet Centers | 1,242 |
| 402 | Strip Center | Trenton Crossing | 7600 North 10th Street | McAllen | TX | 78504 | Weingarten Realty Investors | 2,200 |
| 429 | Regional | Arbor Place Mall | 6700 Douglas Boulevard | Douglasville | GA | 30135 | CBL & Associates | 932 |
| 459 | Lifestyle | Town Square | 6587 Las Vegas Boulevard | Las Vegas | NV | 89119 | Forest City Enterprises | 1,100 |
| 542 | Outlet | Opry Mills Mall | 101 Opry Mills Drive | Nashville | TN | 37214 | Simon Property Group/Mills | 1,091 |
| 549 | Outlet | Tanger Outlet Center | 4000 Arrowhead Boulevard | Mebane | NC | 27302 | Tanger Outlet Centers | 995 |
| 569 | Regional | The Oaks Mall | 222 W. Hillcrest Drive | Thousand Oaks | CA | 91360 | Macerich | 1,095 |
| 578 | Regional | Paradise Valley Mall | 4568 E. Cactus Road | Phoenix | AZ | 85032 | Macerich | 1,282 |
| 586 | Outlet | Camarillo Promenade | 540 West Ventura Boulevard | Camarillo | CA | 93010 | Simon Property Group/Premium | 2,000 |
| 587 | Regional | Westgate Mall | 7701 Interstate 40 | Amarillo | TX | 79121 | Jones Lang LaSalle | 1,115 |
| 589 | Regional | Dadeland Mall | 7335 N. Kendall Drive | Miami | FL | 33156 | Simon Property Group | 1,495 |
| 591 | Regional | Plaza West Covina | 112 Plaza Drive | West Covina | CA | 91790 | Starwood Capital Group | 1,342 |
| 595 | Outlet | Cincinnati Premium Outlets | 400 Premium Outlets Drive | Monroe | OH | 45050 | Simon Property Group/Premium | 1,171 |
| 596 | Regional | Victoria Mall | 7800 North Navarro | Victoria | TX | 77904 | Hull Storey Gibson Companies, LLC | 1,600 |
| 597 | Regional | Destiny USA | One Destiny USA Drive | Syracuse | NY | 13290 | Pyramid Company | 1,112 |
| 611 | Regional | Anchorage 5th Avenue Mall | 320 West 5th Avenue | Anchorage | AK | 99501 | Simon Property Group | 944 |
| 640 | Outlet | Desert Hills Premium Outlets | 48400 Seminole Drive | Cabazon | CA | 92230 | Simon Property Group/Premium | 1,512 |
| 641 | Outlet | Gilroy Premium Outlets | 681 Leavesley Road | Gilroy | CA | 95020 | Simon Property Group/Premium | 1,600 |
| 642 | Outlet | Columbia Gorge Outlets | 450 NW 257th Way | Troutdale | OR | 97060 | Woodmont Company | 2,667 |
| 667 | Regional | Plaza Carolina Mall | Avenida Fragoso Villa Fontana | Carolina | PR | 00983 | Simon Property Group | 912 |
| 670 | Regional | Chandler Fashion Center | 3111 W Chandler Boulevard | Chandler | AZ | 85226 | Macerich | 969 |
| 676 | Street | Yacht Haven Grande | 5316 Yacht Haven Grande | St. Thomas | USVI | 00802 | Yacht Haven USVI LLC | 1,773 |
| 681 | Regional | Westfield Palm Desert | 72840 Highway 111 | Palm Desert | CA | 92260 | Westfield Corporation | 1,305 |
| 689 | Regional | Florida Mall III | 8001 S. Orange Blossom Trail | Orlando | FL | 32809 | Simon Property Group | 1,045 |
| 696 | Strip Center | Plaza Isabela | PR 2 & PR 4494 | Isabela | PR | 00662 | Developers Diversified Realty | 1,300 |
| 749 | Regional | Plaza Rio Hondo | Hwy. 22 & Rt. 167 | Bayamon | PR | 00961 | Developers Diversified Realty | 1,445 |

**Perfumania**
**Exhibit 1**

| Store List |
|---|

| Store # | Location Type | Name | Address | City | State | Zip | Landlord | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 758 | Outlet | Tanger Outlet Center | 4840 Tanger Outlet Boulevard | N. Charleston | SC | 29418 | Tanger Outlet Centers | 1,344 |
| 763 | Outlet | Fashion Outlets of Niagara | 1951 Fashion Outlet Boulevard | Niagara Falls | NY | 14304 | Macerich | 1,327 |
| 764 | Outlet | Twin Cities Premium Outlets | 3925 Eagan Outlets Parkway | Eagan | MN | 55122 | Simon Property Group/Premium | 1,160 |
| 765 | Regional | Westfield San Francisco Centre | 865 Market Street | San Francisco | CA | 94103 | Westfield Corporation | 1,510 |
| 766 | Outlet | The Outlet Shoppes of Bluegrass | 1155 Buck Creek Road | Simpsonville | KY | 40067 | Horizon Group Properties | 1,100 |
| 767 | Outlet | Downtown Summerlin | 2025 Festival Plaza Drive, Suite 120 | Las Vegas | NV | 89135 | The Howard Hughes Corporation | 904 |
| 768 | Lifestyle | Station Park | 910 West Forbush Place | Farmington | UT | 84025 | Centercal Properties | 1,435 |
| 771 | Outlet | Gloucester Premium Outlets | 100 Premium Outlets Drive | Blackwood | NJ | 08012 | Simon Property Group/Premium | 1,182 |
| 772 | Outlet | Tanger Outlet Center | 400 South Wilson Road | Sunbury | OH | 43074 | Tanger Outlet Centers | 1,200 |
| 774 | Outlet | Tanger Outlet Center | 350 84th Street SW | Byron Center | MI | 49315 | Tanger Outlet Centers | 1,034 |
| 776 | Outlet | Albertville Premium Outlets | 6415 Labeaux Ave NE | Albertville | MN | 55301 | Simon Property Group/Premium | 1,600 |
| 781 | Regional | Ala Moana Center | 1450 Ala Moana Boulevard | Honolulu | HI | 96814 | General Growth Properties | 906 |
| 787 | Outlet | Tucson Premium Outlets | 6401 West Marana Center Boulevard | Tucson | AZ | 85742 | Simon Property Group/Premium | 1,185 |
| 789 | Regional | Chula Vista Center | 555 Broadway | Chula Vista | CA | 91910 | Rouse Properties | 1,198 |
| 65 | | | | | | | *Average Sq. Ft.* | **1,343** |

**Perfumania**
**Exhibit 3.1(b)**

| Merchandise Threshold Schedule | | |
|---|---|---|
| **Cost Value** | **Adjustment Points** | **Adjusted Guaranty** |
| 4,950,000 | 0.42% | 64.30% |
| 4,925,000 | 0.42% | 64.72% |
| 4,900,000 | 0.42% | 65.14% |
| 4,875,000 | 0.40% | 65.56% |
| 4,850,000 | 0.40% | 65.96% |
| 4,825,000 | 0.40% | 66.36% |
| 4,800,000 | 0.40% | 66.76% |
| 4,775,000 | 0.38% | 67.16% |
| 4,750,000 | 0.38% | 67.54% |
| 4,725,000 | 0.38% | 67.92% |
| 4,700,000 | | 68.30% |
| 4,500,000 | | 68.30% |
| 4,475,000 | 0.33% | 67.97% |
| 4,450,000 | 0.33% | 67.64% |
| 4,425,000 | 0.33% | 67.31% |
| 4,400,000 | 0.35% | 66.96% |
| 4,375,000 | 0.35% | 66.61% |
| 4,350,000 | 0.35% | 66.26% |
| 4,325,000 | 0.37% | 65.89% |
| 4,300,000 | 0.37% | 65.52% |
| 4,275,000 | 0.37% | 65.15% |
| 4,250,000 | 0.37% | 64.78% |

Note(s):
1. Adjustments between the increments shall be on a prorata basis.
2. In the event that the Cost value of the Merchandise is greater than $4,950,000, each $25,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.46%.

3. In the event that the Cost value of the Merchandise is less than $4,250,000, each $25,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.41%.

**Perfumania**
**Exhibit 3.1(c)**

| Cost Factor | | |
|---|---|---|
| **Cost Factor** | **Adjustment Points** | **Adjusted Guaranty** |
| **29.60%** | | **68.30%** |
| 29.65% | 0.30% | 68.00% |
| 29.70% | 0.25% | 67.75% |
| 29.75% | 0.25% | 67.50% |
| 29.80% | 0.25% | 67.25% |
| 29.85% | 0.25% | 67.00% |
| 29.90% | 0.25% | 66.75% |
| 29.95% | 0.25% | 66.50% |
| 30.00% | 0.25% | 66.25% |
| 30.05% | 0.25% | 66.00% |
| 30.10% | 0.25% | 65.75% |

_Notes:_
_1. Adjustments between the increments shall be on a prorata basis._
_2. In the event that the Cost Factor of Merchandise is greater than 30.10%, each 0.05% (or pro rata portion thereof) increment shall decrease the Guaranty by 0.26%._

## FORM OF AGENT LETTER OF CREDIT

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2017

Irrevocable Standby Letter of Credit Number: _____

ADVISING BANK:
WELLS FARGO BANK, N.A
ATTN: SBLC DEPARTMENT
401 N. RESEARCH PKWY, MAC D4004-017
WINSTON-SALEM, NC  27101
PNBPUS33SLC

BENEFICIARY:    _____
                _____
                _____
                _____

Credit No.: _____

Gentlemen:

BY ORDER OF:    _____

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of _____ ,with a principal place of business located at _____ (the "Applicant") for a sum or sums not exceeding a total of _____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS, [SWIFT Information to be provided by Issuing Bank] on December 31, 2018, or such earlier date on which the Beneficiary shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by an officer of _____ (the "Beneficiary").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the Beneficiary in the form attached as **Exhibit B**.

If a drawing is received by _____ at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiary, as directed below, in immediately available funds on the next Business Day.  If however, a drawing is received by _____ after 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms with the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiary in immediately available funds on the second succeeding Business Day. We hereby acknowledge that OUR obligations arising under this Letter of Credit shall not be affected by the filing of a petition for relief under the United States Bankruptcy Code by Perfumania Holdings, Inc. or any of its subsidiaries in any manner whatsoever.

As used in this Letter of Credit, "Business Day" shall mean any day other than Saturday, Sunday or a day on which banking institutions in _____ are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause, "Drawn under Letter of Credit No. _____, dated _____, 20[  ] of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the International Standby Practices (ISP98), I.C.C. Publication No. 590.

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned issuing bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,

Authorized official

## EXHIBIT A

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:      Drawing for Amounts Due to:

_____

_____

_____

_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "<u>Letter of Credit</u>").  Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officer of _____, in their capacity as Beneficiary of the Letter of Credit hereby certifies to you that:

(i)     The amount to be drawn is $_____ (the "<u>Amount Owing</u>").

(ii)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof.

(iii)   The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(iv)    In accordance with the terms of the Letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account:

[_____]
[_____]
[_____]
Further Credit to: [Account Title]
[Account No. _____]

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this _____ day of _____, 20[  ].

By: _____

Name: _____

Title: _____

## EXHIBIT B

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:      Reduction of Face Amount

_____
_____
_____
_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "Letter of Credit"). Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officer of _____, in their capacity as Beneficiary of the Letter of Credit hereby confirms to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this _____ day of _____, 20[  ].

By: _____
Name: _____
Title: _____

**Perfumania**

**Exhibit 4.1 (c)**

**Occupancy**

| Store # | Store Name | RENT STORES | OTHER RENT STORES | COMMON AREA MAINTENANC | ALARM | ELECTRICITY | EQUIPMENT LEASES | FILING FEES & LICENSES | GUARD SERVICES | INSURANCES | INVENTORY EQUIPMENT EXPENSE | PROPERTY TAXES | REAL ESTATE TAXES | REPAIRS & MAINTENANCE | TELEPHONE | UTILITIES | Total Occupancy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | Serramonte Center | 211 | 5 | 57 | 1 | 13 | - | 3 | - | 12 | 0 | 7 | 17 | 11 | 15 | 4 | 357 |
| 63 | Kittery Premium Outlets | 228 | - | 51 | 1 | 15 | 63 | 0 | - | 8 | 0 | 1 | 15 | 8 | 11 | 9 | 348 |
| 65 | Lighthouse Place Premium Outlets | 334 | 6 | 48 | 1 | 10 | - | - | - | 8 | 1 | 2 | 20 | 5 | 12 | 8 | 456 |
| 105 | Pheasant Lane Mall | 203 | - | 116 | 1 | 21 | - | - | - | 8 | 1 | - | 50 | 3 | 13 | 8 | 425 |
| 105 | Calhoun Premium Outlets | 197 | - | 52 | 1 | 20 | - | 1 | - | 10 | 0 | 3 | 2 | 16 | 20 | 3 | 325 |
| 166 | Outlet Collection - Seattle | 194 | 7 | 75 | 1 | 17 | - | 7 | - | 11 | 0 | 0 | 7 | 4 | 13 | 4 | 340 |
| 167 | Grove City Premium Outlets | 291 | - | 60 | 1 | 13 | - | - | - | 11 | 0 | - | 18 | 11 | 15 | 7 | 428 |
| 204 | Williamsburg Premium Outlets | 285 | - | 66 | 1 | 8 | - | 2 | - | 10 | 0 | 1 | 10 | 4 | 13 | 8 | 408 |
| 209 | Tanger Outlet Center | 220 | 21 | 47 | 1 | 10 | - | 1 | - | 8 | 0 | - | 2 | 6 | 15 | 4 | 336 |
| 213 | Vero Beach Outlets | 85 | - | 36 | 1 | 9 | - | 0 | - | 8 | 0 | - | 5 | 5 | 13 | 3 | 161 |
| 250 | The Outlets at Lake George | 154 | 6 | 34 | 1 | 33 | - | - | - | 14 | 0 | - | 9 | 6 | 12 | 4 | 274 |
| 275 | Rockvale Outlets | 110 | - | 35 | 1 | 14 | - | - | - | 8 | 0 | - | - | 9 | 11 | 2 | 193 |
| 300 | Fashion Outlet of Las Vegas | 257 | - | 67 | 1 | 17 | - | 1 | 6 | 8 | 0 | 0 | 5 | 3 | 14 | 4 | 384 |
| 302 | Tuscola Outlets | 69 | - | - | 1 | 8 | - | - | - | 8 | 1 | - | - | 5 | 20 | 3 | 115 |
| 305 | Riverchase Galleria | 200 | - | 133 | 1 | 39 | - | 1 | - | 8 | 2 | 1 | - | 10 | 10 | 8 | 415 |
| 316 | Tucson Mall | 133 | 5 | 52 | 1 | 24 | - | 1 | - | 8 | 0 | 5 | 7 | 6 | 12 | 3 | 256 |
| 321 | Plaza Carolina Mall | 465 | - | 149 | 1 | 21 | - | - | - | 19 | 0 | - | 18 | 7 | 29 | 7 | 715 |
| 327 | Plaza del Sol | 424 | - | 101 | 1 | 19 | - | - | - | 26 | 0 | - | 10 | 6 | 29 | 10 | 627 |
| 331 | Las Catalinas Mall | 743 | - | 126 | 1 | 28 | - | 0 | 6 | 19 | 0 | - | 10 | 11 | 32 | 0 | 975 |
| 346 | Las Americas Premium Outlets | 209 | - | 49 | 1 | 22 | - | 1 | - | 8 | 0 | 3 | 33 | 14 | 18 | 5 | 364 |
| 355 | Hagerstown Premium Outlets | 238 | - | 55 | 1 | 10 | - | 1 | - | 10 | 0 | 1 | 15 | 5 | 12 | 1 | 350 |
| 360 | The Outlets at Orange | 398 | 28 | 95 | 1 | - | - | 1 | - | 8 | 1 | 4 | 11 | 11 | 15 | 4 | 578 |
| 366 | Plaza del Caribe | 571 | - | 116 | 1 | 54 | - | 8 | 4 | 27 | 0 | - | 18 | 8 | 42 | 8 | 858 |
| 372 | Outlets at San Clemente | 222 | - | 49 | 1 | 4 | - | 1 | - | 15 | 0 | 2 | 19 | 8 | 12 | - | 332 |
| 387 | Valley River Center | 201 | - | 55 | 1 | 8 | - | - | - | 8 | 0 | 1 | 30 | 7 | 12 | 2 | 326 |
| 391 | Tanger Outlet Center | 206 | 7 | 63 | 1 | 26 | - | 1 | 32 | 8 | 0 | - | - | 18 | 14 | 2 | 378 |
| 402 | Trenton Crossing | 164 | 2 | 10 | 1 | 11 | - | 0 | - | 8 | 0 | 6 | 17 | 7 | 8 | 3 | 239 |
| 429 | Arbor Place Mall | 190 | 9 | - | 1 | 20 | - | 2 | - | 8 | 1 | 5 | - | 19 | 18 | 5 | 280 |
| 459 | Town Square | 185 | - | - | 1 | 16 | - | 1 | - | 8 | 0 | 1 | - | 11 | 12 | 5 | 240 |
| 542 | Opry Mills Mall | 216 | - | 76 | 1 | 4 | - | 2 | - | 8 | 1 | 1 | 18 | 11 | 14 | 4 | 356 |
| 549 | Tanger Outlet Center | 98 | - | 37 | 1 | 10 | - | - | - | 8 | 0 | - | 4 | 16 | 14 | 2 | 194 |
| 569 | The Oaks Mall | 303 | - | 93 | 1 | 11 | - | 1 | - | 8 | 0 | 5 | 33 | 11 | 12 | 5 | 483 |
| 578 | Paradise Valley Mall | 180 | 9 | 40 | 1 | 46 | - | 0 | - | 8 | 0 | 3 | 21 | 2 | 12 | 3 | 325 |
| 586 | Camarillo Promenade | 508 | - | 90 | 1 | 15 | - | 1 | - | 8 | 0 | 2 | 26 | 13 | 13 | 11 | 692 |
| 587 | Westgate Mall | 110 | - | 48 | 1 | 9 | - | - | - | 8 | 0 | 10 | 17 | 8 | 13 | 0 | 224 |
| 589 | Dadeland Mall | 495 | - | 222 | 1 | 15 | - | 1 | 3 | 8 | 0 | - | 76 | 18 | 13 | 6 | 858 |
| 591 | Plaza West Covina | 192 | 4 | - | 1 | - | - | 1 | - | 8 | 0 | 2 | 27 | 21 | 12 | 4 | 272 |
| 595 | Cincinnati Premium Outlets | 196 | - | 49 | 1 | 10 | - | 3 | - | 8 | 0 | - | 11 | 5 | 21 | 5 | 311 |
| 596 | Victoria Mall | 126 | - | 7 | 1 | 18 | - | 0 | - | 8 | 2 | 8 | 8 | 5 | 13 | 9 | 206 |
| 597 | Destiny USA | 127 | - | 91 | 1 | 14 | - | 0 | - | 12 | 0 | - | 137 | 2 | 13 | 7 | 404 |
| 611 | Anchorage 5th Avenue Mall | 182 | - | 72 | 1 | 13 | - | 0 | - | 8 | 1 | 3 | 8 | 11 | 12 | 2 | 314 |
| 640 | Desert Hills Premium Outlets | 763 | - | 78 | 1 | 12 | - | 1 | - | 8 | 0 | 6 | 22 | 13 | 36 | 7 | 948 |
| 641 | Gilroy Premium Outlets | 432 | - | 59 | 1 | 14 | - | 3 | - | 8 | 0 | 5 | 21 | 12 | 34 | 8 | 599 |
| 642 | Columbia Gorge Outlets | 232 | - | 93 | 1 | 11 | - | 0 | - | 8 | 0 | 2 | 18 | 10 | 15 | 4 | 396 |
| 667 | Plaza Carolina Mall | 462 | - | 80 | 1 | 16 | - | - | - | 19 | 0 | - | 11 | 8 | 28 | 7 | 633 |
| 670 | Chandler Fashion Center | 218 | - | 64 | 1 | 18 | - | 0 | - | 8 | 0 | - | 23 | 0 | 12 | 2 | 346 |
| 681 | Yacht Haven Grande | 211 | - | 0 | 1 | 33 | - | 82 | 13 | 8 | 1 | - | - | 13 | 9 | 2 | 373 |
| 681 | Westfield Palm Desert | 122 | - | 129 | 1 | 20 | - | 1 | - | 8 | 0 | 4 | 43 | 3 | 13 | 7 | 352 |
| 689 | Florida Mall III | 381 | 12 | 120 | 1 | 9 | - | 0 | 16 | 8 | 0 | 2 | 26 | 13 | 17 | 5 | 611 |
| 696 | Plaza Isabela | 176 | - | 42 | 1 | 34 | - | - | 4 | 22 | 0 | - | 4 | 8 | 46 | 9 | 347 |
| 749 | Plaza Rio Hondo | 274 | 9 | 83 | 1 | 17 | - | - | 6 | 26 | 0 | - | 7 | 7 | 27 | 9 | 467 |
| 758 | Tanger Outlet Center | 141 | 1 | 54 | 1 | 13 | - | 1 | - | 8 | 0 | 3 | 19 | 19 | 7 | 4 | 272 |
| 763 | Fashion Outlets of Niagara | 277 | - | 61 | 3 | 9 | - | 0 | - | 8 | 1 | - | 27 | 9 | 14 | 3 | 411 |
| 764 | Twin Cities Premium Outlets | 218 | 7 | 45 | 1 | 13 | - | - | 3 | 10 | 0 | - | 31 | 15 | 11 | 5 | 361 |
| 765 | Westfield San Francisco Centre | - | - | 267 | 1 | 28 | - | 1 | 6 | 8 | 2 | 4 | 101 | 20 | 20 | 14 | 473 |
| 766 | The Outlet Shoppes of Bluegrass | 145 | 12 | 34 | 1 | 7 | - | - | - | 11 | 1 | 6 | 5 | 6 | 11 | 6 | 245 |
| 767 | Downtown Summerlin | 208 | 9 | 45 | 1 | - | - | 1 | - | 8 | 0 | 2 | 10 | 14 | 12 | 6 | 318 |
| 768 | Station Park | 119 | - | 62 | 1 | 7 | - | - | - | 8 | 0 | 3 | 22 | 6 | 11 | 9 | 249 |
| 771 | Gloucester Premium Outlets | 199 | 14 | 43 | 1 | 28 | - | 0 | - | 8 | 1 | - | - | 11 | 16 | 13 | 336 |
| 772 | Tanger Outlet Center | 185 | 42 | 40 | 1 | 10 | - | 1 | 9 | 8 | 1 | - | 15 | 10 | 8 | 4 | 335 |
| 773 | Tanger Outlet Center | 125 | 13 | 37 | 1 | 15 | - | - | - | 8 | 0 | - | 13 | 13 | 17 | 5 | 233 |
| 776 | Albertville Premium Outlets | 230 | 14 | 56 | 1 | 10 | - | - | - | 8 | 1 | - | 25 | 8 | 12 | 7 | 373 |
| 781 | Ala Moana Center | 342 | 24 | 195 | 1 | 51 | - | 0 | - | 8 | 0 | - | 35 | 15 | 13 | 4 | 688 |
| 787 | Tucson Premium Outlets | 222 | 11 | 48 | 1 | 19 | - | 0 | - | 8 | 0 | 5 | 9 | 8 | 16 | 8 | 357 |
| 189 | Chula Vista Center | 87 | - | 50 | 1 | 11 | - | - | - | 8 | 0 | 4 | 14 | 5 | 5 | 4 | 192 |
| 65 | **Total** | 15,889 | 277 | 4,406 | 75 | 1,085 | - | 136 | 107 | 674 | 40 | 132 | 1,225 | 605 | 1,044 | 343 | 26,038 |
| | **Per Week** | 111,221 | 1,940 | 30,840 | 524 | 7,595 | - | 955 | 750 | 4,715 | 281 | 925 | 8,572 | 4,237 | 7,310 | 2,402 | 182,268 |
| | **Per Store Week** | 1,711 | 30 | 474 | 8 | 117 | - | 15 | 12 | 73 | 4 | 14 | 132 | 65 | 112 | 37 | 2,804 |

**SALE GUIDELINES**

A.      The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.      On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.      At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 7 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.      . The Merchant and the Agent may advertise the Sale as a "store closing" "sale on everything", "everything must go", or similar themed sale.

F.      Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.      Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.      The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.      The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores. The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

L.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall have no responsibility therefor.

M.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

N.      If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

If to the Merchant:

Lisa Laukitis
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522
Attention: Lisa Laukitis
Tel. 212.735.3000
Email. lisa.laukitis@skadden.com

If to the Agent:

Douglas D. Herrmann, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
T. 302.777.6552
E. herrmannd@pepperlaw.com

| STORE 781 | | | | |
|---|---|---|---|---|
| SKU | DESCRIPTION | RETAIL | COST | UNITS SENT |
| 146888 | G.ARMANI ARMANI CODE W EDP/S S.TESTER | $ 0.01 | $ 0.01 | 1 |
| 147725 | BURBERRY THE BEAT W EDP/S S.TESTER | $ 0.01 | $ 11.38 | 1 |
| 150587 | E.LAUDER BEAUTIFUL W EDP/S S.TESTER | $ 0.01 | $ 0.01 | 1 |
| 190594 | BVLGARI OMNIA AMETHYSTE W EDT/S S.TESTER | $ 0.01 | $ - | 1 |
| 191331 | LANCOME MIRACLE W EDP/S S.TESTER | $ 0.01 | $ 0.01 | 1 |
| 192910 | G.ARMANI ACQUA DI GIOIA W EDP/S S.TESTER | $ 0.01 | $ 0.01 | 1 |
| 199503 | S.FERRAGAMO INCANTO AMITY W EDT/S S.TESTER | $ 0.01 | $ 4.93 | 1 |
| 200409 | R.COPENHAGEN 1775 RIVAL M EDT/S S.TESTER | $ 0.01 | $ 5.76 | 1 |
| 200600 | REALM INTENSE W EDT/S S.TESTER | $ 0.01 | $ 4.50 | 1 |
| 200693 | SOFIA VERGARA W EDP/S S.TESTER | $ 0.01 | $ 5.00 | 1 |
| 202185 | P.HILTON GOLD RUSH W EDP/S S.TESTER | $ 0.01 | $ 3.79 | 1 |
| 202290 | R.COPENHAGEN 1775 IMPERIAL M EDT/S S.TESTER | $ 0.01 | $ 5.70 | 1 |
| 200411 | R.COPENHAGEN 1775 VALOR M EDT/S S.TESTER | $ 0.01 | $ 6.29 | 1 |
| 193396 | GUCCI FLORA W EDT/S S.TESTER | $ 0.01 | $ - | 1 |
| 158723 | MICHAEL KORS W EDP/S S.TESTER | $ 0.01 | $ 0.45 | 1 |
| 190730 | LANCOME TRESOR W EDP/S S.TESTER | $ 0.01 | $ - | 1 |
| 194900 | P.RABANNE LADY MILLION W EDP/S S.TESTER | $ 0.01 | $ - | 1 |
| 202898 | RIHANNA RIRI KISS COSMETIC BAG GWP | $ 25.00 | $ 2.50 | 6 |

| STORE 640 | | | | |
|---|---|---|---|---|
| SKU | DESCRIPTION | RETAIL | COST | UNITS SENT |
| 202508 | JAY-Z GOLD M TRAVEL BAG SPRING 2016 GWP | $ 25.00 | $ 5.00 | 6 |
| 203314 | P.HILTON ROSE RUSH W BACKPACK GWP | $ 75.00 | $ 4.50 | 12 |
| 203279 | PARIS HILTON BLING CLUTCH GWP | $ 50.00 | $ 2.40 | 6 |
| 201966 | WORLD OF POLO M 2016 DUFFLE BAG GWP | $ 50.00 | $ - | 6 |
| 201308 | J.CHOO MAN M EDT/S S.TESTER | $ 0.01 | $ 12.00 | 1 |
| 203002 | Y.S.LAURENT MON PARIS W EDP/S S.TESTER | $ 0.01 | $ - | 1 |
| 193396 | GUCCI FLORA W EDT/S S.TESTER | $ 0.01 | $ - | 1 |
| 200954 | S.JOHN 3AM M EDT/S S.TESTER | $ 0.01 | $ 4.57 | 1 |
| 202399 | S.VERGARA TEMPTING W EDP/S S.TESTER | $ 0.01 | $ 5.00 | 1 |
| 200300 | M.JACOBS DAISY DREAM W EDT/S S.TESTER | $ 0.01 | $ - | 1 |
| 201445 | S.FERRAGAMO SIGNORINA W EDT/S S.TESTER | $ 0.01 | $ 7.49 | 1 |
| 201490 | D&G INTENSO M EDP/S S.TESTER | $ 0.01 | $ - | 1 |
| 194609 | GUCCI GUILTY W EDT/S S.TESTER | $ 0.01 | $ - | 1 |
| 197269 | GUCCI BY GUCCI M EDT/S S.TESTER | $ 0.01 | $ - | 1 |
| 202178 | T.BAHAMA MARITIME M EDC/S S.TESTER | $ 0.01 | $ 5.62 | 1 |
| 145456 | HANAE MORI M EDT/P/S S.TESTER | $ 0.01 | $ 0.01 | 1 |
| 202163 | V.CAMUTO CAPRI W EDP/S S.TESTER | $ 0.01 | $ 5.86 | 1 |
| 147604 | Y.S.LAURENT L'HOMME M EDT/S S.TESTER | $ 0.01 | $ 0.03 | 1 |
| 191892 | H.BOSS BOSS #6 M EDT/S S.TESTER | $ 0.01 | $ - | 1 |
| 193366 | BURBERRY SPORT W EDT/S S.TESTER | $ 0.01 | $ 6.71 | 1 |
| 198350 | GUCCI GUILTY BLACK W EDT/S S.TESTER | $ 0.01 | $ - | 1 |
| 200692 | S.VERGARA LOVE W EDP/S S.TESTER | $ 0.01 | $ 6.90 | 1 |

## Exhibit 11.1(s) Promotional Calendar

**<u>EXHIBIT 2</u>**

**Sales Guidelines**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

In re:                      :    Chapter 11
                  :

MODEL REORG ACQUISITION, LLC, et al.,  :    Case No. 17-_____ (___)
                  :

           Debtors.[1]    :    (Joint Administration Pending)
                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SALE GUIDELINES

The following procedures shall apply to the Sales[2] to be held at the Closing Locations:

1.      The Sales shall be conducted so that the Closing Locations in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Closing Locations.

2.      The Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Sales shall be conducted on Sunday unless the Merchant had been operating such Closing Location on a Sunday.

3.      On "shopping center" property, the Merchant or the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Closing Location's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Location is located; provided that the Merchant and the Agent may solicit customers in the Closing Locations themselves.  On "shopping center" property, the Merchant and the Agent shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Sales, the Merchant shall vacate the Closing Locations in broom clean condition, and shall leave the Locations in the same condition as on the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Perfumania Holdings, Inc. (7964); Perfumania, Inc. (6340); Magnifique Parfumes and Cosmetics, Inc. (6420); Ten Kesef II, Inc. (1253); Perfumania.com, Inc. (4688); Model Reorg Acquisition, LLC (0318); Northern Group, Inc. (3226); Perfumania Puerto Rico, Inc. (6787); Quality King Fragrance, Inc. (4939); Scents of Worth, Inc. (1732); Jacavi, LLC (6863); Distribution Concepts, LLC (8845); Flowing Velvet, Inc.  (7294); Aladdin Fragrances, Inc. (4338); Niche Marketing Group, Inc. (1943); Northern Brands, Inc. (7186); Northern Amenities, Ltd. (5387); Global Duty Free Supply, Inc. (2686); and Perfumers Art, Inc. (6616).  The address of the Debtors' corporate headquarters is 35 Sawgrass Drive, Suite 2, Bellport, New York 11713.

[2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Agency Agreement.

Sales Commencement Date, ordinary wear and tear excepted, <u>provided</u>, <u>however</u>, that the Agent and the Merchant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Closing Location.

5.      Subject to the entry of the Final Approval Order:  (i) the Agent and the Merchant may abandon any FF&E and Merchandise not sold in the Sales at the Closing Locations at the earlier of the conclusion of the Sales or the applicable Sales Termination Date; (ii) any abandoned FF&E and Merchandise left in a Closing Location after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

6.      The Agent and the Merchant may advertise the sale as a "sale on everything", "everything must go", or similar themed sale.  The Agent and the Merchant may also advertise the sale as a "store closing" and have a "countdown to closing" sign prominently displayed in a manner consistent with these Sales Guidelines.

7.      Agent and the Merchant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sales; <u>provided</u>, <u>however</u>, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Agent and the Merchant shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sales Guidelines.  In addition, the Agent and the Merchant shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Locations and (ii) enclosed mall Closing Locations to the extent the entrance to the applicable Closing Location does not require entry into the enclosed mall common area; <u>provided</u>, <u>however</u>, that such banners shall be located or hung so as to make clear that the Sales is being conducted only at the affected Closing Location, and shall not be wider than the storefront of the Closing Location.  In addition, the Agent and the Merchant shall be permitted to utilize sign walkers in a safe and professional manner.  Nothing contained in these Sales Guidelines shall be construed to create or impose upon the Agent and the Merchant any additional restrictions not contained in the applicable lease agreement.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Locations to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Agent and the Merchant shall not make any alterations to the storefront or exterior walls of any Closing Locations.

10.      The Agent and the Merchant shall not make any alterations to interior or exterior Closing Location lighting.  No property of the landlord of a Closing Location shall be removed or sold during the Sales.  The hanging of exterior banners or signage or banners in a Closing Location shall not constitute an alteration to a Closing Location.

11.      The Agent and the Merchant shall keep Closing Location premises and surrounding areas clean and orderly consistent with present practices.

2

12.     Subject to the provisions of the Agency Agreement, the Agent and the Merchant shall have the right to sell all FF&E.  The Agent and the Merchant may advertise the sale of the FF&E in a manner consistent with these guidelines at the Closing Locations.  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Closing Location business hours.

13.     At the conclusion of the Sales at each Closing Location, pending assumption or rejection of applicable leases, the landlords of the Closing Locations shall have reasonable access to the Closing Location's premises as set forth in the applicable leases.  The Agent, the Merchant and their agents and representatives shall continue to have exclusive and unfettered access to the Closing Locations until the respective Closing Locations are turned back to the landlord in a manner consistent with the lease rejection procedures approved by the Court.

14.     Postpetition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

15.     The rights of landlords against Merchant for any damages to a Closing Location shall be reserved in accordance with the provisions of the applicable lease.

16.     If and to the extent that the landlord of any Closing Location affected hereby contends that the Agent or the Merchant are in breach of or default under these Sales Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant' counsel and the Agent's counsel as follows: (i) Skadden Arps Slate Meagher & Flom LLP, Four Times Square, New York, NY 10036 (Attn: Lisa Laukitis), lisa.laukitis@skadden.com; (ii) Skadden Arps Slate Meagher & Flom LLP, 500 Boylston St., Boston, MA 02116 (Attn: Greg Milmoe & Raquelle Kaye), greg.milmoe@skadden.com and raquelle.kaye@skadden.com; and (iii) Pepper Hamilton LLP, 1313 Market Street, P.O. Box 1709 Wilmington, DE 19899-1709 (Attn: Douglas Herrmann), herrmannd@pepperlaw.com.