**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

In re:                       :   Chapter 11
                             :

MODEL REORG ACQUISITION, LLC, et al.,  :   Case No. 17-11794 (___)
                             :

               Debtors.[1]    :   (Joint Administration Pending)
                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER BANKRUPTCY
CODE SECTIONS 105, 361, 362, 363, AND 364, BANKRUPTCY RULES 2002 AND 4001,
AND LOCAL BANKRUPTCY RULE 4001-2 (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY
BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE
PROTECTION, (III) SCHEDULING A FINAL HEARING, AND
(IV) GRANTING RELATED RELIEF**

        The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors" and, together with their non-Debtor affiliates, the "Company"), hereby move (the

"Motion") for entry of interim and final orders (the "Interim Order" and "Final Order,"

respectively) under sections 105, 361, 362, 363, and 364 of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Bankruptcy Rules"), authorizing (i) the Debtors to (a) obtain postpetition financing and (b) use

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Perfumania Holdings, Inc. (7964); Perfumania, Inc. (6340); Magnifique Parfumes and Cosmetics, Inc. (6420);
Ten Kesef II, Inc. (1253); Perfumania.com, Inc. (4688); Model Reorg Acquisition, LLC (0318); Northern
Group, Inc. (3226); Perfumania Puerto Rico, Inc. (6787); Quality King Fragrance, Inc. (4939); Scents of Worth,
Inc. (1732); Jacavi, LLC (6863); Distribution Concepts, LLC (8845); Flowing Velvet, Inc. (7294); Aladdin
Fragrances, Inc. (4338); Niche Marketing Group, Inc. (1943); Northern Brands, Inc. (7186); Northern
Amenities, Ltd. (5387); Global Duty Free Supply, Inc. (2686); and Perfumers Art, Inc. (6616).  The address of
the Debtors' corporate headquarters is 35 Sawgrass Drive, Suite 2, Bellport, New York 11713.

cash collateral, (ii) the granting liens and superpriority claims in favor of the DIP Lenders (as

defined below) and adequate protection in favor of the Senior Credit Facility Lenders (as defined

below), (iii) the modification of the automatic stay, (iv) the scheduling of a final hearing, and

(v) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by

reference the Declaration of Michael W. Katz in Support of Chapter 11 Petitions and First Day

Pleadings (the "First Day Declaration")[2] and the Declaration of Robert Warshauer In Support of

the Motion (the "Warshauer Declaration"), each filed concurrently herewith.  In further support

of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## OVERVIEW

1.      As more fully described in this Motion and in the First Day Declaration,

the Debtors' principal objective in filing these chapter 11 cases (the "Chapter 11 Cases") is to

undergo a comprehensive reorganization of the Debtors that will (i) leave all Allowed Claims

Unimpaired, (ii) close underperforming stores and reject unfavorable leases to establish a

foundation for sustainable long-term growth and to improve the overall returns from the

Company's retail footprint going forward, (iii) provide meaningful consideration to Perfumania's

stockholders who opt-in to a Stockholder Release, (iv) issue 100% of Reorganized Perfumania to

NewHoldCo in exchange for an equity infusion, and (v) obtain debtor-in-possession financing

that will convert to an exit credit facility upon emergence from chapter 11.

2.      To achieve these objectives, the Debtors seek authority to enter into that

certain Ratification Agreement and Amendment Agreement (the "Ratification Agreement" or

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the First
Day Declaration or DIP Credit Agreement.

"DIP Credit Agreement"),[3] dated August 26, 2017, by and among the Debtors and Wells Fargo Bank, N.A. ("Wells Fargo"), as administrative and collateral agent (in such capacity, the "DIP Agent") for itself and the other lender parties thereto (the "DIP Lenders").  The Ratification Agreement provides for, among other things, (i) a senior secured debtor-in-possession asset-based revolving facility in an aggregate principal amount of $83,750,000 (the "DIP Facility") to refinance the Debtors' prepetition revolving asset-based secured credit facility (the "Senior Credit Facility"), (ii) the consensual use of Cash Collateral (as defined herein), (iii) the ability to draw upon letters of credit up to $10 million from the DIP Agent (with certain borrowing restrictions); and (iv) certain other amendments to the Credit Agreement (as defined in the Ratification Agreement).

　　　　3.　　　The Debtors have an immediate and urgent need for debtor-in-possession financing.  The prepetition Senior Credit Facility[4] is critical to the Debtors' operations and integral to the Debtors' cash management system.  The Debtors draw on the Senior Credit Facility daily to cover operating expenses, including employee payroll, rent, and payments to vendors for goods and inventory.  Without the ability to draw upon this facility and use Cash Collateral, the Debtors would be unable to maintain operations pending confirmation of the Plan that will maximize value for all constituents.  The proposed DIP Facility not only satisfies the Debtors' postpetition financing needs, but also ensures financing for the Debtors' businesses upon emergence from chapter 11 as the DIP Lenders have made a fully underwritten commitment to provide financing at exit pursuant to the terms of the $100,000,000 Senior Secured Exit Revolving Loan Facility Commitment Letter, dated August 26, 2017, executed by Wells Fargo

---

[3]　　The DIP Credit Agreement is attached hereto as Exhibit A.

[4]　　Copies of the Senior Credit Facility and related documents thereto will be made available to parties in interest upon request.

and Perfumania Holdings (the "Exit Facility Commitment Letter"), a copy of which is attached here to as Exhibit C. The DIP Facility presents the Debtors with the best economic terms available that will allow the Debtors to repay the existing Secured Credit Facility, while providing critical liquidity to maintain operations in the ordinary course and satisfying ongoing administrative expenses during these Chapter 11 Cases.

    4.  By this Motion, the Debtors seek entry of the proposed Interim Order and Final Order (together, the "DIP Orders"), which, among other things:

  a.  authorize the Debtors to obtain senior secured postpetition financing on a superpriority basis consisting of a senior secured superpriority asset-based revolving credit facility up to the lesser of (x) $83,750,000 or (y) a borrowing base calculated with reference to specified percentages of the eligible credit card and trade receivables and inventory of the Borrowers and Guarantors, which availability may be reduced by the lender in its reasonable discretion;

  b.  authorize the Debtors to execute and deliver the DIP Credit Agreement and any other agreements and documents related thereto (collectively with the DIP Credit Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

  c.  authorize the Debtors to use Cash Collateral;

  d.  grant adequate protection to the Senior Credit Facility Lenders;

  e.  grant to the DIP Agent valid, binding, continuing, enforceable, fully-perfected liens, subject and junior only to the Carve Out (as defined below) and valid, enforceable, properly perfected, and unavoidable prepetition liens that are senior to the liens of the Senior Credit Facility Lenders (as defined herein), upon substantially all of the Debtors' assets;

  f.  grant allowed superpriority administrative expense claims to the DIP Agent with respect to all amounts owed by the Debtors to the DIP Agent pursuant to the DIP Facility, subject to the Carve Out, to the extent set forth in the Interim Order;

  g.  authorize and direct the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents;

  h.  authorize the Debtors to use the proceeds of the DIP Facility in accordance with the Budget (as defined in the DIP Credit Agreement), including to repay in full the Senior Credit Facility;

i. waive (subject to the entry of the Final Order) the Debtors' right to surcharge the DIP Collateral pursuant to Bankruptcy Code section 506(c);

j. authorize the Senior Credit Facility Lenders to be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and for the "equities of the case" exception under section 552(b) to not apply to the Senior Credit Facility Lenders with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral;

k. modify the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of the DIP Documents and the DIP Orders; and

l. schedule a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2) to consider entry of the Final Order granting the relief requested in this Motion on a final basis.

## JURISDICTION AND VENUE

5. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

6. The statutory and legal predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 364, Bankruptcy Rules 2002 and 4001, and Local Bankruptcy Rule 4001-2.

7. Pursuant to Bankruptcy Rule 7008 and Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

**BACKGROUND**

**A.    The Chapter 11 Cases**

8.    On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

9.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has been appointed by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), nor has a trustee or examiner been appointed in the Chapter 11 Cases.

**B.    Background and Current Business Operations**

10.    Perfumania is an independent, national, vertically integrated wholesale distributor and specialty retailer of perfumes and fragrances.  The Company's wholesale business distributes designer fragrances to mass market retailers, drug, and other chain stores, retail wholesale clubs, traditional wholesalers, and other distributors throughout the United States.   The Company's retail business is operated  through a chain of retail stores that specialize in the sale of fragrances and related products at discounted prices up to 75% below the manufacturers' suggested retail prices and a Company-owned website that offers a selection of the Company's more popular products for sale online.

11.    Contemporaneous with the commencement of the Chapter 11 Cases, the Debtors filed their prepackaged joint plan of reorganization (the "Plan").  The Plan provides for a comprehensive reorganization of the Debtors that will allow the Company to close underperforming stores and reject unfavorable lease terms to establish a foundation for

sustainable long-term growth and to improve the overall returns from the Company's retail footprint going forward.  All Allowed Claims are Unimpaired under the Plan, including the Debtors' general unsecured creditors, such as trade vendors, employees, and landlords.  The Debtors will not solicit votes on the acceptance or rejection of the Plan because all holders of Claims against, or Interests in, the Debtors hold either (i) an unclassified Claim, (ii) a Claim or Interest that is Unimpaired, and are therefore deemed to have accepted the Plan, or (iii) an Interest that does not entitle such holder to receive or retain any property under the Plan, and are therefore deemed to have rejected the Plan.

12.    Additional factual background regarding the Debtors, including their business operations, their capital structure, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration.

**C.    Pre-Petition Marketing Process**

13.    As set forth in greater detail in the Warshauer Declaration, before the Petition Date, the Debtors engaged Imperial Capital, LLC ("Imperial") to assist them in evaluating strategic and financial alternatives. Imperial reached out via email, phone calls and in person meetings to nine well regarded financial institutions who have significant chapter 11 experience, wherewithal and potential interest in providing DIP financing for the Debtors. Despite these efforts, the Debtors were unable to obtain any DIP financing proposals on more economically advantageous terms than those provided by the DIP Agent.  Based on the feedback received by Imperial the potential investors are, (i) unable to compete with the interest and fee structure the DIP Lenders have proposed, (ii) unwilling get into a priming fight with the DIP Lenders, (iii) unwilling to provide DIP financing on a junior secured basis, and (iv) unwilling to extend credit to the Company just before the Company's peak selling season, which results in

higher-than-average draws on the DIP Facility.  Warshauer Declaration ¶ 8.  In sum, no third-party lender indicated that they would be willing to provide postpetition financing to the Debtors on more favorable terms than those negotiated in the DIP Facility.  Accordingly, the Debtors determined, in their sound business judgment, that the DIP Facility is the Debtors' best option to finance these Chapter 11 Cases.

**D.     The Debtors' Prepetition Capital Structure**

(i)     Common Stock

14.     As of the Petition Date, there were 15,493,763 shares of common stock in Perfumania Holdings outstanding.  Prior to the Petition Date, Stephen L. Nussdorf, Glenn H. Nussdorf, Arlene Nussdorf, Lillian Ruth Nussdorf  (the "Nussdorf Family") and an Affiliate of Rene Garcia ("Garcia") established a Delaware limited liability company, MJA Beauty, LLC ("NewHoldCo").  The Nussdorf Family and Garcia contributed an aggregate of  8,352,032 shares of the Company's common stock to NewHoldCo totaling approximately 54% of the Company's outstanding common stock.

(ii)     Principal Debt Obligations

15.     As of the Petition Date, Perfumania had approximately $199 million in long term debt consisting of the following, each as further described below: (a) $18.8 million outstanding on its $175 million Senior Credit Facility and $180.2 million in promissory notes including $54.8 million of accrued interest.

16.     Senior Credit Facility. On January 7, 2011, the Company entered into a revolving senior credit facility (the "Senior Credit Facility") pursuant to a certain Credit Agreement (as amended, amended and restated, modified, supplemented, or restated and in effect

from time to time the "Credit Agreement")[5] among Perfumania Holdings and certain of its subsidiaries as Borrowers[6] and certain affiliates as Guarantors;[7] a syndicate of banks (the "Senior Credit Facility Lenders"); Wells Fargo Bank, as administrative agent, collateral agent and swing line lender, and other parties thereto.

17.      The Senior Credit Facility is used for the Company's general corporate purposes and those of its subsidiaries, including working capital and capital expenditures.  The maximum borrowing amount under the Senior Credit Facility is the lesser of $175 million and a borrowing base calculated with reference to specified percentages of the Company's eligible credit card, trade receivables and inventory, which availability may be reduced by certain reserves.  Under this facility, which does not require amortization of principal, revolving loans may be drawn, repaid and reborrowed up to such maximum borrowing amount.  The Company must maintain availability under the facility of at least the greater of 10% of the aggregate amount that may be advanced against the borrowing base or $10 million.  As of the Petition Date, the Company had approximately $18.78 million outstanding under the Senior Credit Facility and $88,446,947 million of net availability to borrow under the Senior Credit Facility.

18.      Interest under the Senior Credit Facility is at variable rates plus specified margins that are determined based upon the Company's excess availability from time to time. The Company is also required to pay monthly commitment fees based on the unused amount of the Senior Credit Facility and a monthly fee with respect to outstanding letters of credit.

---

[5]      The Credit Agreement was amended twice: Amendment No. 1 to the Credit Agreement and Consent dated as of December 23, 2011 and Amendment No. 2 to the Credit Agreement, dated as of April 25, 2014.

[6]      Perfumania Holdings, collectively with QFG, SOW, Five Star, Northern Group, Inc., Perfumania, Inc., Magnifique Parfumes and Cosmetics, Inc., Ten Kesef II, Inc., Perfumania Puerto Rico, Inc., Perfumania.com, Inc., Parlux, and Parlux Ltd. (collectively, the "Borrowers").

[7]      Aladdin Fragrances, Inc., collectively with Niche Marketing Group, Inc., and Model Reorg (collectively, the "Guarantors").

19.    All obligations of the Company related to the Senior Credit Facility are secured by first priority perfected security interests in all personal and real property owned by the Company, including without limitation 100% (or, in the case of excluded foreign subsidiaries, 66%) of the outstanding equity interests in the subsidiaries. The Company is subject to customary limitations on its ability to, among other things, pay dividends and make distributions, make investments and enter into joint ventures, and dispose of assets. As of the Petition Date, the Company was in compliance with all financial and operating covenants.

20.    <u>Principal Unsecured Debt Obligations.</u> In addition, the Company has the following unsecured notes payable outstanding to affiliates which in the aggregate total $125.4 million of principal and constitute the Company's main outstanding unsecured debt obligations:

a.    <u>QKD Note</u>. Model Reorg Acquisition, LLC ("<u>Model Reorg</u>") issued an unsecured subordinated promissory note, dated as of August 11, 2008, in the principal amount of $35 million to Quality King Distributors, Inc. (the "<u>QKD Note</u>"). The QKD Note provides for payment of principal in quarterly installments between July 31, 2019 and October 31, 2022, with a final installment on October 31, 2022 of the remaining balance, and payment of interest in quarterly installments commencing on January 31, 2011 at the then current senior debt rate, as defined in the Senior Credit Facility, plus 1% per annum;

b.    <u>Nussdorf Trust Notes</u>. Promissory notes issued by Model Reorg in the aggregate principal amount of approximately $85.4 million held by six estate trusts established by Glenn, Stephen and Arlene Nussdorf (the "<u>Nussdorf Trust Notes</u>"). The Nussdorf Trust Notes were originally issued in 2008 in the principal amount of $55.4 million, but were replaced by amended and restated notes reflecting an additional $30 million loaned by the trusts on April 18, 2012, in order to help finance the Parlux Acquisition. The Nussdorf Trust Notes provide for payment of the principal in full on July 31, 2019 and payments of interest in quarterly installments commencing on July 31, 2012 at the then current senior debt rate plus 2% per annum; and

c.    <u>2004 Note</u>. On December 9, 2004, Perfumania, Inc. issued a subordinated convertible note to Glenn and Stephen Nussdorf in exchange for a $5 million subordinated demand loan made in March 2004 (the "<u>2004 Note</u>").

21.     The QKD Note, the Nussdorf Trust Notes, and the 2004 Note are subordinated to the Senior Credit Facility.  No principal may be paid on any of them until three months after the Senior Credit Facility terminates and is paid in full, and payment of interest is subject to satisfaction of certain conditions, including the Company's maintaining excess availability under the Senior Credit Facility of the greater of $17.5 million or 17.5% of the borrowing base certificate after giving effect to the payment, and a fixed charge coverage ratio, as defined in the credit agreement, of 1.1:1.0.  No payments of principal or interest have ever been made on the QKD Note or the Nussdorf Trust Notes.  On the 2004 Note, no payments of principal or interest have been made since October 2008.  As of July 29, 2017, accrued interest payable on the Nussdorf Trust Notes, the QKD Note, and the 2004 Note was approximately $54.8 million in the aggregate.  Shortly before and in anticipation of the filing of the petitions in these Cases, the QKD Note, the Nussdorf Trust Notes and the 2004 Note were amended to waive existing defaults and extend their stated maturities until ninety days after the stated maturity date of the proposed Exit Facility (as defined below).

## COMPLIANCE WITH LOCAL BANKRUPTCY RULE 4001-2

22.     Local Bankruptcy Rule 4001-2(a)(i) requires that certain provisions contained in the financing documents and/or the DIP Orders be highlighted, and that the Debtors must provide justification for the inclusion of such provisions.  The Debtors believe that certain provisions of the DIP Facility discussed below may implicate Local Bankruptcy Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of these cases.  Below are the provisions that might fall within the ambit of Local Bankruptcy Rule 4001-2.

(i)     506(c) Waiver.  Local Bankruptcy Rule 4001-2(a)(i)(C) requires identification of provisions that seek to waive, without notice, the debtor's

rights under Bankruptcy Code section 506(c).  Subject to the entry of the Final Order, the DIP Credit Agreement makes it an event of default if the Debtors (or any other party in interest) obtain an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to subject any of the DIP Agent's collateral to a surcharge pursuant to Bankruptcy Code section 506(c).  This provision is justified because (i) the Debtors need the financing provided by the DIP Facility and the DIP Lenders were not willing to provide the DIP Facility without the section 506(c) waiver, (ii) such waiver does not take effect until after the Final Order is entered, and (iii) the DIP Facility provides for a Carve Out that will fund certain administrative expenses and professional fees following an event of default under the DIP Facility.  Accordingly, the Debtors submit that the 506(c) waiver of the DIP Facility is necessary and appropriate under the circumstances.  Moreover, because this provision will only be effective upon entry of the Final Order and to the extent such order so provides, parties in interest will have an opportunity to be heard with respect to this provision.

(ii)     Equities of the Case under Section 552(b).  Local Rule 4001-2(a)(i)(H) requires identification of provisions that seek to affect this Court's power to consider the equities of the case under Bankruptcy Code section 552(b). The Interim Order provides that the equities of the case exception under section 552(b) of the Bankruptcy Code shall not apply to the Agent or any of the DIP Lenders with respect to proceeds, products, offspring or profits of any of the DIP Collateral.  Interim Order §5.9.  In the course of negotiations, the DIP Agent insisted upon this provision as a condition to funding.  This provision is justified (i) in light of the Debtors' need for the DIP Facility, (ii) it will not be effective until entry of the Final Order after notice and a hearing, and (iii) the fact that the DIP Facility provides for a Carve Out that will fund certain administrative expenses and professional fees following an event of default under the DIP Facility.  Moreover, because this provision will only be effective upon entry of the Final Order and to the extent such order so provides, parties in interest will have an opportunity to be heard with respect to this provision.

(iii)    "Creeping" roll-up of the Senior Credit Facility. Local Rule 4001-2(a)(i)(E) requires identification of provisions that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.   The Debtors are seeking authority to incrementally repay all outstanding amounts owed under the Senior Credit Facility.  The "creeping" roll-up feature of the DIP Facility provides that the Debtors' collection of receivables and other proceeds of collateral under the Senior Credit Facility will be applied to satisfy amounts owed under the Senior Credit Facility and free up corresponding borrowing availability under the DIP Facility.  As such, additional availability will be created under the DIP Facility, creating a gradual roll-up of the Senior Credit Facility into the DIP Facility.  The Debtors believe that repayment

12

of the amounts outstanding under the Senior Credit Facility is appropriate under the circumstances and will not prejudice the Debtors or their estates. First, the DIP Agent was otherwise unwilling to lend and the Debtors have been unable to obtain other financing on reasonable terms sufficient to provide needed liquidity. Second, the validity, enforceability, and priority of the liens granted by the Debtors under the Senior Credit Facility are subject to the "challenge" rights of third parties, including any committee appointed in these Chapter 11 Cases. Thus, insofar as the satisfaction of the Senior Credit Facility is premised upon the validity of the blanket liens granted by the Debtors thereunder, a committee, if any, will have an opportunity to examine the propriety of such repayment, and to clawback such repayment to the extent that the underlying liens are avoided. For these reasons, the Debtors submit that the roll-up feature of the DIP Facility is appropriate and in the best interests of the Debtors, their estates, and creditors.

(iv)   <u>Liens on Avoidance Actions.</u> Local Rule 4001-2(a)(i)(D) requires identification of provisions that grant prepetition secured creditors liens on the debtor's claim and causes of action arising under Bankruptcy Code sections 544, 545, 547, 548, and 549. The obligations under the DIP Facility are secured by DIP Liens on, among other things, upon entry of the Final Order, all avoidance actions and the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. This provision is justified (i) in light of the Debtors' need for the DIP Facility, (ii) it will not be effective until entry of the Final Order after notice and a hearing, and (iii) the fact that the DIP Facility provides for a Carve Out that will fund certain administrative expenses and professional fees following an event of default under the DIP Facility. Moreover, because this provision will only be effective upon entry of the Final Order and to the extent such order so provides, parties in interest will have an opportunity to be heard with respect to this provision.

23.   The Debtors do not believe that the other provisions of Local Bankruptcy Rule 4001-2(a)(i) are implicated; thus, they are not mentioned herein.

# SUMMARY OF THE DIP FACILITY TERMS[8]

24. In accordance with Bankruptcy Rules 4001, the following summarizes the significant terms of the DIP Facility, as set forth in the DIP Documents and the Interim Order.

| | |
|---|---|
| **Borrowers**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Perfumania Holdings, Inc., Quality King Fragrance, Inc., Scents of Worth, Inc., Northern Group, Inc., Perfumania, Inc., Magnifique Parfumes and Cosmetics, Inc., Ten Kesef II, Inc., Perfumania Puerto Rico, Inc., Perfumania.com, Inc., (collectively, "<u>Debtor Borrowers</u>"), Five Star Fragrance Company, Inc., Parlux Fragrances, LLC, and Parlux Ltd., (each a "<u>Non-Debtor Borrower</u>" and collectively with the Debtor Borrowers, the "<u>Borrowers</u>").  See Ratification Agreement Preamble. |
| **Guarantors** | Aladdin Fragrances, Inc, Niche Marketing Group, Inc., and Model Reorg Acquisition, LLC (the "<u>Guarantors</u>").  See Ratification Agreement Preamble. |
| **Agent** | Wells Fargo.  See Ratification Agreement Preamble. |
| **DIP Lenders**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Wells Fargo and the other lenders party to the Senior Credit Facility.  See Ratification Agreement Preamble. |
| **Commitment**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(ii)* | Subject to certain limitations, a senior secured superpriority asset-based revolving credit facility up to the lesser of (x) $83,750,000 or (y) a borrowing base calculated with reference to specified percentages of the eligible credit card and trade receivables and inventory of the Borrowers and Guarantors, which availability may be reduced by the lender in its reasonable discretion, and with certain borrowing restrictions, the ability to draw upon letters of credit up to $10 million (the "<u>Letters of Credit</u>").  See Ratification Agreement § 1.2. |
| **Term/Maturity**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(ii)* | "Maturity Date"  shall mean the earliest to occur of (a) December 31, 2017, (b) forty-five (45) days after the entry of the Interim Financing Order if the Permanent Financing Order has not been entered prior to the expiration of such forty-five (45) day period (or such longer period if consented to in writing by the Agent), (c) the effective date of a plan of reorganization filed in the Chapter 11 Case pursuant to an order entered by the Bankruptcy Court, (d) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties, other than, for the avoidance of doubt, the Store Closing GOB Sales (as defined in Section 5.4(a) of the Ratification Agreement), (e) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of any Debtor to a Chapter 7 case, (f) the date this Agreement is otherwise terminated for any reason whatsoever pursuant to the terms of this Agreement, and (g) the acceleration of the Obligations or termination of the Commitments hereunder, including without limitation, as a result of the occurrence of an Event of Default.  See Ratification Agreement § 1.2(n). |
| **Interest Rates**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local* | Each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin.  Base Rate means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent |

---

[8] This summary of the DIP Facility is based upon the DIP Documents and is provided for the benefit of this Court and other parties in interest.  To the extent there are any conflicts between this summary and the DIP Documents, the terms of the DIP Documents shall govern.  Capitalized terms used in this summary but not otherwise defined herein shall have the meanings set forth in the DIP Documents.

| | |
|---|---|
| *Bankruptcy Rule 4001-2(a)(ii)* | (0.50%) or (b) the rate of interest in effect for such day as publicly announced from time to time by Wells Fargo as its "prime rate."  <u>See</u> Prepetition Credit Agreement § 2.08; Ratification Agreement § 1.2(bb).  The Applicable Margin means 3.25% for the Base Rate Margin and 4.5% for the Letter of Credit Fee.  <u>See</u> Ratification Agreement § 1.2(b). |
| **Default Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(ii)* | Effectively immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Lenders, the default rate is, other than with respect to the Letter of Credit Fees, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin, if any, applicable to Base Rate Loans, plus (iii) two percent (2%) per annum; and with respect to the Letter of Credit Fees, a rate equal to the Applicable Margin for Standby Letters of Credit or Commercial Letters of Credit, as applicable, plus two percent (2%) per annum. Prepetition Credit Agreement § 2.08. |
| **Expenses and Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | In addition to the fees and expenses provided under the Prepetition Credit Agreement, Borrowers shall pay to Agent, for the account of DIP Lenders on a pro rata basis according to their respective Commitments, a debtor-in-possession financing facility fee, in the amount of one percent (1%) of the Aggregate Commitments, on account of the financing provided by Agent and DIP Lenders to Borrowers in these Chapter 11 Cases, which fee shall be fully earned and due and payable on the Ratification Closing Date.  Subject to the terms of the Interim Order, Borrowers shall pay to Agent and any Lender on demand all reasonable documented out-of-pocket costs and expenses that Agent or any Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Loan Documents and the Interim Order.  <u>See</u> Ratification Agreement §§ 6, 11.6; Interim Order § 5.12. |
| **Liens and Priorities**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i), (xi),Local Bankruptcy Rules 4001-2(a)(i)(A) and (D)and 4001-2(a)(ii)* | Claims arising under the DIP Facility (the "<u>DIP Claims</u>") shall have priority and shall be secured by liens on the Collateral (as defined in the Interim Order), in all instances subject to the Carve Out (as defined below):<br><br>a.    pursuant to section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Facility (the "<u>DIP Obligations</u>") will be entitled to super-priority administrative expense status in the Chapter 11 Cases (the ""<u>Superpriority Claims</u>");<br><br>b.    pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Obligations will be secured by a perfected first priority lien on all unencumbered assets of the Debtors; and<br><br><u>See</u> Interim Order §§ 2.1, 2.2 |
| **Lien Validation and Perfection**<br><br>*Local Bankruptcy Rule* 4001(a)(i)(B) | The recitals in the Interim Order provide stipulations by the Debtors to the validity and priority of the liens securing the obligation under the DIP Facility. Notwithstanding anything to the contrary in the Interim Order, any challenge to the validity of the obligations under DIP Facility shall be properly filed with the Court (x) by any Committee on or before the earlier of (i) sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee and (ii) the entry of an order in any of the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code, or (y) if no Committee is appointed, by any party in interest with requisite standing on or before the earlier of (i) seventy-five (75) calendar days from the date of entry of this Interim Order and (ii) the entry of an order in any of the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that nothing herein shall permit any party to challenge the extent or validity of the Post-Petition Obligations for any disbursements in excess of the Pre-Petition Obligations.  <u>See</u> Interim Order § 4.1; Ratification Agreement §§ 2.2, 2.3. |

| | |
|---|---|
| **Release of Claims**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | In consideration of the furnishing of the DIP Facility, the Borrowers, subject to the rights of another party to bring a challenge action during the Review Period, will absolutely release and forever discharge the Agent and DIP Lenders from any and all claims and causes of action of every kind and nature that the Borrowers may hold against such released parties. See Interim Order §§ 4.1; 4.5; Ratification Agreement § 8. |
| **Adequate Protection**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iv), (c)(1)(B)(ii)* | The DIP Lenders shall receive adequate protection in the Collateral (as defined in the Ratification Agreement), including through the provision of replacement liens, superpriority administrative expense claims (subject to the payment of the Carve Out), and current cash payment of reasonable fees and expenses, including attorneys' fees.  See Interim Order §§ 2.6, 5.12 |
| **Carve Out**<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The term "Carve Out" means the sum of: (i) all allowed administrative expenses pursuant to 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Bankruptcy Court and pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code, plus interest at the statutory rate, as determined by agreement of the U.S. Trustee or by final order of the Bankruptcy Court (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all Reported Fee Accruals (as defined in the Ratification Agreement), less the amount of any fee retainers received by professionals retained by the Debtors or any Committee pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code (the "Professionals") and not previously applied to the fees and expenses of the Professionals (the "Pre-Trigger Allowed Professional Fees") incurred by such Professionals at any time after the Petition Date and before or on the date of delivery by the Agent of a Carve-Out Trigger Notice (as defined in the Ratification Agreement) (the "Pre-Trigger Date Professional Fee Carve Out"); provided, that the Pre-Trigger Date Professional Fee Carve Out (A) shall not at any time exceed the aggregate amount of the fees and expenses identified in the Budget for each such Professional or category of Professional covering the period of time through (but not after) the date of delivery of a Carve-Out Trigger Notice, les any amounts actually paid to such Professionals in respect of fees and expenses, and (B) shall be permanently reduced by the amount set forth in any Carve Out Escrow Notice (defined below) received by Agent in accordance with Section 2.3(c) of this Interim Order; and (iv) all fees, disbursements, costs and expenses of the Professionals to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order or otherwise,, incurred on and after the first Business Day following delivery by the Agent of a Carve Out Trigger Notice (the "Post-Trigger Allowed Professional Fees"; and together with the Pre-Trigger Allowed Professional Fees, collectively, the "Allowed Professional Fees") in an aggregate amount not to exceed $1.5 (the "Post-Trigger Date Professional Fee Carve Out"; and together with the Pre-Trigger Date Professional Fee Carve Out, collectively, the "Professional Fee Carve-Out").  See Interim Order § 2.3 |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(ii)* | Usual and customary events of default for financings of this type, including, without limitation: nonpayment of principal, interest and fees, covenant defaults, breaches of representations and warranties, judgments exceeding a certain threshold, certain bankruptcy-related defaults, and dismissal or conversion under the Bankruptcy Cases. See Ratification Agreement § 7.10; Prepetition Credit Agreement § 8.01. |
| **Affirmative and Negative Covenants** | The DIP Credit Agreement requires compliance with financial, negative and affirmative covenants that are ordinary and customary in debtor-in-possession financings, including, without limitation, satisfaction of "milestone" deadlines for the progress of these Chapter 11 |

| | |
|---|---|
| *Local Bankruptcy Rule 4001-2(a)(ii)* | Cases.  See Ratification Agreement § 5. |
| **Budget Compliance**<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The use of the proceeds of the DIP Facility shall be in compliance with the Budget, a copy of the form of which is attached hereto as Exhibit B.  See Ratification Agreement § 5.3. |
| **Use of Proceeds and Cash Collateral**<br><br>*Bankruptcy Rules 4001(b)(1)(B), (c)(1)(B); Local Bankruptcy Rule 4001-2(a)(ii)* | All Loans and Letters of Credit provided by Agent or any Lender to Borrowers pursuant to the Financing Order, the Credit Agreement or otherwise, shall only be used by Borrowers to the extent (a) provided for in the Budget, (b) permitted by the Loan Documents, and (c) as authorized by the Bankruptcy Court and consented to by the Agent for: (i) general working capital needs, (ii) the repayment of the Obligations and (iii) the payment of fees, expenses, and costs incurred in connection with this Ratification Agreement and the Chapter 11 Case, including the payment of any adequate protection payments approved in the Financing Order. None of the proceeds of any Loans or the Letters of Credit shall be used to make any payments to a Sanctioned Entity or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any operations of a Sanctioned Entity or a Sanctioned Person), or in any other manner that would result in a violation of Sanctions by any Person.  See Ratification Agreement § 5.2; Interim Order §1.2. |
| **Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The Ratification Agreement includes the following milestones:<br>• On the Petition Date, the Debtors shall file motions, each in form and substance satisfactory to the Lender, requesting approval from the Bankruptcy Court (i) to retain the Third Party Liquidator to conduct Debtors' going out of business sales on terms and conditions acceptable to Agent (the "Store Closing GOB Sales"); and (ii) to conduct the Store Closing GOB Sales at all of the sixty-five (65) store locations identified on Schedule 5.5 hereto with an Applicable Rejection Date of September 30, 2017 (the "Phase 1 GOB Sales") and the store locations to be identified to Lender with an Applicable Rejection Date of October 31, 2017 in accordance with Section 5.5(d) below (the "Phase 2 GOB Sales") on terms and conditions acceptable to Agent.  Prior to conducting the Phase 2 GOB Sales, Debtors must enter into an amendment to the Retention Agreement, or an additional Retention Agreement, in form and substance acceptable to Agent, to conduct the Phase 2 GOB Sales.<br><br>• On or before the third (3rd) day following the Petition Date, Debtors shall obtain orders from the Bankruptcy Court, each in form and substance satisfactory to Agent, authorizing (i) the retention of the Third Party Liquidator on terms and conditions acceptable to Agent, and (ii) the Store Closing GOB Sales, which orders shall authorize and direct, among other things, that all proceeds from the Store Closing GOB Sales shall be remitted to Agent for application against the Obligations and otherwise on terms and conditions acceptable to Agent.<br><br>• On or before the fifth (5th) day following the Petition Date, Debtors shall file with the Bankruptcy Court a motion seeking approval of a Disclosure Statement and proposed plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Plan of Reorganization"), each on terms and conditions satisfactory to Agent;<br><br>• On or before the thirtieth (30th) day following the Petition Date, Debtors shall provide Lender with the list of store locations at which the Phase 2 GOB Sales shall be conducted; and on the thirty-fifth day following the Petition Date, the Phase 2 GOB Sales shall commence;<br><br>• On or before the thirty-fifth (35th) day following the Petition Date, Debtors shall file a proposed order confirming the Plan of Reorganization, in form and substance acceptable to Agent; |

|  | • On or before the forty-fifth (45th) day following the Petition Date, Debtors shall accept or reject the lease for each store location set forth on Schedule 5.5 attached hereto with an Applicable Rejection Date of October 31, 2017: |
|  | • On or before the fifty-fifth (55th) day following the Petition Date any objections to confirmation of the Plan of Reorganization are due to be filed with, or delivered to, any court-approved noticing agent. |
|  | • The official vote tabulation with respect to voting on the Plan of Reorganization, if any, results in all impaired classes of claims and interests under the Plan of Reorganization that are entitled to vote on the Plan of Reorganization voting to accept or being deemed to vote to accept the Plan of Reorganization. |
|  | • On or before the sixtieth (60th) day following the Petition Date, the Debtors shall obtain an order from the Bankruptcy Court (i) approving the Disclosure Statement on terms and conditions satisfactory to the Agent, and such order is not thereafter vacated, reversed, modified or altered on appeal or by reconsideration without the prior written consent of the Agent and (ii) confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to Agent (the "<u>Plan of Reorganization Confirmation Order</u>"). |
|  | • On or before the seventy-fifth (75th) day following the Petition Date, the Plan of Reorganization Confirmation Order shall become a Final Order, not subject to being vacated, reversed, modified or altered on appeal or by reconsideration. |
|  | • On or before the ninetieth (90th) day following the Petition, the Effective Date under (and as defined in) the Plan of Reorganization shall occur. |
|  | <u>See</u> Ratification Agreement § 5.5. |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | Borrowers to provide indemnity to the Indemnitee (as defined in the Prepetition Credit Agreement) for various liabilities, not including any Indemnified Liability that a court of competent jurisdiction determines to have resulted from gross negligence or willful misconduct of the Indemnified Person or certain parties related to it.  <u>See</u> Prepetition Credit Agreement § 10.04 |
| **Modification of the Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are modified to the extent necessary to permit Agent and each DIP Lender to perform, immediately upon entry of the Interim Order and at any time thereafter, any act authorized or permitted under or by virtue of the Interim Order or the DIP Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition Obligations or the Post-Petition Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Documents (subject to Section 5.12 of this Interim Order) and apply such payments to the Pre-Petition Obligations or Post-Petition Obligations pursuant to the Loan Documents and/or this Interim Order, as applicable.  <u>See</u> Interim Order § 3.4 |

## RELIEF REQUESTED

25.     The Debtors seek authority (i) to obtain postpetition financing pursuant to the terms and conditions of the DIP Credit Agreement and to use Cash Collateral, (ii) grant liens and superpriority claims in favor of the DIP Agent and adequate protection in favor of the Senior Credit Facility Lenders, (iii) modify the automatic stay, (iv) schedule a final hearing, and (v) grant related relief.

## BASIS FOR RELIEF

### A.    The Debtors' Need For Liquidity

26.     As further described in the First Day Declaration and the Warshauer Declaration, the Debtors require immediate access to the DIP Facility and to Cash Collateral to fund the costs of working capital obligations, operating expenses, and expenses relating to administration of the Chapter 11 Cases to preserve and maintain the going concern value of the Debtors' estates.  The Debtors' forecasted liquidity needs during the period until entry of a Final Order are set forth in detail in the budget attached hereto as Exhibit B.  Absent immediate access to the DIP Facility, the Debtors will not have sufficient liquidity to operate their business or fund their ordinary course expenditures, including paying their over 1,400 employees and obtaining adequate inventory for the upcoming holiday season – the Company's most profitable time of year.  Absent adequate funding, the Debtors may be required to close their stores prematurely, reduce their volume in advance of the holiday season, lose valuable wholesale accounts, cease operations, and liquidate on a piecemeal basis, causing irreparable harm to the Debtors and their estates.  Warshauer Declaration ¶ 16.  Accordingly, the Debtors have an urgent and immediate need to access the DIP Facility.

**B.**      **The Debtors' Negotiation of the DIP Facility**

27.      As fully discussed in the Warshauer Declaration, recognizing the Debtors' need for capital during these Chapter 11 Cases, the Debtors and their advisors initiated a marketing process to obtain debtor-in-possession financing.  In connection therewith, the Debtors' advisors prepared summary documentation describing the Debtors' capital structure, asset base, and financing needs.  Simultaneously, the Debtors' advisors began identifying potential financing sources, with a focus on institutions with the ability to provide financing on an expedited bases.

28.      In total, Imperial reached out to nine well regarded financial institutions who have significant chapter 11 experience, wherewithal and potential interest in providing DIP financing for the Debtors.  For the reasons discussed above, the Debtors were unable to obtain any proposals for the DIP Financing on more economically advantageous terms.  Warshauer Declaration ¶ 8.

29.      During this marketing process, the Debtors and their advisors sought to (i) secure financing that would provide sufficient liquidity for both the pendency of the Chapter 11 Cases and for the Debtors to execute upon their business plan post-emergence; and (ii) minimize the Debtors' cost of capital.  In particular, given the significant challenges facing the retail industry, and the difficult outcomes in some other recent retail bankruptcies, the Debtors believed it was particularly important to secure an attractive debtor-in-possession financing package that would also serve as a stepping stone into an exit facility.  By having both debtor-in-possession and exit financing commitments in hand, the Debtors can send a strong message to the market that the Debtors have the capacity to successfully implement their anticipated restructuring and emerge from bankruptcy in an expedited timeframe.

30.     Ultimately, only the DIP Lenders were willing to provide the Debtors with any postpetition financing.  Indeed, no third-party lender indicated that they would be willing to provide postpetition financing to the Debtors on more favorable terms than those negotiated in the DIP Facility.  Warshauer Declaration ¶ 9.  In addition to committing to provide the DIP Facility, Wells Fargo also committed to provide a senior secured asset-based revolving credit facility upon emergence from chapter 11 (the "Exit Facility"), pursuant to the terms of the Exit Facility Commitment Letter.  Together, these financing facilities will provide sufficient liquidity for the Debtors' operations and provide confidence to vendors, customers, landlords, and employees that the Debtors will be able to operate successfully during and after the Debtors' have emerged from chapter 11.  The negotiations over the DIP Facility and Exit Facility were conducted at arms' length and in good faith and proceeded over several weeks as the debtors sought to secure the best possible terms under the circumstances.  Warshauer Declaration ¶ 10.  Accordingly, after careful consideration and extensive discussions with the Debtors' advisors, the Debtors determined that the DIP Facility and Exit Facility offers them the best chance for a cost-efficient, quick, and consensual restructuring.  The Debtors submit that the DIP Facility is their best option to finance these Chapter 11 Cases and the decision to enter into the DIP Credit Agreement constitutes a sound exercise of their business judgment.

## APPLICABLE AUTHORITY

31.     For the reasons set forth herein, the Debtors have an immediate need for adequate postpetition financing to continue operating their business in the ordinary course and preserve the value of their assets.

32.     The Debtors were unable to obtain adequate unsecured credit allowable as an unsecured claim or superpriority administrative expense because substantially all of the

Debtors' assets remain subject to prepetition liens.  The Debtors were also unable to obtain postpetition financing on a junior secured basis.  The DIP Facility reflects the most favorable terms on which the DIP Lenders were willing to offer financing.  Warshauer Declaration ¶ 10. The Debtors believe that the DIP Facility will allow them to continue their operations in the ordinary course, maintain prudent cash balances, satisfy working capital requirements, fund restructuring costs, and otherwise meet their liquidity needs throughout the Chapter 11 Cases. The Debtors believe that the terms of the DIP Credit Agreement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

## I.     THE DIP FACILITY SHOULD BE APPROVED

### A.     The DIP Facility Is Necessary To Preserve The Value Of The Debtors' Estates And Is In The Best Interests Of Creditors.

33.     Without the DIP Facility, the Debtors will be unable to fund the day-to-day operating expenses of their business necessary to maintain the value of the Debtors' assets, including payments to landlords, vendors, employees, and other general corporate and working capital requirements – all of which are critical to sustain the Company's going concern value. Absent sufficient funds to support the Debtors' operations, the value of the Debtors' assets and operations will quickly erode, to the detriment of the Debtors' estates and stakeholders.  See In re Farmland Indus., Inc., 294 B.R. 855, 885 (Bankr. W.D. Mo. 2003) (approving postpetition financing and noting that "[w]ithout the continued financing, the Debtors would likely be forced into a Chapter 7 or 11 liquidation, to the detriment of all creditors").

34.     As a result of ongoing expenses, including those related to the Debtors' restructuring efforts and ordinary course expenditures, the Debtors have an immediate need for postpetition financing.  Without the critical funding provided by the DIP Facility, the Debtors would, among other things: (i) not be able to obtain adequate inventory for the upcoming holiday

season, which is the Company's most profitable time period for both its retail and wholesale

business segments; (ii) be forced to close stores prematurely; and (iii) be unable to pay their over

1,400 employees.  Shortfalls in liquidity could also cause irreparable damage to the Debtors'

relationships with customers, vendors, and wholesale accounts.  Thus, the Debtors submit that

the DIP Facility is in the best interest of the Debtors' estates, creditors, and all other stakeholders.

> **B.      The Debtors Should Be Authorized To Obtain Postpetition Financing On A Senior Secured Superpriority Basis Pursuant To Bankruptcy Code Sections 364(c).**

35.      Bankruptcy Code section 364 allows a debtor to obtain (a) unsecured

credit in the ordinary course of business, (b) unsecured credit outside the ordinary course of

business, (c) credit with specialized priority or with certain security interests, and (d) secured

credit by granting a senior or pari passu lien on already encumbered property.  In other words,

section 364 is "structured with an escalating series of inducements . . . " that may be offered to

attract postpetition financing.  <u>Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs.,</u>

<u>Inc.)</u>, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), <u>aff'd</u>, 881 F.2d 6 (2d Cir. 1989).

36.      Here, the Debtors assert that the DIP Agent should be entitled to assert

superpriority claims on account of the DIP Facility obligations under Bankruptcy Code section

364(c) and priming liens on the Collateral (as defined in the Ratification Agreement) under

Bankruptcy Code section 364(d).

37.      Courts consider various factors in determining whether a debtor may

obtain postpetition financing under Bankruptcy Code section 364(c), including whether (i) the

debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is

necessary to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable,

and adequate given the circumstances of the debtor-borrower and the proposed lender, (iv) entry

into the financing constitutes an exercise of the debtor's sound and reasonable business judgment, and (v) the financing was negotiated in good faith and at arm's-length between the debtor and the lender.  See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011); In re Farmland Indus., Inc., 294 B.R. at 879-81; In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

    38.  To satisfy the requirements of Bankruptcy Code section 364(c), a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Id.; see, e.g., In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); In re Gen. Growth Props., Inc., 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009) (observing that debtor's "reasonable efforts, under the circumstances, to locate financing" was a sufficient showing under section 364).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

39.     Here, due, in part, to the existing prepetition liens and security interests on the Debtors' assets, including under the Senior Credit Facility, the Debtors were unable to procure sufficient debtor-in-possession unsecured financing allowable under sections 364(a), 364(b), and 364(c)(1).  The Debtors and their advisors have searched for debtor-in-possession financing on the most favorable terms.  As set forth above and in the Warshauer Declaration, the Debtors engaged in a robust prepetition process to secure debtor-in-possession financing.  The Debtors' management, with the assistance of their advisors, explored various alternative sources of capital and financing as a part of this process, but determined that financing was unavailable on an unsecured basis.  The Debtors' extensive efforts to seek the necessary postpetition financing from sources within the Debtors' existing capital structure and from third parties were reasonable and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

**C.     The DIP Facility Is Necessary To Preserve The Assets Of The Debtors' Estates**

40.     As detailed in the First Day Declaration and the Warshauer Declaration, it is essential that the Debtors immediately obtain the financing necessary to preserve and protect the value of their estates.  The Debtors do not have sufficient working capital, financing or cash collateral to continue the operation of their businesses without near-term, additional financing.

41.     The DIP Facility is necessary for working capital, operating costs and expenses incurred during the Chapter 11 Cases.  The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing.  For instance, the DIP Facility will ensure the Debtors have sufficient liquidity to meet accruing payroll obligations, rent obligations, and payments to vendors that will come due over the course of these Chapter 11 Cases.  The Debtors' inability to pay their employees would threaten the stability of the Debtors' workforce and would result in significant

disruptions to the operation of the Debtors' businesses, which, in turn, could jeopardize the

Debtors' ability to quickly emerge from chapter 11 while providing all creditors with a full

recovery.  The DIP Facility is therefore necessary to ensure that the Debtors are able to maintain

their businesses and thereby maximize the value of their estates. See Burtch v. Ganz (In re

Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to

maximize their estates' assets).

   42. Without the DIP Facility, the Debtors would be "to force[d] . . . to close

down their operations and thus doom any effort at reorganization which will hopefully extract

the maximum value of the assets involved to the benefit of all classes of creditors and other

constituencies involved in this case."  In re Dynaco Corp., 162 B.R. 389, 396 (Bankr. D. N.H.

1993).  Because this result would be fundamentally at odds to the rehabilitative purposes of

chapter 11, approval of this Motion is warranted.  Id. at 394 (noting that "'it is apparent that the

Congress intended business under reorganization to proceed in as normal a fashion as possible'"

(quoting In re Prime, Inc., 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

   **D.**  **The Terms Of The DIP Facility Are Fair, Reasonable, And Appropriate**

   43. In considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances and disparate

bargaining power of both the debtor and potential lender. See In re Farmland Indus., Inc., 294

B.R. at 886; see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust

Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986).

   44. The terms of the DIP Credit Agreement were negotiated in good faith and

at arm's-length between the Debtors and the DIP Lenders, resulting in agreements designed to

permit the Debtors to obtain the needed liquidity to maximize the value of their assets through

confirmation of the Plan.  Warshauer Declaration ¶¶ 10, 15.  The DIP Agent required that the Debtors grant the DIP Liens and Postpetition Financing Superpriority Claims upon the terms and conditions set forth the DIP Credit Agreement and DIP Orders.  The DIP Liens and Postpetition Financing Superpriority Claims will be subject to the Carve Out.  Such carve outs generally "preserve the adversary system" by ensuring that the committees and the debtor's estate are adequately assisted by counsel.  See In re Ames Dep't Stores, 115 B.R. at 38 (noting that courts generally "insist on a carve out" for professional fees, and that "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  Additionally, the Carve Out protects against administrative insolvency during the course of the cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the official committee of unsecured creditors, if any, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

45.    With respect to the creeping roll-up feature of the DIP Facility, it is a reasonable and appropriate provision under the circumstances.  The DIP Facility is an asset-based revolving credit facility and is structured in substantially the same way as the Senior Credit Facility: the Debtors' receivables are swept on a daily basis to pay down the outstanding amounts owed under the Senior Credit Facility and the Debtors can reborrow in accordance with certain lending formulae, sublimits, and other terms and conditions under the Ratification Agreement.  Continuing this prepetition practice, the DIP Facility allows proceeds from cash collected to be applied in the ordinary course of the Debtors' operations to first pay down the outstanding amounts owed under the Senior Credit Facility, which will in turn free up borrowing availability under the DIP Facility, and then to repay all Postpetition Obligations (as defined in

the Ratification Agreement).  All outstanding Letters of Credit under the Senior Credit Facility

will also be deemed to have been issued under the DIP Credit Agreement.

46.     The roll-up feature of the DIP Facility is fair and reasonable and will not

prejudice the Debtors or their estates for a least two principal reasons.  First, the DIP Lenders

were unwilling to enter into the DIP Facility unless the Senior Credit Facility was fully repaid.

As the Debtors were unable to obtain other DIP financing, the roll-up feature of the DIP Facility,

which is a condition precedent under the DIP Credit Agreement, was necessary and appropriate

to obtain needed liquidity.  Courts in this district and others have permitted debtors to use

postpetition financing to pay prepetition secured claims of a lender where, as here, the loan

cannot be obtained on any other basis and the claims of the prepetition lenders are fully secured.

See, e.g., Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future

Holding Corp.), 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015); see also In re

UniTek Global Servs., Inc., Case No. 14-12471 (PJW) (Bankr. D. Del. Dec. 2, 2014), In re

Coldwater Creek Inc., Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014); In re Quantum

Foods, LLC, Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014).

47.     Second, as of the Petition Date, the Company only had approximately

$18.78 million outstanding under the Senior Credit Facility.  The Debtors believe that this

outstanding amount is far less than the value of the Prepetition Collateral.  In addition to these

prepetition secured obligations being oversecured, the validity, enforceability, and priority of the

liens granted by the Debtors under the Senior Credit Facility are subject to the "challenge" rights

of third parties, including any committee appointed in these Chapter 11 Cases.  See In re Halcon

Resources Corp., Case No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) (authorizing roll-up

of a prepetition asset-based lending facility where the secured obligations being rolled up were

oversecured and the rolled-up debt was subject to challenge); In re Pacific Sunwear of

California, Inc., Case No. 16-10882 (LSS) (Bankr. D. Del. April 7, 2016) (same).  Thus, insofar

as the satisfaction of the Senior Credit Facility is premised upon the validity of the blanket liens

granted by the Debtors thereunder, parties in interest will have an opportunity to examine the

propriety of such repayment and to clawback such repayment to the extent that the underlying

liens are avoided.  For the foregoing reasons, the Debtors submit that the repayment feature of

the DIP Facility is appropriate and in the best interests of the Debtors, their estates, and creditors.

48.     Accordingly, the DIP Facility provides the Debtors with the liquidity they

need to operate their businesses during the Chapter 11 Cases.  After thorough analysis by the

Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable

and appropriate under the circumstances.

### E.     Entry Into The DIP Facility Reflects The Debtors' Sound Business Judgment

49.     The Debtors exercised their reasonable business judgment in determining

that the DIP Facility is the best financing option available under the present circumstances.

Bankruptcy courts routinely defer to a debtor's business judgment in considering whether to

approve the debtor's request to obtain postpetition financing.  See e.g., Trans World Airlines, Inc.

v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del.

1994) (approving post-petition loan and receivables facility because such facility "reflect[ed]

sound and prudent business judgment"); In re Ames Dep't Stores, 115 B.R. at 40 (observing that

the court should defer to debtor's "reasonable business judgment . . . so long as the financing

agreement does not . . . leverage the bankruptcy process . . ." and its purpose is to benefit the

estate rather than another party-in-interest).

50.     The Debtors believe that the DIP Credit Agreement contains terms that are fair, reasonable, and in the best interests of the Debtors and their estates.  As explained herein, the Debtors would be irreparably harmed without the ability to enter into the DIP Facility, including the roll-up, and virtually all of their creditor constituencies would suffer.  As described above, these Chapter 11 Cases are remarkable in that they feature a reorganization of a publicly-held retail company that provides for full recovery to all creditor constituencies.  Accordingly, the Debtors submit that their decision to enter into the DIP Credit Agreement represents a sound exercise of their business judgment.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); In re Ames Dept. Stores, 115 B.R. at 38 (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties").

## II.    THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES UNDER THE DIP CREDIT AGREEMENT

51.     As described above, the Debtors have agreed, subject to Court approval, to pay certain fees described in the DIP Credit Agreement and reasonable costs and expenses to the DIP Agent, including without limitation, fees and expenses of the professionals retained by the DIP Lenders, without the necessity of filing retention applications or fee applications.

52.     These fees and other obligations under the DIP Credit Agreement were negotiated in good faith and at arms' length and represent the most favorable terms to the Debtors on which the DIP Lenders would agree to lend under the DIP Facility.  Warshauer Declaration ¶ 10.  The Debtors considered these fees when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations during the Chapter 11 Cases, and

that paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors, and other parties in interest.  Accordingly, this Court should authorize the Debtors to pay the fees provided under DIP Credit Agreement.

## III.    SUPPORT FOR MODIFICATION OF AUTOMATIC STAY

53.    As set forth more fully in the DIP Orders, the Debtors seek to modify the automatic stay established pursuant to Bankruptcy Code section 362 upon the occurrence of an Event of Default to permit the DIP Agent to exercise certain rights and remedies against the DIP Collateral without having to obtain any further order of this Court.  The Debtors submit that stay modification provisions such as these are ordinary and usual features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that this Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Orders.

## IV.    THE DIP LENDER IS ENTITLED TO THE PROTECTIONS UNDER BANKRUPTCY CODE SECTION 364(e)

54.    Bankruptcy Code section 364(e), which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal." Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493 (11th Cir. 1992)); see also White Rose Food v. General Trading (In re Clinton St. Food Corp.), 170 B.R. 216, 220 (S.D.N.Y. 1994) (Section 364(e) "overcome[s] parties' reluctance to lend to a bankrupt

firm . . ."); <u>Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.)</u>, 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

55.    The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable and are the best possible terms on which the Debtors could obtain postpetition financing.  Further, the terms and conditions of the DIP Credit Agreement were negotiated in good faith and at arm's length with all parties represented by experienced, independent counsel.  Accordingly, the DIP Lenders should be provided with the benefit and protection of Bankruptcy Code section 364(e), such that if any of the provisions of the DIP Facility are later modified, vacated, stayed, or terminated by subsequent order of this or any other Court, the DIP Lenders will be fully protected with respect to any amounts previously disbursed.

## V.    USE OF CASH COLLATERAL SHOULD BE AUTHORIZED UNDER BANKRUPTCY CODE SECTION 363 AND THE PROPOSED ADEQUATE PROTECTION BEING PROVIDED IS APPROPRIATE

56.    Certain cash held by the Debtors may include proceeds from collateral subject to liens under the Senior Credit Facility (the "<u>Cash Collateral</u>").  A debtor's use of property of the estate, including cash collateral, is governed by Bankruptcy Code section 363. Under Bankruptcy Code section 363(c)(2), a debtor may use cash collateral if "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Bankruptcy Code section 363(e)  further provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the

court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

57.     The Bankruptcy Code does not expressly define "adequate protection." Section 361 of the Bankruptcy Code, however, provides a non-exhaustive list of examples of adequate protection, including replacement liens and administrative priority claims.  "The determination of adequate protection is a fact-specific inquiry" to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (internal quotation marks omitted) (citation omitted)); see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); In re N.J. Affordable Homes Corp., No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept.").

58.     The Debtors request that this Court approve and authorize the Debtors' proposed adequate protection of the DIP Lenders' interest, in respect of and as consideration for, the use of Cash Collateral.  The DIP Lenders are entitled to adequate protection on account of their valid, perfected and enforceable interest in the Collateral (as defined in the Ratification Agreement), including the Cash Collateral, in an amount equal to the aggregate diminution in value of their interests in the Collateral.  First and foremost, the Senior Credit Facility Lenders, which are also the DIP Lenders, have consented to the use of Cash Collateral and the proposed adequate protection set forth herein and in the DIP Orders.  Furthermore, to the extent that there is any diminution in value of the Collateral, the DIP Lenders are adequately protected.  Adequate

protection is evaluated on a case-by-case basis and may be provided in various forms, including payment of interest, granting of replacement liens, or administrative claims.  See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case…") (citation and quotation omitted).

59.     The adequate protection package here takes many of these forms: The DIP Agent, for the benefit of itself and the DIP Lenders, will be granted superpriority adequate protection claims to the extent of any diminution in value of the Collateral under Bankruptcy Code section 507(b) (the "Superpriority Claims"), which shall be subordinate only to the Carve Out and the DIP Loan Superpriority Claims (as defined in the Interim Order); and replacement liens (the "Replacement Liens") junior only to the (i) Carve Out, (ii) Permitted Liens (as defined in the Interim Order), and (iii) the DIP Lenders' liens on the Collateral.  The DIP Facility also preserves the Company's going concern value and constitutes adequate protection.  Furthermore, as discussed above, the preservation of the Debtors' business as a going concern in and of itself also constitutes adequate protection.  See In re 495 Cent. Park Ave. Corp., 136 B.R. at 631.  As noted above, without the DIP Facility, the Debtors would be forced to terminate some or all of their operations, destroying a substantial portion of the Company's going concern value. Warshauer Declaration ¶ 16.

60.     Accordingly, based upon the foregoing, the Debtors request that this Court authorize the Debtors to provide the above-described adequate protection to the DIP Lenders in accordance with the terms set forth in the DIP Credit Agreement and the DIP Orders.

## VI.    INTERIM APPROVAL SHOULD BE GRANTED AND THE FINAL HEARING SCHEDULED

61.     Bankruptcy Rule 4001(c) provides that:

> The court may commence a final hearing on a motion for authority
> to obtain credit no earlier than 14 days after service of the motion.
> If the motion so requests, the court may conduct a hearing before
> such 14-day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate
> and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).  Similarly, to the extent the Debtors are seeking authority to sell,

use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003

provides that the Court may only grant immediate relief to the extent it is necessary to avoid

immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).

      62.    Generally, courts find "immediate and irreparable harm" exists where loss

of the business threatens ability to reorganize.  See In re Ames Dep't Stores, Inc., 115 B.R. at 36

n.2.  Approval of postpetition financing on an interim basis under Bankruptcy Rule 4001(c)(2) is

left to the discretion of the court as informed by the facts of each case.  In examining requests for

interim relief under this rule, courts apply the same business judgment standard applicable to

other business decisions, and a debtor should be entitled to borrow those amounts that it believes

prudent in the operation of its business.  See In re Trans World Airlines, Inc., 163 B.R. at 974; In

re Ames Dep't Stores, Inc., 115 B.R. at 40.  After the 14-day period, the request for financing is

not limited to those amounts necessary to prevent the destruction of the debtor's business, and the

debtor is entitled to borrow those amounts that it believes are prudent to the operation of its

business.  In re Ames Dep't Stores, Inc., 115 B.R. at 36.

      63.    The Debtors seek expedited approval of the relief requested in this Motion

in light of the immediate and irreparable harm that the Debtors' estates will incur unless they

obtain the financing necessary to sustain their business.  Absent sufficient funds to support the

Debtors' operating business, the Debtors' business and assets will quickly erode to the detriment

of the Debtors' estates and creditors.

64.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that this Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

65.     The urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain the liquidity provided by the DIP Facility and use Cash Collateral as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Chapter 11 Cases.  Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

**WAIVER OF STAY UNDER BANKRUPTCY RULES 4001(a)(3) AND 6004(h)**

66.     The Debtors request that the Court waive the stay imposed by Bankruptcy Rule 4001(a)(3), which provides that "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise," Fed. R. Bankr. P. 4001(a)(1), and Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in the Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request

that this Court waive the 14-day stays imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

67.     Notice of this Motion shall be given to the following notice parties (the "Notice Parties"): (a) the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) Otterbourg, counsel to the agent for the Debtors' Senior Credit Facility; (d) Wells Fargo Bank, National Association, as agent for the Debtors' Senior Credit Facility; (e) the Internal Revenue Service and applicable state taxing authorities, (f) any party that has asserted or may assert a lien in the Debtors' assets; (g) the Debtors' landlords; and (h) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

68.     No previous request for the relief sought herein has been made to this Court or any other court.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter orders, substantially in the forms annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
        August 26, 2017

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ *Anthony W. Clark*
Anthony W. Clark (I.D. No. 2051)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

J. Gregory Milmoe (*pro hac vice admission pending*)
Raquelle L. Kaye (*pro hac vice admission pending*)
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Fax: (617) 573-4822

- and -

Lisa Laukitis (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

**Ratification Agreement**

## RATIFICATION AND AMENDMENT AGREEMENT

This RATIFICATION AND AMENDMENT AGREEMENT (as amended, modified, supplemented or otherwise modified from time to time, the "**Ratification Agreement**"), dated as of August [ · ], 2017 is by and among Perfumania Holdings, Inc., a Florida corporation and a debtor and debtor-in-possession (sometimes referred to herein as the "Parent" or "Lead Borrower"), Quality King Fragrance, Inc., a Delaware corporation and a debtor and debtor-in-possession ("QKF"), Scents of Worth, Inc., a Florida corporation and a debtor and debtor-in-possession ("SOW"), Northern Group, Inc., a New York corporation and a debtor and debtor-in-possession ("Northern"), Perfumania, Inc., a Florida corporation and a debtor and debtor-in-possession ("Perfumania"), Magnifique Parfumes and Cosmetics, Inc., a Florida corporation and a debtor and debtor-in-possession ("Magnifique"), Ten Kesef II, Inc., a Florida corporation and a debtor and debtor-in-possession ("Ten Kesef"), Perfumania Puerto Rico, Inc., a Puerto Rico corporation and a debtor and debtor-in-possession ("Perfumania PR"), Perfumania.com, Inc., a Florida corporation and a debtor and debtor-in-possession ("Perfumania.com", together with Parent, QKF, SOW, Northern, Perfumania, Magnifique, Ten Kesef, and Perfumania PR, each a "**Debtor Borrower**" and collectively, "**Debtor Borrowers**"), Five Star Fragrance Company, Inc., a New York corporation ("Five Star"), Parlux Fragrances, LLC, a Delaware limited liability company ("Parlux") and Parlux Ltd., a New York corporation ("Parlux Ltd.", and together with Five Star and Parlux each a "**Non-Debtor Borrower**" and collectively with the Debtor Borrowers, the "**Borrowers**"), the Guarantors (as hereinafter defined), the lenders party to the Pre-Petition Credit Agreement referred to below ("**Lenders**"), and Wells Fargo Bank, National Association, as Administrative Agent and Collateral Agent for the Lenders and others (in such capacity, the "**Agent**").

## W I T N E S S E T H:

WHEREAS, Debtor Borrowers and Guarantors (each a "**Debtor**" and collectively, the "**Debtors**") have commenced cases under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the District of Delaware and each Debtor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Case (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers secured by substantially all assets and properties of Borrowers, and Guarantors as set forth in the Pre-Petition Loan Documents (as defined below);

WHEREAS, the Debtors and Non-Debtor Borrowers are requesting that the Bankruptcy Court enter a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantors as set forth in the Financing Order and the Loan Documents (as defined below);

WHEREAS, Borrowers and Guarantors have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to

Borrowers and make certain amendments to the Pre-Petition Credit Agreement (as defined below) and the other Pre-Petition Loan Documents, and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein; and

WHEREAS, Borrowers and Guarantors desire to reaffirm their obligations to Agent and Lenders pursuant to the Pre-Petition Loan Documents and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantors as set forth in the Financing Order.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders, Borrowers, and Guarantors mutually covenant, warrant and agree as follows:

1.    DEFINITIONS.

1.1    Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    **"Bankruptcy Court"** means the United States Bankruptcy Court or the United States District Court for the District of Delaware

(b)    **"Bankruptcy Code"** means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(c)    **"Bankruptcy Events"** means the commencement of the Chapter 11 Case, the events and conditions disclosed to Agent in writing prior to the date hereof leading up to the commencement of the Chapter 11 Case, the occurrence and existence of any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof, the Store Closing GOB Sales, and any claim or liability that (i) was incurred prior to the Petition Date, (ii) is a general unsecured claim not entitled or eligible to be paid at any time during the pendency of the Chapter 11 Case, and (iii) is junior and subordinate in priority in all respects to the Obligations.

(d)    **"Budget"** means the thirteen (13) week budget delivered to Agent in accordance with Section 5.3 of the Ratification Agreement (a summary of such initial Budget is attached to the Ratification Agreement as Exhibit A) in form and substance approved by Agent, together with any subsequent or amended budgets thereto delivered to Agent and Lenders, in form and substance satisfactory to Agent (each such subsequent budget, referred to as the "**Budget**"), in accordance with the terms and conditions of the Ratification Agreement.

(e)    "**Carve-Out**" shall have the meaning set forth in the Financing Order.

(f)    "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by Agent to the Debtors, Debtors' lead counsel in the Chapter 11 Case, counsel to any Committee and the U.S. Trustee following the occurrence and during the continuation of an Event of Default, stating that the Post-Trigger Date Professional Fee Carve-Out has been invoked.

(g)    "**Chapter 11 Case**" means the cases under Chapter 11 of the Bankruptcy Code commenced by Debtors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

(h)    "**Committee**" means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

(i)    "**Debtors**" means, collectively, Debtor Borrowers and Guarantors, each as Debtor and Debtor-in-Possession in the Chapter 11 Case.

(j)    "**Financing Order**" means the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Borrowers on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(k)    "**Interim Financing Order**" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, in the form attached hereto as Exhibit B and/or otherwise in form and substance satisfactory to Agent, together with all extension, modifications, and amendments thereto consented to by Agent, which, among other matters but not by way of limitation, authorizing, on an interim basis, the Borrowers to execute and perform under the terms of the Pre-Petition Loan Documents, as amended and supplemented by the terms and conditions of the Ratification Agreement.

(l)    "**Credit Agreement**" means, the Pre-Petition Credit Agreement as ratified, amended, supplemented and otherwise modified by the Ratification Agreement, as the same now exists or may hereafter be amended from time to time.

(m)    "**Licensor Consents**" means, collectively, (i) Licensor Agreement, dated as of August 19, 2013, by and among Parlux and Artistic Brands Development, LLC, Combermere Entertainment Properties, LLC and the Agent, (ii) Licensor Agreement, dated as of December 6, 2012, by and among Parlux Ltd., Kenneth Cole Productions (LIC), LLC and the Administrative Agent, and (iii) Licensor Agreement, dated as of September 28, 2012, by and among Parlux, Parlux Ltd., Paris Hilton Entertainment, Inc., and Administrative Agent, in each case as amended, restated, amended and restated, supplemented or otherwise modified.

(n)    "**Participant Register**" has the meaning specified in Section 10.06(d) of the Credit Agreement.

(o) **"Permanent Financing Order"** means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing of the Bankruptcy Court, which order shall be in form and substance satisfactory to Agent and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, consented to by the Agent, which among other matters, but not by way of limitation, authorizing the Borrowers to obtain credit, incur the Post-Petition Obligations, and grant Liens therefor and granting super-priority expense claims to Agent and Lenders with respect to all Obligations due Agent and Lenders, subject to no priority claim or administrative expenses of the Chapter 11 Case or any other entity (other than the Carve-Out and Pre-Petition Priority Liens).

(p) **"Petition Date"** means the date of the commencement of the Chapter 11 Case.

(q) **"Post-Petition Collateral"** means, collectively, all now existing and hereafter acquired real and personal property of each Borrower and Guarantor, including each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent pursuant to the Loan Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

(i) all of the Pre-Petition Collateral;

(ii) all Accounts;

(iii) all general intangibles, including, without limitation, all Intellectual Property;

(iv) all goods, including, without limitation, Inventory and Equipment;

(v) all Real Property and fixtures;

(vi) all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(vii) all instruments, including, without limitation, all promissory notes;

(viii) documents and all credit card sales drafts, credit card sales slips or charge slips or receipts, and other forms of store receipts;

(ix) deposit accounts;

(x) all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(xi)    all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(xii)    all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of any Debtor now or hereafter held or received by or in transit to any Lender, the Agent or its Affiliates or at any other depository or other institution from or for the account of any Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiii)    all commercial tort claims, including, without limitation, those identified in the Perfection Certificate;

(xiv)    to the extent not otherwise described above, all Receivables;

(xv)    all Records;

(xvi)    all proceeds of any Excluded Contract;

(xvii)    effective upon entry of a Permanent Financing Order, all claims, rights, interests, assets and properties (recovered by or on behalf of each Borrower and Guarantor or any trustee of such Borrower or Guarantor (whether in the Chapter 11 Case or any subsequent case to which any Chapter 11 Case is converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to (among others) Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code; and

(xviii)    to the extent not covered by the foregoing clauses, all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral;

provided, that, in no event shall "Post-Petition Collateral" include Equity Interests of a Subsidiary which is a CFC in excess of sixty-five percent (65%) of the outstanding voting Equity Interests of such Subsidiary.

(r)    **"Post-Petition Obligations"** means all Obligations (as defined in the Pre-Petition Credit Agreement) of any Borrower arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether

arising under or related to this Ratification Agreement, the Credit Agreement, the other Loan Documents, a Financing Order, by operation of law or otherwise, and whether incurred by such Debtor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and reasonable and documented attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.  For the avoidance of doubt, the Post-Petition Obligations shall include that portion of the outstanding Pre-Petition Obligations, which have been "rolled-up" from time to time as provided in the Financing Order.

(s)     **"Pre-Petition Collateral"** means, collectively, (i) all "Collateral" (as such term is defined in the Pre-Petition Credit Agreement as in effect immediately prior to the Petition Date), (ii) all "Collateral" and "Pledged Collateral" as such terms are defined in each of the other Pre-Petition Loan Documents as in effect immediately prior to the Petition Date, and (iii) all other security for the Pre-Petition Obligations as provided in the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents immediately prior to the Petition Date.

(t)     **"Pre-Petition Loan Documents"** means the Loan Documents (as defined in the Pre-Petition Credit Agreement), as in effect immediately prior to the Petition Date.

(u)     **"Pre-Petition Credit Agreement"** means the Credit Agreement dated January 7, 2011 by and among Wells Fargo, as administrative and collateral agent, the Borrowers and the Guarantors, and the parties from time to time parties thereto as lenders, as amended by Amendment No. 1 to Credit Agreement, dated as of December 23, 2011 and Amendment No. 2 to Credit Agreement, dated as of April 25, 2014, as supplemented by the Joinder Agreement, dated as of April 18. 2012, and otherwise as in effect immediately prior to the Petition Date.

(v)     **"Pre-Petition Obligations"** means all Obligations (as such term is defined in the Pre-Petition Credit Agreement) arising at any time before the Petition Date.

(w)     **"Pre-Petition Priority Liens"** means, collectively, the Liens permitted by the Pre-Petition Loan Documents, to the extent any such permitted Liens are valid, enforceable (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws effecting creditors' rights generally and subject to the general principles of equity, regardless of whether considered in a proceeding in equity or a law), properly perfected, non-avoidable and senior in priority to the Liens securing the Pre-Petition Obligations as of the Petition Date.

(x)     **"Professionals"** has the meaning given in the Financing Order.

(y)     **"Ratification Agreement"** means the Ratification and Amendment Agreement, dated as of the August [ • ], 2017, by and among Borrowers, Guarantors, Agent and Lenders, as the same may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(z)     **"Ratification Closing Date"** means the date on which all of the conditions precedent in Section 9 of the Ratification Agreement have been satisfied (or waived).

(aa)    **"Reported Fee Accruals"** means all allowed fees, disbursements, costs and expenses of the Professionals which have been incurred, accrued or invoiced (but remain unpaid) through the date of service of a Carve-Out Trigger Notice up to, but not exceeding, the aggregate amounts under the heading "Professional Fees & Carve Out Funding" in the Budget (reflected on an accrual basis and not on a cash basis) for the line item for each such Professional (or if less, such Professional's actual fees, disbursements, costs and expenses incurred to such time) minus any payments received on account thereof Any Professional's fees, disbursements, costs and expenses which have been incurred, accrued or invoiced (and remain unpaid) but are in excess of the aggregate amounts reflected in the Budget in the line item for each such Professional shall not constitute "*Reported Fee Accruals*", and shall not constitute part of the Carve-Out.

(bb)    **"Retention Agreement"** means the Agency Agreement made as of August ___, 2017, by and between Perfumania Holdings, Inc. and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, referred herein as "Gordon Brothers"), and acknowledged by the Agent, and any replacement agreement entered into by the Borrowers, and a Third Party Liquidator, on terms and conditions acceptable to Agent.

(cc)    **"Special Reserve"** means the Reserve established by Agent against the Borrowing Base in the amount equal to the greater of (i) ten percent (10%) of the Loan Cap or (ii) $8,000,000, for purposes of determining the amount of the Special Reserve, Availability Reserves but not the Special Reserve shall be deducted from the Borrowing Base.

(dd)    **"Sanctioned Entity"** means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.  As of the date hereof, Crimea, Cuba, North Korea, Sudan, and Syria are Sanctioned Entities.

(ee)    **"Sanctioned Person"** means, at any time, (a) any a Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, or any other Sanctions-related list maintained by any relevant Sanctions authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

(ff)    **"Sanctions"** means individually and collectively, respectively, any and all economic, trade, financial or other sanctions laws, regulations or embargoes imposed, administered or enforced from time to time by:  (a) the United States of America, including, without limitation, those administered by the Office of Foreign Assets Control (OFAC) of the U.S. Department of Treasury, the U.S. Department of State, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other governmental authority in any jurisdiction in which any Loan Party or any of its Subsidiaries is located or doing business.

**1.2**    Amendments to Definitions in the Pre-Petition Credit Agreement.

(a)    Aggregate Commitments.  The definition of "Aggregate Commitments" in the Pre-Petition Credit Agreement is hereby amended to include the following sentence at the end of such definition:

"On the Petition Date, the Aggregate Commitments are $83,750,000.

(b)    Applicable Margin.  The definition of "Applicable Margin" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"'Applicable Margin' means   from and after the Closing Date the percentages set forth in the pricing grid below:

| Base Rate Margin | Letter of Credit Fee |
|---|---|
| 3.25% | 4.50% |

(c)    Availability.  The definition of "Availability" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Availability' means, as of any date of determination thereof by the Agent, the result, if a positive number, of: (a) the Loan Cap, minus (b) the aggregate unpaid balance of Credit Extensions to, or for the account of, the Borrowers.  In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all accounts payable, Taxes, and other items included in the Total Operating Disbursements line item of the Budget are being paid on a timely basis.

(d)    Availability Reserves.  The definition of "Availability Reserves" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Availability Reserves' means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as Administrative Agent from time to time determines in its good faith discretion as being appropriate (a) to reflect the impediments to Agents' ability to realize upon the Collateral, (b) to reflect claims and liabilities that Administrative Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists, or (e) to reflect (i) the Carve-Out Expenses (as defined in the Financing Order) and Professional Expense Escrow (as defined in

the Financing Order), (ii) the amount of any senior liens or claims in or against the Collateral that, in Agent's determination, may be found to have priority over the liens or claims of Agent or any other Credit Party or (iii) the amount of priority or administrative expense claims that, in Administrative Agent's determination, may be required to be paid by Debtors or their estates at any time during the Chapter 11 Cases, or (f) to reflect the value of Inventory at leased locations with respect to which the lease therefor has not been assumed commencing on the date that is ten (10) weeks  prior to the end of the one hundred twenty (120) day lease rejection/assumption period, as such period may be extended or shortened by the Bankruptcy Court, or (g) to reflect the value of Inventory held at any leased location as to which there has been filed a landlord's motion to compel the assumption or rejection of the lease, in an amount determined by Agent, and considering the likelihood or unlikelihood of the success of such motion on its merits in the good faith judgment of Agent. Without limiting the generality of the foregoing, Availability Reserves may include, in Administrative Agent's discretion, (but are not limited to) reserves based on: (i) rent; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of Administrative Agent and Lenders in the Collateral; (iv) salaries, wages and benefits due to employees of any Borrower or Guarantor, (v) Customer Credit Liabilities, (vi) Customer Deposits, (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals, (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of Administrative Agent or Lenders in the Collateral, (ix) amounts due to vendors on account of consigned goods, (x) Cash Management Reserves, (xi) Bank Product Reserves; and (xii) royalties payable in respect of licensed merchandise."

(e)      Borrowing Base.  Clause (d) of the definition of "Borrowing Base" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"(d) the amount equal to the sum of (i) the Special Reserve and (ii) all Availability Reserves."

(f)      Change of Control.  The parenthetical at the end of clause (b) of the definition of "Change of Control" is hereby deleted.

(g)      Credit Parties.  The following parenthetical is hereby added to the end of clause (vi) of the definition:

"(including without limitation, all Bank Product Providers)"

(h)    Eligible Credit Card Receivables. Clause (a) of the definition of "Eligible Credit Card Receivables" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"(a)  Credit Card Receivables which do not constitute a "payment intangible" (as defined in the UCC) or an Account;"

(i)    Eligible Inventory.

(i)    Clause (c) of the definition of "Eligible Inventory" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"(c)(x) Inventory that is not located in the United States of America (excluding territories or possessions of the United States other than the Commonwealth of Puerto Rico), (y) Inventory that is not located at a location that is owned or leased by a Borrower, except Inventory that is in transit between locations that are owned or leased by a Borrower in the United States of America (excluding territories or possessions other than the Commonwealth of Puerto Rico) and/or locations meeting the criteria in the following clause (z), or (z) to the extent that the Borrowers have furnished Agent with (A) any UCC financing statements or other documents that the Lender may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to Agent; provided, that, the aggregate Cost of all Inventory located at Stores in Puerto Rico eligible for inclusion in the calculation of the Borrowing Base shall not exceed $2,000,000;"

(ii)    Clause (k) of the definition of "Eligible Inventory" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"(k) Inventory subject to any patent or trademark license requiring either (i) the payment of royalties or fees or (ii) which restricts such Borrower's or any Agent's right to freely dispose of such Inventory unless such Agent has, at its option, entered in an acceptable agreement with the owner of such trademark or patent; or made such other arrangements acceptable to Agents (for the avoidance of doubt, so long as the applicable Licensor Consent remains in full force and effect, the Inventory which is the subject of the license referred to in such Licensor Consent, will not be deemed ineligible pursuant to this clause (k));"

(j)    Eligible Trade Receivables. Notwithstanding anything to the contrary set forth in the definition of Eligible Trade Receivables set forth in the Pre-Petition Credit Agreement, (a) Dated Accounts are no longer Eligible Trade Receivables, and (b)

Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity are not Eligible Trade Receivables.

(k)    Interest Payment Date.  The definition of "Interest Payment Date" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

""Interest Payment Date" means the first day after the end of each month and the Maturity Date."

(l)    Letter of Credit Sublimit.  The first two sentences of the definition of "Letter of Credit Sublimit in the Pre-Petition Credit Agreement are hereby deleted and the following substituted therefor:

""Letter of Credit Sublimit" means an amount equal to $10,000,000.  The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Commitments."

(m)    Material Adverse Effect.  The definition of "Material Adverse Effect" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

""Material Adverse Effect' means (a) a material adverse effect on (i) the business, operations, results of operations, assets, liabilities or financial condition of Loan Parties and their Subsidiaries, taken as a whole or (ii) any Agent's or any Lender's material rights and remedies under the Agreement and the other Loan Documents, (b) a material impairment of (i) Loan Parties' and their Subsidiaries' ability, taken as a whole, to perform their obligations under the Loan Documents to which they are parties or (ii) the Agents' and Credit Parties' ability to enforce the Obligations or realize upon the Collateral (other than as a result of an action taken or not taken that is solely in the control of any Agent or another Credit Party, as the case may be), (c) subject to Permitted Liens, a material impairment of the enforceability or priority of Collateral Agent's Liens with respect to the Collateral (other than as a result of an action taken or not taken that is solely in the control of any Agent or another Credit Party, as the case may be) or (d) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party; provided, that, the commencement of the Chapter 11 Cases shall not constitute a Material Adverse Effect."

(n)    Maturity Date.  The definition of "Maturity Date" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

""Maturity Date' shall mean the earliest to occur of (a) December 31, 2017, (b) forty-five (45) days after the entry of the Interim Financing

Order if the Permanent Financing Order has not been entered prior to the expiration of such forty-five (45) day period (or such longer period if consented to in writing by the Agent), (c) the effective date of a plan of reorganization filed in the Chapter 11 Case pursuant to an order entered by the Bankruptcy Court, (d) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties, other than, for the avoidance of doubt, the Store Closing GOB Sales (as defined in Section 5.4(a) of the Ratification Agreement), (e) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of any Debtor to a Chapter 7 case, (f) the date this Agreement is otherwise terminated for any reason whatsoever pursuant to the terms of this Agreement, and (g) the acceleration of the Obligations or termination of the Commitments hereunder, including without limitation, as a result of the occurrence of an Event of Default.""

(o)     Permitted Dispositions.  Clause (a) of the definition of Permitted Dispositions is hereby deleted in its entirety and the following substituted therefor:

"(a) bulk sales or other dispositions of the Inventory of a Loan Party not in the ordinary course of business in connection with Store Closing GOB Sales, at arm's length, provided, that (i) such sales are in accordance with the terms of this Agreement, including, without limitation, Sections 5.4 and 5.5 of the Ratification Agreement, and (ii) all Net Proceeds received in connection therewith are applied to the Obligations in accordance with Section 2.05 hereof;

(p)     Agent and Lenders.  All references to the terms "Collateral Agent" "Administrative Agent" "Agent" and "Lenders" shall include their respective successors and permitted assigns.

(q)     Borrowers, Guarantors and Debtors.  All references to the terms "Borrowers", "Guarantors" or "Debtors" in the Loan Documents shall be deemed and each such reference is hereby amended to mean and include (as applicable) the Debtors and Non-Debtor Borrowers (each as defined herein), and their successors and assigns (including any trustee or other fiduciary hereafter appointed as any Debtor's legal representative, as applicable, or with respect to any Debtor the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Debtor, as the case may be).

(r)     Delivery of Borrowing Base Certificates.  Section 6.02(b) of the Pre-Petition Credit Agreement is hereby amended by deleting  the entire clause and substituting the following therefor:

"(b)     on the fourth Business Day of each week, a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding week, each Borrowing Base Certificate to

be certified as complete and correct by a Responsible Officer of the Lead Borrower;"

(s)     Collateral.  All references to the term "Collateral" in the Credit Agreement or the other Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(t)     Credit Agreement.  All references to the term "Agreement" in the Pre-Petition Credit Agreement or the term "Credit Agreement" in the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean the Credit Agreement (as defined in the Ratification Agreement), and as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof and the Financing Order.

(u)     [Reserved].

(v)     Loan Documents.  All references to the term "Loan Documents" in the Credit Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Pre-Petition Loan Documents, as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms of the Ratification Agreement, as amended and supplemented thereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(w)     Material Adverse Effect.  All references to the term "Material Adverse Effect," "material adverse effect" or "material adverse change" in the Credit Agreement, the Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "provided, that, the Bankruptcy Events shall not, individually or collectively, constitute a Material Adverse Effect."

(x)     Obligations.  All references to the term "Obligations" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(y)     Permitted Encumbrances.  The definition of "Permitted Encumbrances" in the Pre-Petition Credit Agreement is hereby amended by (i) deleting the period appearing at the end of clause (p) of such definition and replacing it with a semi-colon, and (ii) adding the following clauses at the end thereof:

"(x) all Liens existing on the Petition Date that constitute Pre-Petition Priority Liens"; and

(y) the Carve-Out."

(z)     Permitted Indebtedness.  The definition of "Indebtedness" in the Pre-Petition Credit Agreement is hereby amended by deleting clause (b)(i) therein and replacing it with the following:

"(i) trade accounts payable or accrued obligations incurred in the ordinary course of business or during the pendency of the Chapter 11 Case and payable in accordance with the Budget,"

(aa)    Permitted Investments.  The definition of "Permitted Investments" in the Pre-Petition Credit Agreement is hereby amended by deleting clause (n) thereof in its entirety.

(bb)    Termination of LIBO Rate Loans.  Notwithstanding anything to the contrary contained in the Pre-Petition Credit Agreement or the other Loan Documents (a) the Borrowers' right to request LIBO Rate Loans in accordance with Section 2 of the Credit Agreement is hereby terminated and of no further force or effect, (b) no Committed Borrowing made on or after the Petition Date shall bear interest at a rate determined by reference to the LIBO Rate, (c) all LIBO Rate Loans shall be converted to Base Rate Loans on the Petition Date, and (d) Borrowers shall not request, and Agent and Lenders shall have no obligation to provide, any LIBO Rate Loans.

**1.3**    Interpretation.

(a)    For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Pre-Petition Credit Agreement, as amended, supplemented or otherwise modified by this Ratification Agreement.

(b)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(c)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

**2.**    ACKNOWLEDGMENTS.

**2.1**    Pre-Petition Obligations.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that, as of August 25, 2017, Borrowers are indebted to Agent and Lenders in respect of all Pre-Petition Obligations in an aggregate principal amount of not less than $18,821,219.59 consisting of (a) Loans to each Borrower made pursuant to the Pre-Petition Loan Documents, together with interest accrued and accruing thereon, and (b) outstanding Obligations arising from or in connection with Letters of Credit issued under the Pre-Petition Credit Agreement together with interest accrued and accruing thereon, and all costs, expenses, and fees (including reasonable documented attorneys' fees and out-of-pocket legal expenses), plus all other charges now or hereafter owed by Borrowers to Agent and Lenders, all of which are unconditionally owing by the Borrowers and to the Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

**2.2**    Guaranteed Obligations.  Each Guarantor hereby acknowledges, confirms and agrees that:

(a)    all obligations of such Guarantors under the Pre-Petition Loan Documents are unconditionally owing by such Guarantor to Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)    the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Guarantor pursuant to the Pre-Petition Loan Documents extends to all Post-Petition Obligations, without duplication.

**2.3**    Acknowledgment of Security Interests.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that Agent, for the benefit of itself and the other Credit Parties, has and shall continue to have (a) valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent pursuant to the Pre-Petition Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, and (b) valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent, for the benefit of itself and the Credit Parties, under the Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Agent and Lenders, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement (including, without limitation, Pre-Petition Priority Liens) and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent.

**2.4**    Binding Effect of Documents.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that: (a) each of the Pre-Petition Loan Documents to which it is a party was duly executed and delivered to Agent and Lenders by such Borrower or Guarantor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Guarantor contained in the Pre-Petition Loan Documents constitute the legal, valid and binding obligations of such Borrower or Guarantor enforceable against it in accordance with the terms thereof, and such Borrower or Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in (i), subject to the entry and terms of the Financing Order, the Loan Documents and (ii) the Financing Order.

**3.**    ADOPTION AND RATIFICATION.

**3.1.**    Each Borrower and Guarantor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Loan Documents to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Pre-Petition Loan Documents, as supplemented and amended by this Ratification Agreement, and in accordance with the Financing Order.  All of the Pre-Petition Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Guarantors, each as Debtor and Debtor-in-Possession (as applicable) and considered as agreements between such Borrowers or Guarantors, on the one hand, and Agent and Lenders, on the other hand.  Each Borrower and Guarantor party hereto hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Pre-Petition Loan

Documents, as amended and supplemented pursuant hereto and the Financing Order, and each Borrower and Guarantor, as Debtor and Debtor-in-Possession (as applicable), agrees to be fully bound by the terms of the Loan Documents to which such Borrower or Guarantor is a party.

       3.2.     Notwithstanding anything in Section 3.1 of this Ratification Agreement to the contrary, the Agent and Lenders acknowledge that certain Events of Default, as further described on <u>Exhibit D</u> hereto, have occurred and are continuing under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents, including, but not limited to, as a result of the commencement of the Chapter 11 Case and the other Bankruptcy Events (the "**Existing Defaults**").   Agent and each Lender waive any such Existing Defaults under the Loan Documents.  From and after the Ratification Closing Date, for purposes of determining whether any Default or Event of Default has occurred under the Credit Agreement or any other Loan Document, the Agent and the Lenders hereby agree that all such Existing Defaults shall be excluded from any determination of the existence or continuation of a Default or Event of Default  and only Defaults and Events of Default (as provided  in the Credit Agreement) occurring from and after the Ratification Closing Date shall constitute Defaults and Events of Default under the Credit Agreement.  For the avoidance of doubt, none of the Existing Defaults shall give any right to the Agent or any Lender to exercise or enforce any of their respective rights or remedies under the Credit Agreement or the other Loan Documents on the basis of the occurrence and/or existence of any one or more of the Existing Defaults.

      **4.**     <u>GRANT OF SECURITY INTEREST</u>.

       As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), the Debtor Borrowers and the Guarantors, each as Debtor and Debtor-in-Possession, and the Non-Debtor Borrowers each hereby grant, pledge and assign to Agent, for the benefit of itself and the other Credit Parties, and also confirm, reaffirm and restate the prior grant to Agent, for the benefit of itself and the other Credit Parties of, continuing senior priority security interests in and liens upon, and rights of setoff against, all of the Collateral.

      **5.**     <u>ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS</u>.

       In addition to the representations, warranties and covenants made by Borrowers and Guarantors to Agent and Lenders, under the Credit Agreement or the other Loan Documents (in each case, for the avoidance of doubt, as amended by or provided in this Ratification Agreement) each Borrower and Guarantor hereby represents, warrants and covenants to Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition precedent to the making of Loans by Agent and Lenders:

      **5.1**     <u>Financing Order</u>.  No Borrower or Guarantor shall seek to have any Financing Order vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to in writing by Agent).

5.2     Use of Proceeds.  All Loans and Letters of Credit provided by Agent or any Lender to Borrowers pursuant to the Financing Order, the Credit Agreement or otherwise, shall only be used by Borrowers to the extent (a) provided for in the Budget, (b) permitted by the Loan Documents, and (c) as authorized by the Bankruptcy Court and consented to by the Agent for: (i) general working capital needs, (ii) the repayment of the Obligations and (iii) the payment of fees, expenses, and costs incurred in connection with this Ratification Agreement and the Chapter 11 Case, including the payment of any adequate protection payments approved in the Financing Order. None of the proceeds of any Loans or the Letters of Credit shall be used to make any payments to a Sanctioned Entity or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any operations of a Sanctioned Entity or a Sanctioned Person), or in any other manner that would result in a violation of Sanctions by any Person.

5.3     Budget.

(a)     Borrowers have prepared and delivered to Agent and Lenders a thirteen (13) week post-petition Budget.  The Budget has been thoroughly reviewed by the Borrowers and their management and sets forth, for the periods covered thereby, projected weekly cash receipts and cash disbursements for each week (each such week ending on Saturday) of the thirteen (13) consecutive week period commencing with the week ending September 2, 2017.  Subsequent thirteen (13) week budgets shall be delivered to Agent and Lenders, in form and substance satisfactory to Agent and Lenders, during the tenth week of the Budget for the period commencing on the last date of the then-current Budget through the day that is thirteen weeks following such date.  Upon approval by Agent and Lenders, such budget shall be deemed to be the Budget for the next thirteen (13) week period.

(b)     Not later than 4:00 p.m. (Eastern time) on the Thursday of each week commencing with the Thursday following the first full week ending after the Petition Date, Lead Borrower shall furnish to Agent a weekly report (the "**Budget Compliance Report**") that (i) sets forth as of the preceding Saturday of each such week on a cumulative basis from the Petition Date until the fourth (4th) full week ending on a Saturday after the Petition Date and then on a rolling four (4) week basis at all times thereafter (each such period referred to herein as a "**Measurement Period**"), the actual results for the following line items set forth in the Budget: (A) Total Operating Receipts, and (B) Total Operating Disbursements, noting therein variances from values set forth for such periods in the Budget, and (ii) provides an explanation for all such variances greater than ten percent (10%) in any line items or sub-line items, certified by the chief financial officer of the Borrowers.  Such report/reconciliation shall also note any variances with values set forth in the Budget as of the day of such report/reconciliation.

(c)     Each Borrower and Guarantor acknowledges, confirms and agrees that the following  covenants shall be tested pursuant to the Budget Compliance Report for the applicable Measurement Period ending as of each Sunday, with such testing commencing on the Thursday following the first full three (3) weeks ending after the Petition Date: (i) the actual Total Operating Receipts shall not be less than eighty-five percent (85%) of the projected Total Operating Receipts set forth in the Budget in respect of such Measurement Period, and (ii) Total Operating Disbursements shall not be more than one hundred and ten percent (110%) of the

projected Total Operating Disbursements set forth in the Budget in respect of such Measurement Period.

(d)    Each Borrower and Guarantor hereby confirms, acknowledges and agrees that, unless waived in writing by Agent, (i) a failure to maintain the deviations in the Total Operating Receipts and Total Operating Receipts line items of the Budget in an amount equal to or less than the percentage set forth in Section 5.3(c) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "**Material Budget Deviation**") and (ii)  the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Agent, as provided in Section 5.3(b) hereof shall constitute an Event of Default.  Notwithstanding any approval by Agent or any Lender of the Budget or any subsequent or amended Budget(s), Agent and Lenders will not, and shall not be required to, provide any Loans or Letters of Credit to any Borrower pursuant to the Budget, but shall only provide Loans and Letters of Credit in accordance with the terms and conditions set forth in the Credit Agreement as amended by this Ratification Agreement, the other Loan Documents and the Financing Order.   Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(e)    Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Agent and the other Credit Parties that are reimbursable by Borrowers or any other amounts owing by Borrowers to Agent and the Credit Parties (including, without limitation attorneys and consulting fees and expenses) in accordance with the Credit Agreement and the other Loan Documents, such projections shall not limit, impair, modify or waive the Borrowers' and Guarantors' obligation to pay the actual amounts due to Agent and/or the other Credit Parties in respect of such costs, expenses and other amounts owing to Agent and Lenders in accordance with the Credit Agreement and the other Loan Documents and the actual amounts paid in respect of any such costs, expenses and other amounts other shall not be subject to the variance compliance set forth in Section 5.3(c).

(f)    Notwithstanding anything herein to the contrary, the Budget may be updated, modified or supplemented (with the consent and/or at the request of Agent) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, Agent and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed the Budget; provided, that three weeks prior to the last date set forth in the Budget (as amended, modified, supplemented, or replaced from time to time with Agent's consent), during the tenth (10th) week of the Budget, the Borrowers shall submit a budget for the next successive thirteen week period to Agent, which budget shall be in (A) form substantially similar to the previous initial Budget (or otherwise in form acceptable to Agent) and (B) substance acceptable to Agent; provided, further, that  in the event that Agent and the Borrowers cannot, while acting diligently, reasonably, and in good faith, agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Budget has terminated. Each Budget delivered to Agent shall be accompanied by such supporting documentation as reasonably requested by Agent.  Each Budget shall be prepared in good faith based upon assumptions which the Borrowers believe to be reasonable and are satisfactory to Agent.

**5.4**    Third Party Liquidator.

(a)    Lead Borrower shall retain, at all times during which the Obligations remain outstanding, on terms and conditions acceptable to Agent and at the sole cost and expense of Borrowers, Gordon Brothers or such other nationally recognized third party liquidator entity reasonably acceptable to Agent (the "**Third Party Liquidator**").  The Third Party Liquidator shall among other things, assist Borrowers in the preparation of and compliance with, on an ongoing basis, the Budget and the liquidation of the store locations identified on Schedule 5.5(1) and Schedule 5.5(2) (collectively, the "**Closed Stores**").  The Third Party Liquidator shall report directly to the Chief Executive Officer and President of Parent.

(b)    The Loan Parties hereby irrevocably authorize and direct the Third Party Liquidator to consult with Agent on all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the Third Party Liquidator relating to the Collateral, or the financial condition or operations of the businesses of each of the Loan Parties.  The Loan Parties agree to provide the Third Party Liquidator with complete access to and supervision over all of the books and records of each Borrower and Guarantor, all of the premises of each Borrower and Guarantor and to all management and employees of Borrowers as and when deemed necessary by the Third Party Liquidator.

(c)    Borrowers shall not amend, modify or terminate the Retention Agreement without the prior written consent of Agent.  Borrowers acknowledge and agree that Borrowers shall authorize, instruct, and direct the Third Party Liquidator to keep Agent (1) fully informed of the progress of the business and operations of Borrowers and respond fully to any inquiries of Agent regarding the business and operations of Borrowers and (2) communicate and fully cooperate with Agent and share all information with Agent regarding Borrowers and Guarantors, and the business and operations of Borrowers and Guarantors.

(d)    If the Third Party Liquidator resigns, Borrowers shall immediately notify Agent in writing and provide Agent with a copy of any notice of resignation immediately upon the sending of such notice by such Third Party Liquidator.  Any replacement or successor Third Party Liquidator shall be reasonably acceptable to Agent and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Lender within five (5) Business Days immediately following the notice of resignation of the resigning Third Party Liquidator, or within such longer period of time as Agent may consent to in writing.

**5.5**    Sale Milestones.  Borrowers and Guarantors covenant and agree to satisfy each of the following conditions:

(a)    On the Petition Date, the Debtors shall file motions, each in form and substance satisfactory to the Lender, requesting approval from the Bankruptcy Court (i) to retain the Third Party Liquidator to conduct Debtors' going out of business sales on terms and conditions acceptable to Agent (the "Store Closing GOB Sales"); and (ii) to conduct the Store Closing GOB Sales at all of the sixty-five (65) store locations identified on Schedule 5.5 hereto with an Applicable Rejection Date of September 30, 2017 (the "Phase 1 GOB Sales") and the store locations to be identified to Lender with an Applicable Rejection Date of October 31, 2017 in accordance with Section 5.5(d) below (the "Phase 2 GOB Sales") on

terms and conditions acceptable to Agent. Prior to conducting the Phase 2 GOB Sales, Debtors must enter into an amendment to the Retention Agreement, or an additional Retention Agreement, in form and substance acceptable to Agent, to conduct the Phase 2 GOB Sales.

**(b)**     On or before the third (3rd) day following the Petition Date, Debtors shall obtain orders from the Bankruptcy Court, each in form and substance satisfactory to Agent, authorizing (i) the retention of the Third Party Liquidator on terms and conditions acceptable to Agent, and (ii) the Store Closing GOB Sales, which orders shall authorize and direct, among other things, that all proceeds from the Store Closing GOB Sales shall be remitted to Agent for application against the Obligations and otherwise on terms and conditions acceptable to Agent.

**(c)**     On or before the fifth (5th) day following the Petition Date, Debtors shall file with the Bankruptcy Court a motion seeking approval of a Disclosure Statement and proposed plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "<u>Plan of Reorganization</u>"), each on terms and conditions satisfactory to Agent;

**(d)**     On or before the thirtieth (30th) day following the Petition Date, Debtors shall provide Lender with the list of store locations at which the Phase 2 GOB Sales shall be conducted; and on the thirty-fifth day following the Petition Date, the Phase 2 GOB Sales shall commence;

**(e)**     On or before the thirty-fifth (35th) day following the Petition Date, Debtors shall file a proposed order confirming the Plan of Reorganization, in form and substance acceptable to Agent;

**(f)**     On or before the forty-fifth (45th) day following the Petition Date, Debtors shall accept or reject the lease for each store location set forth on Schedule 5.5 attached hereto with an Applicable Rejection Date of October 31, 2017:

**(g)**     On or before the fifty-fifth (55th) day following the Petition Date any objections to confirmation of the Plan of Reorganization are due to be filed with, or delivered to, any court-approved noticing agent.

**(h)**     The official vote tabulation with respect to voting on the Plan of Reorganization, if any, results in all impaired classes of claims and interests under the Plan of Reorganization that are entitled to vote on the Plan of Reorganization voting to accept or being deemed to vote to accept the Plan of Reorganization.

**(i)**     On or before the sixtieth (60th) day following the Petition Date, the Debtors shall obtain an order from the Bankruptcy Court (i) approving the Disclosure Statement on terms and conditions satisfactory to the Agent, and such order is not thereafter vacated, reversed, modified or altered on appeal or by reconsideration without the prior written consent of the Agent and (ii) confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to Agent (the "<u>Plan of Reorganization Confirmation Order</u>").

**(j)**     On or before the seventy-fifth (75th) day following the Petition Date, the Plan of Reorganization Confirmation Order shall become a Final Order, not subject to being vacated, reversed, modified or altered on appeal or by reconsideration.

**(k)**    On or before the ninetieth (90th) day following the Petition, the Effective Date under (and as defined in) the Plan of Reorganization shall occur.

**5.6**    Ratification of Blocked Account Agreements.    To the extent Agent deems it necessary in its reasonable discretion and promptly upon Agent's request, Borrowers and Guarantors shall promptly provide Agent with evidence, in form and substance satisfactory to Agent, that the Blocked Account Agreements and other deposit account arrangements provided for in the Pre-Petition Credit Agreement have been ratified and amended by the parties thereto, or their respective successors in interest to reflect the commencement of the Chapter 11 Case, that each Debtor Borrower and each Guarantor, as Debtor and Debtor-in-Possession, is the successor in interest to such Debtor Borrower or Guarantor, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in the Ratification Agreement.

**5.7**    ERISA.    Each Borrower and Guarantor hereby represents and warrants with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower or Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "**PBGC**") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower or Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower or Guarantor.

**6.**    DIP FACILITY FEE.

Borrowers shall pay to Agent, for the account of Lenders on a pro rata basis according to their respective Commitments, a debtor-in-possession financing facility fee, in the amount of one percent (1%) of the Aggregate Commitments, on account of the financing provided by Agent and Lenders to Borrowers in the Chapter 11 Case, which fee shall be fully earned and due and payable on the Ratification Closing Date and which may be charged directly to the loan account of any Borrower maintained by Agent or paid by the Loan Parties concurrently with the of the initial Loans, as provided under Section 9 of this Ratification Agreement.

**7.**    AMENDMENTS TO THE PRE-PETITION CREDIT AGREEMENT.

**7.1**    Increase in Commitments.    Section 2.15 of the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"2.15    Reserved."

**7.2**    OFAC.    The following Section 5.27 is added to Article V of the Pre-Petition Credit Agreement:

"5.27    OFAC/Sanctions.    No Loan Party nor any of its Subsidiaries is in violation of any Sanctions.    No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from

investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with the Anti-corruption Laws. Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with the Anti-corruption Laws in all material respects. No proceeds of any loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any applicable sanction by any Person (including any Credit Party or other individual or entity participating in any transaction)."

**7.3** <u>Delivery of Other Information.</u>  Section 6.02 of the Pre-Petition Credit Agreement is hereby amended by adding the following two additional subsections (j) and (k):

(j) As soon as practicable (and, in any event, at least three (3) Business Days or such shorter period as agreed by Lender in its sole discretion) in advance of filing with the Bankruptcy Court or delivering to any official committee appointed in any of the Cases (or the professionals to any such committee) or to the U.S. Trustee, as the case may be, the proposed Final Financing Order and all other proposed orders and pleadings related to the debtor-in-possession financing, any other financing or any use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto and (ii) substantially simultaneously with the filing with the Bankruptcy Court or delivering to any official committee appointed in any of the Cases (or the professionals to any such committee) or the U.S. Trustee, as the case may be, all other notices, filings, motions, pleadings or other information concerning the financial condition of Borrowers or any of the other Loan Parties or other Indebtedness of the Loan Parties or, to the extent not required to be delivered pursuant to subclause (i) above, any request for relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure that may be filed with the Bankruptcy Court or delivered to any official committee appointed in any of the Cases (or the professional to any such committee); and

(k)     promptly, such additional information regarding the Cases or the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Lender may from time to time reasonably request.

7.4    <u>Field Examinations and Appraisals</u>.  Notwithstanding anything to the contrary set forth in Section 6.10(b) and 6.10(c) of the Pre-Petition Credit Agreement, Agent may conduct, at the expense of Borrowers, field examinations and appraisals at Agent's discretion.

7.5    <u>Permitted Investments</u>.  Notwithstanding anything to the contrary set forth in Section 7.02 of the Pre-Petition Credit Agreement, no Loan Party or any of its Subsidiaries shall make any Permitted Investments, other than as provided in the Financing Orders and the Budget; provided, that, in any event, Loan Parties nor any of their respective Subsidiaries shall make any Permitted Acquisitions.

7.6    <u>Permitted Dispositions</u>.  Notwithstanding anything to the contrary set forth in Section 7.05 of the Pre-Petition Credit Agreement, no Loan Party or any of its Subsidiaries Borrowers shall make any Permitted Dispositions, other than as provided in the Financing Orders and the Budget.

7.7    <u>Restricted Payments</u>.  Notwithstanding anything to the contrary set forth in Section 7.06 of the Pre-Petition Credit Agreement, no Loan Party or any of its Subsidiaries shall make any Restricted Payments except (a) with the prior written consent of the Administrative Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Lender), and (b) to the extent specifically set forth in the DIP Budget.

7.8    <u>Prepayments of Indebtedness</u>.  Notwithstanding anything to the contrary set forth in Section 7.07 of the Pre-Petition Credit Agreement, no Loan Party or any of its Subsidiaries shall make any prepayments of Indebtedness except as permitted pursuant to the Financing Orders, and shall not make any payments of Subordinated Indebtedness, whether characterized as prepayments of payments of Subordinated Indebtedness.

7.9    <u>Financial Covenants</u>.  Section 7.15 of the Pre-Petition Credit Agreement is hereby deleted.

7.10    <u>Events of Default</u>.  Section 8.01 of the Pre-Petition Credit Agreement is hereby amended as follows:

(a)    Section 8.01(f) of the Pre-Petition Credit Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:"

"(f)    <u>Insolvency Proceedings, Etc</u>.  Any Non-Debtor Borrower or any Subsidiary thereof (other than a debtor in the Chapter 11 Case) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any part of its property; or a proceeding shall be commenced or a petition filed, without the application or consent of such Person, seeking or requesting the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed and the appointment continues undischarged, undismissed or unstayed for forty-

five (45) calendar days or an order or decree approving or ordering any of the foregoing shall be entered; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any part of its property is instituted without the consent of such Person and continues undismissed or unstayed for forty-five (45) calendar days, or an order for relief is entered in any such proceeding; or

(b)    Section 8.01(g) of the Pre-Petition Credit Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:"

"(g)    <u>Inability to Pay Debts; Attachment</u>. (i) Any Non Debtor Borrower or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due in the ordinary course of business, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within fifteen (15) days after its issuance or levy; or

(c)    Section 8.01 of the Pre-Petition Credit Agreement is hereby amended by (i) replacing the period appearing at the end of Section 8.01(q) with a semicolon, and (ii) adding the following at the end of such Section:

"(r)    the occurrence of any condition or event which permits Agent and Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in any Financing Order);

(s)    the termination or non-renewal of the Loan Documents as provided for in any Financing Order;

(t)    any Loan Party suspends or discontinues all or any material part of its business (other than with respect to the Store Closing GOB Sales as defined in and permitted by the Ratification Agreement), or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee or examiner with expanded powers is appointed in the Chapter 11 Case or otherwise for any Loan Party, or any of their respective properties;

(u)    any act, condition or event occurring after the Petition Date that has or could reasonably expect to have a Material Adverse Effect;

(v)    conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(w)    dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(x)  grant of a lien on or other interest in any property of any Loan Party, other than a Permitted Encumbrance or a lien or encumbrance permitted by any Financing Order (including the Carve-Out), which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral;

(y) the grant of an administrative expense claim in any Chapter 11 Case which is superior to or ranks in parity with the rights of the Agent (other than administrative expense claims permitted by any Financing Order or the Ratification Agreement, or the Carve-Out);

(z)  the failure of any Borrower or Guarantor to comply with any Financing Order or the Ratification Agreement, or the modification, reversal, revocation, remand, stay, rescinding, vacating or amendment of any Financing Order, in whole or in part, on appeal or by the Bankruptcy Court, without the prior written consent of the Agent;

(aa)  the appointment of a trustee in any Chapter 11 Case pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(bb)  the appointment in any Chapter 11 Case of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(cc)  the filing of a plan of reorganization or liquidation by or on behalf of any Loan Party which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by the Agent;

(dd) the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Loan Party which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by Administrative Agent;

(ee) the filing of a motion by any Borrower or Guarantor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from any Agent or any of the Lenders directly) of any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(ff)  (i) the failure of Borrowers or Guarantors to comply with any material provision of the retention agreement between Borrowers and the Third Party Liquidator, without with the prior consent of the Agent; or (ii) the termination of any such agreements for any reason without the prior written consent of the Agent; and

(gg) any Material Budget Deviation (as defined in Section 5.3(d) of the Ratification Agreement) for any Measurement Period.

**7.11**    Participations. Section 10.06(d) of the Pre-Petition Credit Agreement is hereby amended by adding the following paragraph:

"Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Lead Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register."

**7.12**    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. Section 10.14 of the Pre-Petition Credit Agreement is hereby amended by deleting such Sections in their entirety and replacing them with the following:

"(a)    The validity, interpretation and enforcement of this Agreement and the other Loan Documents (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by (i) the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York and (ii) to the extent applicable, the Bankruptcy Code.

(b)    Each Borrower, each Guarantor, Agent, each Lender, and each L/C Issuer irrevocably consent and submit to the non-exclusive jurisdiction of the Bankruptcy Court and the United States District Court for the Southern District of New York, and any appellate court from any thereof. whichever the Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Loan Documents or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Loan Documents or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Agent shall have the right to bring any action or proceeding against a Borrower or its property in the courts of any other jurisdiction which Agent deems reasonably necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against such Borrower or its property)."

7.13    <u>Schedule of Commitments</u>.    Schedule 2.01 of the Credit Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule 2.01 in the form attached hereto as Schedule 2.01 to this Ratification Agreement.

7.14    <u>Form of Borrowing Base Certificate</u>.    Exhibit G to the Pre-Petition Credit Agreement is hereby amended by deleting the Form of Borrowing Base Certificate in its entirety and replacing it with the Form of Borrowing Base Certificate attached hereto as <u>Exhibit G</u> to this Ratification Agreement.

8.    <u>RELEASE</u>.

8.1    <u>Release of Pre-Petition Claims</u>.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of Agent and Lenders contained herein and the making of any Loans by Agent and Lenders, each of the Loan Parties, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agent, each Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Agent, each Lender and all such other parties being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever but, for the avoidance of doubt, excluding any claims or causes of action for gross negligence or willful misconduct (individually, a "**Pre-Petition Released Claim**" and collectively, "**Pre-Petition Released Claims**") of every name and nature, known or unknown, suspected or

unsuspected, both at law and in equity, which any of the Loan Parties, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the Ratification Closing Date, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Pre-Petition Credit Agreement, as amended and supplemented through the date hereof, and the other Loan Documents.

(b)     Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Borrower and Guarantor pursuant to this Section 8.1.  If any Loan Party violates the foregoing covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all reasonable documented attorneys' fees and out-of-pocket legal costs incurred by any Releasee as a result of such violation.

**8.2**     Release of Post-Petition Claims. Upon the Payment in Full of all of the Obligations, in consideration of the agreements of Agent and Lenders contained herein and the making of any Loans by Agent and Lenders, each of the Loan Parties hereby covenants and agrees to execute and deliver in favor of Agent and Lenders a valid and binding termination and release agreement, in form and substance satisfactory to Agent.  If any Loan Party violates such covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all reasonable documented attorneys' fees and out-of-pocket legal costs incurred by any Releasee as a result of such violation.

**8.3**     Releases Generally.

(a)     Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof  may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)     Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

**9.**     CONDITIONS PRECEDENT.

The amendments, representations and warranties, covenants, defaults and all other agreements and obligations contained in Sections 1 through 8 of this Ratification Agreement shall only become effective upon the satisfaction (or waiver) of all of the following conditions

precedent (the time of such satisfaction (or waiver) referred to herein as the "**Ratification Closing Date**"):

9.1    as of the Petition Date, the Pre-Petition Loan Documents shall not have been terminated;

9.2    Debtors shall have (a) commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware by no later than August 26, 2017; (b) complied in full with the notice and other requirements of the Bankruptcy Code in a manner reasonably acceptable to Agent with respect to the Interim Financing Order; and (c) Agent shall have received such evidence thereof as it shall reasonably require.  All of the first day orders entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Case shall be in form and substance reasonably satisfactory to Agent;

9.3    no trustee or examiner with expanded powers shall have been appointed or designated with respect to any Borrower or Guarantor, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

9.4    the Interim Financing Order has been duly entered, is valid, subsisting and continuing and has not been vacated, reversed, or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal or stay;

9.5    a cash management order amending and ratifying the cash management arrangements of Borrowers and Guarantors on terms acceptable to Agent has been duly entered, is valid, subsisting and continuing and has not been vacated, reversed, or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal or stay;

9.6    the execution and delivery of this Ratification Agreement to be delivered in connection herewith by Borrowers, Guarantors and Lenders in form and substance satisfactory to Agent;

9.7    reserved;

9.8    the receipt by Agent of the Retention Agreement;

9.9    the Excess Availability, as determined by Agent, shall not be less than $40,000,000 after giving effect to initial Loans to be made or the initial Letters of Credit to be issued immediately after the Ratification Closing Date and the payment of the fees and expenses required to be paid;

9.10    each Borrower and Guarantor shall have complied in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules;

**9.11**    receipt by Agent of the initial Budget in form and substance acceptable to Agent;

**9.12**    receipt by Agent, of an executed Perfection Certificate with respect to the Borrowers and Guarantors, in the form annexed hereto, as Exhibit C;

**9.13**    receipt by Agent, of an executed Borrowing Base Certificate with respect to the Borrowers, in the form annexed hereto, as Exhibit G;

**9.14**    other than the voluntary commencement of the Chapter 11 Case, no material impairment of the priority of Agent's and Lenders' security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent and Lenders to the Petition Date;

**9.15**    Borrowers shall have (i) engaged the Third Party Liquidator in accordance with Section 5.4 and Section 5.5 of the Ratification Agreement, and (ii) have provided the Third Party Liquidator with such information as they may reasonably require;

**9.16**    Other than the Bankruptcy Events, no Material Adverse Effect shall have occurred since January 28, 2017;

**9.17**    None of the materials previously furnished to Agent by Borrowers or Guarantors contain any material misstatements, or omit to state any material facts necessary to make the statements therein, taken as a whole in the light of the circumstances under which they were made, not misleading in any material respect.

**9.18**    Agent, for the benefit of itself and the other Credit Parties, shall hold perfected, first priority security interests in and liens upon the Collateral (subject to the Permitted Encumbrances and the Carve-Out) and Agent shall have received such evidence thereof as it requires; and

**9.19**    Other than the Existing Defaults, no Default or Event of Default shall have occurred or be existing under any of the Loan Documents, as modified pursuant hereto, and assumed by Borrowers and Guarantor.

## 10.    ADDITIONAL CONDITIONS PRECEDENT TO ALL LOANS AND LETTERS OF CREDIT.

In addition to the satisfaction of the conditions precedent under Section 9 of this Ratification Agreement with respect to the effectiveness of the noted Sections of this Ratification Agreement and the making of the initial Loans under the Credit Agreement, and the satisfaction of the conditions precedent in Section 4.02 of the Credit Agreement with respect to all Loans and other financial accommodations available to Borrowers (such conditions in Section 4.02, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Credit Agreement:

**10.1**    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered the Permanent Financing Order. Neither Agent nor any Lender shall provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order and the time to appeal to contest such order shall have expired;

**10.2**    requests for further credit shall be for purposes and in amounts in accordance with the Budget;

**10.3**    subject to the Financing Order, all fees and expenses required to be paid to Agent and Lenders pursuant to the Ratification Agreement and the Credit Agreement, as amended thereby, shall have been paid or shall be paid concurrently with the making of the Loans after the Ratification Closing Date; and

**10.4**    other than the Existing Defaults, no Default or Event of Default shall have occurred or be existing under any of the Loan Documents, as amended, supplemented or otherwise modified pursuant this Ratification Agreement and assumed by Borrowers and Guarantor.

**11.**    <u>MISCELLANEOUS</u>.

**11.1**    <u>Amendments and Waivers</u>.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

**11.2**    <u>Further Assurances</u>.  Each Borrower and Guarantor shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Loan Documents or the Financing Order.  Upon the request of Agent, at any time and from time to time, each Borrower and Guarantor shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office, the financing statements, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent.

**11.3**    <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

**11.4**    <u>Counterparts</u>.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

**11.5**    <u>Additional Events of Default</u>.  The parties hereto acknowledge, confirm and agree that the failure of any Borrower or Guarantor to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Borrower or Guarantor in connection herewith shall constitute an Event of Default under the Loan Documents.

**11.6**    <u>Costs and Expenses</u>.    Subject to the terms of the Financing Order, Borrowers shall pay to Agent and any Lender on demand all costs and expenses that Agent or any Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Loan Documents and the Financing Order.  Subject to the terms of the Financing Order, the foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Borrowers.  Subject to the terms of the Financing Order, all sums provided for in this Section 11.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents.  Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Borrower or Guarantor.

**11.7**    <u>Effectiveness</u>.  This Ratification Agreement shall become effective upon the execution hereof by the Borrowers, Guarantors, Agent and Lenders and the entry of the Interim Financing Order.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

**BORROWERS**:

PERFUMANIA HOLDINGS, INC.
PERFUMANIA, INC.
MAGNIFIQUE PARFUMES AND COSMETICS, INC.
TEN KESEF II, INC.
PERFUMANIA PUERTO RICO, INC.
QUALITY KING FRAGRANCE, INC.
SCENTS OF WORTH, INC.
FIVE STAR FRAGRANCE COMPANY, INC.
NORTHERN GROUP, INC.
PERFUMANIA.COM, INC.
PARLUX, LTD.
PARLUX FRAGRANCES, LLC

By: _____
Michael W. Katz
President and Chief Executive Officer

**GUARANTORS**:

ALADDIN FRAGRANCES, INC.
NICHE MARKETING GROUP, INC.

By: _____
Michael W. Katz
President and Chief Executive Officer

MODEL REORG ACQUISITION, LLC

By PERFUMANIA HOLDINGS, INC.,
as sole member

By: _____
Michael W. Katz
President and Chief Executive Officer

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Agent, Lender and L/C Issuer

By: _____
Name: _____
Title: _____

EXHIBIT A
to
RATIFICATION AND AMENDMENT AGREEMENT

**BUDGET**

(see attached)

**Perfumania Holdings, Inc.**
*Consolidated 13-Week Cash Flow*
*USD in 000s*

| Week # | Week 1 Forecast | Week 2 Forecast | Week 3 Forecast | Week 4 Forecast | Week 5 Forecast | Week 6 Forecast | Week 7 Forecast | Week 8 Forecast | Week 9 Forecast | Week 10 Forecast | Week 11 Forecast | Week 12 Forecast | Week 13 Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending Year** | **02-Sep 2017** | **09-Sep 2017** | **16-Sep 2017** | **23-Sep 2017** | **30-Sep 2017** | **07-Oct 2017** | **14-Oct 2017** | **21-Oct 2017** | **28-Oct 2017** | **04-Nov 2017** | **11-Nov 2017** | **18-Nov 2017** | **25-Nov 2017** | **Total 13 Weeks** |
| CASH FLOW FROM OPERATIONS | | | | | | | | | | | | | | |
| Total Operating Receipts | $ 5,815 | $ 6,361 | $ 7,046 | $ 8,134 | $ 8,486 | $ 10,053 | $ 6,636 | $ 6,791 | $ 8,064 | $ 8,027 | $ 9,265 | $ 9,395 | $ 9,190 | $ 103,264 |
| Total Operating Disbursements | (10,674) | (14,049) | (12,918) | (12,068) | (16,822) | (10,789) | (9,857) | (9,517) | (9,868) | (8,163) | (5,904) | (3,435) | (5,608) | (129,673) |
| **Net Operating Cash Flow** | **(4,859)** | **(7,689)** | **(5,872)** | **(3,934)** | **(8,335)** | **(736)** | **(3,221)** | **(2,725)** | **(1,804)** | **(136)** | **3,361** | **5,960** | **3,582** | **(26,409)** |
| Net Cash Flow from Investing | (100) | - | (200) | - | - | - | (200) | - | - | - | - | (200) | - | (700) |
| CASH FLOW FROM RESTRUCTURING ACTIVITIES | | | | | | | | | | | | | | |
| Professional Fees & Carve Out Funding | (270) | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (330) | (210) | (210) | (210) | (330) | (3,030) |
| Other Restructuring Costs | (102) | - | - | - | (1,300) | - | - | - | - | (40) | - | - | - | (1,442) |
| Net Cash Flow from Restructuring | (372) | (210) | (210) | (210) | (1,510) | (210) | (210) | (210) | (330) | (250) | (210) | (210) | (330) | (4,472) |
| **Net Cash Flow** | **(5,331)** | **(7,899)** | **(6,282)** | **(4,144)** | **(9,845)** | **(946)** | **(3,631)** | **(2,935)** | **(2,134)** | **(386)** | **3,151** | **5,550** | **3,252** | **(31,581)** |
| Total Non-Cash ABL Activity | (105) | - | - | - | (228) | - | - | - | - | (441) | - | - | - | (774) |
| **Beginning ABL Balance** | **21,631** | **15,816** | **9,455** | **2,408** | | | | | | | | | | **21,631** |
| Total Receipts / Sweeps | (5,815) | (6,361) | (7,046) | (2,408) | - | - | - | - | - | - | - | - | - | (21,631) |
| Total Disbursements / Drawdowns | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending ABL Balance** | **15,816** | **9,455** | **2,408** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Beginning DIP ABL Balance** | **-** | **11,251** | **25,510** | **38,839** | **45,391** | **55,464** | **56,411** | **60,042** | **62,977** | **65,111** | **65,938** | **62,788** | **57,237** | **-** |
| Total Receipts / Sweeps | - | - | - | (5,726) | (8,486) | (10,053) | (6,636) | (6,791) | (8,064) | (8,027) | (9,265) | (9,395) | (9,190) | (81,633) |
| Total Disbursements / Drawdowns | 11,251 | 14,259 | 13,328 | 12,278 | 18,559 | 10,999 | 10,267 | 9,727 | 10,198 | 8,855 | 6,114 | 3,845 | 5,938 | 135,619 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending DIP ABL Balance** | **$ 11,251** | **$ 25,510** | **$ 38,839** | **$ 45,391** | **$ 55,464** | **$ 56,411** | **$ 60,042** | **$ 62,977** | **$ 65,111** | **$ 65,938** | **$ 62,788** | **$ 57,237** | **$ 53,986** | **$ 53,986** |

EXHIBIT B
to
RATIFICATION AND AMENDMENT AGREEMENT

**Form of Interim Financing Order**

(see attached)

EXHIBIT C
to
RATIFICATION AND AMENDMENT AGREEMENT

**Form of Perfection Certificate**

(See attached)

EXHIBIT D
to
RATIFICATION AND AMENDMENT AGREEMENT

**Existing Defaults**

• **8.01(f) Insolvency Proceedings Default** – the Debtors are filing or have filed proceedings under Debtor Relief Laws and orders with respect to such filings have been or are being entered.

• **8.01(l) Cessation of Business Default** – Certain Debtors have taken actions to suspend operations of their respective businesses, liquidate all or a material portion of their assets or Store locations and have engaged a liquidator to perform going-out-of-business sales.

SCHEDULE 2.01
to
RATIFICATION AND AMENDMENT AGREEMENT

**Schedule 2.01**

**Commitments**

| Lender | Address for Notices | Amount of Commitment |
|---|---|---|
| Wells Fargo Bank, National Association | One Boston Place, 18th Floor Boston, Massachusetts 02108 Attention: Portfolio Manager – Perfumania Facsimile No.: (617) 523-4032 | $83,750,000 |
| | | |
| **Total** | | $83,750,000 |

EXHIBIT G
to
RATIFICATION AND AMENDMENT AGREEMENT

**Form of Borrowing Base Certificate**

(see attached)

SCHEDULE 5.5
to
RATIFICATION AND AMENDMENT AGREEMENT

**Phase 1 and Phase 2 Store Closing GOB Sales**

**Schedule 1**
**EXCEPT AS OTHERWISE NOTED BELOW, ALL OF THE FOLLOWING REAL
PROPERTY LEASES ARE REJECTED TOGETHER WITH ALL ANCILLARY AND
COLLATERAL DOCUMENTS, AMENDMENTS, EXHIBITS, MODIFICATIONS,
REVISIONS, SUPPLEMENTS, RIDERS, ATTACHMENTS, SCHEDULES,
SIDE LETTERS AND THE LIKE**

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Arkin Associates | Magnifique Parfumes and Cosmetics, Inc. | Lincoln Road Mall<br>334 Lincoln Road<br>Miami Beach, FL 33139 | 5/8/1998 | 10/31/2017 | $227,445.00 |
| Avison Young | Magnifique Parfumes and Cosmetics, Inc. | Tuscola Outlets<br>400 Tuscola Boulevard<br>Tuscola, IL 61953 | 3/20/1998 | 9/30/2017 | $8,487.20 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Arbor Place Mall<br>6700 Douglas Boulevard<br>Douglasville, GA 30135 | 8/10/2006 | 9/30/2017 | $77,447.51 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Imperial Valley Mall<br>3451 S. Dogwood Avenue<br>El Centro, CA 92243 | 3/9/2005 | 10/31/2017 | $166,269.24 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Mall del Norte<br>5300 San Dario<br>Laredo, TX 78041 | 12/23/1993 | 10/31/2017 | $158,408.52 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Sunrise Mall<br>2370 N. Expressway<br>Brownsville, TX 78521 | 1/31/2004 | 10/31/2017 | $116,488.80 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Triangle Town Center<br>5959 Triangle Town Boulevard<br>Raleigh, NC 27616 | 10/20/2004 | 10/31/2017 | $120,299.04 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Westland Mall<br>1695 W. 49th Street<br>Hialeah, FL 33012 | 2/4/1998 | 10/31/2017 | $269,360.88 |
| CBRE | Magnifique Parfumes and Cosmetics, Inc. | Oakland Mall<br>326 West Fourteen Mile Road<br>Troy, MI 48083 | 8/11/2015 | 10/31/2017 | $105,500.99 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Centercal Properties | Magnifique Parfumes and Cosmetics, Inc. | Station Park<br>910 West Forbush Place<br>Farmington, UT 84025 | 11/16/2013 | 9/30/2017 | $76,815.24 |
| Craig Realty Group | Magnifique Parfumes and Cosmetics, Inc. | Outlets at Castle Rock<br>5050 Factory Shops Boulevard<br>Castle Rock, CO 80108 | 11/28/1992 | 10/31/2017 | $30,454.41 |
| Craig Realty Group | Magnifique Parfumes and Cosmetics, Inc. | Outlets at San Clemente<br>101 West Avenida Vista Hermosa<br>San Clemente, CA 92672 | 11/12/2015 | 9/30/2017 | $105,947.04 |
| Craig Realty Group | Magnifique Parfumes and Cosmetics, Inc. | Outlets at Traverse Mountain<br>3700 N. Cabelas Boulevard<br>Lehi, UT 84043 | 11/16/2012 | 10/31/2017 | $6,304.86 |
| Developers Diversified Realty | Perfumania Puerto Rico, Inc. | Plaza del Sol<br>725 Avenida West Main<br>Bayamon, PR 00961 | 11/27/1998 | 9/30/2017 | $66,952.08 |
| Developers Diversified Realty | Perfumania Puerto Rico, Inc. | Plaza Isabela<br>PR #2 Int. PR #4494<br>Isabela, PR 00662 | 5/2/2013 | 9/30/2017 | $54,606.64 |
| Developers Diversified Realty | Perfumania Puerto Rico, Inc. | Plaza Rio Hondo<br>Hwy 22 & Rt 167<br>Bayamon, PR 00961 | 8/3/2013 | 9/30/2017 | $136,579.80 |
| Dimond Group | Magnifique Parfumes and Cosmetics, Inc. | Dimond Center<br>800 East Dimond Boulevard<br>Anchorage, AK 99515 | 10/14/2009 | 10/31/2017 | $122,380.20 |
| EB Development | Magnifique Parfumes and Cosmetics, Inc. | Vero Beach Outlets<br>1876 94th Drive<br>Vero Beach, FL 32966 | 8/26/1995 | 9/30/2017 | $14,631.01 |
| Empresas Fonalledas | Perfumania Puerto Rico, Inc. | Plaza del Caribe<br>Suite 2050 Ponce Bypass<br>Ponce , PR 00716 | 11/16/1998 | 9/30/2017 | $278,864.11 |
| Equity One | Magnifique Parfumes and Cosmetics, Inc. | Serramonte Center<br>36-A Serramonte Drive<br>Daly City, CA 94015 | 7/31/1992 | 9/30/2017 | $100,626.72 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Fanatics, Inc. as Sublessee of Perfumania, Inc. | Perfumania, Inc. | 251 International Parkway, Sunrise, FL 33325 | 8/6/2013 | 8/31/2017 | $0.00 |
| FFO Real Estate Advisors | Magnifique Parfumes and Cosmetics, Inc. | Louisiana Boardwalk Outlets 494 Boardwalk Boulevard Bossier City, LA 71111 | 5/12/2005 | 10/31/2017 | $41,767.74 |
| Forest City Enterprises | Magnifique Parfumes and Cosmetics, Inc. | Town Square 6587 Las Vegas Boulevard Las Vegas, NV 89119 | 11/19/2007 | 9/30/2017 | $23,213.16 |
| FSH Associates LP | Magnifique Parfumes and Cosmetics, Inc. | Rockvale Outlets 35 S. Willowdale Drive Lancaster, PA 17602 | 3/22/1997 | 9/30/2017 | $22,559.00 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Ala Moana Center 1450 Ala Moana Boulevard Honolulu, HI 96814 | 5/19/2015 | 9/30/2017 | $234,385.79 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Altamonte Mall 451 E. Altamonte Drive Altamonte, FL 32701 | 6/22/1994 | 10/31/2017 | $112,145.76 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Bayside Marketplace 401 Biscayne Boulevard Miami , FL 33132 | 9/5/1993 | 10/31/2017 | $339,933.24 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Christiana Mall 704 Christiana Mall Newark, DE 19702 | 11/18/2006 | 10/31/2017 | $165,821.88 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Oglethorpe Mall 7804 Abercorn Extension Savannah, GA 31406 | 3/6/2003 | 10/31/2017 | $137,360.76 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Riverchase Galleria 2000 Riverchase Galleria Hoover, AL 35244 | 5/2/1998 | 9/30/2017 | $139,230.24 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Staten Island Mall 2655 Richmond Avenue Staten Island, NY 10314 | 9/14/1996 | 10/31/2017 | $208,030.36 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | The Shops at La Cantera 15900 La Cantera Parkway San Antonio, TX 78256 | 6/16/2005 | 10/31/2017 | $133,450.32 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Tucson Mall 4500 N. Oracle Road Tucson, AZ 85705 | 6/4/2004 | 9/30/2017 | $0.00 |
| General Growth Properties (Now JLL) | Magnifique Parfumes and Cosmetics, Inc. | Lakeside Mall 14600 Lakeside Circle Sterling Heights, MI 48313 | 4/24/1993 | 10/31/2017 | $180,299.04 |
| Grid Properties | Magnifique Parfumes and Cosmetics, Inc. | DC USA 3100 14th Street,  NW Washington, DC 20010 | 7/7/2012 | 10/31/2017 | $86,954.64 |
| Gumberg Asset Management Corp. | Magnifique Parfumes and Cosmetics, Inc. | Southland Mall 20505 South Dixie Highway Cutler Bay, FL 33189 | 11/19/2008 | 10/31/2017 | $128,034.24 |
| Harlem Irving Realty, Inc. | Magnifique Parfumes and Cosmetics, Inc. | Harlem Irving Plaza 4134 North Harlem Norridge, IL 60706 | 7/12/1998 | 10/31/2017 | $0.00 |
| Horizon Group Properties | Magnifique Parfumes and Cosmetics, Inc. | The Outlet Shoppes of Bluegrass 1155 Buck Creek Road Simpsonville, KY 40067 | 7/31/2014 | 9/30/2017 | $74,449.98 |
| Hull Storey Gibson Companies, LLC | Magnifique Parfumes and Cosmetics, Inc. | Victoria Mall 7800 North Navarro Victoria, TX 77904 | 10/30/2008 | 9/30/2017 | $53,583.96 |
| Jones Lang LaSalle | Magnifique Parfumes and Cosmetics, Inc. | Westgate Mall 7701 Interstate 40 Amarillo, TX 79121 | 10/16/2008 | 9/30/2017 | $67,494.24 |
| Kimco Realty | Magnifique Parfumes and Cosmetics, Inc. | Oakwood Plaza North 3501 Oakwood Boulevard Hollywood, FL 33020 | 9/27/1996 | 10/31/2017 | $0.00 |
| KTR South Florida LLC | Perfumania, inc. | 251 International Parkway, Sunrise, FL 33325 | 9/1/2002 | 8/31/2017 | $457,750.32 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Chandler Fashion Center<br>3111 W Chandler Boulevard<br>Chandler, AZ 85226 | 8/4/2011 | 9/30/2017 | $119,067.12 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Fashion Outlets of Niagara<br>1951 Fashion Outlet Boulevard<br>Niagara Falls, NY 14304 | 10/24/2014 | 9/30/2017 | $147,390.14 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Kings Plaza<br>5149 Kings Plaza Road<br>Brooklyn, NY 11234 | 10/3/1998 | 10/31/2017 | $438,290.51 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | The Oaks Mall<br>222 W. Hillcrest Drive<br>Thousand Oaks, CA 91360 | 11/25/2008 | 9/30/2017 | $164,106.12 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Paradise Valley Mall<br>4568 E. Cactus Road<br>Phoenix, AZ 85032 | 11/7/2008 | 9/30/2017 | $145,041.96 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Valley River Center<br>G28  Valley River Center<br>Eugene, OR 97401 | 10/8/2004 | 9/30/2017 | $104,804.64 |
| Mohr Affinity, LLC | Magnifique Parfumes and Cosmetics, Inc. | Lake Elsinore Outlets<br>17600 Collier Avenue<br>Lake Elsinore, CA 92530 | 2/24/1992 | 10/31/2017 | $16,483.24 |
| Moonbeam Equities | Magnifique Parfumes and Cosmetics, Inc. | Cortana Mall<br>9843 Cortana Place<br>Baton Rouge, LA 70815 | 1/30/1997 | 10/31/2017 | $15,517.41 |
| New England Development | Magnifique Parfumes and Cosmetics, Inc. | Palm Beach Outlets<br>1801 Palm Beach Lakes Boulevard<br>West Palm Beach, FL 33401 | 2/13/2014 | 10/31/2017 | $141,419.46 |
| Prestige Properties | Magnifique Parfumes and Cosmetics, Inc. | The Mall at Bay Plaza<br>200 Baychester Avenue<br>Bronx, NY 10475 | 8/15/2014 | 10/31/2017 | $210,183.30 |
| Pyramid Company | Magnifique Parfumes and Cosmetics, Inc. | Destiny USA<br>One Destiny USA Drive<br>Syracuse, NY 13290 | 11/7/2008 | 9/30/2017 | $127,414.32 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Rouse Properties | Magnifique Parfumes and Cosmetics, Inc. | Chula Vista Center<br>555 Broadway<br>Chula Vista, CA 91910 | 2/19/2016 | 9/30/2017 | $69,514.05 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Albertville Premium Outlets<br>6415 Labeaux Ave NE<br>Albertville, MN 55301 | 11/14/2014 | 9/30/2017 | $124,077.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Allen Premium Outlets<br>820 West Stacy Road<br>Allen, TX 75013 | 4/23/2004 | 10/31/2017 | $269,318.28 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Anchorage 5th Avenue Mall<br>320 West 5th Avenue<br>Anchorage, AK 99501 | 4/8/2010 | 9/30/2017 | $95,297.16 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Arizona Mills<br>5000 S. Arizona Mills Circle<br>Tempe, AZ 85282 | 11/20/1997 | 10/31/2017 | $28,057.93 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Barton Creek Square<br>2901 S. Capital of Texas Highway<br>Austin, TX 78746 | 11/19/2005 | 10/31/2017 | $22,645.68 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Calhoun Premium Outlets<br>455 Belwood Road<br>Calhoun, GA 30701 | 11/22/1992 | 9/30/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Camarillo Premium Outlets<br>990 Camarillo Center Drive<br>Camarillo, CA 93010 | 9/19/1998 | 10/31/2017 | $254,897.94 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Camarillo Promenade<br>540 West Ventura Boulevard<br>Camarillo, CA 93010 | 4/23/2009 | 9/30/2017 | $234,383.04 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Carolina Premium Outlets<br>1025 Outlet Center Drive<br>Smithfield, NC 27577 | 4/16/2004 | 10/31/2017 | $84,938.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Castleton Square<br>6020 East 82nd Street<br>Indianapolis, IN 46250 | 9/15/2007 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Charlotte Premium Outlets<br>5512 New Fashion Way<br>Charlotte, NC 28278 | 7/31/2014 | 10/31/2017 | $100,759.59 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Cielo Vista Mall<br>8401 Gateway Boulevard<br>West El Paso, TX 79925 | 9/5/1997 | 10/31/2017 | $254,509.92 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Cincinnati Premium Outlets<br>400 Premium Outlets Drive<br>Monroe, OH 45050 | 8/6/2009 | 9/30/2017 | $98,812.44 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Coral Square Mall<br>9443 West Atlantic Boulevard<br>Coral Springs, FL 33071 | 11/11/1992 | 10/31/2017 | $41,611.05 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Dadeland Mall<br>7335 N. Kendall Drive<br>Miami, FL 33156 | 10/29/2008 | 9/30/2017 | $295,143.84 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Desert Hills Premium Outlets<br>48400 Seminole Drive<br>Cabazon, CA 92230 | 7/17/2009 | 9/30/2017 | $317,004.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Edinburgh Premium Outlets<br>11861 N. Executive Drive<br>Edinburgh, IN 46124 | 2/1/1990 | 10/31/2017 | $73,690.65 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Ellenton Premium Outlets<br>5299 Factory Shops Boulevard<br>Ellenton, FL 34222 | 8/26/1993 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Florida Mall III<br>8001 S. Orange Blossom Trail<br>Orlando, FL 32809 | 4/7/2013 | 9/30/2017 | $198,577.56 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Florida Mall<br>8001 Orange Blossom Trail<br>Orlando, FL 32809 | 7/7/1995 | 10/31/2017 | $356,088.60 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gaffney Premium Outlets<br>445 Factory Shops Boulevard<br>Gaffney, SC 29341 | 11/6/1996 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gilroy Premium Outlets<br>681 Leavesley Road<br>Gilroy, CA 95020 | 5/9/2009 | 9/30/2017 | $189,161.76 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gilroy Premium Outlets<br>8375-47 Arroya Circle Bldg. A<br>Gilroy, CA 95020 | 9/6/1991 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gloucester Premium Outlets<br>100 Premium Outlets Drive<br>Blackwood, NJ 08012 | 8/13/2015 | 9/30/2017 | $125,048.53 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Grand Prairie Premium Outlets<br>2950 West Interstate 20<br>Grand Prairie, TX 75052 | 8/16/2012 | 10/31/2017 | $157,160.88 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Grapevine Mills<br>3000 Grapevine Mills Pkwy.<br>Grapevine, TX 76051 | 10/30/1997 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Grove City Premium Outlets<br>1191 Leesburg Grove City Road<br>Grove City, PA 16127 | 8/19/1994 | 9/30/2017 | $137,823.48 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gulfport Premium Outlets<br>10775 Factory Outlet Boulevard<br>Gulfport, MS 39503 | 10/27/1995 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Hagerstown Premium Outlets<br>495 Premium Outlets Boulevard<br>Hagerstown, MD 21740 | 11/27/1998 | 9/30/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Houston Premium Outlets<br>29300 Hempstead Road<br>Cypress, TX 77433 | 3/27/2008 | 10/31/2017 | $61,761.70 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Jackson Premium Outlets<br>537 Monmouth Road<br>Jackson, NJ 08527 | 12/14/2002 | 10/31/2017 | $12,452.84 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Kittery Premium Outlets<br>345 US Route 1<br>Kittery, ME 03904 | 6/14/1991 | 9/30/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Las Americas Premium Outlets<br>4125 Camino de la Plaza<br>San Diego, CA 92173 | 5/20/2005 | 9/30/2017 | $102,859.44 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Las Vegas Premium Outlets - North<br>705 S Grand Central Parkway<br>Las Vegas, NV 89106 | 8/1/2003 | 10/31/2017 | $400,353.90 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Las Vegas Premium Outlets - South<br>7400 S. Las Vegas Boulevard<br>Las Vegas, NV 89123 | 11/26/1993 | 10/31/2017 | $391,398.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Lighthouse Place Premium Outlets<br>909 Lighthouse Place<br>Michigan City, IN 46360 | 7/26/1991 | 9/30/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Mall at Rockingham Park<br>99 Rockingham Park Boulevard<br>Salem, NH 03079 | 11/9/2007 | 10/31/2017 | $26,370.60 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Mall of Georgia<br>3333 Buford Drive<br>Buford, GA 30519 | 11/15/2008 | 10/31/2017 | **$0.00** |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Merrimack Premium Outlets<br>80 Premium Outlets Boulevard<br>Merrimack, NH 03054 | 6/14/2012 | 10/31/2017 | $84,531.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Miami International Mall<br>1455 NW 107 Ave.<br>Miami, FL 33172 | 4/11/2007 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Newport Centre<br>30-112A Mall Drive West<br>Jersey City, NJ 07310 | 4/11/2003 | 10/31/2017 | $144,549.84 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | North Georgia Premium Outlets<br>800 Hwy 400<br>South Dawsonville, GA 30534 | 4/25/1997 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Opry Mills Mall<br>101 Opry Mills Drive<br>Nashville, TN 37214 | 5/10/2000 | 9/30/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Orlando Premium Outlets - International Drive<br>4951 International Drive<br>Orlando, FL 32819 | 8/14/2008 | 10/31/2017 | $137,588.07 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Orlando Premium Outlets - Vineland Avenue<br>8200 Vineland Avenue<br>Orlando, FL 32821 | 6/2/2000 | 10/31/2017 | $934,173.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Osage Beach Premium Outlets<br>4540 Highway 54, Box E-4<br>Osage Beach, MO 65065 | 4/3/1993 | 10/31/2017 | $129,309.12 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Pheasant Lane Mall<br>310 Daniel Webster HWY.<br>Nashua, NH 03060 | 7/31/1992 | 9/30/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Philadelphia Premium Outlets<br>18 West Lightcap Road<br>Limerick, PA 19464 | 11/8/2007 | 10/31/2017 | $9,182.73 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Pismo Beach Premium Outlets<br>333 Five Cities Drive<br>Pismo Beach, CA 93449 | 11/27/1994 | 10/31/2017 | $155,077.32 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Plaza Carolina Mall<br>Avenida Fragoso Villa Fontana<br>Carolina, PR 00983 | 1/30/1999 | 9/30/2017 | $175,194.18 |
| Simon | Perfumania Puerto Rico, Inc. | Plaza Carolina Mall<br>Avenida Fragoso Villa Fontana<br>Carolina, PR 00983 | 7/26/2011 | 9/30/2017 | $171,601.10 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Pleasant Prairie Premium Outlets<br>11211 120th Avenue Pleasant<br>Prairie, WI 53158 | 7/7/1990 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Potomac Mills<br>2700 Potomac Mills Circle<br>Woodbridge, VA 22192 | 9/30/1993 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Rio Grande Valley Premium Outlets<br>5001 East Expressway 83<br>Mercedes, TX 78570 | 11/2/2006 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Round Rock Premium Outlets<br>4401 N. IH 35<br>Round Rock, TX 78664 | 8/3/2006 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | San Francisco Premium Outlets<br>400 Livermore Outlets Drive<br>Livermore, CA 94551 | 11/8/2012 | 10/31/2017 | $146,210.40 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | San Marcos Premium Outlets<br>3939 IH-35 South<br>San Marcos, TX 78666 | 8/1/1990 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Sawgrass Depot<br>12801 West Sunrise Blvd<br>Sunrise, FL 33323 | 4/24/2009 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Sawgrass Mills<br>12801 W. Sunrise Boulevard<br>Sunrise, FL 33323 | 10/15/1990 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Seattle Premium Outlets<br>10600 Quil Ceda Boulevard<br>Tulalip, WA 98271 | 5/5/2005 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Silver Sands Premium Outlets<br>10406 W. Emerald Coast Parkway<br>Destin, FL 32550 | 10/5/2001 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | South Shore Plaza<br>250 Granite Street<br>Braintree, MA 02184 | 11/24/2008 | 10/31/2017 | $194,230.08 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | St. Augustine Premium Outlets<br>2700 State Road 16<br>St. Augustine, FL 32092 | 10/26/2012 | 10/31/2017 | $109,080.24 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Sugarloaf Mills<br>5900 Sugarloaf Parkway<br>Lawrenceville, GA 30043 | 10/24/2002 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Tampa Premium Outlets<br>2382 Grand Cypress Drive<br>Lutz, FL 33559 | 10/29/2015 | 10/31/2017 | $173,654.78 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | The Crossings Premium Outlets<br>1000 Premium Outlets Drive<br>Tannersville, PA 18372 | 8/29/1991 | 10/31/2017 | $144,291.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | The Outlets at Orange<br>20 City Blvd. W. Bldg. B.<br>Orange, CA 92868 | 11/19/1998 | 9/30/2017 | $208,113.84 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Tucson Premium Outlets<br>6401 West Marana Center Boulevard<br>Tucson, AZ 85742 | 10/1/2015 | 9/30/2017 | $135,767.23 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Twin Cities Premium Outlets<br>3925 Eagan Outlets Parkway<br>Eagan, MN 55122 | 8/14/2014 | 9/30/2017 | $119,551.21 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Vacaville Premium Outlets<br>131 Nut Tree Road<br>Vacaville, CA 95687 | 11/13/1992 | 10/31/2017 | $53,837.25 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Waikele Premium Outlets<br>94-790 Lumiaina Street<br>Waipahu, HI 96797 | 12/3/1999 | 10/31/2017 | $347,390.40 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Waterloo Premium Outlets<br>655 Route 318<br>Waterloo, NY 13165 | 4/7/1995 | 10/31/2017 | $39,054.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Williamsburg Premium Outlets<br>5699 Richmond Road<br>Williamsburg, VA 23188 | 10/29/1994 | 9/30/2017 | $135,202.92 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Woodburn Premium Outlets<br>101 Arney Road<br>Woodburn, OR 97071 | 10/12/2002 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Woodbury Common Premium Outlets<br>676 Bluebird Ct.<br>Central Valley, NY 10917 | 5/1/1993 | 10/31/2017 | $349,131.72 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Wrentham Village Premium Outlets<br>One Premium Outlet Blvd.<br>Wrentham, MA 02093 | 10/8/1997 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Singerman Real Estate | Magnifique Parfumes and Cosmetics, Inc. | Lincoln City Outlets 1500 SE East Devils Lake Road Lincoln City, OR 97367 | 2/1/1990 | 10/31/2017 | $109,828.44 |
| Sobert Realty Corp. | Magnifique Parfumes and Cosmetics, Inc. | The Outlets at Lake George 1415 State Route 9 Lake George, NY 12845 | 1/7/1996 | 9/30/2017 | $88,913.08 |
| Starwood Capital Group | Magnifique Parfumes and Cosmetics, Inc. | Chicago Ridge Mall 671 Chicago Ridge Mall Drive Chicago Ridge, IL 60415 | 6/15/2012 | 10/31/2017 | $86,779.31 |
| Starwood Capital Group | Magnifique Parfumes and Cosmetics, Inc. | Franklin Park Mall 5001 Monroe Street Toledo, OH 43623 | 5/6/2005 | 10/31/2017 | $102,354.96 |
| Starwood Capital Group | Magnifique Parfumes and Cosmetics, Inc. | Plaza West Covina 112 Plaza Drive West Covina, CA 91790 | 11/12/2008 | 9/30/2017 | $80,781.72 |
| Starwood Capital Group | Magnifique Parfumes and Cosmetics, Inc. | The Mall at Wellington Green 10300 W. Forest Hill Boulevard Wellington, FL 33414 | 5/9/2003 | 10/31/2017 | $0.00 |
| Talisman Companies | Magnifique Parfumes and Cosmetics, Inc. | Fashion Outlet of Las Vegas 32100 Las Vegas Blvd. Primm, NV 89019 | 7/12/1998 | 9/30/2017 | $41,055.36 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 104 N. Michigan Avenue Atlantic City, NJ 08401 | 5/27/2005 | 9/30/2017 | $98,766.96 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 1100 Cornerstone Boulevard Daytona, FL 32117 | 11/17/2016 | 10/31/2017 | $137,422.77 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 1645 Parkway Sevierville, TN 37862 | 9/18/1992 | 10/31/2017 | $0.00 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 1770 West Main Street Riverhead, NY 11901 | 7/1/1994 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 300 Tanger Boulevard Branson, MO 65616 | 12/10/1994 | 10/31/2017 | $19,106.90 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 301 Tanger Drive,  Suite #227 Terrell, TX 75160 | 10/25/1995 | 10/31/2017 | $86,408.64 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 350 84th Street SW Byron Center, MI 49315 | 7/30/2015 | 9/30/2017 | $82,517.01 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 36484 Seaside Outlet Drive Rehoboth Beach, DE 19971 | 7/17/2015 | 9/30/2017 | $117,744.02 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 400 South Wilson Road Sunbury, OH 43074 | 6/23/2016 | 9/30/2017 | $130,468.43 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 4000 Arrowhead Boulevard Mebane, NC 27302 | 11/5/2010 | 9/30/2017 | $57,227.81 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 4015 IH 35 South San Marcos, TX 78666 | 10/15/1993 | 10/31/2017 | $115,579.20 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 417 The Arches Circle Deer Park , NY 11729 | 10/22/2008 | 10/31/2017 | $192,250.56 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 4840 Tanger Outlet Boulevard N. Charleston, SC 29418 | 5/18/2013 | 9/30/2017 | $79,796.40 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 6699 North Landmark Drive Park City, UT 84098 | 12/16/2011 | 10/31/2017 | $10,013.78 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 6800 N. 95th Avenue Glendale, AZ 85305 | 9/28/2013 | 10/31/2017 | $80,106.36 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center<br>800 Steven B. Tanger Blvd.<br>Commerce, GA 30529 | 7/12/1996 | 10/31/2017 | $85,051.92 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center<br>8470 Factory Shops Boulevard<br>Jeffersonville, OH 43128 | 7/22/1993 | 10/31/2017 | $12,827.72 |
| The Feil Organization | Magnifique Parfumes and Cosmetics, Inc. | North Riverside Park Mall<br>7501 North Cermak Road<br>North Riverside, IL 60546 | 9/25/1992 | 10/31/2017 | $0.00 |
| The Howard Hughes Corporation | Magnifique Parfumes and Cosmetics, Inc. | Downtown Summerlin<br>2025 Festival Plaza Drive,  Suite 120<br>Las Vegas, NV 89135 | 10/9/2014 | 9/30/2017 | $107,533.54 |
| The Howard Hughes Corporation | Magnifique Parfumes and Cosmetics, Inc. | The Outlet Collection at Riverwalk<br>1 Poydras Street<br>New Orleans, LA 70130 | 5/22/2014 | 10/31/2017 | $91,711.75 |
| The Taubman Company | Magnifique Parfumes and Cosmetics, Inc. | Great Lakes Crossing<br>4512 Baldwin Road<br>Auburn Hills, MI 48326 | 11/12/1998 | 10/31/2017 | $47,992.98 |
| The Taubman Company | Magnifique Parfumes and Cosmetics, Inc. | Great Lakes Crossing<br>4768 Baldwin Road<br>Auburn Hills, MI 48326 | 5/1/2009 | 10/31/2017 | $179,685.24 |
| The Taubman Company | Magnifique Parfumes and Cosmetics, Inc. | Stamford Town Center<br>100 Greyrock Place<br>Stamford, CT 06901 | 7/7/1993 | 10/31/2017 | $41,260.32 |
| Triple Five | Magnifique Parfumes and Cosmetics, Inc. | Mall of America I<br>219 North Garden Street<br>Bloomington, MN 55425 | 8/11/1992 | 10/31/2017 | $63,154.11 |
| Vornado Realty | Perfumania Puerto Rico, Inc. | Las Catalinas Mall<br>Carretera Estatal PR-52<br>Caguas, PR 00725 | 5/2/1998 | 9/30/2017 | $166,876.80 |
| Weingarten Realty Investors | Magnifique Parfumes and Cosmetics, Inc. | Trenton Crossing<br>7600 North 10th Street<br>McAllen, TX 78504 | 7/24/2006 | 9/30/2017 | $69,779.52 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Westfield Corporation | Magnifique Parfumes and Cosmetics, Inc. | Westfield Palm Desert<br>72840 Highway 111<br>Palm Desert, CA 92260 | 4/20/2012 | 9/30/2017 | $76,070.00 |
| Westfield Corporation | Magnifique Parfumes and Cosmetics, Inc. | Westfield San Francisco Centre<br>865 Market Street<br>San Francisco, CA 94103 | 11/27/2013 | 9/30/2017 | $142,608.00 |
| Woodmont Company | Magnifique Parfumes and Cosmetics, Inc. | Columbia Gorge Outlets<br>450 NW 257th Way<br>Troutdale, OR 97060 | 9/25/2009 | 9/30/2017 | $126,461.76 |
| WP Glimcher | Magnifique Parfumes and Cosmetics, Inc. | Edison Mall<br>4125 Cleveland Avenue<br>Ft. Myers, FL 33901 | 10/29/1998 | 10/31/2017 | $203,499.00 |
| WP Glimcher | Magnifique Parfumes and Cosmetics, Inc. | Melbourne Square<br>1700 West New Haven Avenue<br>Melbourne, FL 32904 | 9/26/2008 | 10/31/2017 | $76,444.50 |
| WP Glimcher | Magnifique Parfumes and Cosmetics, Inc. | Outlet Collection - Seattle<br>1101 Outlet Collection Way<br>Auburn, WA 98001 | 8/25/1995 | 9/30/2017 | $106,047.72 |
| Yacht Haven USVI LLC | Magnifique Parfumes and Cosmetics, Inc. | Yacht Haven Grande<br>5316 Yacht Haven Grande<br>St. Thomas, USVI 00802 | 4/11/2012 | 9/30/2017 | $85,104.00 |

## **EXHIBIT B**

**Budget**

**Perfumania Holdings, Inc.**
*Consolidated 13-Week Cash Flow*
*USD in 000s*

| Week # | Week 1 Forecast | Week 2 Forecast | Week 3 Forecast | Week 4 Forecast | Week 5 Forecast | Week 6 Forecast | Week 7 Forecast | Week 8 Forecast | Week 9 Forecast | Week 10 Forecast | Week 11 Forecast | Week 12 Forecast | Week 13 Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | **02-Sep** | **09-Sep** | **16-Sep** | **23-Sep** | **30-Sep** | **07-Oct** | **14-Oct** | **21-Oct** | **28-Oct** | **04-Nov** | **11-Nov** | **18-Nov** | **25-Nov** | **Total** |
| **Year** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **13 Weeks** |
| CASH FLOW FROM OPERATIONS | | | | | | | | | | | | | | |
| Total Operating Receipts | $ 5,815 | $ 6,361 | $ 7,046 | $ 8,134 | $ 8,486 | $ 10,053 | $ 6,636 | $ 6,791 | $ 8,064 | $ 8,027 | $ 9,265 | $ 9,395 | $ 9,190 | $ 103,264 |
| Total Operating Disbursements | (10,674) | (14,049) | (12,918) | (12,068) | (16,822) | (10,789) | (9,857) | (9,517) | (9,868) | (8,163) | (5,904) | (3,435) | (5,608) | (129,673) |
| **Net Operating Cash Flow** | **(4,859)** | **(7,689)** | **(5,872)** | **(3,934)** | **(8,335)** | **(736)** | **(3,221)** | **(2,725)** | **(1,804)** | **(136)** | **3,361** | **5,960** | **3,582** | **(26,409)** |
| Net Cash Flow from Investing | (100) | - | (200) | - | - | - | (200) | - | - | - | - | (200) | - | (700) |
| CASH FLOW FROM RESTRUCTURING ACTIVITIES | | | | | | | | | | | | | | |
| Professional Fees & Carve Out Funding | (270) | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (330) | (210) | (210) | (210) | (330) | (3,030) |
| Other Restructuring Costs | (102) | - | - | - | (1,300) | - | - | - | - | (40) | - | - | - | (1,442) |
| Net Cash Flow from Restructuring | (372) | (210) | (210) | (210) | (1,510) | (210) | (210) | (210) | (330) | (250) | (210) | (210) | (330) | (4,472) |
| **Net Cash Flow** | **(5,331)** | **(7,899)** | **(6,282)** | **(4,144)** | **(9,845)** | **(946)** | **(3,631)** | **(2,935)** | **(2,134)** | **(386)** | **3,151** | **5,550** | **3,252** | **(31,581)** |
| Total Non-Cash ABL Activity | (105) | - | - | - | (228) | - | - | - | - | (441) | - | - | - | (774) |
| **Beginning ABL Balance** | **21,631** | **15,816** | **9,455** | **2,408** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **21,631** |
| Total Receipts / Sweeps | (5,815) | (6,361) | (7,046) | (2,408) | - | - | - | - | - | - | - | - | - | (21,631) |
| Total Disbursements / Drawdowns | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending ABL Balance** | **15,816** | **9,455** | **2,408** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Beginning DIP ABL Balance** | **-** | **11,251** | **25,510** | **38,839** | **45,391** | **55,464** | **56,411** | **60,042** | **62,977** | **65,111** | **65,938** | **62,788** | **57,237** | **-** |
| Total Receipts / Sweeps | - | - | - | (5,726) | (8,486) | (10,053) | (6,636) | (6,791) | (8,064) | (8,027) | (9,265) | (9,395) | (9,190) | (81,633) |
| Total Disbursements / Drawdowns | 11,251 | 14,259 | 13,328 | 12,278 | 18,559 | 10,999 | 10,267 | 9,727 | 10,198 | 8,855 | 6,114 | 3,845 | 5,938 | 135,619 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending DIP ABL Balance** | **$ 11,251** | **$ 25,510** | **$ 38,839** | **$ 45,391** | **$ 55,464** | **$ 56,411** | **$ 60,042** | **$ 62,977** | **$ 65,111** | **$ 65,938** | **$ 62,788** | **$ 57,237** | **$ 53,986** | **$ 53,986** |

# **EXHIBIT C**

## **Exit Commitment Letter**



**CONFIDENTIAL**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
*One Boston Place, 18th Floor*
*Boston, Massachusetts 02108*

August 26, 2017

Perfumania Holdings, Inc.
35 Sawgrass Drive
Bellport, NY 11713
Attention:  Mr. Michael W. Katz
                  President and Chief Executive Officer

**$100,000,000 Senior Secured Exit Revolving Loan Facility**
**Commitment Letter**

Ladies and Gentlemen:

Perfumania Holdings, Inc. (the "Company"), has advised Wells Fargo Bank, National Association ("Wells Fargo") that (i) it and certain of its subsidiaries are considering the filing of voluntary Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (ii) such proposed Chapter 11 filing of the Company and certain of its subsidiaries (collectively, the "Chapter 11 Cases") is anticipated to be a prepackaged plan of reorganization for the Company and certain of its subsidiaries pursuant to which all creditors will be paid in full prior to the commencement of the Chapter 11 Cases.  As used herein, the term "Transactions" means, collectively, the entering into and funding of the Exit Credit Facility (as defined below), the consummation of the Plan (as defined below) and the transactions contemplated therein, the payment of fees and expenses in connection therewith and any other transactions ancillary to the foregoing.

1.  <u>Commitment</u>.  Wells Fargo is pleased to advise the Company of its fully underwritten commitment to provide the Company a senior secured revolving loan and letter of credit facility upon the confirmation by the U.S. Bankruptcy Court of a plan of reorganization of the Company acceptable to Wells Fargo (the "Plan"), in an amount up to $100,000,000 (the "Exit Credit Facility"), subject to the terms and conditions set forth herein and on substantially the form of Amended and Restated Credit Agreement attached to this letter as <u>Exhibit A</u>, with such additional provisions and modifications which may be agreed to by the parties thereto (together with the exhibits thereto, the "Form of Exit Facility Credit Agreement", and together with this letter and the annexes hereto, the "Commitment Letter").

2.  <u>Titles and Roles; Syndication</u>.  While Wells Fargo has provided a commitment for the entire amount of the Exit Credit Facility as set forth above, Wells Fargo may, prior to and/or after the execution and delivery of the definitive documentation for the Exit Credit Facility, syndicate a portion of Wells

Fargo's commitment with respect to the Exit Credit Facility to other lenders identified by Wells Fargo (collectively, the "Lenders"). Wells Fargo will act as sole lead arranger and sole bookrunner for such syndication. Wells Fargo will also act as the sole administrative and collateral agent for the Exit Credit Facility (in such capacity, "Agent"). Wells Fargo may agree (with the approval of the Company, such approval not to be unreasonably withheld, conditioned or delayed) to appoint additional agents or co-agents and grant additional titles, with such compensation thereto as Wells Fargo may determine to provide (but not requiring any additional amounts from the Company), provided, that, Wells Fargo shall retain the titles of sole lead arranger and sole bookrunner, and Wells Fargo shall retain the titles of sole administrative agent and sole collateral agent and any such other agent or co-agent or holder of a title shall not have any duties or responsibilities, except as Wells Fargo and the Company may expressly agree. Wells Fargo will have "left" and highest placement in the information memoranda and all marketing materials and other documentation used in connection with the Exit Credit Facility. The parties agree that the syndication provisions shall be as set forth on Annex A hereto.

3.    Expenses and Indemnification. The Company agrees (a) to pay or reimburse all reasonable and documented fees, out-of-pocket costs, and expenses (including, without limitation, reasonable and documented fees and disbursements of counsel, reasonable consultant costs and expenses, filing and recording fees, and reasonable and documented out-of-pocket costs and expenses associated with due diligence, travel, appraisals, valuations, audits, and syndication) (the "Expenses") incurred by or on behalf of Wells Fargo (whether before, on, or after the date hereof) in connection with (i) legal and business due diligence, (ii) the preparation, negotiation, execution, and delivery of this Commitment Letter and any and all documentation for the Exit Credit Facility, (iii) the syndication of the Exit Credit Facility, and (iv) the enforcement of any of Wells Fargo's rights and remedies under this Commitment Letter, in each case irrespective of whether any of the Transactions are consummated and (b) to indemnify, defend, and hold harmless Wells Fargo, each of its affiliates, and each of their officers, directors, employees, agents, advisors, attorneys, and representatives (each, an "Indemnified Person") as set forth on Annex B hereto.

4.    Fees. The Company agrees to pay the fees in the set forth in the Form of Exit Facility Credit Agreement and in Schedule 4 hereto, in immediately available funds, as and when indicated therein.

5.    Conditions. The commitment of Wells Fargo to provide the Exit Credit Facility shall be subject to the satisfaction (or waiver by Wells Fargo) of the following (a) the negotiation, execution and delivery of definitive documentation customary for transactions of this type and consistent with the terms and conditions set forth herein and in the Form of Exit Facility Credit Agreement (the "Loan Documents"), all in form and substance reasonably satisfactory to Wells Fargo, (b) since January 28, 2017, there has not occurred any Material Adverse Effect (as defined in the Form of Exit Facility Credit Agreement (it being understood that the commencement of the Chapter 11 Cases, any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof, reduction in payment terms by suppliers, and reclamation claims shall not be deemed a Material Adverse Effect), and (c) the performance of the obligations of the Company set forth in Sections 3, 4, 6 and 7 of this Commitment Letter, and (d) the satisfaction (or waiver by Wells Fargo) of (i) the conditions set forth in Sections 5 and 7 of this Commitment Letter and (ii) the conditions precedent set forth in Sections 4.01 and 4.02 of the Form of Exit Facility Credit Agreement.

6.    Confidentiality.

The Company agrees that this Commitment Letter (including the Form of Exit Facility Credit Agreement) is delivered to it on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by the Company, directly or indirectly, to any other person except (a) (i) this Commitment Letter (including any exhibits and annexes hereto) may be provided to the Bankruptcy Court and filed on the Bankruptcy Court's docket to obtain its approval for any of the

Company and its subsidiaries to execute, deliver and perform its obligations hereunder, so long as any pleadings or filings with respect to this Commitment Letter shall be reasonably acceptable to Agent and (ii) the terms of this Commitment Letter and the Exit Credit Facility as provided in the Form of Exit Facility Agreement but not any Fee Letter (as such term is defined in Form of Exit Facility Credit Agreement) may be disclosed in the Disclosure Statement submitted by the Company and its subsidiaries to the Bankruptcy Court, (b) after execution and delivery by the Company and Wells Fargo, but before being filed on the Bankruptcy Court's docket to the extent permitted by this Section 6, this Commitment Letter may be disclosed to the appointed advisors to any committee in connection with the Chapter 11 Cases so long as the disclosure to such advisors is on a confidential "professionals eyes only" basis, (c) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors involved in the Transactions, in each case on a confidential and need-to-know basis, (d) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation (including the Securities Exchange Act of 1934) or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof), (e) upon notice to Wells Fargo, this Commitment Letter and the existence and contents hereof (but not Schedule 4 hereto or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed in any syndication or other marketing material in connection with the Exit Credit Facility or in connection with any public filing requirement, (f) the Form of Exit Credit Facility Agreement may be disclosed to potential Lenders and (h) to implement the Transactions, Schedule 4 may be disclosed to the Bankruptcy Court and the US Trustee (provided that in a filing with the Bankruptcy Court, Schedule 4 shall only be filed in a redacted form reasonably acceptable to Agent).

         Wells Fargo agrees that material, non-public information regarding the Company and its subsidiaries, their operations, assets, and existing and contemplated business plans shall be treated by Wells Fargo in a confidential manner, and shall not be disclosed by Wells Fargo to persons who are not parties to this Commitment Letter, except: (i) to its officers, directors, employees, advisors, attorneys, accountants, auditors, and consultants to Wells Fargo on a "need to know" basis in connection with Transactions contemplated hereby and on a confidential basis, (ii) to subsidiaries and affiliates of Wells Fargo, provided that any such subsidiary or affiliate shall have agreed to receive such information hereunder subject to the terms of this paragraph, (iii) to regulatory authorities with jurisdiction over Wells Fargo and its affiliates, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation, provided that prior to any disclosure under this clause (iv), the disclosing party agrees to provide the Company with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to the Company pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to by the Company, (vi) as requested or required by any governmental authority pursuant to any subpoena or other legal process, provided that prior to any disclosure under this clause (vi) the disclosing party agrees to provide the Company with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to the Company pursuant to the terms of the subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Wells Fargo), (viii) in connection with any proposed assignment or participation of Wells Fargo's interest in the Exit Credit Facility, provided that any such proposed assignee or participant shall have agreed to receive such information subject to the terms of this paragraph, and (ix) in connection with any litigation or other adverse proceeding involving parties to this Commitment Letter; provided that prior to any disclosure to a party other than the Company, the Lenders (as defined in the Form of Exit Facility Credit Agreement), their respective affiliates and their respective counsel under this clause (ix) with respect to litigation involving a party other than the Company, the Lenders, and their respective affiliates, the disclosing party agrees to provide the Company with prior notice thereof.

Anything to the contrary in this Commitment Letter notwithstanding, the Company agrees that (i) Wells Fargo shall have the right to provide information concerning the Exit Credit Facility to loan syndication and reporting services, and (ii) the Projections, the Marketing Materials (as defined in Annex B hereto) and all other information provided by or on behalf of the Company and its affiliates to Wells Fargo regarding the Company and its affiliates, and the Transactions may be disseminated by or on behalf of Wells Fargo to prospective lenders, who, in the case of disclosure of information under clause (i) or clause (ii), have agreed to be bound by customary confidentiality undertakings (including, "click-through" agreements), all in accordance with Wells Fargo's standard loan syndication practices (whether transmitted electronically by means of a website, e-mail or otherwise, or made available orally or in writing, including at potential lender or other meetings). The Company hereby further authorizes Wells Fargo to download copies of the Company's logos from their respective websites and post copies thereof on an Intralinks® or similar workspace and use the logos on any confidential information memoranda, presentations and other marketing materials prepared in connection with the syndication of the Exit Credit Facility.

7. <u>Information</u>. Wells Fargo is relying on the accuracy of the information furnished to it by or on behalf of the Company and their affiliates, without independent verification thereof. The Company acknowledges that it is a condition precedent to the funding of the Exit Credit Facility that (a) all written information (other than forward looking information and projections of future financial performance) concerning Company and its subsidiaries (the "Information") that has been, or is hereafter, made available by or on behalf of the Company or its affiliates is, or when delivered shall be, when considered as a whole, complete and correct in all material respects and does not, or shall not when delivered, contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in any material respect in light of the circumstances under which such statements have been made, and (b) all projections that have been or are hereafter made available by or on behalf of the Company or its affiliates are, or when delivered shall be, prepared in good faith on the basis of information and assumptions that are believed by the Company to be reasonable at the time such projections were prepared; it being recognized by Wells Fargo that projections of future events are not to be viewed as facts and actual results may vary significantly from projected results.

8. <u>Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities.</u>

The Company acknowledges that Wells Fargo or one or more of its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein or otherwise. The Company also acknowledges that Wells Fargo does not have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to the Company, confidential information obtained by Wells Fargo from other companies.

The Company further acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Company and its Subsidiaries, on the one hand, and Wells Fargo, on the other hand, is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether Wells Fargo or one or more of its affiliates has advised or is advising the Company on other matters, (b) Wells Fargo, on the one hand, and the Company, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor does the Company rely on, any fiduciary duty on the part of Wells Fargo, (c) the Company is capable of evaluating and understanding, and each understands and accepts, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) the Company has been advised that Wells Fargo or one or more of its affiliates is engaged in a broad range of transactions that may involve interests that differ from its interests and that Wells Fargo does not have any obligation to disclose such interests and transactions to it by virtue of any fiduciary, advisory or agency relationship, and (e) the Company

waives, to the fullest extent permitted by law, any claims it may have against Wells Fargo for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that Wells Fargo shall not have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including its stockholders, employees or creditors.

The Company further acknowledges that one or more of Wells Fargo's affiliates are full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, Wells Fargo or one or more of Wells Fargo's affiliates may provide investment banking and other financial services to, and/or acquire, hold or sell, for their respective own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, the Company and other companies with which the Company may have commercial or other relationships. With respect to any debt or other securities and/or financial instruments so held by Wells Fargo or one or more of its affiliates or any of their respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

9. Governing Law, Etc. This Commitment Letter (including the Form of Exit Facility Credit Agreement), and any claim or dispute concerning the subject matter hereof or thereof shall be governed by, and construed in accordance with, the laws of the State of New York (but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York. Each of the parties hereto consents to the exclusive jurisdiction and venue of the federal and/or state courts located in New York, New York. This Commitment Letter (including the Form of Exit Facility Credit Agreement) sets forth the entire agreement between the parties with respect to the matters addressed herein, supersedes all prior communications, written or oral, with respect hereto, and may not be amended, supplemented, or modified except in a writing signed by the parties hereto. This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Commitment Letter by telecopier or other electronic transmission shall be equally effective as delivery of a manually executed counterpart of this Commitment Letter. This Commitment Letter shall not be assignable by any party hereto without the prior written consent of the other party hereto, except that Wells Fargo may assign its obligations to one of its Affiliates (any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons. In the event that this Commitment Letter is terminated or expires, the Expenses and Indemnification, Fees and Deposit, Confidentiality, Sharing Information; Absence of Fiduciary Relationship; Affiliate Transactions, Governing Law, Etc., and Waiver of Jury Trial provisions hereof shall survive such termination or expiration. Anything contained herein to the contrary notwithstanding, the obligations of the Company under this Commitment Letter, shall terminate at the earlier of the time of the execution and delivery of the Loan Documents (as defined in the Form of Exit Facility Credit Agreement) at the earlier of the date of execution at which time the terms of the Loan Documents shall supersede the terms of this Commitment Letter) or two years after the date hereof.

10. Waiver of Jury Trial. To the maximum extent permitted by applicable law, each party hereto irrevocably waives any and all rights to a trial by jury in any action or proceeding (whether based on contract, tort, or otherwise) arising out of or relating to this Commitment Letter or the Transactions or the actions of Wells Fargo or any of its affiliates in the negotiation, performance, or enforcement of this Commitment Letter.

11. <u>Patriot Act</u>.  Each Lender subject to the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "Act") hereby notifies the Loan Parties that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify such person in accordance with the Act.

12. <u>Acceptance and Termination</u>.  This Commitment Letter will be of no force and effect unless a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by Wells Fargo by 5:00 p.m. (Eastern time) on August 27, 2017.  The commitment of Wells Fargo under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate at 5:00 p.m. on the earlier of (a) December 31, 2017 or (b) the "Maturity Date" (other than pursuant to clause (c) of such definition due to the confirmation of a plan of reorganization by the Bankruptcy Court which is acceptable to Wells Fargo, in its Reasonable Judgment (as defined in Form of Exit Facility Credit Agreement) or such later date as may be agreed upon in writing by Wells Fargo and the Company, if the initial borrowings under the Exit Credit Facility have not occurred on or prior to such date.

If the Company accepts and agrees to the foregoing, please so indicate by executing and arranging for the Company to execute the enclosed copy of this letter and return it to Wells Fargo.

We look forward to continuing to work with you to complete this transaction.

Very truly yours,

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: _____

Title: _Managing Director_

The provisions of this Commitment Letter are
agreed to and accepted on August 26 , 2017:

PERFUMANIA HOLDINGS, INC.

By: *Michael Katz*

Name: Michael Katz
Title: President & Chief Executive Officer

## ANNEX A

### Syndication Provisions

Wells Fargo will be entitled to manage all aspects of any syndication of the Exit Credit Facility, including decisions as to the selection of prospective lenders to be approached and included, the timing of all offers to prospective lenders, the amount offered, the allocation and acceptance of prospective commitments, the amount of compensation payable to prospective lenders, and any titles to be awarded to such prospective lenders. The Company agrees that no Lender will receive any compensation for its participation in the Exit Credit Facility except as expressly agreed to and offered by Wells Fargo.

The Company agrees to cooperate in such syndication process and use commercially reasonable efforts to assist Wells Fargo in forming a syndicate. Such assistance shall include, but will not be limited to:

(a) making senior management and representatives of the Company available to participate in meetings and to provide information to prospective lenders at such times and places as Wells Fargo may reasonably request,

(b) ensuring that Wells Fargo's syndication efforts benefit from the existing lending relationships of the Company,

(c) arranging for direct contact between senior management and other representatives and advisors of Company and the prospective lenders,

(d) assisting in the preparation of the Marketing Materials (as defined below);

(e) at the expense of the Company, hosting, with Wells Fargo, one or more meetings of prospective lenders, and, in connection with any such lender meeting (a "Lender Meeting"), consulting with Wells Fargo with respect to the presentations to be made at any such Lender Meeting, making available appropriate officers and other representatives of Company, and rehearsing such presentations prior to such Lender Meetings, as reasonably requested by Wells Fargo.

To assist Wells Fargo in its syndication efforts, the Company agrees to promptly prepare and provide to Wells Fargo such information with respect to the Company, and the Transactions as Wells Fargo may reasonably request, including, without limitation, (a) financial information and projections as Wells Fargo may reasonably request, including projected monthly balance sheets, income statements, statements of cash flows and Availability of Borrowers and Guarantors for the period through the fiscal year ended on or about January 31, 2019, projected annual balance sheets, income statements, statements of cash flows and Availability of Borrowers and Guarantors through the fiscal year ended on or about January 31, 2021, in each case as to such projections, all in form and substance reasonably satisfactory to Wells Fargo (the "Projections"), (b) a confidential information memorandum that includes information with respect to the the Company, and the Transaction as Wells Fargo may reasonably request, including the Projections, all in form and substance reasonably satisfactory to Wells Fargo (the "Marketing Materials"), and (c) a version of the Marketing Materials (the "Public Information Materials") that does not contain Projections or other material non-public information concerning the Company, its respective affiliates or its securities for purposes of the United States federal and state securities laws ("Material Non-Public Information"). The Company hereby represents and warrants that, (i) all information included in the Marketing Materials (other than the Projections) that has been or is hereafter made

available to Wells Fargo by the Company, or any of its representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in the light of the circumstances under which such statements are made, and (ii) the Projections that have been or will be made available to Wells Fargo by the Company, or any of its representatives have been or will be prepared in good faith based upon reasonable assumptions. The Company understands that in arranging and syndicating the Exit Credit Facility, Wells Fargo may use and rely on the Marketing Materials without independent verification thereof and that the Company will promptly notify Wells Fargo of any changes in circumstances that could be expected to call into question the continued reasonableness of any assumption underlying the Projections. The Company further agrees to update the Marketing Materials as necessary during the syndication process so as to cause the foregoing representations and warranties to continue to be true and correct.

Before distribution of any Marketing Materials (a) to prospective lenders that do not wish to receive Material Non-Public Information concerning the Company, its affiliates or its securities (such lenders, "Public Lenders;" all other lenders, "Private Lenders"), the Company agrees to provide Wells Fargo with a customary letter authorizing the dissemination of the Public Information Materials and confirming the absence of Material Non-Public Information therein and (b) to prospective Private Lenders, the Company agrees to provide Wells Fargo with a customary letter authorizing the dissemination of those materials. In addition, at the request of Wells Fargo, the Company will identify Public Information Materials by clearly and conspicuously marking the same as "PUBLIC." The Company agrees that Wells Fargo may distribute the following documents to all prospective lenders, unless the Company advises Wells Fargo in writing (including by email) within a reasonable time prior to their intended distributions that such material should only be distributed to prospective Private Lenders: (i) administrative materials for prospective lenders such as lender meeting invitations and funding and closing memoranda, and (ii) other materials intended for prospective lenders after the initial distribution of the Marketing Materials, including drafts and final versions of the definitive documentation for the Exit Credit Facility. If the Company advises Wells Fargo that any of the foregoing items should be distributed only to Private Lenders, then Wells Fargo agrees not to distribute such materials to Public Lenders without the Company's prior written consent (including by email).

## ANNEX B

### Indemnification Provisions

To the fullest extent permitted by applicable law, Perfumania Holdings, Inc. (the "Indemnifying Party") agrees that it will indemnify, defend, and hold harmless each of the Indemnified Persons from and against (i) any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements, (ii) any and all actions, suits, proceedings and investigations in respect thereof, and (iii) any and all legal or other costs, expenses or disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise (including, without limitation, the reasonable and documented out-of-pocket costs and expenses, as and when incurred, of investigating, preparing or defending any such action, proceeding or investigation (whether or not in connection with litigation in which any of the Indemnified Persons is a party) (provided that the obligations to reimburse legal fees and expenses shall be limited to the reasonable legal fees and expenses of one firm of counsel for all such Indemnified Parties taken as a whole, and in the case of an actual conflict of interest where the Indemnified Person affected by such conflict informs you of such conflict and thereafter retains its own counsel with your prior written consent (not to be unreasonably withheld), one counsel for such affected Indemnified Party) and including, without limitation, any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements, resulting from any  act or omission of any of the Indemnified Persons), directly or indirectly, caused by, relating to, based upon, arising out of or in connection with (a) the Transactions, (b) the Commitment Letter or the Exit Credit Facility, or (c) any untrue statement or alleged untrue statement of a material fact contained in, or omissions or alleged omissions in, information furnished by Indemnifying Party or Company, or any of their subsidiaries or affiliates in connection with the Transactions or the Commitment Letter; provided, that, such indemnity agreement shall not apply to any portion of any such loss, claim, damage, obligation, penalty, judgment, award, liability, cost, expense or disbursement of an Indemnified Person to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence or willful misconduct of  such Indemnified Person or any of the officers, directors, employees, agents or members thereof.

If any action, suit, proceeding or investigation is commenced, as to which any of the Indemnified Persons proposes to demand indemnification, it shall notify the Indemnifying Party with reasonable promptness; provided, that, any failure by any of the Indemnified Persons to so notify the Indemnifying Party shall not relieve the Indemnifying Party from its obligations hereunder. Wells Fargo, on behalf of the Indemnified Persons, shall have the right to retain counsel of its choice to represent the Indemnified Persons, and the Indemnifying Party shall pay the reasonable and documented fees and out-of-pocket expenses of such counsel (subject to the proviso in clause (iii) of the prior paragraph). The Indemnifying Party shall be liable for any settlement of any claim against any of the Indemnified Persons made with its written consent, which consent shall not be unreasonably withheld. Without the prior written consent of Wells Fargo, the Indemnifying Party shall not settle or compromise any claim, permit a default or consent to the entry of any judgment in respect thereof.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these Indemnification Provisions is made but is found by a judgment of a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Indemnifying Party, on the one hand, and the Indemnified Persons, on the other hand, shall contribute to the losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements to which the Indemnified Persons may be subject in accordance with the relative benefits received by the Indemnifying Party, on the one hand, and the Indemnified Persons, on the other hand, and also the relative fault of the Indemnifying Party, on the one hand, and the Indemnified Persons collectively and in

the aggregate, on the other hand, in connection with the statements, acts or omissions which resulted in such losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements and the relevant equitable considerations shall also be considered.  No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any other person who is not also found liable for such fraudulent misrepresentation.  Notwithstanding the foregoing, none of the Indemnified Persons shall be obligated to contribute any amount hereunder that exceeds the amount of fees previously received by such Indemnified Person pursuant to the Commitment Letter.

Neither expiration nor termination of Wells Fargo's commitments under the Commitment Letter or funding or repayment of the loans under the Exit Credit Facility shall affect these Indemnification Provisions which shall remain operative and continue in full force and effect subject to Section 9 of the Commitment Letter.

## EXHIBIT A
## TO

### EXIT CREDIT FACILITY COMMITMENT LETTER

**PROPOSED FORM OF EXIT CREDIT FACILITY AGREEMENT**

Each term used but not defined in this Form of Exit Facility Credit Agreement shall have the meaning assigned to such term in the Commitment Letter, dated of even date herewith, from Wells Fargo to Perfumania Holdings, Inc. which this Form of Exit Facility Credit Agreement is attached.

The parties to the Commitment Letter agree that the attached Form of Exit Facility Credit Agreement is in substantially final form, however, the parties agree that modifications may be made to reflect changes in circumstances during the pendency of the Cases.

All references to Wells Fargo in this Form of Exit Facility Credit Agreement include its successors and assigns and Well Fargo may designate one of its affiliates to act in its place in any of the roles for which Wells Fargo is specified in the Form of Exit Facility Credit Agreement.

4874481.4

**EXHIBIT A TO COMMITMENT LETTER**

**[OTTERBOURG DRAFT 8/26/17] --**
**DISTRIBUTED FOR DISCUSSION PURPOSES ONLY--**
**EXIT CREDIT FACILITY REMAINS SUBJECT TO APPROVAL OF WELLS FARGO CREDIT**
**COMMITTEE AND ADDITIONAL REVIEW AND COMMENT OF WELLS FARGO**
**AND PERFUMANIA**

---

**AMENDED AND RESTATED CREDIT AGREEMENT**

**Dated as of _____ __, 201__**

**among**

**PERFUMANIA HOLDINGS, INC.,**
**as the Lead Borrower**

**The Other Borrowers Named Herein**

**The Guarantors Named Herein**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
**as Agent, L/C Issuer, and Swing Line Lender,**

**The Lenders Party Hereto**

**and**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

**as Sole Lead Arranger and Sole Bookrunner**

---

4867723.8

## Table of Contents

                                                                                            **Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ....................................................... 1

    1.01      Defined Terms......................................................................................... 1
    1.02      Other Interpretive Provisions ............................................................... 51
    1.03      Accounting Terms .................................................................................. 52
    1.04      Rounding ................................................................................................ 52
    1.05      Times of Day.......................................................................................... 52
    1.06      Letter of Credit Amounts ...................................................................... 52
    1.07      Currency Equivalents Generally ........................................................... 52

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ...................................... 53

    2.01      Committed Loans; Reserves................................................................... 53
    2.02      Borrowings, Conversions and Continuations of Committed Loans...... 53
    2.03      Letters of Credit. ................................................................................... 55
    2.04      Swing Line Loans.................................................................................. 62
    2.05      Prepayments. ......................................................................................... 64
    2.06      Termination or Reduction of Commitments .......................................... 66
    2.07      Repayment of Loans.............................................................................. 66
    2.08      Interest................................................................................................... 66
    2.09      Fees ........................................................................................................ 67
    2.10      Computation of Interest and Fees.......................................................... 67
    2.11      Evidence of Debt................................................................................... 67
    2.12      Payments Generally; Agent's Clawback............................................... 68
    2.13      Sharing of Payments by Lenders .......................................................... 69
    2.14      Settlement Amongst Lenders. ............................................................... 70
    2.15      Increase in Commitments. ..................................................................... 70

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF LEAD
             BORROWER .......................................................................................... 72

    3.01      Taxes. .................................................................................................... 72
    3.02      Illegality ................................................................................................ 75
    3.03      Inability to Determine Rates ................................................................. 75
    3.04      Increased Costs; Reserves on LIBO Rate Loans................................... 75
    3.05      Compensation for Losses ...................................................................... 77
    3.06      Mitigation Obligations; Replacement of Lenders. ............................... 77
    3.07      Survival ................................................................................................. 78
    3.08      Designation of Lead Borrower as Borrowers' Agent............................ 78

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ............................ 78

    4.01      Conditions of Initial Credit Extension ................................................. 78
    4.02      Conditions to all Credit Extensions...................................................... 82

ARTICLE V REPRESENTATIONS AND WARRANTIES ....................................................................83

    5.01       Existence, Qualification and Power ...........................................................83
    5.02       Authorization; No Contravention ..............................................................84
    5.03       Governmental Authorization; Other Consents ...........................................84
    5.04       Binding Effect ...........................................................................................84
    5.05       Financial Statements; No Material Adverse Effect. ...................................84
    5.06       Litigation ..................................................................................................85
    5.07       No Default .................................................................................................85
    5.08       Ownership of Property; Liens ...................................................................85
    5.09       Environmental Compliance .......................................................................86
    5.10       Insurance ..................................................................................................87
    5.11       Taxes ........................................................................................................87
    5.12       ERISA Compliance. ..................................................................................87
    5.13       Subsidiaries; Equity Interests. ..................................................................87
    5.14       Margin Regulations; Investment Company Act. ........................................88
    5.15       Disclosure. ................................................................................................88
    5.16       Compliance with Laws. .............................................................................88
    5.17       Intellectual Property; Licenses, Etc. .........................................................89
    5.18       Labor Matters ...........................................................................................89
    5.19       Security Documents. .................................................................................89
    5.20       Solvency ...................................................................................................90
    5.21       Deposit Accounts; Credit Card Arrangements. .........................................90
    5.22       Brokers .....................................................................................................90
    5.23       Customer and Trade Relations ..................................................................90
    5.24       Material Contracts ....................................................................................91
    5.25       Casualty. ...................................................................................................91
    5.26       OFAC/Sanctions. ......................................................................................91
    5.27       Interrelated Business ................................................................................91

ARTICLE VI AFFIRMATIVE COVENANTS ...............................................................................91

    6.01       Financial Statements .................................................................................92
    6.02       Certificates; Other Information .................................................................93
    6.03       Notices. .....................................................................................................95
    6.04       Payment of Obligations ............................................................................96
    6.05       Preservation of Existence, Etc. .................................................................96
    6.06       Maintenance of Properties. ........................................................................96
    6.07       Maintenance of Insurance. ........................................................................96
    6.08       Compliance with Laws. .............................................................................98
    6.09       Books and Records; Accountants. .............................................................98
    6.10       Inspection Rights. .....................................................................................98
    6.11       Use of Proceeds. ......................................................................................99
    6.12       Additional Loan Parties. ...........................................................................99
    6.13       Cash Management. ....................................................................................99
    6.14       Information Regarding the Collateral. ......................................................101
    6.15       Physical Inventories. ...............................................................................101
    6.16       Environmental Laws ...............................................................................102
    6.17       Further Assurances. ................................................................................102
    6.18       Compliance with Terms of Leaseholds ...................................................103
    6.19       Material Contracts ..................................................................................103

6.20        Designation as Senior Debt ............................................................................. 103
6.21        Keepwell ......................................................................................................... 103
6.22        Confirmation Order. ........................................................................................ 103

ARTICLE VII NEGATIVE COVENANTS ............................................................................. 104

7.01        Liens ................................................................................................................ 104
7.02        Investments. .................................................................................................... 104
7.03        Indebtedness; Disqualified Stock .................................................................... 104
7.04        Fundamental Changes ..................................................................................... 104
7.05        Dispositions ..................................................................................................... 105
7.06        Restricted Payments. ....................................................................................... 105
7.07        Prepayments of Indebtedness .......................................................................... 105
7.08        Change in Nature of Business ......................................................................... 105
7.09        Transactions with Affiliates ............................................................................ 106
7.10        Burdensome Agreements ................................................................................. 106
7.11        Use of Proceeds ............................................................................................... 107
7.12        Amendment of Material Documents ................................................................ 107
7.13        Fiscal Year. ...................................................................................................... 107
7.14        Deposit Accounts; Credit Card Processors. .................................................... 107
7.15        Financial Covenants ........................................................................................ 107
7.16        Inactive Subsidiaries. ...................................................................................... 107
7.17        Permitted Activities of Parent. ........................................................................ 108

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES .................................................... 108

8.01        Events of Default ............................................................................................. 108
8.02        Remedies Upon Event of Default .................................................................... 111
8.03        Application of Funds ....................................................................................... 112

ARTICLE IX THE AGENT ...................................................................................................... 113

9.01        Appointment and Authority. ........................................................................... 113
9.02        Rights as a Lender ........................................................................................... 114
9.03        Exculpatory Provisions .................................................................................... 114
9.04        Reliance by Agent ........................................................................................... 115
9.05        Delegation of Duties ........................................................................................ 115
9.06        Resignation of Agent. ...................................................................................... 115
9.07        Non-Reliance on Agent and Other Lenders ..................................................... 116
9.08        No Other Duties, Etc. ...................................................................................... 116
9.09        Agent May File Proofs of Claim ..................................................................... 116
9.10        Collateral and Guaranty Matters ..................................................................... 117
9.11        Notice of Transfer ........................................................................................... 118
9.12        Reports and Financial Statements ................................................................... 118
9.13        Agency for Perfection ...................................................................................... 119
9.14        Indemnification of Agent ................................................................................ 119
9.15        Relation among Lenders ................................................................................... 119
9.16        Defaulting Lenders. ......................................................................................... 119

ARTICLE X MISCELLANEOUS .............................................................................................. 121

| | | |
|---|---|---|
| 10.01 | Amendments, Etc. | 121 |
| 10.02 | Notices; Effectiveness; Electronic Communications. | 123 |
| 10.03 | No Waiver; Cumulative Remedies | 125 |
| 10.04 | Expenses; Indemnity; Damage Waiver. | 125 |
| 10.05 | Payments Set Aside | 127 |
| 10.06 | Successors and Assigns. | 127 |
| 10.07 | Treatment of Certain Information; Confidentiality | 130 |
| 10.08 | Right of Setoff. | 131 |
| 10.09 | Interest Rate Limitation | 131 |
| 10.10 | Counterparts; Integration; Effectiveness | 132 |
| 10.11 | Survival | 132 |
| 10.12 | Severability | 132 |
| 10.13 | Replacement of Lenders | 132 |
| 10.14 | Governing Law; Jurisdiction; Etc. | 133 |
| 10.15 | Waiver of Jury Trial | 134 |
| 10.16 | No Advisory or Fiduciary Responsibility | 134 |
| 10.17 | USA PATRIOT Act Notice. | 135 |
| 10.18 | Foreign Asset Control Regulations | 135 |
| 10.19 | Time of the Essence. | 135 |
| 10.20 | Press Releases. | 135 |
| 10.21 | Additional Waivers. | 136 |
| 10.22 | No Strict Construction. | 137 |
| 10.23 | Attachments | 137 |

ARTICLE XI AMENDMENT AND RESTATEMENT ......................................................... 137

| | | |
|---|---|---|
| 11.01 | Existing Credit Agreement. | 137 |
| 11.02 | Restatement. | 137 |

**EXHIBITS**

| | |
|---|---|
| A | Form of LIBO Rate Loan Notice |
| B | Form of Swing Line Loan Notice |
| C-1 | Form of Note |
| C-2 | Form of Swing Line Note |
| D | Form of Compliance Certificate |
| E | Form of Assignment and Assumption |
| F | Form of Customs Broker Agreement |
| G | Form of Borrowing Base Certificate |
| H | Form of Credit Card Notification |

**SCHEDULES**

| | |
|---|---|
| 1(C) | List of Chapter 11 Plan Documents |
| 1(I) | Inactive Subsidiaries |
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.05 | Supplement to Interim Financial Statements |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Other Equity Investments |
| 5.17 | Intellectual Property Matters |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Transactions with Affiliates |
| 10.02 | Agent's Office; Certain Addresses for Notices |

## AMENDED AND RESTATED CREDIT AGREEMENT

This AMENDED AND RESTATED CREDIT AGREEMENT ("Agreement") is entered into as of _____ __, 20__, among Perfumania Holdings, Inc., a Florida corporation (sometimes referred to herein as "Holdings" or "Lead Borrower"), Quality King Fragrance, Inc., a Delaware corporation ("QKF"), Scents of Worth, Inc., a Florida corporation ("SOW"), Five Star Fragrance Company, Inc., a New York corporation ("Five Star"), Northern Group, Inc., a New York corporation ("Northern"), Perfumania, Inc., a Florida corporation ("Perfumania"), Magnifique Parfumes and Cosmetics, Inc., a Florida corporation ("Magnifique"), Ten Kesef II, Inc., a Florida corporation ("Ten Kesef"), Perfumania Puerto Rico, Inc., a Puerto Rico corporation ("Perfumania PR") and Perfumania.com, Inc., a Florida corporation ("Perfumania.com"), Parlux Fragrances, LLC, a Delaware limited liability company ("Parlux") and Parlux Ltd., a New York corporation ("Parlux Ltd.", and together with Holdings, QKF, SOW, Five Star, Northern, Perfumania, Magnifique, Ten Kesef, Perfumania PR, Perfumania.com, and Parlux, each a "Borrower" and collectively, the "Borrowers" (as hereinafter defined), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), Wells Fargo Bank, National Association, as Agent, L/C Issuer, and Swing Line Lender, and Wells Fargo Bank National Association, as Sole Lead Arranger and Sole Bookrunner.

WHEREAS, Lead Borrower and certain of its Subsidiaries, Agent and Lenders are parties to the Existing Credit Agreement (as defined below) and together with all agreements, documents and instruments at any time executed and/or delivered in connection therewith or related thereto as heretofore amended, modified or supplemented, collectively, the "Existing Loan Documents"), pursuant to which Agent and Lenders have made loans and provided other financial accommodations to Borrowers;

WHEREAS, pursuant to and in connection with the Chapter 11 Plan (as defined below) Borrowers (as defined below) have requested that Agent and Lenders amend and restate the Existing Credit Agreement and the financing arrangements reflected thereby pursuant to and in accordance with the terms and conditions set forth herein; and

WHEREAS, each Lender is willing to agree (severally and not jointly) to amend and restate the Existing Credit Agreement and to continue to make loans and provide such financial accommodations to Borrowers on a pro rata basis according to its Commitment (as defined below) on the terms and conditions set forth herein and Agent is willing to continue to act as agent for Lenders on the terms and conditions set forth herein and the other Loan Documents.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Accelerated Borrowing Base Delivery Event" means either (a) the occurrence and continuance of any Event of Default, or (b) the failure of the Borrowers to maintain Availability at least equal to the greater of (i) seventeen and one-half percent (17.5%) of the Borrowing Base or (ii) $15,000,000.  For purposes of this Agreement, the occurrence of an Accelerated Borrowing Base Delivery Event shall be deemed continuing at the Agent's option (A) so long as such Event of Default has not been waived, and/or (B) if the Accelerated Borrowing Base Delivery Event arises as a result of the Borrowers' failure

to achieve Availability as required hereunder, until Availability has exceeded the greater of seventeen and one-half percent (17.5%) of the Borrowing Base or $15,000,000 for ninety (90) consecutive calendar days, in which case an Accelerated Borrowing Base Delivery Event shall no longer be deemed to be continuing for purposes of this Agreement.  The termination of an Accelerated Borrowing Base Delivery Event as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Accelerated Borrowing Base Delivery Event in the event that the conditions set forth in this definition again arise.

"Accommodation Payment" as defined in Section 10.21(d).

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.  The term "Account" includes health-care-insurance receivables.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of a Controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit, division or line of business of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or of any business unit, division or line of business of another Person, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of any Store locations of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning provided in Section 10.17.

"Additional Commitment Lender" shall have the meaning provided in Section 2.15.

"Adjusted LIBO Rate" means:

(a)      for any Interest Period with respect to any LIBO Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent) equal to (i) the LIBO Rate for such Interest Period multiplied by (ii) the Statutory Reserve Rate; and

(b)      for any interest rate calculation with respect to any Base Rate Loan, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of one percent) equal to (i) the LIBO Rate for an Interest Period commencing on the date of such calculation and ending on the date that is thirty (30) days thereafter multiplied by (ii) the Statutory Reserve Rate.

The Adjusted LIBO Rate will be adjusted automatically as of the effective date of any change in the Statutory Reserve Rate, and shall in any event never be less than zero.

"Adjustment Date" means the first day of each Fiscal Quarter commencing with the Fiscal Quarter beginning May 6, 2018.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on <u>Schedule 10.02</u>, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Advances to Suppliers" means the amounts, net of reserves (such reserves not to exceed $5,000,000 in the aggregate for all Borrowers at any time), outstanding at any time, as determined in accordance with GAAP, advanced by a Borrower to a supplier as prepayments for Inventory, without deduction or setoff for any sums owed by such Borrower to such supplier.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified (and if that Person is an individual, including any member of the Family Group, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (iv) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Wells Fargo in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor thereto.

"Agent Parties" shall have the meaning specified in <u>Section 10.02(c)</u>.

"Agent's Office" means the Agent's address and account as set forth on <u>Schedule 10.02</u>, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Aggregate Commitments" means the Commitments of all the Lenders.  As of the Closing Date, the Aggregate Commitments are $[up to 100,000,000][1].

"Agreement" means this Credit Agreement.

"Allocable Amount" has the meaning specified in <u>Section 10.21(d)</u>.

"Applicable Commitment Fee Percentage" means 0.375%.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means:

(a)      from and after the Closing Date until the Adjustment Date for the Fiscal Quarter ending April 30, 2018 (the "2018 Adjustment Date"), the percentages set forth in Level II of the pricing grid below; and

(b)      on each Adjustment Date occurring after the 2018 Adjustment Date, the Applicable Margin shall be determined from the following pricing grid based upon the Average Daily Availability as of the Fiscal Quarter ended immediately preceding such Adjustment Date; <u>provided</u>, that, notwithstanding anything to the contrary set forth herein, upon the occurrence of an Event of Default, the

---

[1] TBD

Agent may, and at the direction of the Required Lenders shall, immediately increase the Applicable Margin to that set forth in Level II (even if the Average Daily Availability requirements for a different Level have been met) and interest shall accrue at the Default Rate; provided further that if any financial statements used in the calculation of Average Daily Availability or any Borrowing Base Certificates are at any time restated or otherwise revised (including as a result of an audit) or if the information set forth in such financial statements or any Borrowing Base Certificates otherwise proves to be false or incorrect such that the Applicable Margin would have been higher than was otherwise in effect during any period, without constituting a waiver of any Default or Event of Default arising as a result thereof, interest due under this Agreement shall be immediately recalculated at such higher rate for any applicable periods and shall be due and payable on demand.

| Level | Average Daily Availability | LIBOR Margin | Base Rate Margin | Letter of Credit Fee |
|---|---|---|---|---|
| I | Equal to or greater than $50,000,000 | 2.00% | 1.00% | 2.00% |
| II | Less than $50,000,000 | 2.25% | 1.25% | 2.25% |

"Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time. If the commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraised Value" means, with respect to Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Lead Borrower, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender, or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Arranger" means Wells Fargo, in its capacity as sole lead arranger and sole book runner.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit E or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Audited Financial Statements" means the audited consolidated balance sheet of the Lead Borrower and its Subsidiaries for the Fiscal Year ended on or about January 31, 2017, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Lead Borrower and its Subsidiaries, including the notes thereto.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of: (a) the Loan Cap, minus (b) the aggregate unpaid balance of Credit Extensions to, or for the account of, the Borrowers.  In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all accounts payable and Taxes are being paid on a timely basis.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Lender to make Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its good faith discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists.  Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's discretion, (but are not limited to) reserves based on: (i) rent; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of any Borrower, (v) Customer Credit Liabilities, (vi) Customer Deposits, (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals, (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral, (ix) amounts due to vendors on account of consigned goods, (x) Cash Management Reserves, (xi) Bank Product Reserves; and (xii) royalties payable in respect of licensed merchandise.

"Average Total Outstandings" means the daily average aggregate Outstanding Amount of all Loans and all L/C Obligations during the immediately preceding Fiscal Quarter.

"Average Daily Availability" shall mean the average daily Availability for the immediately preceding Fiscal Quarter.

"Bank Product Provider" means any Lender, Affiliate of any Lender or other financial institution (in each case as to any financial institution other than any Lender or an Affiliate of any Lender to the

extent approved by the Agent) that provides any Bank Products to a Loan Party or any Subsidiary of a Loan Party.

"Bank Product Reserves" means such reserves as the Agent from time to time determines in its good faith discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Bank Products" means any services of facilities provided to any Loan Party by the Agent or any Lender or any of their respective Affiliates (but excluding Cash Management Services) including, without limitation, on account of (a) Swap Contracts, (b) merchant services constituting a line of credit, (c) leasing, and (d) supply chain finance services including, without limitation, trade payable services and supplier accounts receivable purchases, but excluding any factoring services.

"Bankruptcy Code" shall mean title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%), (b) the Adjusted LIBO Rate plus one percent (1.00%), or (c) the rate of interest in effect for such day as publicly announced from time to time by Wells Fargo as its "prime rate" but in any event such Base Rate shall not be less than zero.  The "prime rate" is a rate set by Wells Fargo based upon various factors including Wells Fargo's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Wells Fargo shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Blocked Accounts" has the meaning provided in Section 6.13(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank or any other financial institution maintaining such account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank or any other financial institution with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a Committed Borrowing or a Swing Line Borrowing, as the context may require.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)      the face amount of Eligible Credit Card Receivables multiplied by eighty-five percent (85%); plus

(b)      the face amount of Eligible Trade Receivables (net of Receivables Reserves applicable thereto), multiplied by eighty-five percent (85%); plus

(c)      the lesser of (i) the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by the product of eighty-five percent (85%) multiplied by the Appraised Value of Eligible Inventory, or (ii) the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by eighty-five percent (85%); minus

(d)      the then amount of all Availability Reserves.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit G hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Business" means the sale and distribution of designer perfumes and fragrances and other related products.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located and, if such day relates to any LIBO Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Capital Expenditures" means, with respect to any Person for any period, (a) all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a Consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by a Person during such period.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP; provided, that, any lease that is accounted for as an operating lease in accordance with GAAP on the Closing Date and any similar lease may, at the election of the Lead Borrower, be accounted for as an operating lease and not a capital lease, and any obligations thereunder shall not constitute "Capital Lease Obligations".

"Cases" means the cases under Chapter 11 of the Bankruptcy Code of the Lead Borrower, and certain of the Borrowers and Guarantors, each as debtor-in-possession, which have been jointly administered as Chapter 11 Case No. _____ and which are pending in the Bankruptcy Court.

"Cash Collateral Account" means a non-interest bearing account established by one or more of the Loan Parties with Wells Fargo, and in the name of, the Agent (as the Agent shall otherwise direct) and

under the sole and exclusive dominion and control of the Agent, in which deposits are required to be made in accordance with Section 2.03(k) or 8.02(c).

"Cash Collateralize" has the meaning specified in Section 2.03(k).  Derivatives of such term have corresponding meanings.

"Cash Management Reserves" means such reserves as the Agent, from time to time, determines in its good faith discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any one or more of the following types or services or facilities provided to any Loan Party by the Agent or any Lender or any of their respective Affiliates: (a) ACH transactions, (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, (d) credit or debit cards, (e) credit card processing services, and (f) purchase cards.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)        at any time prior to the creation of a Public Market, Permitted Holders shall cease to own and control legally and beneficially (free and clear of all Liens), either directly or indirectly, equity securities in Parent representing more than 51% of the combined voting power of all of Equity Interests entitled to vote for members of the board of directors or equivalent governing body of Parent on a fully-diluted basis (and taking into account all such securities that Permitted Holders have the right to acquire pursuant to any option right (as defined in clause (b) below));

(b)        at any time after the creation of a Public Market any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire,

whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of fifty percent (50%) or more of the Equity Interests of Parent entitled to vote for members of the board of directors or equivalent governing body of Parent on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option right); or

(c)    during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of Parent cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was recommended or approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was recommended or approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(d)    any "change in control" or "sale" or "disposition" or similar event as defined in any Organizational Document of any Loan Party or in any Material Contract, or any document governing Material Indebtedness of any Loan Party; or

(e)    any Person or two or more Persons acting in concert (other than Persons who have fifty percent (50%) or more of such combined voting power as of the date hereof) shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of Parent, or control over the Equity Interests of Parent entitled to vote for members of the board of directors or equivalent governing body of the Borrowers on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire pursuant to any option right) representing fifty percent (50%) or more of the combined voting power of such securities; or

(f)    Parent fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents.

"Chapter 11 Plan" means the Chapter 11 Plan of Reorganization of Perfumania Holdings, as Debtor and Debtor-in-Possession, and its Debtor Affiliates, dated _____, 2017, as amended, supplemented or otherwise modified from time to time in accordance with Section 4.01(o), and together with all exhibits, schedules, annexes, supplements and other attachments thereto.

"Chapter 11 Plan Documents" means the Chapter 11 Plan and the documents listed on Schedule 1(C) hereto.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property of a Loan Party that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate (other than Stores) leased by any Loan Party, pursuant to which such Person (i) acknowledges the Agent's Lien on the Collateral, (ii) waives, releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate (other than Stores), and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"Commercial Letter of Credit Agreement" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the L/C Issuer.

"Commitment" means, as to each Lender, its obligation to (a) make Committed Loans to the Borrowers pursuant to Section 2.01, (b) purchase participations in L/C Obligations, and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Committed Borrowing" means a borrowing consisting of simultaneous Committed Loans of the same Type and, in the case of LIBO Rate Loans, having the same Interest Period made by each of the Lenders pursuant to Section 2.01.

"Committed Loan" has the meaning specified in Section 2.01.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Concentration Account" has the meaning provided in Section 6.13(c).

"Confirmation Order" means the Findings Of Fact, Conclusions Of Law, And Order (i) Approving The Debtors' (A) Disclosure Statement Pursuant To Bankruptcy Code Sections 1125 And 1126(B), (B) Solicitation Of Votes And Voting Procedures, And (C) Forms Of Ballots, And (ii) Confirming Plan of Reorganization.

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender's giving the Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon

the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consolidated Deferred Financing Costs" means, at any date of determination, an amount equal to the portion of the deferred financing costs reflected as an asset on the Borrowers' consolidated balance sheet for amortization over the term of the credit facility hereunder that was deducted in the calculation of Consolidated Net Income for the most recently completed Measurement Period other than as Consolidated Interest Charges, as determined on a Consolidated basis in accordance with GAAP.

"Consolidated EBITDA" means, at any date of determination, for any Measurement Period, an amount equal to (a) the Consolidated Net Income of the Lead Borrower and its Subsidiaries on a Consolidated basis for such Measurement Period, plus (b) the following to the extent deducted in calculating such Consolidated Net Income: (i) Consolidated Interest Charges, (ii) the provision for Federal, state, local and foreign income Taxes, (iii) depreciation and amortization expense, (iv) any charges, costs, fees and expenses relating to restructurings (including, without limitation, charges, costs, fees and expenses incurred in connection with the Chapter 11 Plan), store and property closures, severance and recruiting, and (v) other non-recurring expenses reducing such Consolidated Net Income which do not represent a cash item in such period or any future period, including Consolidated Deferred Financing Costs (in each case of or by the Lead Borrower and its Subsidiaries for such Measurement Period), minus (c) the following to the extent included in calculating such Consolidated Net Income: (i) Federal, state, local and foreign income tax credits and (ii) all non-cash items increasing Consolidated Net Income (in each case of or by the Lead Borrower and its Subsidiaries for such Measurement Period), all as determined on a Consolidated basis in accordance with GAAP.

"Consolidated Fixed Charge Coverage Ratio" means, at any date of determination, for any Measurement Period, the ratio of (a) (i) Consolidated EBITDA for such Measurement Period, minus (ii) Capital Expenditures made during such Measurement Period, minus (iii) the aggregate amount of Federal, state, local and foreign income taxes paid in cash during such Measurement Period, to (b) the sum of (i) Debt Service Charges, plus (ii) the aggregate amount of all Restricted Payments paid by the Lead Borrower and its Subsidiaries for such Measurement Period, all as determined on a Consolidated basis in accordance with GAAP.

"Consolidated Interest Charges" means, for any Measurement Period, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Contracts, but excluding any non-cash or deferred interest financing costs, plus (b) all interest paid or payable with respect to discontinued operations, plus (c) the portion of rent expense with respect to such period under Capital Lease Obligations that is treated as interest in accordance with GAAP, minus (d) interest income during such period (excluding any portion of interest income representing accruals of amounts received in a previous period), in each case of or by the Lead Borrower and its Subsidiaries for the most recently completed Measurement Period, all as determined on a Consolidated basis in accordance with GAAP.

"Consolidated Net Income" means, as of any date of determination, the net income of the Lead Borrower and its Subsidiaries for the most recently completed Measurement Period, all as determined on a Consolidated basis in accordance with GAAP, provided, however, that the foregoing shall exclude (a) extraordinary gains and extraordinary losses for such Measurement Period, (b) the income (or loss) of such Person that is not a Subsidiary of the Lead Borrower during such Measurement Period in which any other Person has a joint interest, except to the extent of the amount of cash dividends or other

distributions actually paid in cash to such Person during such period, (c) the income (or loss) of such Person during such Measurement Period and accrued prior to the date it becomes a Subsidiary of a Person or any of such Person's Subsidiaries or is merged into or consolidated with a Person or any of its Subsidiaries or that Person's assets are acquired by such Person or any of its Subsidiaries, and (d) the income (or loss) of any direct or indirect Subsidiary of a Person to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income (or loss) is not at the time permitted by operation of the terms of its Organization Documents or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, except that the Lead Borrower's equity in any net loss of any such Subsidiary for such Measurement Period shall be included in determining Consolidated Net Income.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Corporate Reorganization" means the restructurings contemplated by the Chapter 11 Plan Documents.

"Cost" means the lower of cost or market value of Inventory, with cost being determined on a weighted average basis, based upon the Borrowers' accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger.  "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold.

"Credit Card Agreements" shall mean all agreements now or hereafter entered into by any Borrower or for the benefit of any Borrower, in each case with any Credit Card Issuer or any Credit Card Processor with respect to sales transactions involving credit card or debit card purchases, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements set forth on Schedule 5.21(b) hereto.

"Credit Card Issuer" shall mean any person (other than a Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by Agent.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(i).

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) or "account" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a

Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each L/C Issuer, (iv) the Arranger, (v) each Bank Product Provider, (vi) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (vii) any other Person to whom Obligations (including Other Liabilities) under this Agreement and the other Loan Documents are owing, and (viii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable and documented out-of-pocket expenses incurred by the Agent and its respective Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) outside consultants for the Agent, (C) appraisers, (D) field examinations, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral, or (D) any workout, restructuring or negotiations in respect of any Obligations, and (iii) all customary fees and charges (as adjusted from time to time) of the Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrowers (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, and (b) with respect to the L/C Issuer, and its Affiliates, all reasonable and documented out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; and (c) all reasonable and documented out-of-pocket expenses incurred by the Credit Parties and their Affiliates who are not the Agent, the L/C Issuer or any Affiliate of any of them, after the occurrence and during the continuance of an Event of Default, provided, that, such Credit Parties and their Affiliates shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrowers, (c) layaway obligations of the Borrowers, and (d) liabilities in connection with frequent shopping programs of the Borrowers.

"Customer Deposits" means deposits made by customers with respect to the purchase of goods or the performance of services.

"Customs Broker Agreement" means an agreement in substantially the form attached hereto as Exhibit F or otherwise reasonably acceptable to the Agent among a Borrower, a customs broker, freight forwarder, consolidator or other carrier, and the Agent, in which the customs broker, freight forwarder,

consolidator or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"Dated Account" means an Account of a Borrower that has been outstanding more than sixty (60) days from its due date or more than ninety (90) days from its invoice date pursuant to a specific dating program disclosed to Agent and created in the ordinary course of such Borrower's business.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.  All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debt Service Charges" means for any Measurement Period, the sum of (a) Consolidated Interest Charges scheduled to be paid (whether or not actually paid) for such Measurement Period, plus (b) principal payments scheduled to be paid (whether or not actually paid) on account of Indebtedness (excluding the Obligations and any Synthetic Lease Obligations but including, without limitation, Capital Lease Obligations) for such Measurement Period, in each case determined on a Consolidated basis in accordance with GAAP.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Obligations other than Letter of Credit Fees, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin, if any, applicable to Base Rate Loans, plus (iii) two percent (2%) per annum; provided, however, that with respect to a LIBO Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan plus two percent (2%) per annum, and (b) when used with respect to Letter of Credit Fees, a rate equal to the Applicable Margin for Standby Letters of Credit or Commercial Letters of Credit, as applicable, plus two percent (2%) per annum.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under this Agreement on the date that it is required to do so under this Agreement (including the failure to make available to the Agent amounts required pursuant to a settlement or to make a required payment in connection with a Letter of Credit Disbursement), (b) notified the Borrowers, the Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under this Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements generally (as reasonably determined by the Agent) under which it has committed to extend credit, (d) failed, within one (1) Business Day after written request by the Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund any amounts required to be funded by it under this Agreement, (e) otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it under this Agreement on the date that it is required to do so under this Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or

acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Defaulting Lender Rate" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Committed Loans that are Base Rate Loans (inclusive of the Applicable Margin applicable thereto).

"Dilution Reserve" means, for any period, an amount equal to a percentage of the amount of Eligible Trade Receivables included in the Borrowing Base, which percentage shall be reasonably determined by the Agent by (i) dividing (A) the amount of charge-offs of Eligible Trade Receivables and returns of goods purchased from the Borrowers during such period which had, at the time of sale, resulted in the creation of an Eligible Trade Receivable, by (B) the amount of sales (exclusive of sales and other similar taxes) of the Borrowers during such period and thereafter and (ii) deducting a percentage to be determined by the Agent in its good faith discretion (but in no event shall the Dilution Reserve be less than zero).

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale, transfer, license or other disposition of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests but excluding Inventory sold in the ordinary course of business) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Equity Interests that do not constitute Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or redeemable (other than solely for Equity Interests that do not constitute Disqualified Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the Maturity Date; provided, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Lead Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Lead Borrower or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Lead Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"Effective Date" shall mean the date designated as such under the Chapter 11 Plan after (a) the Confirmation Order shall have become a Final Order and (b) all of the conditions precedent to the effectiveness of the Chapter 11 Plan shall have been satisfied or waived in accordance with the Chapter 11 Plan Documents.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by (i) the Agent, the L/C Issuer and the Swing Line Lender, and (ii) unless an Event of Default has occurred and is continuing, the Lead Borrower (each such approval not to be unreasonably withheld or delayed); provided, that, notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' Affiliates or Subsidiaries or any holder of Subordinated Indebtedness.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable of a Borrower (other than Five Star and SOW) that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a Borrower from a Credit Card Processor and/or Credit Card Issuer, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent in its discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (j) below.  Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, an Account shall indicate no Person other than a Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer, a Credit Card Processor, or Credit Card Issuer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by Borrowers to reduce the amount of such Credit Card Receivable.  Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a)     Credit Card Receivables which do not constitute a "payment intangible" (as defined in the UCC) or an "account" (as defined in the UCC);

(b)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(c)     Credit Card Receivables (i) that are not subject to a perfected first priority security interest in favor of the Agent, and (ii) with respect to which a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents and the Permitted Encumbrances described in clauses (a), (e), (o), and (q) of the definition thereof);

(d)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e)     Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)     Credit Card Receivables due from a Credit Card Issuer or Credit Card Processor of the applicable credit card which is the subject of any bankruptcy or insolvency proceedings;

(g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(h)     Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

(i)     Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent; or

(j)     Credit Card Receivables which the Agent determines in its discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, items of Inventory of a Borrower (other than SOW) that are finished goods, merchantable and readily saleable to the public in the ordinary course of such Borrower's business deemed by the Agent in its discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (a) complies with each of the representations and warranties respecting Inventory made by the Borrowers in the Loan Documents, and (b) is not excluded as ineligible by virtue of one or more of the criteria set forth below.  Except as otherwise agreed by the Agent, in its discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a)     Inventory that is not solely owned by a Borrower or a Borrower does not have good and valid title thereto;

(b)     Inventory that is leased by or is on consignment to a Borrower or which is consigned by a Borrower to a Person which is not a Loan Party;

(c)     (x) Inventory that is not located in the United States of America (excluding territories or possessions of the United States other than the Commonwealth of Puerto Rico), (y) Inventory that is not located at a location that is owned or leased by a Borrower, except Inventory that is in transit between locations that are owned or leased by a Borrower in the United States of America (excluding territories or possessions other than the Commonwealth of Puerto Rico) and/or locations meeting the criteria in the following clause (z), or (z) to the extent that the Borrowers have furnished the Agent with (A) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Agent; provided, that, the aggregate Cost of all Inventory located at Stores in Puerto Rico eligible for inclusion in the calculation of the Borrowing Base shall not exceed $2,000,000;

(d)　　Inventory that is located in a distribution center leased by a Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement;

(e)　　Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, (iv) are work in process, raw materials, or constitute spare parts, promotional, marketing, packaging and shipping materials or supplies used or consumed in a Borrower's business, in each case other than Finished SKU Inventory, (iv) are seasonal in nature and which have been packed away for sale in the subsequent season, (v) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(f)　　(i) Inventory that is not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents and the Permitted Encumbrances described in clauses (a), (e), (o), and (q) of the definition thereof);

(g)　　Inventory that consists of samples, labels, bags, packaging, and other similar non-merchandise categories;

(h)　　Inventory that is not insured in compliance with the provisions of Section 5.10 hereof;

(i)　　Inventory that has been sold but not yet delivered or as to which a Borrower has accepted a deposit;

(j)　　Inventory subject to any patent or trademark license requiring either (i) the payment of royalties or fees or (ii) which restricts such Borrower's or Agent's right to freely dispose of such Inventory unless, in each case, the Agent has, at its option, entered into an acceptable agreement with the owner of such trademark or patent; or made such other arrangements acceptable to the Agent (for the avoidance of doubt, so long as the applicable Licensor Consent remains in full force and effect, the Inventory which is the subject of the license referred to in such Licensor Consent, will not be deemed ineligible pursuant to this clause (j));

(k)　　Inventory acquired in a Permitted Acquisition or which is not of the type usually sold in the ordinary course of the Borrowers' business, unless and until the Agent has completed or received (A) an appraisal of such Inventory from appraisers satisfactory to the Agent and establishes an Inventory advance rate and Inventory Reserves (if applicable) therefor, and otherwise agrees that such Inventory shall be deemed Eligible Inventory, and (B) such other due diligence as the Agent may require, all of the results of the foregoing to be reasonably satisfactory to the Agent.

"Eligible Trade Receivables" means Accounts deemed by the Agent in its discretion to be eligible for inclusion in the calculation of the Borrowing Base arising from the sale of Inventory (other than those consisting of Credit Card Receivables) of a Borrower (other than Five Star and SOW) that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Account (i) has been earned by performance and represents the bona fide amounts due to such Borrower from an account debtor, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is reasonably acceptable to the Agent in its discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (t) below. Without limiting the foregoing, to qualify as an Eligible Trade Receivable, an Account shall indicate no Person other than a Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending,

promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower could reasonably be expected to be obligated to rebate to a customer pursuant to the terms of any written agreement) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrowers to reduce the amount of such Eligible Trade Receivable. Except as otherwise agreed by the Agent, any Account included within any of the following categories shall not constitute an Eligible Trade Receivable:

(a)    Accounts that are not evidenced by an invoice;

(b)    Accounts that have been outstanding for more than ninety (90) days from the date of their original invoice date or more than sixty (60) days past the due date, or, if the Account is a Dated Account, the Account is not paid within the earlier of thirty (30) days following its due date or one hundred fifty (150) days following its original invoice date; provided, that, the aggregate amount of all Dated Accounts included in the Borrowing Base shall not in any event exceed $5,000,000;

(c)    Accounts due from any account debtor if fifty percent (50%) or more of the Dollar amount of all Accounts owing by the account debtor are ineligible under the other criteria set forth in this definition;

(d)    Accounts (i) that are not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents and the Permitted Encumbrances described in clauses (a), (e), (o), and (q) of the definition thereof);

(e)    Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

(f)    Accounts which arise out of any sale made not in the ordinary course of business, made on a basis other than upon credit terms usual to the business of the Borrowers or are not payable in Dollars;

(g)    Accounts which are owed by any account debtor whose principal place of business is not within the continental United States, the Commonwealth of Puerto Rico or Canada unless, at Agent's option, if: (i) the account debtor has delivered to such Borrower an irrevocable letter of credit issued or confirmed by a bank satisfactory to Agent and payable only in the United States of America and in Dollars, sufficient to cover such Account, in form and substance satisfactory to Agent and if required by Agent, the original of such letter of credit has been delivered to Agent or Agent's agent and the issuing bank has been notified of and agreed in writing to the assignment of the proceeds of such letter of credit to Agent, or (ii) such Account is subject to credit insurance payable to Agent issued by an insurer and on terms and in an amount reasonably acceptable to Agent, or (iii) such Account is otherwise reasonably acceptable in all respects to Agent (subject to such lending formula with respect thereto as Agent may determine);

(h)    Accounts which are owed by any Affiliate or any employee of a Loan Party;

(i)    Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Agent have not been duly obtained, effected or given and are not in full force and effect;

(j)        Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(k)        Accounts due from any Governmental Authority except to the extent that the subject account debtor is the federal government of the United States of America and has complied with the Federal Assignment of Claims Act of 1940 and any similar state legislation;

(l)        Accounts (i) owing from any Person that is also a supplier to or creditor of a Loan Party or any of its Subsidiaries unless such Person has waived any right of setoff in a manner reasonably acceptable to the Agent or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling a Loan Party or any of its Subsidiaries to discounts on future purchase therefrom, but the portion of the Accounts owing by such Person in excess of the amount owing by such Borrower to such Person pursuant to such manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements may be deemed Eligible Accounts;

(m)        Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis or subject to any right of return, set off or charge back, but the portion of the Accounts owing by such Person in excess of the amount of such right of return, set off or charge back may be deemed Eligible Accounts;

(n)        Accounts payable other than in Dollars or that are otherwise on terms other than those normal and customary in the Loan Parties' business;

(o)        Accounts evidenced by a promissory note or other instrument;

(p)        Accounts consisting of amounts due from vendors as rebates or allowances;

(q)        Accounts which are in excess of the credit limit for such account debtor established by the Loan Parties in the ordinary course of business and consistent with past practices;

(r)        Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity;

(s)        to the extent such Account, together with all other Accounts owing by such account debtor and its Affiliates (other than Wal-Mart Stores, Inc. and its Affiliates) determined by Agent in its good faith discretion as of any date of determination exceeds twenty percent (20%) of all Eligible Trade Receivables in the Borrowing Base or in the case of Wal-Mart Stores, Inc. and its Affiliates, twenty-five percent (25%) of all Eligible Accounts in the Borrowing Base; or

(t)        Accounts which constitute Credit Card Receivables.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other

Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Lead Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Lead Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Lead Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Lead Borrower or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01.  An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excess Swing Line Loans" has the meaning set forth in Section 2.14(a).

"Excluded Accounts" means (a) deposit accounts that are specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's salaried employees, (b) deposit accounts that are specifically and exclusively used for paying taxes, including sales taxes, (c) deposit accounts (excluding any deposit accounts referred to in clauses (a) and (b) above) so long as the average daily balance (determined on a monthly basis) is less than $10,000 individually and less than $100,000 in the aggregate for all such deposit accounts excluded in this clause,

and (d) deposit accounts that are zero balance accounts so that no funds are maintained in such accounts for more than one (1) Business Day.

"Excluded Swap Obligation" means, with respect to any Borrower or Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the joint and several obligations of such Borrower hereunder or the Guarantee of such Guarantor, or the grant by such Borrower or Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Borrower's or Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the liability of such Borrower or the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such joint and several obligation or Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) taxes imposed on or measured by net income (however denominated), franchise taxes, and branch profits taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 10.13), or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) taxes attributable to such Recipient's failure to comply with Section 3.01(e), and (d) any U.S. federal withholding taxes imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.18.

"Existing Credit Agreement" means that certain Credit Agreement, dated as of January 7, 2011, by and among certain of the Borrowers, certain of the Guarantors, Wells Fargo, as administrative and collateral agent, and a syndicate of lenders, as amended, restated, amended and restated, supplemented or otherwise modified on or prior to the date of this Agreement, including without limitation as amended by the Ratification and Amendment.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments.

"Facility Guaranty" means the Amended and Restated Guaranty, dated as of the Closing Date, made by the Guarantors in favor of the Agent and the other Credit Parties, in form reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"FATCA" means Sections 1471 through 1474 of the Code , as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Factored Receivables" means any Accounts of a Loan Party which have been factored or sold by an account debtor of a Loan Party to Wells Fargo or any of its Affiliates pursuant to a factoring arrangement or otherwise.

"Family Group" means (a) with respect to any individual, such individual and his or her spouse, parents, siblings, children, grandchildren, nephews, nieces, heirs, legatees, lineal descendants, executors, administrators, and other representatives, and (b) any trust, family partnership or similar investment entity of which any of the foregoing Persons are trustee(s), managing member(s), managing partner(s) or similar officer(s) and/or that is for the benefit of any of the foregoing Persons as long as one or more of such Persons has the exclusive or joint right to control the voting and disposition of securities held by such trust, family partnership or similar investment entity.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that, (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Wells Fargo on such day on such transactions as determined by the Agent.

"Fee Letter" means the Amended and Restated Fee Letter, dated as of the Closing Date, between the Lead Borrower and the Agent, as the same may be amended, supplemented, modified, amended and restated, or replaced from time to time by the parties thereto.

"Final Order" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court of competent jurisdiction which judgment, order, ruling or other decree has not been reversed or stayed and as to which (a) the time to appeal or petition for review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending or (b) any appeal or petition for review, rehearing or certiorari has been finally decided or waived and no further appeal or petition for review, review, rehearing or certiorari can be taken or granted.

"Finished SKU Inventory" means finished Inventory of a Borrower with stock-keeping units (SKU's) that have not been placed in final outside packaging as to which (a) the applicable Borrower has set aside on its books, adequate reserves in accordance with GAAP or (b) a reserve is reflected in the determination of the Appraised Value, in each case without duplication with respect to the cost of final outside packaging with respect thereto.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended from time to time.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall generally end on or about the last Saturday of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on or about the last day of each January, April, July and October of such Fiscal Year in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Year" means any period of twelve (12) consecutive months ending on or about January 31 of any calendar year.

"Foreign Asset Control Regulations" has the meaning set forth in <u>Section 10.18</u>.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Fee" has the meaning assigned to such term in <u>Section 2.03(j)</u>.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum

reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, the following (together with their successors and assigns): Aladdin Fragrances, Inc., a New York corporation, Niche Marketing Group, Inc., a New York corporation, Model Reorg Acquisition, LLC, a Delaware limited liability company, and each other direct or indirect Subsidiary of Parent or (other than any CFC) that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12, unless and until any such Person ceases to be a Guarantor in accordance with the terms of the Loan Documents.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Inactive Subsidiaries" shall mean, collectively, (a) each Subsidiary of Parent listed on Schedule 1(I) hereto and (b) a Subsidiary of Parent designated in writing by Lead Borrower to the Agent after the date hereof as an Inactive Subsidiary and agreed to by the Agent, provided, that, (i) such Subsidiary so designated after the date hereof shall only be considered an Inactive Subsidiary to the extent that the representations with respect thereto set forth in Section 5.13(b) hereof are true and correct with respect thereto and the Agent shall have received such evidence thereof as it may reasonably require and (ii) such Subsidiaries are sometimes referred to herein collectively as "Inactive Subsidiaries".

"Increase Effective Date" shall have the meaning provided therefor in Section 2.15(d).

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)       all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)       the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)       net obligations of such Person under any Swap Contract;

(d)       all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the stated due date for such trade account payable);

(e)       indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)       all Attributable Indebtedness of such Person;

(g)       all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Stock, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, customer lists, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, granting a Lien in the Intellectual Property and certain other assets of the Loan Parties, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Interest Payment Date" means, (a) as to any LIBO Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided, however, that if any Interest Period for a LIBO Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan (including a Swing Line Loan), the first day after the end of each month and the Maturity Date.

"Interest Period" means, as to each LIBO Rate Loan, the period commencing on the date such LIBO Rate Loan is disbursed or converted to or continued as a LIBO Rate Loan and ending on the date one (1), two (2), three (3) or six (6) months thereafter, as selected by the Lead Borrower in its LIBO Rate Loan Notice; provided, that,

(a)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)      no Interest Period shall extend beyond the Maturity Date.

For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Lead Borrower's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in the Agent's good faith discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's good faith discretion, include (but are not limited to) reserves based on:

(a)      Obsolescence;

(b)      Seasonality;

(c)      Shrink;

(d)      Imbalance;

(e)      Change in Inventory character;

(f)      Change in Inventory composition;

(g)      Change in Inventory mix;

(h)      Markdowns (both permanent and point of sale);

(i)      Retail markdowns and markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

(j)      Out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, (c) an Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the U.S. Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrowers (or any Subsidiary) or in favor of the L/C Issuer and relating to any such Letter of Credit.

"Joinder Agreement" means an agreement, in form satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may determine.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Issuer" means (a) Wells Fargo in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder (which successor may only be a Lender selected by the Agent in its discretion), and (b) any other Lender selected by the Agent in its discretion.  The L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the L/C Issuer and/or for such Affiliate to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or administration of any such Letter of Credit, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"L/C Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit.  For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any Rule under the ISP or any article of the UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral; as of the Closing Date those states are Pennsylvania, Virginia, and Washington.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lead Borrower" has the meaning specified in the introductory paragraph hereto.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" has the meaning specified in the introductory paragraph hereto and, as the context requires, includes the Swing Line Lender.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder.

"Letter of Credit Application" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Disbursement" means a payment made by the L/C Issuer pursuant to a Letter of Credit.

"Letter of Credit Expiration Date" means the day that is seven (7) days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 2.03(l).

"Letter of Credit Indemnified Costs" has the meaning specified in Section 2.03(f).

"Letter of Credit Related Person" has the meaning specified in Section 2.03(f).

"Letter of Credit Sublimit" means an amount equal to $10,000,000.  The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Commitments.  A permanent reduction of the Aggregate Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Aggregate Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Commitments.

"LIBO Borrowing" means a Borrowing comprised of LIBO Loans.

"LIBO Rate" means for any Interest Period with respect to a LIBO Rate Loan, the rate per annum rate which appears on the Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on the second London Business Day preceding the first day of such Interest Period (or if such rate does not appear on the Reuters Screen LIBOR01 Page, then the rate as determined by the Agent from another recognized source or interbank quotation), for a term, and in an amount, comparable to the Interest Period and the amount of the LIBO Rate Loan requested (whether as an initial LIBO Rate Loan or as a continuation of a LIBO Rate Loan or as a conversion of a Base Rate Loan to a LIBO Rate Loan) by Borrowers in accordance with this Agreement (and, if any such rate is below zero, the LIBO Rate shall be deemed to be zero), which determination shall be made by Agent and shall be conclusive in the absence of manifest error.  If such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Rate Loan being made, continued or converted by Wells Fargo and with a term equivalent to such Interest Period would be offered to Wells Fargo by major banks in the London interbank eurodollar market in which Wells Fargo participates at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period.

"LIBO Rate Loan" means a Committed Loan that bears interest at a rate based on the Adjusted LIBO Rate.

"LIBO Rate Loan Notice" means a notice for a LIBO Borrowing or continuation pursuant to Section 2.02(b), which shall be substantially in the form of Exhibit A.

"Licensor Consents" means, collectively, (i) Licensor Agreement, dated as of August 19, 2013, by and among Parlux and Artistic Brands Development, LLC, Combermere Entertainment Properties, LLC and the Agent, (ii) Licensor Agreement, dated as of December 6, 2012, by and among Parlux Ltd., Kenneth Cole Productions (LIC), LLC and the Agent, and (iii) Licensor Agreement, dated as of September 28, 2012, by and among Parlux, Parlux Ltd., Paris Hilton Entertainment, Inc., and Agent, in each case as amended, restated, amended and restated, supplemented or otherwise modified.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to such Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent, of any public, private or "going out of business", "store closing", or other similarly themed sale or other disposition of the Collateral for the purpose of liquidating the Collateral.  Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means an extension of credit by a Lender to the Borrowers under Article II in the form of a Committed Loan or a Swing Line Loan.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Commitments or (b) the Borrowing Base.

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, all Borrowing Base Certificates, the Blocked Account Agreements, the Credit Card Notifications, the Security Documents, the Facility Guaranty, each Request for Credit Extension, and any other instrument or agreement now or hereafter executed and delivered in connection herewith each as amended, restated, replaced, amended and restated and in effect from time to time; provided, that, Loan Documents shall not include agreements evidencing Cash Management Services and Bank Products.

"Loan Parties" means, collectively, the Borrowers and the Guarantors.

"London Business Day" means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Material Adverse Effect" means (a) a material adverse effect on (i) the business, operations, results of operations, assets, liabilities or financial condition of Loan Parties and their Subsidiaries, taken

as a whole or (ii) Agent's or any Credit Party's material rights and remedies under the Agreement and the other Loan Documents, (b) a material impairment of (i) Loan Parties' and their Subsidiaries' ability, taken as a whole, to perform their obligations under the Loan Documents to which they are parties or (ii) the Agent's and Credit Parties' ability to enforce the Obligations or realize upon the Collateral (other than as a result of an action taken or not taken that is solely in the control of Agent or another Credit Party, as the case may be), (c) subject to Permitted Liens, a material impairment of the enforceability or priority of Agent's Liens with respect to the Collateral (other than as a result of an action taken or not taken that is solely in the control of Agent or another Credit Party, as the case may be) or (d) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"Material Contract" means, with respect to any Person, each contract (other than leases for Stores) to which such Person is a party (a) involving aggregate consideration payable to or by such Person of (i) $25,000,000 or more in any Fiscal Year in the case of (A) an individual purchase order or (B) multiple purchase orders issued pursuant to the same agreement or (ii) $5,000,000 or more in any Fiscal Year in the case of any other contract or (b) otherwise material to the operations, business, properties or financial condition of such Person.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $500,000. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means the date which is the fifth anniversary of the Closing Date.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Measurement Period" means, at any date of determination, the most recently ended period of twelve (12) consecutive Fiscal Months for which Agent has received financial statements required under the terms of this Agreement.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Lead Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions)

paid by any Loan Party to third parties (other than Affiliates)); and (b) with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Consenting Lender" has the meaning provided therefor in Section 10.01.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Note" means (a) a promissory note made by the Borrowers in favor of a Lender evidencing Committed Loans made by such Lender, substantially in the form of Exhibit C-1, and (b) the Swing Line Note, as each may be amended, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Nussdorf Convertible Note" means the Subordinated Convertible Note, dated as of December 9, 2004, by Holdings in favor of Stephen Nussdorf and Glenn Nussdorf in the original principal amount of $5,000,000, as amended by that certain Amendment to Subordinated Convertible Note dated as of April 28, 2006, that certain Note and Subordination Amendment Agreement dated as of May 26, 2009 and as the same may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Nussdorf Convertible Note Subordination Agreement" means the Subordination Agreement dated of even date herewith, by and between Agent and Stephen Nussdorf and Glenn Nussdorf, as the same now exists or may hereafter be amended, supplemented or otherwise modified in accordance with the terms hereof.

"Nussdorf Sibling Notes" means collectively, (a) the Second Amended and Restated Subordinated Promissory Note, dated April 18, 2012, by Model in favor of the Trust under Article 2 of the Trust Agreement dated November 1, 1998 with Glenn Nussdorf as Grantor (successor to the Glenn Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98) in the original principal amount of $11,390,212.15, (b) the Second Amended and Restated Subordinated Promissory Note, dated April 18, 2012, by Model in favor of the Glenn Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98 in the original principal amount of $17,065,018.85, (c) the Second Amended and Restated Subordinated Promissory Note, dated April 18, 2012, by Model in favor of the Trust under Article 2 of the Trust Agreement dated November 1, 1998 with Stephen Nussdorf as Grantor (successor to the Stephen Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98) in the original principal amount of $11,390,212.15, (d) the Second Amended and Restated Subordinated Promissory Note, dated April 18, 2012, by Model in favor of the Stephen Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98 in the original principal amount of $17,065,018.85, (e) the Second Amended and Restated Subordinated Promissory Note, dated April 18, 2012, by Model in favor of the Trust under Article 2 of the Trust Agreement dated November 1, 1998 with Arlene Nussdorf as Grantor (successor to the Arlene Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98) in the original principal amount of $11,390,212.15, and (f) the Second Amended and Restated Subordinated Promissory Note, dated April 18, 2012, by Model in favor of the Arlene Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98 in the original principal amount of $17,065,018.85, in each case, as the same now exist or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Nussdorf Sibling Subordination Agreement" means the Subordination Agreement, dated the Closing Date, by and between Agent and the Trust under Article 2 of the Trust Agreement dated

November 1, 1998 with Glenn Nussdorf as Grantor (successor to the Glenn Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98), Glenn Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98, the Trust under Article 2 of the Trust Agreement dated November 1, 1998 with Stephen Nussdorf as Grantor (successor to the Stephen Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98), Stephen Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98, the Trust under Article 2 of the Trust Agreement dated November 1, 1998 with Arlene Nussdorf as Grantor (successor to Arlene Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98), Arlene Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98, as the same now exists or may hereafter be amended, supplemented or otherwise modified in accordance with the terms hereof.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding, and (b) any Other Liabilities; provided, that, notwithstanding anything contained in the foregoing or in any of the other Loan Documents to the contrary, the Obligations shall exclude any Excluded Swap Obligation.  The definitions of "Obligations" and "Guaranteed Obligations" as used or defined in any other Loan Document, including the Facility Guarantee are deemed to exclude any Excluded Swap Obligation, notwithstanding anything contained in such other Loan Documents to the contrary.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Liabilities" means (a) any obligation on account of (i) any Cash Management Services furnished to any of the Loan Parties or any of their Subsidiaries and/or (ii) any transaction with Agent, any Lender or any of its respective Affiliates, which arises out of any Bank Product entered into with any Loan Party and any such Person, as each may be amended from time to time; and (b) any liability with respect to Factored Receivables.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06(b)).

"Outstanding Amount" means (i) with respect to Committed Loans and Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Committed Loans and Swing Line Loans, as the case may be, occurring on such date; and (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Parent" means MJA Beauty, LLC, a Delaware limited liability company.

"Parlux" means Parlux Fragrances, Inc., a Delaware corporation.

"Parlux Ltd." means Parlux Ltd., a New York corporation.

"Participant" has the meaning specified in Section 10.06(d).

"Participant Register" has the meaning specified in Section 10.06(d).

"Payment Conditions" means, at the time of determination with respect to any specified transaction or payment, that

(a) no Default or Event of Default then exists or would arise as a result of entering into such transaction or the making such payment,

(b) on the date of such transaction or payment, using the Availability as of the date of the most recent calculation of the Borrowing Base immediately prior to any such transaction or payment with respect thereto, Availability shall be not less than the greater of (i) 25% of the Borrowing Base after giving pro forma effect to such transaction or payment as if such transaction or payment had been made or (ii) $25,000,000,

(c) after giving effect to such transaction or payment but prior to any such proposed transaction or payment with respect thereto being made, the Agent shall have received from Lead Borrower projections reasonably satisfactory to the Agent demonstrating that projected average Availability for each Fiscal Month at all times during the six (6) month period immediately succeeding any such transaction or payment shall be not less than the greater of (i) 25% of the Borrowing Base after giving pro forma effect to such transaction or payment as if such transaction or payment had been made or (ii) $25,000,000,

(d) the Consolidated Fixed Charge Coverage Ratio of the Lead Borrower and its Subsidiaries, calculated on a pro forma basis, shall be equal to or greater than 1.10:1.00 for the Measurement Period after giving pro forma effect to such transaction or payment as if such transaction had been entered into or such payment had been made as of the first day of such Measurement Period, and

(e) Agent shall have received a certificate of a Responsible Officer of Borrowers certifying as to the compliance with the preceding clauses and demonstrating (in reasonable detail) the calculations required thereby.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Lead Borrower or any ERISA Affiliate or to which the Lead Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Perishable Inventory" means inventory consisting of meat, dairy, cheese, seafood, produce, prepared meals, delicatessen, non-artificial floral products and bakery goods and other similar categories of Inventory which have a short shelf life.

"Permitted Acquisition" means any Acquisition in which all of the following conditions are satisfied:

(i)     No Default then exists or would arise from the consummation of such Acquisition;

(ii)     Such Acquisition shall have been approved by the Board of Directors of the Person (or similar governing body if such Person is not a corporation) which is the subject of such Acquisition and such Person shall not have announced that it will oppose such Acquisition or shall not have commenced any action which alleges that such Acquisition shall violate applicable Law, unless Agent waives compliance with this condition;

(iii)     The Lead Borrower shall have furnished the Agent with thirty (30) days' prior written notice of such intended Acquisition and shall have furnished the Agent with a current draft of the acquisition documents (and final copies thereof as and when executed), a summary of any due diligence undertaken by the Loan Parties in connection with such Acquisition, appropriate financial statements of the Person which is the subject of such Acquisition, pro forma projected financial statements for the twelve (12) month period following such Acquisition after giving effect to such Acquisition (including balance sheets, cash flows and income statements by month for the acquired Person, individually, and on a Consolidated basis with all Loan Parties), and such other information as the Agent may reasonably require, all of which shall be reasonably satisfactory to the Agent;

(iv)     Either (A) the legal structure of the Acquisition shall be acceptable to the Agent in its discretion, or (B) the Loan Parties shall have provided the Agent with a favorable solvency opinion from an unaffiliated third party valuation firm reasonably satisfactory to the Agent;

(v)     After giving effect to the Acquisition, if the Acquisition is an Acquisition of the Equity Interests, a Loan Party shall acquire and own, directly or indirectly, a majority of the Equity Interests in the Person being acquired and shall Control a majority of any voting interests or shall otherwise Control the governance of the Person being acquired;

(vi)     Any assets acquired shall be utilized in, and if the Acquisition involves a merger, consolidation or Acquisition of Equity Interests, the Person which is the subject of such Acquisition shall be engaged in, a business otherwise permitted to be engaged in by a Borrower under this Agreement;

(vii)     If the Person which is the subject of such Acquisition will be maintained as a Subsidiary of a Loan Party, or if the assets acquired in an acquisition will be transferred to a Subsidiary which is not then a Loan Party, such Subsidiary shall have been joined as a Borrower hereunder or as a Guarantor, as the Agent shall determine, and the Agent shall have received a first priority security and/or mortgage interest in such Subsidiary's Equity Interests, Inventory, Accounts, Real Estate and other property of the same nature as constitutes collateral under the Security Documents;

(viii)     The total consideration paid for all such Acquisitions (whether in cash, tangible property, notes or other property) after the Closing Date shall not exceed in the aggregate the sum of $2,500,000; and

(ix)     The Loan Parties shall have satisfied the Payment Conditions (determined, at the Loan Parties' option, as of the closing date of such Acquisition or the date of the execution of the definitive agreement with respect to such Permitted Acquisition, so long as the date upon which such definitive agreement is executed is not more than sixty (60) days prior to the closing date of such Acquisition).

"Permitted Disposition" means any of the following:

(a)     Dispositions of Inventory in the ordinary course of business;

(b)     bulk sales or other Dispositions of the Inventory of a Loan Party not in the ordinary course of business in connection with Store closings, at arm's length, provided, that such Store closings and related Inventory Dispositions shall not exceed (i) in any Fiscal Year of Parent and its Subsidiaries, more than twenty (20) stores, provided, that, all sales of Inventory not in the ordinary course of business in connection with Store closings shall be in accordance with liquidation agreements and with professional liquidators reasonably acceptable to the Agent; provided, further that (i) all Net Proceeds received in connection therewith are applied to the Obligations in accordance with Section 2.05 hereof, and (ii) the expiration of any Store lease shall be deemed a Store closing for purposes of this clause (b);

(c)     non-exclusive licenses, sub-licenses and cross-licenses of (and other grants of rights to use) Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business;

(d)     licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business; provided, that, if requested by the Agent, the Agent shall have entered into an intercreditor agreement with the Person operating such licensed department on terms and conditions reasonably satisfactory to the Agent;

(e)     Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary and is not replaced with similar property having at least equivalent value and Dispositions of other Equipment with a book value not exceeding $1,000,000 in the aggregate in any Fiscal Year;

(f)     Dispositions among the Loan Parties or by any Subsidiary to a Loan Party;

(g)　　　　Reserved;

(h)　　　　Dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party;

(i)　　　　Dispositions consisting of the compromise, settlement or collection of accounts receivable in the ordinary course of business, consistent with practices in effect on the Closing Date;

(j)　　　　Dispositions of cash, cash equivalents and Permitted Investments described in clauses (a) through (e) of the definition of "Permitted Investments", in each case in the ordinary course of business consistent with practices in effect on the Closing Date; and

(l)　　　　to the extent constituting Dispositions, Permitted Encumbrances..

"Permitted Encumbrances" means:

(a)　　　　Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)　　　　Carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are (i) not overdue by more than forty-five (45) days or are being contested in compliance with Section 6.04 or (ii) do not in the aggregate secure an aggregate amount of obligations in excess of $250,000;

(c)　　　　Pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)　　　　Deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety and appeal bonds, performance bonds, stay, appeal and customs bonds and other obligations of a like nature incurred in the ordinary course of business or letter of credit guarantees in respect thereof;

(e)　　　　Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)　　　　Easements, covenants, conditions, restrictions, encroachments, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Loan Parties, taken as a whole, and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the ordinary conduct of business of the Loan Parties, taken as a whole;

(g)　　　　Liens existing on the date hereof and listed on Schedule 7.01 and any renewals or extensions thereof, provided, that, (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased other than to the extent of any unused commitments thereunder (plus unpaid accrued interest and premiums (including any prepayment premiums or penalties) thereon and underwriting discounts, defeasance costs, fees (including upfront fees and original issue discount), commissions and expenses), (iii) the direct or any contingent obligor with respect thereto is not changed, and (iv) any renewal or extension of the obligations secured or benefited thereby is otherwise permitted hereunder;

(h)       Liens on fixed or capital assets acquired by any Loan Party which are permitted under clause (c) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition (except in the case of any refinancing of such indebtedness that is otherwise permitted hereunder), (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of such fixed or capital assets and (iii) such Liens shall not extend to any other property or assets of the Loan Parties;

(i)       Liens in favor of the Agent;

(j)       Landlords' and lessors' Liens in respect of rent not in default;

(k)       Possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the date hereof and Permitted Investments, provided, that, such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)       Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)       Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party or any Subsidiary thereof;

(n)       voluntary Liens on property (other than property of the type included in the Borrowing Base) in existence at the time such property is acquired pursuant to a Permitted Acquisition or on such property of a Subsidiary of a Loan Party in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition; provided, that such Liens are not incurred in connection with or in anticipation of such Permitted Acquisition and do not attach to any other assets of any Loan Party or any Subsidiary;

(o)       Liens or rights of setoff against credit balances of Borrowers with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to Borrower in the ordinary course of business, but not liens on or rights of setoff against any other property or assets of Borrowers, pursuant to the Credit Card Agreements to secure the obligations of Borrowers to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(p)       Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations not secured by deposits permitted pursuant to paragraph (d) above, (A) that are being contested in good faith by appropriate proceedings, (B) as to which the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) which contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(q)       Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set off or similar rights; and

(r)       Liens consisting of non-exclusive licenses and sublicenses of (and other grants of rights to use) Intellectual Property in the ordinary course of business.

"Permitted Holders" means Stephen Nussdorf, Glenn Nussdorf, Arlene Nussdorf, Ruth Nussdorf, all trusts in which any of Stephen Nussdorf, Glenn Nussdorf, Arlene Nussdorf, or Ruth Nussdorf are grantors, Rene Garcia, JM-CO Capital Fund, LLC and their respective Affiliates, trusts (and the trustees and beneficiaries thereof), funds, and investment vehicles Controlled by them.

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists or would arise from the incurrence thereof:

(a)    Indebtedness outstanding on the date hereof and listed on Schedule 7.03 and any refinancings, refundings, renewals or extensions thereof; provided, that, (i) the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder, and the direct or contingent obligor with respect thereto is not changed as a result of or in connection with such refinancing, refunding, renewal or extension, (ii) the result of such extension, renewal or replacement shall not be an earlier maturity date or decreased weighted average life of such Indebtedness, and (iii) the terms relating to principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms as a whole, of any such refinancing, refunding, renewing or extending Indebtedness, and of any agreement entered into and of any instrument issued in connection therewith, are no less favorable in any material respect to the Loan Parties or the Lenders than the terms of any agreement or instrument governing the Indebtedness being refinanced, refunded, renewed or extended and the interest rate applicable to any such refinancing, refunding, renewing or extending Indebtedness does not exceed the then applicable market interest rate;

(b)    Indebtedness of (i) any Loan Party or any Subsidiary thereof to any other Loan Party and (ii) any Subsidiary that is not a Loan Party to any Subsidiary that is not a Loan Party;

(c)    without duplication of Indebtedness described in clause (f) of this definition, purchase money Indebtedness of any Loan Party or any Subsidiary thereof to finance the acquisition of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof except by an amount equal to any reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder or result in an earlier maturity date or decreased weighted average life thereof provided, that, the terms relating to principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms taken as a whole, of any such refinancing, refunding, renewing or extending Indebtedness, and of any agreement entered into and of any instrument issued in connection therewith, are no less favorable in any material respect to the Loan Parties or the Lenders than the terms of any agreement or instrument governing the Indebtedness being refinanced, refunded, renewed or extended and the interest rate applicable to any such refinancing, refunding, renewing or extending Indebtedness does not exceed the then applicable market interest rate, provided, however, that, the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed $5,000,000 at any time outstanding;

(d)    obligations (contingent or otherwise) of any Loan Party or any Subsidiary thereof existing or arising under any Swap Contract, provided, that, such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates, and not for purposes of speculation or taking a "market view;" provided, that, the aggregate Swap Termination Value thereof shall not exceed $5,000,000 at any time outstanding;

(e)      contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of Stores;

(f)      Indebtedness incurred for the construction or acquisition or improvement of, or to finance or to refinance, any Real Estate owned by any Loan Party or any Subsidiary thereof (including therein any Indebtedness incurred in connection with sale-leaseback transactions permitted hereunder), provided, that, (A) all Net Proceeds received in connection with any such Indebtedness are applied to the Obligations, and (B) the Loan Parties shall use commercially reasonable efforts cause the holders of such Indebtedness and the lessors under any sale-leaseback transaction to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent;

(g)      Indebtedness with respect to the deferred purchase price for any Permitted Acquisition, provided, that, such Indebtedness does not require the payment in cash of principal (other than in respect of working capital adjustments) prior to the Maturity Date, has a maturity which extends beyond the Maturity Date, and is subordinated to the Obligations on terms reasonably acceptable to the Agent;

(h)      Indebtedness of any Person that becomes a Subsidiary of a Loan Party in a Permitted Acquisition, which Indebtedness is existing at the time such Person becomes a Subsidiary of a Loan Party (other than Indebtedness incurred solely in contemplation of such Person's becoming a Subsidiary of a Loan Party);

(i)      the Subordinated Indebtedness evidenced by the QKD Note, the Nussdorf Convertible Note and the Nussdorf Sibling Notes;

(j)      the Obligations;

(k)      to the extent constituting Indebtedness, judgments, decrees, attachments or awards not constituting an Event of Default under Section 8.01(h); and

(l)      Indebtedness not specifically described herein in an aggregate principal amount not to exceed $1,000,000 at any time outstanding; provided, that, no Loan Party shall be liable, directly or indirectly (contingent or otherwise) for any obligations or Indebtedness of Parent.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)      readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided, that, the full faith and credit of the United States of America is pledged in support thereof;

(b)      commercial paper issued by any Person organized under the laws of any state of the United States of America and rated, at the time of the acquisition thereof, at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than one year from the date of acquisition thereof;

(c)      time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or an Affiliate thereof or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) at the time of

acquisition thereof, issues (the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) at the time of acquisition thereof, has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than one year from the date of acquisition thereof;

(d)        fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)        Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above;

(f)        Investments existing on the Closing Date, and set forth on Schedule 7.02, but not any increase in the amount thereof or any other modification of the terms thereof;

(g)        (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the date hereof, (ii) additional Investments by any Loan Party or any Subsidiary thereof in any Loan Party and (iii) additional investments by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party;

(h)        Investments (i) consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, (ii) received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and (iii) comprised of notes payable, or stock or other securities issued by account debtors pursuant to negotiated agreements with respect to settlement of such account debtor's Accounts in the ordinary course of business consistent with past practices;

(i) Advances to Suppliers and Short Term Supplier Advances so long as during any Fiscal Quarter, the aggregate amount of outstanding Advances to Suppliers (other than Short Term Advances to Suppliers) do not exceed $4,000,000 to all suppliers (and $3,000,000 with respect to any one supplier (including to Affiliates of Loan Parties) and (ii) the aggregate amount of outstanding Short Term Advances to Suppliers do not exceed $8,000,000 with respect to all suppliers (and $5,000,000 with respect to any one supplier (including to Affiliates of Loan Parties);

(j)        Guarantees constituting Permitted Indebtedness;

(k)        Investments by any Loan Party in Swap Contracts entered into in the ordinary course of business and for bona fide business (and not speculative purposes) to protect against fluctuations in interest rates in respect of the Obligations;

(l)        Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(m)       advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an aggregate amount not to exceed $250,000 at any time outstanding;

(n)       Investments constituting Permitted Acquisitions;

(o)       Capital contributions made by any Loan Party to another Loan Party; and

(p)       other Investments not specifically described herein and not exceeding $250,000 at any time outstanding;

provided, however, that, notwithstanding the foregoing, no such Investments specified in clauses (a) through (e) shall be permitted unless (i) either (A) no Loans are then outstanding, or (B) the Investment is a temporary Investment pending expiration of an Interest Period for a LIBO Rate Loan, the proceeds of which Investment will be applied to the Obligations after the expiration of such Interest Period, and (ii) such Investments are pledged to the Agent as additional collateral for the Obligations pursuant to such agreements as may be reasonably required by the Agent.

"Permitted Overadvance" means an Overadvance made by the Agent, in its discretion, which:

(a)       Is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)       Is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)       Is made to pay any other amount chargeable to any Loan Party hereunder; and

(d)       Together with the principal amount of all other Permitted Overadvances then outstanding, shall not (i) exceed an amount equal to five percent (5%) of the Aggregate Commitments at any time or (ii) unless a Liquidation is occurring, remain outstanding for more than forty-five (45) consecutive Business Days, unless in each case, the Required Lenders otherwise agree.

provided, however, that, the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding the Lender's obligations with respect to Letters of Credit, or (ii) result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder, and further, provided, that, in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Commitments (as in effect prior to any termination of the Commitments pursuant to Section 2.06 or Section 8.02 hereof).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than an Multi-Employer Plan, established by the Lead Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Platform" has the meaning specified in Section 6.02.

"Pledge Agreement" means the Securities Pledge Agreement, dated as of the Closing Date, among the Loan Parties party thereto and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Portal" has the meaning set forth in Section 2.02(b).

"Prepayment Event" means:

(a)     any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party;

(b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party in an amount in excess of $500,000, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

(c)     the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, (ii) as consideration for a Permitted Acquisition or (iii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

(d)     the incurrence by a Loan Party of any Indebtedness for borrowed money other than Permitted Indebtedness; or

(e)     the receipt by any Loan Party of any Extraordinary Receipts.

"Public Market" shall exist if (a) a Public Offering has been consummated and (b) any Equity Interests of Parent have been distributed by means of an effective registration statement under the Securities Act of 1933.

"Public Lender" has the meaning specified in Section 6.02.

"Public Offering" means a public offering of the Equity Interests of Parent pursuant to an effective registration statement under the Securities Act of 1933.

"QKD Note" means the Amended and Restated Subordinated Promissory Note dated January 7, 2011, by Model in favor of Quality King Distributors, Inc. in the original principal amount of $35,000,000, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"QKD Subordination Agreement" means the Subordination Agreement, dated January 7, 2011, by and between Agent and Quality King Distributors, Inc., as the same now exists or may hereafter be amended, supplemented or otherwise modified in accordance with the terms hereof.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant guarantee, keepwell, or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Ratification Agreement" means the Ratification and Amendment Agreement, (as amended, modified, supplemented or otherwise modified from time to time, the "Ratification Agreement"), dated as of August [ · ], 2017 is by and among Perfumania Holdings, Inc., a Florida corporation and a debtor and debtor-in-possession, Quality King Fragrance, Inc., a Delaware corporation and a debtor and debtor-in-possession , Scents of Worth, Inc., a Florida corporation and a debtor and debtor-in-possession , Northern Group, Inc., a New York corporation and a debtor and debtor-in-possession, Perfumania, Inc., a Florida corporation and a debtor and debtor-in-possession, Magnifique Parfumes and Cosmetics, Inc., a Florida corporation and a debtor and debtor-in-possession, Ten Kesef II, Inc., a Florida corporation and a debtor and debtor-in-possession, Perfumania Puerto Rico, Inc., a Puerto Rico corporation and a debtor and debtor-in-possession, Perfumania.com, Inc., a Florida corporation and a debtor and debtor-in-possession, Five Star Fragrance Company, Inc., a New York corporation, Parlux Fragrances, LLC, a Delaware limited liability company and Parlux Ltd., a New York corporation, the Guarantors, the lenders party to the Existing Credit Agreement, and Wells Fargo, as administrative Agent and collateral agent for the Lenders and others.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Reasonable Judgment" means a determination made in the exercise of reasonable judgment of a lender providing secured revolving credit exit financing to the debtors by amending and restating the existing debtor-in-possession financing arrangements.

"Receivables Reserves" means such Reserves as may be established from time to time by the Agent in the Agent's good faith discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables, including, without limitation, Dilution Reserves.

"Recipient" means (a) the Agent, (b) any Lender, (c) the L/C Issuer or (d) any other recipient of any payment to be made by or on account of any obligation of the Loan Parties, as applicable.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Lead Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in Section 9.12(b).

"Request for Credit Extension" means (a) with respect to a Committed Borrowing, conversion or continuation of Committed Loans, an electronic notice via the Portal or LIBO Rate Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application and, if required by the L/C Issuer, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"Required Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of: (a) the Borrowing Base, minus (b) the aggregate unpaid balance of Credit

Extensions to, or for the account of, the Borrowers.  In calculating Required Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all accounts payable and Taxes are being paid on a timely basis.

"Required Lenders" means, as of any date of determination, at least two (2) Lenders holding in the aggregate more than fifty percent (50%) of the Aggregate Commitments or, if the commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, at least two (2) Lenders holding in the aggregate more than fifty percent (50%) of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition); provided, that, the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all Inventory Reserves, Availability Reserves and Receivables Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer (or for purposes of Sections 4.01(a)(iii) and (iv), the secretary) of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment and any payment of management fees (or other fees of a similar nature) by any Person to any holder of an Equity Interest of any Person or any of its Subsidiaries.  Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Reuters Screen LIBOR01 Page" means the display page LIBOR01 on the Reuters service or any successor display page, other published source, information vendor or provider that has been designated by the sponsor of Reuters Screen LIBOR01 page.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time, (a) any a Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, or any other Sanctions-related list maintained by any relevant Sanctions authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic, trade, financial or other sanctions laws, regulations or embargoes imposed, administered or enforced from time to time by: (a) the United States of America, including, without limitation, those administered by the Office of Foreign Assets Control (OFAC) of the U.S. Department of Treasury, the U.S. Department of State, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other governmental authority in any jurisdiction in which any Loan Party or any of its Subsidiaries is located or doing business.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Amended and Restated Security Agreement dated as of the Closing Date among the Loan Parties and the Agent as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means, collectively, the following: (as the same now exist or may hereafter be amended, modified, supplemented, renewed, restated or replaced): the Security Agreement, the Pledge Agreement, the Intellectual Property Security Agreement, the Blocked Account Agreements, the Credit Card Notifications, and each other security agreement, document or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Short Term Advances to Suppliers" means Advances to Suppliers, if, and only to the extent that, a Borrower shall receive Inventory shipments within (5) Business Days within from the date on which the Advance to such Supplier was made.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Solvent" and "Solvency" means, with respect to any Person on a particular date of determination, that on such date (a) at fair valuation, all of the properties and assets of such Person are greater than the sum of the debts, including contingent liabilities, of such Person, (b) the present fair saleable value of the properties and assets of such Person is not less than the amount that would be

required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person is able to realize upon its properties and assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts beyond such Person's ability to pay as such debts mature, and (e) such Person is not engaged in a business or a transaction, and is not about to engage in a business or transaction, for which such Person's properties and assets would constitute unreasonably small capital after giving due consideration to the prevailing practices in the industry in which such Person is engaged.  The amount of all guarantees at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, can reasonably be expected to become an actual or matured liability.

"Spot Rate" has the meaning given to such term in Section 1.07 hereof.

"Standard Letter of Credit Practice" means, for the L/C Issuer, any domestic or foreign Law or letter of credit practices applicable in the city in which the L/C Issuer issued the applicable Letter of Credit or, for its branch or correspondent, such Laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Standby Letter of Credit Agreement" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the L/C Issuer.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D.  LIBO Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subordinated Indebtedness" means the Indebtedness of the Loan Parties under the QKD Note, the Nussdorf Sibling Notes and the Nussdorf Convertible Note and any other Indebtedness of the Loan

Parties which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent.

"Subordinated Indebtedness Payment Conditions" means, at the time of determination with respect to any proposed payment in respect of Subordinated Indebtedness, that

(a) no Default or Event of Default then exists or would arise as a result of the making such payment,

(b) on the date of such payment, using the Availability as of the date of the most recent calculation of the Borrowing Base immediately prior to any such payment with respect thereto, Availability shall be not less than the greater of (i) 17.5% of the Borrowing Base after giving pro forma effect to such payment as if such payment had been made or (ii) $17,500,000,

(c) after giving effect to such payment, but prior to any such proposed transaction or payment with respect thereto being made, Agent shall have received from Lead Borrower projections reasonably satisfactory to the Agent demonstrating that projected average Availability for each Fiscal Month at all times during the three (3) month period immediately succeeding any such payment shall be not less than the greater of (i) 17.5% of the Borrowing Base after giving pro forma effect to such transaction or payment as if such transaction or payment had been made or (ii) $17,500,000, and

(d) the Consolidated Fixed Charge Coverage Ratio of the Lead Borrower and its Subsidiaries, calculated on a pro forma basis, shall be equal to or greater than 1.10:1.00 for each of the twelve (12) months immediately preceding the date of such payment for which the Agent has received financial statements after giving pro forma effect to such transaction or payment as if such transaction had been entered into or such payment had been made as of the first day of such twelve (12) month period;

provided, that, notwithstanding the satisfaction of the foregoing conditions, no prepayments of Subordinated Indebtedness shall be permitted prior to the first anniversary of the Closing Date.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Supermajority Lenders" means, as of any date of determination, at least two (2) Lenders holding in the aggregate more than sixty-six and two-thirds (66 2/3%) of the Aggregate Commitments or, if the commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, at least two (2) Lenders holding in the aggregate more than sixty-six and two-thirds (66 2/3%) of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition); provided, that, the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Lenders.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward

foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Swing Line" means the revolving credit facility made available by the Swing Line Lender pursuant to <u>Section 2.04</u>.

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to <u>Section 2.04</u>.

"Swing Line Lender" means Wells Fargo, in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"Swing Line Loan" has the meaning specified in <u>Section 2.04(a)</u>.

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to <u>Section 2.04(b)</u>, which, if in writing, shall be substantially in the form of <u>Exhibit B</u>.

"Swing Line Note" means the promissory note of the Borrowers substantially in the form of <u>Exhibit C-2</u>, payable to the Swing Line Lender, evidencing the Swing Line Loans made by the Swing Line Lender.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $[_____][2] and (b) the Aggregate Commitments.  The Swing Line Sublimit is part of, and not in addition to, the Aggregate Commitments.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such

---

[2] TBD

Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VII, or (c) the termination of the Commitments in accordance with the provisions of Section 2.06(a) hereof.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"Trading With the Enemy Act" has the meaning set forth in Section 10.18.

"Type" means, with respect to a Committed Loan, its character as a Base Rate Loan or a LIBO Rate Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"UFCA" has the meaning specified in Section 10.21(d).

"UFTA" has the meaning specified in Section 10.21(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Wells Fargo" means Wells Fargo Bank, National Association and its successors and assigns.

**1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations (or words of similar import) shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Cash Collateralization (or receipt of backstop letters of credit reasonably satisfactory to the L/C Issuer and the Agent)) or other collateral as may be reasonably satisfactory to the Agent of all of the Obligations other than (i) unasserted contingent indemnification Obligations, and (ii) any Other Liabilities that, at such time, are allowed by the applicable Bank Product Provider, provider of Cash Management Services or provider of arrangements with respect to Factored Receivables to remain outstanding without being required to be repaid.

(e)    All references to the term "good faith" used herein when applicable to the Agent or any Lender shall mean, notwithstanding anything to the contrary contained herein or in the UCC, honesty in fact in the conduct or transaction concerned.  Borrowers and Guarantors shall have the burden

of proving any lack of good faith on the part of the Agent or any Lender alleged by any Borrower or Guarantor at any time.

### 1.03    Accounting Terms

(a)    _Generally_.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except (i) as requested pursuant to GAAP or (ii) as otherwise specifically prescribed herein (including in the definition of "Capital Lease Obligations").

(b)    _Changes in GAAP_.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

### 1.04    Rounding.  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

### 1.05    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

### 1.06    Letter of Credit Amounts.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

### 1.07    Currency Equivalents Generally.  Any amount specified in this Agreement (other than in Articles II, IX, and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars.  For purposes of this Section 1.07, the "Spot Rate" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two (2) Business Days prior to the date of such determination; provided, that, the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

2.01    **Committed Loans; Reserves**.  (a) Subject to the terms and conditions set forth herein, each Lender severally agrees to make loans (each such loan, a "Committed Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Commitment, or (y) such Lender's Applicable Percentage of the Borrowing Base; subject in each case to the following limitations:

(i)    after giving effect to any Committed Borrowing, the Total Outstandings shall not exceed the Loan Cap,

(ii)    after giving effect to any Committed Borrowing, the aggregate Outstanding Amount of the Committed Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Commitment,

(iii)    The Outstanding Amount of all L/C Obligations shall not at any time exceed the Letter of Credit Sublimit

Within the limits of each Lender's Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.01, prepay under Section 2.05, and reborrow under this Section 2.01.  Committed Loans may be Base Rate Loans or LIBO Rate Loans, as further provided herein.

(b)    The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(c) hereof.

(c)    The Agent shall have the right, at any time and from time to time after the Closing Date in its reasonable discretion to establish, modify or eliminate Reserves upon notice to the Lead Borrower.

2.02    **Borrowings, Conversions and Continuations of Committed Loans.**

(a)    Committed Loans (other than Swing Line Loans) shall be either Base Rate Loans or LIBO Rate Loans as the Lead Borrower may request subject to and in accordance with this Section 2.02.  All Swing Line Loans shall be only Base Rate Loans.  Subject to the other provisions of this Section 2.02, Committed Borrowings of more than one Type may be incurred at the same time.

(b)    Each request for a Committed Borrowing consisting of a Base Rate Loan shall be made by electronic request of the Lead Borrower through the Agent's Commercial Electronic Office Portal or through such other electronic portal provided by the Agent (the "Portal").  The Borrowers hereby acknowledge and agree that any request made through the Portal shall be deemed made by a Responsible Officer of the Borrowers.  Each request for a Committed Borrowing consisting of a LIBO Rate Loan shall be made pursuant to the Lead Borrower's submission of a LIBO Rate Loan Notice, which must be received by the Agent not later than 11:00 a.m. three (3) Business Days prior to the requested date of any Borrowing or continuation of LIBO Rate Loans.  Each LIBO Rate Loan Notice shall specify (i) the requested date of the Borrowing or continuation, as the case may be (which shall be a Business Day), (ii) the principal amount of LIBO Rate Loans to be borrowed or continued (which shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof), and (iii) the duration of the Interest Period with respect thereto.  If the Lead Borrower fails to specify an Interest

Period, it will be deemed to have specified an Interest Period of one month. On the requested date of any LIBO Rate Loan, (i) in the event that Base Rate Loans are outstanding in an amount equal to or greater than the requested LIBO Rate Loan, all or a portion of such Base Rate Loans shall be automatically converted to a LIBO Rate Loan in the amount requested by the Lead Borrower, and (ii) if Base Rate Loans are not outstanding in an amount at least equal to the requested LIBO Rate Loan, the Lead Borrower shall make an electronic request via the Portal for additional Base Rate Loans in an such amount, when taken with the outstanding Base Rate Loans (which shall be converted automatically at such time), as is necessary to satisfy the requested LIBO Rate Loan. If the Lead Borrower fails to make such additional request via the Portal as required pursuant to clause (ii) of the foregoing sentence, then the Borrowers shall be responsible for all amounts due pursuant to Section 3.05 hereof arising on account of such failure. If the Lead Borrower fails to give a timely notice with respect to any continuation of a LIBO Rate Loan, then the applicable Committed Loans shall be converted to Base Rate Loans, effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans.

(c)    The Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Committed Loans, and if no timely notice of a conversion or continuation is provided by the Lead Borrower, the Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(b). In the case of a Committed Borrowing, each Lender shall make the amount of its Committed Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Agent either by (i) crediting the account of the Lead Borrower on the books of Wells Fargo with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Lead Borrower.

(d)    The Agent, without the request of the Lead Borrower, may advance any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under Section 2.05(c). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(d) shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans.

(e)    Except as otherwise provided herein, a LIBO Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan. During the existence of a Default, no Loans may be requested as, converted to or continued as LIBO Rate Loans without the Consent of the Required Lenders.

(f)    The Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Agent shall notify the Lead Borrower and the Lenders of any change in Wells Fargo's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(g)    After giving effect to all Committed Borrowings, all conversions of Committed Loans from one Type to the other, and all continuations of Committed Loans as the same Type, there shall not be more than eight (8) Interest Periods in effect with respect to LIBO Rate Loans.

(h)    The Agent, the Lenders, the Swing Line Lender and the L/C Issuer shall have no obligation to make any Loan or to provide any Letter of Credit if an Overadvance would result.  The Agent may, in its discretion, make Permitted Overadvances without the consent of the Borrowers, the Lenders, the Swing Line Lender and the L/C Issuer and the Borrowers and each Lender and L/C Issuer shall be bound thereby.  Any Permitted Overadvance may constitute a Swing Line Loan.  A Permitted Overadvance is for the account of the Borrowers and shall constitute a Base Rate Loan and an Obligation and shall be repaid by the Borrowers in accordance with the provisions of Section 2.05(c).  The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding.  The making by the Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations to purchase participations with respect to Letter of Credits or of Section 2.04 regarding the Lenders' obligations to purchase participations with respect to Swing Line Loans.  The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03    Letters of Credit.**

(a)    Subject to the terms and conditions of this Agreement, upon the request of the Lead Borrower made in accordance herewith, and prior to the Maturity Date, the L/C Issuer agrees to issue a requested Letter of Credit for the account of the Loan Parties.  By submitting a request to the L/C Issuer for the issuance of a Letter of Credit, the Borrowers shall be deemed to have requested that the L/C Issuer issue the requested Letter of Credit.  Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be irrevocable and shall be made in writing pursuant to a Letter of Credit Application by a Responsible Officer and delivered to the L/C Issuer and the Agent via telefacsimile or other electronic method of transmission reasonably acceptable to the L/C Issuer not later than 11:00 a.m. at least two Business Days (or such other date and time as the Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the requested date of issuance, amendment, renewal, or extension.  Each such request shall be in form and substance reasonably satisfactory to the L/C Issuer and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as the Agent or the L/C Issuer may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that the L/C Issuer generally requests for Letters of Credit in similar circumstances.  The Agent's records of the content of any such request will be conclusive.

(b)    The L/C Issuer shall have no obligation to issue a Letter of Credit if, after giving effect to the requested issuance, (i) the Total Outstandings would exceed Loan Cap, (ii) the aggregate Outstanding Amount of the Committed Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans would exceed such Lender's Commitment, or (iii) the Outstanding Amount of the L/C Obligations would exceed the Letter of Credit Sublimit;

(c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the L/C Issuer shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's participation with respect to such Letter of Credit may not be reallocated pursuant to Section 9.16(b), or (ii) the L/C Issuer has not otherwise entered into arrangements

reasonably satisfactory to it and the Borrowers to eliminate the L/C Issuer's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include the Borrowers cash collateralizing such Defaulting Lender's participation with respect to such Letter of Credit in accordance with <u>Section 9.16(b)</u>.  Additionally, the L/C Issuer shall have no obligation to issue and/or extend a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of Law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit or request that the L/C Issuer refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally, or (C) if the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Letter of Credit (or such later date as to which the Agent may agree) or all the Lenders have approved such expiry date.

(d)    Any L/C Issuer (other than Wells Fargo or any of its Affiliates) shall notify the Agent in writing no later than the Business Day immediately following the Business Day on which such L/C Issuer issued any Letter of Credit; <u>provided</u> that (i) until the Agent advises any such L/C Issuer that the provisions of <u>Section 4.02</u> are not satisfied, or (ii) unless the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as shall be agreed by the Agent and such L/C Issuer, such L/C Issuer shall be required to so notify the Agent in writing only once each week of the Letters of Credit issued by such L/C Issuer during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as the Agent and such L/C Issuer may agree.  The Borrowers and the Credit Parties hereby acknowledge and agree that all Existing Letters of Credit shall constitute Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Existing Letters of Credit were issued by L/C Issuer at the request of the Borrowers on the Closing Date.  Each Letter of Credit shall be in form and substance reasonably acceptable to the L/C Issuer, including the requirement that the amounts payable thereunder must be payable in Dollars; <u>provided</u> that if the L/C Issuer, in its discretion, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate.  If the L/C Issuer makes a payment under a Letter of Credit, the Borrowers shall pay to Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Committed Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in <u>Section 4.02</u> hereof) and, initially, shall bear interest at the rate then applicable to Committed Loans that are Base Rate Loans.  If a Letter of Credit Disbursement is deemed to be a Committed Loan hereunder, the Borrowers' obligation to pay the amount of such Letter of Credit Disbursement to the L/C Issuer shall be automatically converted into an obligation to pay the resulting Committed Loan.  Promptly following receipt by the Agent of any payment from the Borrowers pursuant to this paragraph, the Agent shall distribute such payment to the L/C Issuer or, to the extent that the Lenders have made payments pursuant to <u>Section 2.03(e)</u> to reimburse the L/C Issuer, then to such Lenders and the L/C Issuer as their interests may appear.

(e)    Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to <u>Section 2.03(d)</u>, each Lender agrees to fund its Applicable Percentage of any Committed Loan deemed made pursuant to <u>Section 2.03(d)</u> on the same terms and conditions as if the Borrowers had requested the amount thereof as a Committed Loan and the Agent shall promptly pay to the L/C Issuer the amounts so received by it from the Lenders.  By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of the L/C Issuer or the Lenders, the L/C Issuer shall be deemed to have granted to each Lender, and each Lender shall be deemed

to have purchased, a participation in each Letter of Credit issued by the L/C Issuer, in an amount equal to its Applicable Percentage of such Letter of Credit, and each such Lender agrees to pay to the Agent, for the account of the L/C Issuer, such Lender's Applicable Percentage of any Letter of Credit Disbursement made by the L/C Issuer under the applicable Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Agent, for the account of the L/C Issuer, such Lender's Applicable Percentage of each Letter of Credit Disbursement made by the L/C Issuer and not reimbursed by Borrowers on the date due as provided in Section 2.03(d), or of any reimbursement payment that is required to be refunded (or that the Agent or the L/C Issuer elects, based upon the advice of counsel, to refund) to the Borrowers for any reason.  Each Lender acknowledges and agrees that its obligation to deliver to the Agent, for the account of the L/C Issuer, an amount equal to its respective Applicable Percentage of each Letter of Credit Disbursement pursuant to this Section 2.03(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of a Default or Event of Default or the failure to satisfy any condition set forth in Section 4.02 hereof.  If any such Lender fails to make available to the Agent the amount of such Lender's Applicable Percentage of a Letter of Credit Disbursement as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and the Agent (for the account of the L/C Issuer) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)   Each Borrower agrees to indemnify, defend and hold harmless each Credit Party (including the L/C Issuer and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including the L/C Issuer, a "Letter of Credit Related Person") (to the fullest extent permitted by Law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by Section 3.01) (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of:

(i)    any Letter of Credit or any pre-advice of its issuance;

(ii)   any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)  any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)  any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)   any unauthorized instruction or request made to the L/C Issuer in connection with any Letter of Credit or requested Letter of Credit or error in computer or electronic transmission;

(vi)  an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

(vii)  any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

(viii) the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

(ix)   the L/C Issuer's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation; or

(x)    the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity.  The Borrowers hereby agree to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.03(f).  If and to the extent that the obligations of the Borrowers under this Section 2.03(f) are unenforceable for any reason, the Borrowers agree to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable Law.  This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)   The liability of the L/C Issuer (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by the Borrowers that are caused directly by the L/C Issuer's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit.  The L/C Issuer shall be deemed to have acted with due diligence and reasonable care if the L/C Issuer's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement.  The Borrowers' aggregate remedies against the L/C Issuer and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by the Borrowers to the L/C Issuer in respect of the honored presentation in connection with such Letter of Credit under Section 2.03(d), plus interest at the rate then applicable to Base Rate Loans hereunder.  The Borrowers shall take action to avoid and mitigate the amount of any damages claimed against the L/C Issuer or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit.  Any claim by the Borrowers under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by the Borrowers as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had the Borrowers taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing the L/C Issuer to effect a cure.

(h)   The Borrowers shall be responsible for preparing or approving the final text of the Letter of Credit as issued by the L/C Issuer, irrespective of any assistance the L/C Issuer may provide such as

drafting or recommending text or by the L/C Issuer's use or refusal to use text submitted by the Borrowers. The Borrowers are solely responsible for the suitability of the Letter of Credit for the Borrowers' purposes. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, the L/C Issuer, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if the Borrowers do not at any time want such Letter of Credit to be renewed, the Borrowers will so notify the Agent and the L/C Issuer at least 15 calendar days before the L/C Issuer is required to notify the beneficiary of such Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Letter of Credit.

(i)    The Borrowers' reimbursement and payment obligations under this Section 2.03 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)    any lack of validity, enforceability or legal effect of any Letter of Credit or this Agreement or any term or provision therein or herein;

(ii)    payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)    the L/C Issuer or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)    the L/C Issuer or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)    the existence of any claim, set-off, defense or other right that the Lead Borrower, or any Loan Party or any of its Subsidiaries may have at any time against any beneficiary, any assignee of proceeds, the L/C Issuer or any other Person;

(vi)    any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this Section 2.03(i), constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against the L/C Issuer, the beneficiary or any other Person; or

(vii)    the fact that any Default or Event of Default shall have occurred and be continuing;

provided, however, that subject to Section 2.03(g) above, the foregoing shall not release the L/C Issuer from such liability to the Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against the L/C Issuer following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of the Borrowers to the L/C Issuer arising under, or in connection with, this Section 2.03 or any Letter of Credit.

(j)    Without limiting any other provision of this Agreement, the L/C Issuer and each other Letter of Credit Related Person (if applicable) shall not be responsible to the Borrowers for, and the L/C

Issuer's rights and remedies against the Borrowers and the obligation of the Borrowers to reimburse the L/C Issuer for each drawing under each Letter of Credit shall not be impaired by:

(i)     honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)     honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)     acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)     the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than the L/C Issuer's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)     acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that the L/C Issuer in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)     any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to the Borrowers;

(vii)     any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)     payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)     acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where the L/C Issuer has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)     honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by the L/C Issuer if subsequently the L/C Issuer or any court or other finder of fact determines such presentation should have been honored;

(xii)  dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)  honor of a presentation that is subsequently determined by the L/C Issuer to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)  Upon the request of the Agent, (i) if the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Obligation that remains outstanding, or (ii) if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations.  Sections 2.05 and 8.02(c) set forth certain additional requirements to deliver Cash Collateral hereunder.  For purposes of Sections 2.03, 2.05 and 8.02(c), "Cash Collateralize" means to pledge and deposit with or deliver to the Agent, for the benefit of the L/C Issuer and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 105% of the Outstanding Amount of all L/C Obligations (other than L/C Obligations with respect to Letters of Credit denominated in a currency other than Dollars, which L/C Obligations shall be Cash Collateralized in an amount equal to 115% of the Outstanding Amount of such L/C Obligations), pursuant to documentation in form and substance reasonably satisfactory to the Agent and the L/C Issuer (which documents are hereby Consented to by the Lenders).  The Borrowers hereby grant to the Agent a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Cash Collateral shall be maintained in blocked, non-interest bearing deposit accounts at Wells Fargo.  If at any time the Agent reasonably determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrowers will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Agent reasonably determines to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the L/C Issuer and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(l)  The Borrowers shall pay to the Agent for the account of each Lender in accordance with its Applicable Percentage a Letter of Credit fee (the "Letter of Credit Fee") for each Letter of Credit equal to the Applicable Margin times the daily Stated Amount under each such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit).  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06.  Letter of Credit Fees shall be (i) due and payable on the first day after the end of each month commencing with the first such date to occur after the issuance of such Letter of Credit, and after the Letter of Credit Expiration Date, on demand, and (ii) computed on a monthly basis in arrears.  Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate as provided in Section 2.08(b) hereof.

(m)  In addition to the Letter of Credit Fees as set forth in Section 2.03(l) above, the Borrowers shall pay immediately upon demand to the Agent for the account of the L/C Issuer as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of Section 2.02(d) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.03(m)):  (i) a fronting fee which shall be imposed by the L/C Issuer upon the issuance of each Letter of Credit of .125% per annum of the face amount thereof, plus (ii) any and all other customary commissions, fees and

charges then in effect imposed by, and any and all expenses incurred by, the L/C Issuer, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations).

(n)    Unless otherwise expressly agreed by the L/C Issuer and the Borrowers when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit.

(o)    The L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in Article IX included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(p)    In the event of a direct conflict between the provisions of this Section 2.03 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.03 shall control and govern.

**2.04    Swing Line Loans.**

(a)    The Swing Line.  Subject to the terms and conditions set forth herein, the Swing Line Lender may, in reliance upon the agreements of the other Lenders set forth in this Section 2.04, make loans (each such loan, a "Swing Line Loan") to the Borrowers from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Applicable Percentage of the Outstanding Amount of Committed Loans and L/C Obligations of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Commitment; provided, however, that after giving effect to any Swing Line Loan, (i) the Total Outstandings shall not exceed Loan Cap, and (ii) the aggregate Outstanding Amount of the Committed Loans of any Lender at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans at such time shall not exceed such Lender's Commitment, and provided, further, that the Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan, and provided, further, that the Swing Line Lender shall not be obligated to make any Swing Line Loan at any time when any Lender is at such time a Defaulting Lender hereunder, unless the Swing Line Lender has entered into satisfactory arrangements with the Borrowers or such Lender to eliminate the Swing Line Lender's risk with respect to such Lender.  Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04.  Each Swing Line Loan shall bear interest only at the rate applicable to Base Rate Loans.  Immediately upon the making of a Swing Line Loan, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Applicable Percentage times the amount of such Swing Line Loan.  The Swing Line Lender shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by the Swing Line Lender in connection with Swing Line Loans made by it or

proposed to be made by it as if the term "Agent" as used in Article IX included the Swing Line Lender with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Swing Line Lender.

(b)     Borrowing Procedures.  Each Swing Line Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Swing Line Lender and the Agent, which may be given by telephone.  Each such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which shall be a Business Day.  Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Agent of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower.  Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Agent (by telephone or in writing) that the Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Agent (by telephone or in writing) of the contents thereof.  Unless the Swing Line Lender has received notice (by telephone or in writing) from the Agent at the request of the Required Lenders prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender may, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrowers at its office by crediting the account of the Lead Borrower on the books of the Swing Line Lender in immediately available funds.

(c)     Refinancing of Swing Line Loans.

(i)     The Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of the Borrowers (which hereby irrevocably authorize the Swing Line Lender to so request on their behalf), that each Lender make a Base Rate Loan in an amount equal to such Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding.  Such request shall be made in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Loan Cap and the conditions set forth in Section 4.02.  Each Lender shall make an amount equal to its Applicable Percentage of the amount of such outstanding Swing Line Loan available to the Agent in immediately available funds for the account of the Swing Line Lender at the Agent's Office not later than 1:00 p.m. on the day specified by the Swing Line Lender, whereupon, subject to Section 2.04(c), each Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount.  The Agent shall remit the funds so received to the Swing Line Lender.

(ii)     If for any reason any Swing Line Loan cannot be refinanced by such a Committed Borrowing in accordance with Section 2.04(c)(i), the request for Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Lenders fund its risk participation in the relevant Swing Line Loan and each Lender's payment to the Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

(iii)     If any Lender fails to make available to the Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately

available to the Swing Line Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Committed Loan included in the relevant Committed Borrowing or funded participation in the relevant Swing Line Loan, as the case may be. A certificate of the Swing Line Lender submitted to any Lender (through the Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Lender's obligation to make Committed Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Lender's obligation to make Committed Loans pursuant to this Section 2.04(c) is subject to the conditions set forth in Section 4.02. No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrowers to repay Swing Line Loans, together with interest as provided herein.

(d)    Repayment of Participations.

(i)    At any time after any Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Lender its Applicable Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(ii)    If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Lender shall pay to the Swing Line Lender its Applicable Percentage thereof on demand of the Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate. The Agent will make such demand upon the request of the Swing Line Lender. The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    Interest for Account of Swing Line Lender. The Swing Line Lender shall be responsible for invoicing the Borrowers for interest on the Swing Line Loans. Until each Lender funds its Base Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.

(f)    Payments Directly to Swing Line Lender. The Borrowers shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

**2.05    Prepayments.**

(a)    The Borrowers may, upon irrevocable notice (except in connection with a termination of the Aggregate Commitment pursuant to last proviso set forth in Section 2.06(a)) from the

Lead Borrower to the Agent, at any time or from time to time voluntarily prepay Committed Loans in whole or in part without premium or penalty; <u>provided</u>, that, (i) such notice must be received by the Agent not later than 11:00 a.m. (A) three (3) Business Days prior to any date of prepayment of LIBO Rate Loans and (B) on the date of prepayment of Base Rate Loans; (ii) any prepayment of LIBO Rate Loans shall be in a principal amount of $2,000,000 or a whole multiple of $1,000,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBO Rate Loans, the Interest Period(s) of such Loans.  The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a LIBO Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to <u>Section 3.05</u>.  Each such prepayment shall be applied to the Committed Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)        The Borrowers may, upon irrevocable notice (except in connection with a termination of the Aggregate Commitment pursuant to the last proviso of <u>Section 2.06(a)</u>) from the Lead Borrower to the Swing Line Lender (with a copy to the Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; <u>provided</u>, that, (i) such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the date of the prepayment, and (ii) any such prepayment shall be in a minimum principal amount of $100,000. Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(c)        If for any reason the Total Outstandings at any time exceed the Loan Cap as then in effect, the Borrowers shall immediately prepay Loans, Swing Line Loans and/or Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess; <u>provided</u>, <u>however</u>, that the Borrowers shall not be required to Cash Collateralize the L/C Obligations pursuant to this <u>Section 2.05(c)</u> unless after the prepayment in full of the Loans the Total Outstandings exceed the Loan Cap as then in effect.

(d)        The Borrower shall prepay the Loans and Cash Collateralize the L/C Obligations in accordance with the provisions of <u>Section 6.13</u> hereof.

(e)        The Borrowers shall prepay the Loans and Cash Collateralize the L/C Obligations in an amount equal to the Net Cash Proceeds received by a Loan Party on account of a Prepayment Event, <u>provided</u>, that, subject to the terms of this Agreement, amount prepaid may be reborrowed.

(f)        Prepayments made pursuant to <u>Section 2.05(c)</u>, <u>(d)</u> and <u>(e)</u> above, <u>first</u>, shall be applied to the Swing Line Loans, <u>second</u>, shall be applied ratably to the outstanding Committed Loans, <u>third</u>, shall be used to Cash Collateralize the remaining L/C Obligations; and, <u>fourth</u>, the amount remaining, if any, after the prepayment in full of all Swing Line Loans and Committed Loans outstanding at such time and the Cash Collateralization of the remaining L/C Obligations in full may be retained by the Borrowers for use in the ordinary course of its business.  Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the L/C Issuer or the Lenders, as applicable.

**2.06    Termination or Reduction of Commitments**.  (a) The Borrowers may, upon irrevocable notice (except as set forth in the last provision of this Section (a)) from the Lead Borrower to the Agent, terminate the Aggregate Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit or from time to time permanently reduce the Aggregate Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit; provided, that, (i) any such notice shall be received by the Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof, (iii) the Borrowers shall not terminate or reduce (A) the Aggregate Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Aggregate Commitments, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, and (C) the Swing Line Sublimit if, after giving effect thereto, and to any concurrent payments hereunder, the Outstanding Amount of Swing Line Loans hereunder would exceed the Swing Line Sublimit; provided, further, that any such notice delivered by the Lead Borrower may state that such notice is conditioned on the funding or consummation of any transaction or transactions specified therein (including, without limitation, any sale or disposition of Collateral or the closing of any other financing transaction).

(b)    If, after giving effect to any reduction of the Aggregate Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the amount of the Aggregate Commitments, such Letter of Credit Sublimit or Swing Line Sublimit shall be automatically reduced by the amount of such excess.

(c)    The Agent will promptly notify the Lenders of any termination or reduction of the Letter of Credit Sublimit, Swing Line Sublimit or the Aggregate Commitments under this Section 2.06.  Upon any reduction of the Aggregate Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All fees (including, without limitation, the commitment fee payable pursuant to Section 2.09(a) hereof and Letter of Credit Fees) and interest in respect of the Aggregate Commitments accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

**2.07    Repayment of Loans.**

(a)    The Borrower shall repay to the Lenders on the Termination Date the aggregate principal amount of Committed Loans outstanding on such date.

(b)    To the extent not previously paid, the Borrower shall repay the outstanding balance of the Swing Line Loans on the Termination Date.

**2.08    Interest.**

(a)    Subject to the provisions of Section 2.08(b) below, (i) each LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period plus the Applicable Margin; (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin; and (iii) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)    (i)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the

Default Rate to the fullest extent permitted by applicable Laws for so long as such Event of Default is continuing.

(ii)      If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws for so long as such Event of Default is continuing.

(iii)      Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)      Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09      Fees**.  In addition to certain fees described in subsections (l) and (m) of <u>Section 2.03</u>:

(a)      <u>Commitment Fee</u>.  The Borrowers shall pay to the Agent, for the account of each Lender in accordance with its Applicable Percentage, a commitment fee calculated on a per annum basis equal to the Applicable Commitment Fee Percentage times the actual daily amount by which the Aggregate Commitments exceed the Total Outstandings (exclusive of Swing Line Loans) during the immediately preceding month.  The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in <u>Article IV</u> is not met, and shall be due and payable monthly in arrears on the first day after the end of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period.  The commitment fee shall be calculated monthly in arrears.

(b)      <u>Other Fees</u>.  The Borrower shall pay to the Arranger and the Agent for their own respective accounts fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10      Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a 360-day year (except for Base Rate Loans which shall, so long as it is calculated based on the prime rate, be on the basis of a 365 day year (or 366 days in a leap year) and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, <u>provided</u>, that, any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.12(a)</u>, bear interest for one day, and <u>further provided</u>, that, for purposes of calculating interest, all principal payments made by or on account of the Borrowers shall be deemed to have been applied to the Loans one (1) Business Day(s) after receipt.  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11      Evidence of Debt.**

(a)      The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "<u>Loan Account</u>") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations

due to such Lender.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)     In addition to the accounts and records referred to in Section 2.11(a), each Lender and the Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans.  In the event of any conflict between the accounts and records maintained by the Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

**2.12    Payments Generally; Agent's Clawback.**

(a)     General.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  Subject to Section 2.14 hereof, the Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Agent after 2:00 p.m., at the option of the Agent, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)     (i)     Funding by Lenders; Presumption by Agent.  Unless the Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of LIBO Rate Loans (or in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Agent such Lender's share of such Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Committed Borrowing available to the Agent, then the applicable Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative

processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans. If the Borrowers and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Committed Borrowing to the Agent, then the amount so paid shall constitute such Lender's Committed Loan included in such Committed Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Agent.

(ii)     Payments by Borrowers; Presumptions by Agent. Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders or the L/C Issuer hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuer, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender or the L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent. If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several. The obligations of the Lenders hereunder to make Committed Loans, to fund participations in Letters of Credit and Swing Line Loans and to make payments hereunder are several and not joint. The failure of any Lender to make any Committed Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Committed Loan, to purchase its participation or to make its payment hereunder.

(e)     Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13     Sharing of Payments by Lenders**. If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Obligations greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments

as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided, that:

       (i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

       (ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Committed Loans or subparticipations in L/C Obligations or Swing Line Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

### 2.14    Settlement Amongst Lenders.

       (a)     The amount of each Lender's Applicable Percentage of outstanding Loans (including outstanding Swing Line Loans, except that settlements of Swing Line Loans during the months of November and December of each year shall be required to be made by the Swing Line Lender only with respect to those Swing Line Loans in excess of $15,000,000 in the aggregate only (the "Excess Swing Line Loans")) shall be computed weekly (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Loans (including Swing Line Loans other than Excess Swing Line Loans) and repayments of Loans (including Swing Line Loans other than Excess Swing Line Loans) received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

       (b)     The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Loans and Swing Line Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all Committed Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day.  The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

### 2.15    Increase in Commitments.

(a)    <u>Request for Increase</u>.  Provided no Default or Event of Default then exists or would arise therefrom, upon notice to the Agent (which shall promptly notify the Lenders), the Lead Borrower may, from time to time, request an increase in the Aggregate Commitments by an amount (for all such requests) not exceeding $50,000,000; <u>provided</u>, that, (i) any such request for an increase shall be in a minimum amount of $5,000,000, and (ii) the Lead Borrower may make a maximum of three (3) such requests.  At the time of sending such notice, the Lead Borrower (in consultation with the Agent) shall specify the time period within which each Lender is requested to respond (which shall in no event be less than ten (10) Business Days from the date of delivery of such notice to the Lenders).

(b)    <u>Lender Elections to Increase</u>.  Each Lender shall notify the Agent within such time period whether or not it agrees to increase its Commitment and, if so, whether by an amount equal to, greater than, or less than its Applicable Percentage of such requested increase.  Any Lender not responding within such time period shall be deemed to have declined to increase its Commitment.

(c)    <u>Notification by Agent; Additional Lenders</u>.  The Agent shall notify the Lead Borrower and each Lender of the Lenders' responses to each request made hereunder.  To achieve the full amount of a requested increase and subject to the approval of the Agent, the L/C Issuer and the Swing Line Lender (which approvals shall not be unreasonably withheld), to the extent that the existing Lenders decline to increase their Commitments, or decline to increase their Commitments to the amount requested by the Lead Borrower, the Agent, in consultation with the Lead Borrower, will use its reasonable efforts to arrange for other Eligible Assignees to become a Lender hereunder and to issue commitments in an amount equal to the amount of the increase in the Aggregate Commitments requested by the Lead Borrower and not accepted by the existing Lenders (and the Lead Borrower may also invite additional Eligible Assignees to become Lenders), <u>provided</u>, <u>however</u>, that without the consent of the Agent, at no time shall the Commitment of any Additional Commitment Lender be less than $5,000,000.

(d)    <u>Effective Date and Allocations</u>.  If the Aggregate Commitments are increased in accordance with this Section, the Agent, in consultation with the Lead Borrower, shall determine the effective date (the "<u>Increase Effective Date</u>") and the final allocation of such increase.  The Agent shall promptly notify the Lead Borrower and the Lenders of the final allocation of such increase and the Increase Effective Date and on the Increase Effective Date (i) the Aggregate Commitments under, and for all purposes of, this Agreement shall be increased by the aggregate amount of such Commitment Increases, and (ii) <u>Schedule 2.01</u> shall be deemed modified, without further action, to reflect the revised Commitments and Applicable Percentages of the Lenders.  In no event shall the fees, interest rate and other compensation offered or paid in respect of additional Commitments or increase in Commitments have higher rates than the amounts paid and payable to the then existing Lenders in respect of their Commitments and the terms and conditions applicable to the increase in the Aggregate Commitments shall be the same as for the other Obligations.

(e)    <u>Conditions to Effectiveness of Increase</u>.  As a condition precedent to such increase, (i) the Lead Borrower shall deliver to the Agent a certificate of each Loan Party dated as of the Increase Effective Date (in sufficient copies for each Lender) signed by a Responsible Officer of such Loan Party (A) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such increase, and (B) in the case of the Borrowers, certifying that, before and after giving effect to such increase, the representations and warranties of each other Loan Party contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, that are qualified as to materiality or Material Adverse Effect are true and correct on and as of the Increase Effective Date and the representations and warranties that are not so qualified are true and correct in all material respects, in each case with the same effect as though such representations and warranties had been made on and as of the Increase Effective Date, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case

such representations and warranties shall have been true and correct to the extent required hereunder or under the other Loan Documents on and as of such earlier date); provided, that, for purposes of this Section 2.15, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01, (ii) the Borrowers, the Agent, and any Additional Commitment Lender shall have executed and delivered a joinder to the Loan Documents in such form as the Agent shall reasonably require; (iii) the Borrowers shall have paid such fees and other compensation to the Additional Commitment Lenders as the Lead Borrower and such Additional Commitment Lenders shall agree; (iv) the Borrowers shall have paid such arrangement fees to the Agent as the Lead Borrower and the Agent may agree; (v) the Borrowers shall deliver to the Agent and the Lenders an opinion or opinions, in form and substance reasonably satisfactory to the Agent, from counsel to the Borrowers reasonably satisfactory to the Agent and dated such date; (vi) the Borrowers and the Additional Commitment Lender shall have delivered such other instruments, documents and agreements as the Agent may reasonably have requested; and (vii) no Default exists.  The Borrowers shall prepay any Committed Loans outstanding on the Increase Effective Date (and pay any additional amounts required pursuant to Section 3.05) to the extent necessary to keep the outstanding Committed Loans ratable with any revised Applicable Percentages arising from any non-ratable increase in the Commitments under this Section.

(f)     Effects of Increase.  In the event that Borrowers exercise the option to increase the Aggregate Commitments as provided herein, (i) each of the references to "Availability" herein shall be automatically increased so that the ratio of the Availability to the Aggregate Commitments as so increased remains the same as prior to such increase, (ii) the Swing Line Sublimit shall be automatically increased so that the ratio of the Swing Line Sublimit to the Aggregate Commitments as so increased remains the same as prior to such increase, and (iii) Borrowers, may, at their option, request that the Letter of Credit Sublimit be increased so that the ratio of the Letter of Credit Sublimit to the Aggregate Commitments as so increased remains the same as prior to such increase.

(g)     Conflicting Provisions.  This Section shall supersede any provisions in Sections 2.13 or 10.01 to the contrary.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF LEAD BORROWER

### 3.01    Taxes.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided, that, if the Borrowers shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent, Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     Payment of Other Taxes by the Borrowers.  Without limiting the provisions of subsection (a) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Agent, each Lender and the L/C Issuer, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Agent, such Lender or the L/C Issuer, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Lender or the L/C Issuer (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Agent, a Lender or the L/C Issuer, shall be conclusive absent manifest error.

(d)      Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Lead Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)      Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Lead Borrower (with a copy to the Agent), at the time or times prescribed by applicable law or reasonably requested by the Lead Borrower or the Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  Such delivery shall be provided on the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered.  In addition, any Lender, if requested by the Lead Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Agent as will enable the Lead Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(ii)      Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States:

(A)      any Lender that is a U.S. Person shall deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Agent, but only if such Lender is legally entitled to do so), duly completed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Agent, but only if such Lender is legally entitled to do so), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (A) with respect to

payments of interest under any Loan Document, duly completed copies of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (B) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty,

> (2)      duly completed copies of IRS Form W-8ECI,

> (3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (i) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (ii) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (iii) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of IRS Form W-8BEN, or

> (4)      to the extent a Foreign Lender is not the beneficial owner, duly completed copies of IRS Form W-8IMY, accompanied by the appropriate certification documents from each beneficial owner;

(C)      any Foreign Lender shall deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Agent, but only if such Lender is legally entitled to do so), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Lead Borrower or the Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Agent as may be necessary for the Lead Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Lead Borrower and the Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds.  If the Agent, any Lender or the L/C Issuer determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent, such Lender or the L/C Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided, that, the Borrowers, upon the request of the Agent, such Lender or the L/C Issuer, agree to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent, such Lender or the L/C Issuer in the event the Agent, such Lender or the L/C Issuer is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Agent, any Lender or the L/C Issuer to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrowers or any other Person.

**3.02    Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Agent, any obligation of such Lender to make or continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall be suspended until such Lender notifies the Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates**.  If the Agent determines that for any reason in connection with any request for a LIBO Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or (c) the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Lead Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Lead Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Committed Borrowing of Base Rate Loans in the amount specified therein.

**3.04    Increased Costs; Reserves on LIBO Rate Loans.**

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate) or the L/C Issuer;

(ii)     subject any Lender or the L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBO Rate Loan made by it, or change the basis of taxation of payments to such Lender or the L/C Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or the L/C Issuer); or

(iii)     impose on any Lender or the L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer, the Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error.  The Borrowers shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation, provided, that, the Borrowers shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date

that such Lender or the L/C Issuer, as the case may be, notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)      Reserves on LIBO Rate Loans.  The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Lead Borrower shall have received at least ten (10) days' prior notice (with a copy to the Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

**3.05    Compensation for Losses**.  Upon demand of any Lender (with a copy to the Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Lead Borrower; or

(c)      any assignment of a LIBO Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Lead Borrower pursuant to Section 10.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBO Rate Loan made by it at the LIBO Rate for such Loan by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan was in fact so funded.

**3.06    Mitigation Obligations; Replacement of Lenders.**

(a)      Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or

3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, the Borrowers may replace such Lender in accordance with <u>Section 10.13</u>.

**3.07    Survival**.  All of the Borrowers' obligations under this <u>Article III</u> shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

**3.08    Designation of Lead Borrower as Borrowers' Agent.**

(a)    Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead  Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)    Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)    The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension.  Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**4.01    Conditions of Initial Credit Extension**.  The obligation of the L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

(i)    executed counterparts of this Agreement;

(ii)       a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)      such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)      copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)       favorable opinions of counsel to the Loan Parties, addressed to the Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Agent may reasonably request;

(vi)      a certificate signed by a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in Sections 4.02(a) and (b) have been satisfied, (B) that there has been no event or circumstance since the date of the financial statements for the Fiscal Quarter ended July 29, 2017 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, (C) to the Solvency of the Loan Parties as of the Closing Date after giving effect to the transactions contemplated hereby, and (D) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)     a duly completed Compliance Certificate as of the last day of the Fiscal Quarter of the Lead Borrower and its Subsidiaries most recently ended prior to the Closing Date, signed by a Responsible Officer of the Lead Borrower;

(viii)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(ix)      Reserved;

(x)       Reserved;

(xi)      the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(xii)     all other Loan Documents, each duly executed by the applicable Loan Parties;

(xiii)    appraisals (based on net liquidation value) by a third party appraiser acceptable to the Agent of all Inventory of the Borrowers, the results of which are satisfactory to the Agent,

(xiv)    reserved;

(xv)    results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, and releases or subordination agreements satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(xvi)    (A)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent, (B) the Credit Card Notifications, and Blocked Account Agreements required pursuant to Section 6.13 hereof, (C) control agreements with respect to the Loan Parties' securities and investment accounts, and (D) Collateral Access Agreements as required by the Agent;

(xvii)    evidence that the stated maturities of the Subordinated Indebtedness have been extended to a date that is at least three (3) months after the Maturity Date; and

(xviii)    such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require.

(b)    After giving effect to (i) the first funding under the Loans, (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby, and (iii) all Letters of Credit to be issued at, or immediately subsequent to, such establishment, Availability shall be not less than $____ [3].

(c)    The Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week ended most recently ended prior to the Closing Date, and executed by a Responsible Officer of the Lead Borrower.

(d)    [The Agent shall have received and be satisfied with (i) projected monthly balance sheets, income statements, statements of cash flows and Availability of Borrowers and Guarantors for the period through the Fiscal Year ended on or about [January 31, 2019], (ii) projected annual balance sheets, income statements, statements of cash flows and Availability of Borrowers and Guarantors through the Fiscal Year ended on or about January 31, 2021, in each case as to the projections described in clauses (i) and (ii), with the results and assumptions set forth in all of such projections in form and substance satisfactory to the Agent, and an opening pro forma balance sheet for Borrowers and Guarantors in form and substance satisfactory to the Agent, (iii) any updates or modifications to the projected financial statements of Borrowers and Guarantors previously received by the Agent on August 15, 2017, in each case in form and substance satisfactory to Agent, (iv) copies of satisfactory interim

_____

[3] This number shall be:  $30,000,000 if the Closing Date occurs in October, $40,000,000 if the Closing Date occurs in November and $40,000,000 if the Closing Date occurs in December

unaudited financial statements for each monthly period ended since the Audited Financial Statements, and (v) such other information (financial or otherwise) reasonably requested by the Agent.][4]

(e)    There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(f)    There shall not have occurred any default of any Material Contract of any Loan Party (other than a failure to deliver conforming goods, so long as the Account or portion thereof arising in respect of such non-conforming goods shall not be included in Eligible Trade Receivables for purpose of the Borrowing Base).

(g)    The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(h)    All fees and expenses required to be paid to the Agent or the Arranger on or before the Closing Date shall have been paid in full, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(i)    The Borrowers shall have paid all fees , charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided, that, such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent).

(j)    The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act that is requested from the Loan Parties in writing at least five (5) Business Days prior to the Closing Date, in each case, the results of which are satisfactory to the Agent.

(k)    The Chapter 11 Plan, shall be acceptable to Agent, in its Reasonable Judgment and shall have been approved by the Bankruptcy Court.

(l)    The Agent shall have received satisfactory evidence that the Borrowers and the other Loan Parties have satisfied all obligations in accordance with the Chapter 11 Plan that are payable or otherwise due as of the Effective Date, including payment of any transaction costs.

(m)    Reserved;

(n)    Agent shall have received evidence that the Corporate Reorganization shall have been consummated in accordance with the Chapter 11 Plan Documents.

(o)    The Confirmation Order, which, among other things confirms the Chapter 11 Plan and authorizes the Borrowers to take, and approves, such actions necessary to consummate the Chapter 11 Plan, including entering into this Agreement shall be in full force and effect, in form and substance acceptable to Agent in its Reasonable Judgment, shall be a Final Order and shall not (i) be subject to a motion to stay, or (ii) have been vacated, reversed, stayed, amended or modified in any manner that is adverse (as determined in by the Agent) to the rights and interests of each of the Agent and any Lender and their respective affiliates, in their capacities as such, in any respect without written

---

[4] The dates in this section assume an exit before January 1, 2018

consent of the Agent.  The Chapter 11 Plan shall not have been amended or modified in any manner that is materially adverse (as determined by the Agent in its Reasonable Judgment) to the rights and interests of each of the Agent and any Lender and their respective affiliates, in their capacities as such, relative to the version of the Chapter 11 Plan approved by the Confirmation Order, without written consent of the Agent.

(p)    The Effective Date shall have occurred concurrently with the effectiveness of this Agreement, and the settlement of all other debt and claims payable on the Effective Date shall have occurred, and all conditions precedent thereto as set forth therein shall have been satisfied or waived.

(q)    No Material Adverse Effect in the business, operations, financial condition or assets of the Borrowers and the Guarantors (taken as a whole) shall have occurred since the date of the financial statements for the Fiscal Quarter ended July 29, 2017 (it being understood that the commencement and continuance of the Cases, events attendant thereto, and consummation of the Chapter 11 Plan and the transactions contemplated thereby shall not be deemed to be or result in a material adverse change).

(r)    The Agent shall have received a copy of the Confirmation Order as duly entered by the Bankruptcy Court and entered on the docket of the Clerk of the Bankruptcy Court in the Cases, and such order shall include such provisions with respect to the Loan Documents as are reasonably satisfactory to Agent and, providing, among other things, that Loan Parties shall be authorized to (i) enter into this Agreement and the other Loan Documents, (ii) grant the liens and security interests and incur or guaranty the Indebtedness under this Agreement and the other Loan Documents, and (iii) issue, execute and deliver all documents, agreements and instruments necessary or appropriate to implement and effectuate all obligations under this Agreement and the other Loan Documents and to take all other actions necessary to implement and effectuate borrowings under this Agreement and the other Loan Documents.

(s)    The Agent shall have received a report of the amounts of administrative expenses, priority tax claims, general unsecured claims, secured claims, and reclamation claims arising in the Cases which are to be paid in cash on the Closing Date and reasonably projected to be allowed and payable after the Closing Date, which amounts are, in all material respects, set forth in the projections delivered to Agent pursuant to Section 3.01(d) hereof.

(t)    No Default under the Loan Documents shall exist on the Closing Date.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02    Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Request for Credit Extension (other than a LIBO Rate Loan Notice requesting only a continuation of LIBO Rate Loans) and each L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

(a)    The representations and warranties of each other Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, that are qualified as to materiality or Material Adverse Effect shall be

true and correct on and as of the date of such Credit Extension and the representations and warranties that are not so qualified shall be true and correct in all material respects, in each case with the same effect as though such representations and warranties had been made on and as of the date of such Credit Extension, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct to the extent required hereunder or under the other Loan Documents on and as of such earlier date); provided, that, for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)     The Agent and, if applicable, the L/C Issuer or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)     No Overadvance shall result from such Credit Extension.

Each Request for Credit Extension (other than a LIBO Rate Loan Notice requesting only a continuation of LIBO Rate Loans) submitted by the Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Agent to cease making Loans and issuing Letters of Credit, the Lenders will fund their Applicable Percentage of all Loans and participate in all Swing Line Loans and Letters of Credit whenever made or issued, which are requested by the Lead Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, agreed to by the Agent, provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights of the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01     Existence, Qualification and Power**.  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, in each case subject to the entry of the Confirmation Order; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization

number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02** **Authorization; No Contravention**.  Subject to the entry of the Confirmation Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject that would reasonably be expected to result in a Material Adverse Effect; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Loan Documents); or (d) violate any Law in any material respect.

**5.03** **Governmental Authorization; Other Consents**.  Subject to the entry of the Confirmation Order, no approval, consent (including, the consent of equity holders or creditors of any Loan Party), exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or regulatory body or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof) or (b) such as have been obtained or made prior to the date hereof and are in full force and effect.

**5.04** **Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05** **Financial Statements; No Material Adverse Effect.**

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present in all material respects the financial condition of the Lead Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein;

(b)    The unaudited Consolidated and consolidating balance sheet of the Lead Borrower and its Subsidiaries dated July 29, 2017, and the related Consolidated and consolidating statements of income or operations, Shareholders' Equity and cash flows for the Fiscal Quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Lead Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.  Schedule 5.05 sets forth all Material Indebtedness of the Loan Parties and their Consolidated Subsidiaries as of the date of such financial statements except for

those previously disclosed in the audited financial statements and any other Permitted Indebtedness among the Loan Parties and their Subsidiaries.

(c)     Since the date of the financial statements for the Fiscal Quarter ended July 29, 2017, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)     To the best knowledge of the Lead Borrower, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in or could reasonably be expected to result in a misstatement in any material respect, in any financial information delivered or to be delivered to the Agent or the Lenders, of (i) covenant compliance calculations provided hereunder or (ii) the assets, liabilities, financial condition or results of operations of the Lead Borrower and its Subsidiaries on a Consolidated basis.

(e)     The Consolidated and consolidating forecasted balance sheet and statements of income and cash flows of the Lead Borrower and its Subsidiaries delivered pursuant to Section 6.01(d) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Loan Parties' reasonable estimate of its future financial performance.  Such forecasted balance sheets and statements of income and cash flow are not guaranties of future performance, and actual results may differ from such forecasted balance sheets and statements of income and cash flow.

**5.06     Litigation**.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as disclosed in Schedule 5.06, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.07     No Default**.  No Loan Party or any Subsidiary is in default under or with respect to, any Material Contract (other than a failure to deliver conforming goods, so long as the Account or portion thereof arising in respect of such non-conforming goods shall not be included in Eligible Trade Receivables for purpose of the Borrowing Base) or any Material Indebtedness.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08     Ownership of Property; Liens**.

(a)     Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in or rights to use, all Real Estate necessary or used in the ordinary conduct of its business.  Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid rights to use all personal property and assets material to the ordinary conduct of its business, except as could not reasonably be expected to result in a Material Adverse Effect.

(b)     Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien (other than Permitted Encumbrances) thereon as of the Closing Date.  Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to

each such Lease as of the Closing Date.  Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof.

(c)    Schedule 7.01 sets forth a complete and accurate list of all Liens on the property or assets of each Loan Party and each of its Subsidiaries consisting of Liens permitted by clause (g) of the definition of Permitted Encumbrances, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto.  The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d)    Schedule 7.02 sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(e)    Schedule 7.03 sets forth a complete and accurate list of all Indebtedness of each Loan Party or any Subsidiary of a Loan Party on the Closing Date consisting of Indebtedness permitted under clause (a) of the definition of Permitted Indebtedness, showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09    Environmental Compliance**.  (a) Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as otherwise set forth in Schedule 5.09, (i) none of the properties (other than leased properties at which Stores of the Borrowers currently are or formerly were located) currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; (ii) there are no underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property (other than leased properties at which Stores of the Borrowers currently are located) currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property (other than leased properties at which Stores of the Borrowers formerly were located) formerly owned or operated by any Loan Party or Subsidiary thereof; (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and (iv) Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Except as otherwise set forth on Schedule 5.09, (i) no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and (ii) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property (other than leased premises at which Stores are or were formerly located) currently or formerly owned or operated by any

Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to have a Material Adverse Effect.

**5.10** **Insurance**.  Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date and the Agent acknowledges and agrees that such insurance satisfies the requirements of Section 6.07. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11** **Taxes**.  The Loan Parties and their Subsidiaries have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien (other than Permitted Encumbrances) has been filed, and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12** **ERISA Compliance.**

(a)  Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Lead Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.  No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan.

(b)  There are no pending or, to the best knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)  (i)  No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13** **Subsidiaries; Equity Interests.**

(a)    The Loan Parties have no Subsidiaries other than those disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.  All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Loan Documents and Permitted Encumbrances.  Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary.  The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part(b) of Schedule 5.13.  All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

(b)    The Inactive Subsidiaries do not have any material liabilities, are not engaged in any material business or commercial activities, do not own any assets with a book value of more than $100,000 in the aggregate and are not obligated or liable, directly or indirectly, contingently or otherwise, in respect of any material Indebtedness.

**5.14    Margin Regulations; Investment Company Act.**

(a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose, in each case, that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**.  No report, financial statement, certificate or other information furnished (in writing) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16    Compliance with Laws**.  Each of the Loan Parties and each Subsidiary is in compliance (A) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect and (B) with Sections 10.17 and 10.18.

**5.17    Intellectual Property; Licenses, Etc.**  The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, except as could not reasonably be expected to result in a Material Adverse Effect.  To the best knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person, except as could not reasonably be expected to result in a Material Adverse Effect.  Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Loan Parties, individually and collectively, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters**.  There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened.  The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect.  No Loan Party or any of its Subsidiaries has incurred any material liability or obligation under the Worker Adjustment and Retraining Act or similar state Law.  All material payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party.  Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement.  There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition.  There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries.  The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19    Security Documents.**

(a)    The Pledge Agreement creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement) consisting of Pledged Securities and Intercompany Notes (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and the Pledged Securities (as defined in the Security Agreement) have been delivered to the Agent (together with stock powers or other appropriate instruments of transfer executed in blank form).  The Agent has a fully perfected first priority Lien on, and security interest in, to and under all right, title and interest of each pledgor thereunder in such Collateral, and such security interest is in each case prior and superior in right and interest to any other Person.

(b)    The Security Agreement creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable

bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement (or the Agent has been authorized to make such filings).  Upon such filings and/or the obtaining of "control" (as defined in the UCC), the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person.

(c)     When the Intellectual Property Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified in Schedule II of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

**5.20     Solvency**.  After giving effect to the transactions contemplated by this Agreement, and before and after giving effect to each Credit Extension, the Loan Parties, on a Consolidated basis, are Solvent.  No transfer of property has been or will be made by any Loan Party and no obligation has been or will be incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of any Loan Party.

**5.21     Deposit Accounts; Credit Card Arrangements.**

(a)     Annexed hereto as Schedule 5.21(a) is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; and (iii) the identification of each Blocked Account Bank.

(b)     Annexed hereto as Schedule 5.21(b) is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22     Brokers**.  No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan  Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23     Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened in writing, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations.

**5.24    Material Contracts**.  Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the date hereof.  The Loan Parties are not in breach or in default in any material respect of or under any Material Contract (other than a failure to deliver conforming goods, so long as the Account or portion thereof arising in respect of such non-conforming goods shall not be included in Eligible Trade Receivables for purpose of the Borrowing Base) and have not received any notice of the intention of any other party thereto to terminate any Material Contract.

**5.25    Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26    OFAC/Sanctions.**

No Loan Party nor any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with the Anti-corruption Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with the Anti-corruption Laws in all material respects.  No proceeds of any loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any applicable sanction by any Person (including any Credit Party or other individual or entity participating in any transaction).

**5.27    Interrelated Business**.  Other than the Inactive Subsidiaries, Borrowers and Guarantors make up a related organization of various entities constituting a single economic and business enterprise so that Borrowers and Guarantors share an identity of interests such that any benefit received by any one of them benefits the others.  Certain Borrowers and Guarantors render services to or for the benefit of certain other Borrowers and/or Guarantors, as the case may be, purchase or sell and supply goods to or from or for the benefit of certain others, make loans, advances and provide other financial accommodations to or for the benefit of certain other Borrowers and Guarantors, and provide administrative, marketing, payroll and management services to or for the benefit of the certain Borrowers and Guarantors.  Certain Borrowers and Guarantors have the same chief executive office.  Borrowers and Guarantors have certain centralized accounting and legal services, and certain common officers and directors.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), or any Letter of Credit shall remain outstanding, the Loan Parties shall,

and shall (except in the case of the covenants set forth in <u>Sections 6.01</u>, <u>6.02</u>, and <u>6.03</u>) cause each Subsidiary to:

**6.01    Financial Statements**.  Deliver to the Agent:

(a)    as soon as available, but in any event within ninety (90) days after the end of each Fiscal Year of the Lead Borrower (commencing with the Fiscal Year ended on or about February 3, 2018), a Consolidated and consolidating balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated and consolidating statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the consolidated figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and unqualified opinion of a Registered Public Accounting Firm of nationally recognized standing reasonably acceptable to the Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and which shall not include any explanation, supplemental comment or other comment concerning the ability of the applicable person to continue as a going concern or the scope of the audit and such consolidating statements to be certified by a Responsible Officer of the Lead Borrower to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Lead Borrower and its Subsidiaries;

(b)    as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year of the Lead Borrower (commencing with the Fiscal Quarter ended on or about October 28, 2017), a Consolidated and consolidating balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated and consolidating statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter and for the portion of the Lead Borrower's Fiscal Year then ended, setting forth in each case in comparative form the consolidated figures for (i) such period set forth in the projections delivered pursuant to <u>Section 6.01(d)</u> hereof, (ii) the corresponding Fiscal Quarter of the previous Fiscal Year and (iii) the corresponding portion of the previous Fiscal Year, all in reasonable detail, such Consolidated statements to be certified by a Responsible Officer of the Lead Borrower as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and such consolidating statements to be certified by a Responsible Officer of the Lead Borrower to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Lead Borrower and its Subsidiaries;

(c)    as soon as available, but in any event within thirty (30) days after the end of each of the Fiscal Months of each Fiscal Year of the Lead Borrower or, in the case of any Fiscal Month end that is the end of a Fiscal Quarter, forty-five (45) days after the end of such Fiscal Month, or in the case of January of each Fiscal Year, forty-five (45) days after the end of such Fiscal Month, (commencing with the Fiscal Month ended on _____), a consolidated and consolidating balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Month, and the related consolidated and consolidating statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Month, and for the portion of the Lead Borrower's Fiscal Year then ended, setting forth in each case in comparative form the consolidated figures for (i) such period set forth in the projections delivered pursuant to <u>Section 6.01(d)</u> hereof, (ii) the corresponding Fiscal Month of the previous Fiscal Year and (iii) the corresponding portion of the previous Fiscal Year, all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of the Lead Borrower as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of the Lead Borrower  and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject

only to normal year-end audit adjustments and the absence of footnotes and such consolidating statements to be certified by a Responsible Officer of the Lead Borrower to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Lead Borrower  and its Subsidiaries; and

        (d)     as soon as available, but in any event no more than forty-five (45) days after the end of each Fiscal Year of the Lead Borrower , forecasts prepared by management of the Lead Borrower , in form satisfactory to the Agent, of consolidated balance sheets and statements of income or operations and cash flows of the Lead Borrower  and its Subsidiaries on a monthly basis for the immediately following Fiscal Year (including the Fiscal Year in which the Maturity Date occurs), and as soon as available, any significant revisions to such forecast with respect to such Fiscal Year.

        **6.02**    **Certificates; Other Information**.  Deliver to the Agent and each Lender:

        (a)     concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and (b) and (c) (except that no Compliance Certificate shall be required for the fiscal month ending on the Fiscal Year end), commencing with the delivery of the financial statements for the Fiscal Month ended July 29, 2017, a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, to the extent not previously discussed in the Lead Borrower's audited financial statements, the Lead Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP, and (ii) a copy of management's discussion and analysis with respect to such financial statements;

        (b)     (i) on the fourth Business Day of each week, a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding week through the last week of _____[5], each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Lead Borrower and (ii) thereafter, fifteen (15) days after the end of each Fiscal Month (commencing with the Fiscal Month ending _____ (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding Fiscal Month, each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Lead Borrower; provided, that, at any time that an Accelerated Borrowing Base Delivery Event has occurred and is continuing, at the election of the Agent, such Borrowing Base Certificate shall be delivered on the fourth Business Day of each week, as of the close of business on the immediately preceding week;

        (c)     promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

        (d)     promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange

---

[5] The intention is that weekly delivery of Borrowing Base Certificates will continue through the end of the fiscal year during which the exit occurs provided, that if the exit occurs after the December 31, 2017 Agent will determine, a period of time for which weekly delivery of the Borrowing Base Certificate will continue.

Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

(e)       The financial and collateral reports described on <u>Schedule 6.02</u> hereto, at the times set forth in such Schedule;

(f)       promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement relating to Material Indebtedness and not otherwise required to be furnished to the Lenders pursuant to <u>Section 6.01</u> or any other clause of this <u>Section 6.02</u>;

(g)       as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(h)       promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness; and

(i)       promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect; and

(j)       promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to <u>Section 6.01(a)</u>, (b), or (c) or <u>Section 6.02(d)</u> (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on <u>Schedule 10.02</u>; or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); <u>provided</u>, that:  (A) the Lead Borrower shall deliver paper copies of such documents to the Agent or any Lender that requests the Lead Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (B) the Lead Borrower shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Notwithstanding anything contained herein, in every instance the Lead Borrower shall be required to provide paper copies of the Compliance Certificates required by <u>Section 6.02(b)</u> to the Agent.  The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Loan Parties hereby acknowledge that (i) the Agent and/or the Arranger will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (ii) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender").  The Loan Parties hereby agree that so long as any Loan Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Agent, the Arranger, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

      **6.03**  **Notices**.  Notify the Agent, as soon as practicable, and in any event within five (5) Business Days after any Responsible Officer of any Borrower has actual knowledge:

      (a)  of the occurrence of any Default or Event of Default;

      (b)  of (i) any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws; or (iv) the occurrence of any event, whether or not insured or insurable, as a result of which at any time operations are suspended or terminated for five (5) days or more at locations generating more than ten percent (10%) of the consolidated revenues of Borrowers for the immediately preceding fiscal year;

      (c)  of the occurrence of any ERISA Event which could reasonably be expected to result in liability of any Loan Party in excess of $250,000;

      (d)  of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

      (e)  of any change in any Loan Party's senior executive officers;

      (f)  of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

      (g)  of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(h)    of the filing of any Lien against any Loan Party or its assets for unpaid Taxes in excess of $100,000;

(i)    of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(j)    of any failure by any Loan Party to pay rent at (i) ten percent (10%) or more of such Loan Party's locations at any time or (ii) any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due and such failure would be reasonably likely to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04    Payment of Obligations**.  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (iv) no Lien (other than a Permitted Lien) has been filed with respect thereto and (v) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.  Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**6.05    Preservation of Existence, Etc.**  (a) Preserve, renew and maintain in full force and effect its (i) legal existence and (ii) except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to result in a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06    Maintenance of Properties**.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance.**

(a)        Maintain or cause to be maintained (i) the policies of insurance described on Schedule 5.10 as in effect on the date hereof or otherwise in form and amounts and with insurers as are reasonably acceptable to the Agent and (ii) such other insurance as may be required by applicable Law and furnish to the Agent, upon written request, full information as to the insurance carried.

(b)        Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)        Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)        Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, the Agent or any other party shall be a co insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(e)        Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f)        Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence satisfactory to the Agent of payment of the premium therefor.

(g)        Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07.  Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws**.  Comply (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (ii) such contest effectively suspends enforcement of the contested Laws, and (iii) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect, and (b) with Sections 10.17 and 10.18.

**6.09    Books and Records; Accountants.**

(a)    Maintain proper books of record and account, in which full, true and correct in all material respects entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)    At all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Agent and shall instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Agent.

**6.10    Inspection Rights**.

(a)    Permit representatives and independent contractors of the Agent to visit and inspect any of its properties (provided that the Lender shall use commercially reasonable efforts to minimize disruption to the business of the Loan Parties and their Subsidiaries), to examine its books, correspondence and corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and the Loan Parties agree to render to the Agent such clerical and other assistance as may be reasonably requested by the Agent with regard thereto, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower; provided, however, that when an Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, lawyers and appraisers) retained by the Agent to conduct field examinations and other evaluations, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Borrowing Base, (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Loan Parties' business plan and cash flows.  The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such examinations and evaluations.  Without limiting the foregoing, the Loan Parties acknowledge that the Agent shall undertake two (2) field examinations each Fiscal Year at the Loan Parties' expense; provided, that, if Availability is less than the amount equal to the greater of (A) twenty-five percent (25%) of the Loan Cap or (b) $20,000,000 at any time during a Fiscal Year, the Agent shall undertake three (3) field examinations in each such Fiscal Year at the Loan Parties' expense.  Notwithstanding the foregoing, the Agent may cause additional field examinations to be undertaken (1) as it in its discretion deems necessary

or appropriate, at its own expense or, (2) if required by Law or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Inventory and other Collateral, including, without limitation, the assets included in the Borrowing Base. The Loan Parties shall pay the fees and expenses of the Agent and such professionals with respect to such appraisals. Without limiting the foregoing, the Loan Parties acknowledge that the Agent shall undertake two (2) appraisals each Fiscal Year at the Loan Parties' expense; provided, that, if Availability is less than the amount equal to the greater of (i) twenty-five percent (25%) of the Loan Cap or (ii) $25,000,000 at any time during a Fiscal Year, the Agent shall undertake three (3) appraisals in each such Fiscal Year at the Loan Parties' expense. Notwithstanding the foregoing, the Agent may cause additional appraisals to be undertaken (i) as it in its discretion deems necessary or appropriate, at its own expense or, (ii) if required by Law or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

6.11    **Use of Proceeds**. Use the proceeds of the Credit Extensions (a) to finance the acquisition of working capital assets of the Borrowers, including the purchase of inventory and equipment, in each case in the ordinary course of business, (b) to finance Capital Expenditures of the Borrowers, and (c) for general corporate purposes of the Loan Parties, in each case to the extent expressly permitted under applicable Law and the Loan Documents.

6.12    **Additional Loan Parties**. Notify the Agent at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) which is not a CFC or an Inactive Subsidiary to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a counterpart of the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (except that, if such Subsidiary is a CFC, the Equity Interests of such Subsidiary to be pledged may be limited to 65% of the outstanding voting Equity Interests of such Subsidiary and 100% of the non-voting Equity Interests of such Subsidiary and such time period may be extended based on local law or practice), in each case in form, content and scope reasonably satisfactory to the Agent. In no event shall compliance with this Section 6.12 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.12 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

6.13    **Cash Management.**

(a)    On or prior to the Closing Date:

(i)    deliver to the Agent copies of notifications (each, a "Credit Card Notification") substantially in the form attached hereto as Exhibit H which have been executed on behalf of such Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b); and

(ii)     enter into a Blocked Account Agreement satisfactory in form and substance to the Agent with respect to each deposit account (other than Excluded Accounts; the deposit accounts covered by such Control Agreements, collectively, the "Blocked Accounts").

(b)     The Loan Parties shall ACH or wire transfer no less frequently than on each Business Day (and whether or not there are then any outstanding Obligations) to a Blocked Account all amounts on deposit in each such DDA (other than the operating accounts of each Borrower) and all payments due from Credit Card Issuers and Credit Card Processors.

(c)     Each Blocked Account Agreement shall require the ACH or wire transfer no less frequently than each Business Day (and whether or not there are then any outstanding Obligations) to the concentration account maintained by the Agent at Wells Fargo (the "Concentration Account"), of all cash receipts and collections (except in the case of Blocked Account Agreements in respect of operating accounts of Borrower, as to which Agent may agree to other terms and conditions), including, without limitation, the following:

(i)     all available cash receipts from the sale of Inventory and other assets (whether or not constituting Collateral);

(ii)     all proceeds of collections of Accounts;

(iii)     all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition, sale or other transaction or event, including, without limitation, any Prepayment Event;

(iv)     the then contents of each DDA (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

(v)     the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank); and

(vi)     the proceeds of all credit card charges.

(d)     The Concentration Account shall at all times be under the sole dominion and control of the Agent.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Concentration Account shall be applied as provided in this Agreement.  In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(e)     Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

**6.14    Information Regarding the Collateral.**

(a)    Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's type of organization or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.  The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC (or the Agent has been given all information required to make such filings) that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest (subject to Permitted Encumbrances) in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b)    Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Closing Date, the Lead Borrower shall advise the Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same.  From time to time as may be reasonably requested by the Agent, the Lead Borrower shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default resulting from the matters disclosed therein.

**6.15    Physical Inventories.**

(a)    Cause not less than one (1) physical inventory of Inventory (other than Inventory of SOW) located in Stores to be undertaken, at the expense of the Loan Parties, in each twelve (12) month period and periodic cycle counts, in each case consistent with past practices, conducted by such inventory takers as are satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Agent.  The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.  The Lead Borrower, within forty-five (45) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)    Undertake monthly cycle counts of Inventory located in Borrowers' distribution centers and retain copies thereof and adjustment to such Inventory for inspection during any field examinations.

(c)    Permit the Agent, in its discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Loan Parties).

**6.16    Environmental Laws**.  Except, in each, case, where failure to do so could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (a) Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17    Further Assurances.**

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties provided, that, notwithstanding anything to the contrary in any of the Loan Documents, the Loan Parties shall not have any  obligation to taking any actions to preserve, protect or perfect any security interest or lien in any Intellectual Property included in the Collateral in any jurisdiction other than the United States.  The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets required to be Collateral are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the Lien of the Security Documents upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions (or authorize the Agent to take such actions) as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties.  In no event shall compliance with this Section 6.17(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    Upon the request of the Agent, use commercially reasonable efforts to cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

(d)    Upon the request of the Agent, use commercially reasonable efforts to cause any of its landlords (other than with respect to Stores) to deliver a Collateral Access Agreement to the Agent in such form as the Agent may reasonably require.

**6.18    Compliance with Terms of Leaseholds**.  Except as otherwise expressly permitted hereunder, make all payments and otherwise perform all material obligations in respect of all Leases of real property to which any Loan Party or any of its Subsidiaries is a party, keep such Leases in full force and effect and not allow such Leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so; provided, that, the foregoing provisions of this Section 6.18 shall not prohibit closing Stores in the ordinary course of business or terminating, lapsing, nonrenewing or modifying leases with respect to Stores in the ordinary course of business without notice to the Agent.

**6.19    Material Contracts**.  Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it (other than a failure to deliver nonconforming goods, which failure is cured by the applicable Borrower in the ordinary course of business), maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time reasonably requested by the Agent and, upon request of the Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and cause each of its Subsidiaries to do so.

**6.20    Designation as Senior Debt**.  Designate all Obligations as "Designated Senior Indebtedness" (or other similar term of like import) under, and as defined in, the QKD Note, the Nussdorf Sibling Notes and the Nussdorf Convertible Note.

**6.21    Keepwell**.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Facility Guaranty and otherwise honor all Obligations in respect of Swap Obligations; provided, that, each Qualified ECP Guarantor shall only be liable under this Section 6.21 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 6.21, or otherwise under this Agreement or the Facility Guaranty, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 6.21 shall remain in full force and effect until payment in full of the Obligations.  Each Qualified ECP Guarantor intends that this Section 6.21 constitute, and this Section 6.21 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**6.22    Confirmation Order.**  Lead Borrower has delivered to Agent a complete and correct copy of the Chapter 11 Plan and the Confirmation Order (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).  Parent and its Subsidiaries are not in default in the performance of or compliance with any provisions of the Chapter 11 Plan.  The Chapter 11 Plan is in full force and effect as of the date hereof and has not been terminated, rescinded or withdrawn, and substantially concurrently with the effectiveness of this Agreement, the Effective Date has occurred.  The Confirmation Order is a Final Order and is in full force and effect, and has not been stayed, or amended or modified in any material respect without the consent of Agents.  All conditions to confirmation and effectiveness of the Chapter 11 Plan have been satisfied or validly waived pursuant to the Chapter 11 Plan (other than conditions consisting of the effectiveness of this Agreement).  No court of competent jurisdiction has issued any injunction, restraining order or other order which prohibits consummation of any material transactions described in the Confirmation Order and no governmental or other action or proceeding has been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described in the Confirmation Order.

**ARTICLE VII**
**NEGATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction an effective financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments.**.  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock**.  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock; or (c) issue and sell Equity Interests <u>provided</u>, that, (i) with respect to any Equity Interests, all dividends in respect of which are to be paid (and all other payments in respect of which are to be made) shall be in additional shares of such Equity Interests, in lieu of cash, (ii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Loan Party issuing such Equity Interests, and (iii) all payments in respect of such Equity Interests are expressly subordinated to the Obligations, and (iv) no such Equity Interests shall be issued in a Subsidiary of a Loan Party.

**7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)    any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, <u>provided</u>, that, the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, <u>provided</u>, that, when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person;

(b)    any Subsidiary which is a Loan Party may merge into any Subsidiary organized under the laws of a jurisdiction of the United States which is a Loan Party or into any Borrower, <u>provided</u>, that, in any merger involving any Borrower, such Borrower shall be the continuing or surviving Person;

(c)    in connection with a Permitted Acquisition, any Subsidiary of a Loan Party may merge with or into or consolidate with any other Person or permit any other Person to merge with or into or consolidate with it; <u>provided</u>, that, (i) the Person surviving such merger shall be a wholly-owned Subsidiary of a Loan Party and such Person shall become a Loan Party to the extent required in accordance with the provisions of <u>Section 6.12</u> hereof, and (ii) in the case of any such merger to which any Loan Party is a party, such Loan Party is the surviving Person;

(d)    any CFC that is not a Loan Party may merge into any CFC that is not a Loan Party; and

(e)      In no event, without the prior written consent of Agent, shall any Loan Party organized under the laws of a jurisdiction of the United States, change its jurisdiction of organization (including, without limitation, by merging with or into any other entity, reorganizing, dissolving, liquidating, reincorporating or incorporating in any other jurisdiction) to a jurisdiction outside of the United States.

**7.05    Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06    Restricted Payments.**  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)      each Subsidiary of a Loan Party may make Restricted Payments to any other Loan Party and any Subsidiary that is not a Loan Party may make Restricted Payments to any other Subsidiary of Parent that is not a Loan Party;

(b)      the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person;

(c)      if the Payment Conditions are satisfied, the Loan Parties and each Subsidiary may purchase, redeem or otherwise acquire Equity Interests issued by it so long as the amount of Equity Interests purchased, redeemed or retired in any Fiscal Year does not exceed $2,500,000; and

(d)      if the Payments Conditions are satisfied, the Lead Borrower may declare or pay cash dividends to Parent so long as the aggregate amount of dividends paid in any Fiscal Year does not exceed $2,500,000.

Notwithstanding anything to the contrary set forth in this Section 7.06, no Restricted Payments shall be made prior to the first anniversary of the Closing Date.

**7.07    Prepayments of Indebtedness**.  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (other than Obligations under the Loan Documents), or make any payment in violation of any subordination terms of any Subordinated Indebtedness, except (a) regularly scheduled or mandatory prepayments in respect of Permitted Indebtedness (other than Subordinated Indebtedness), as long as no Event of Default then exists, (b) voluntary prepayments, repurchases, redemptions or defeasances in respect of Permitted Indebtedness (other than Subordinated Indebtedness), as long as the Payment Conditions are satisfied and no Event of Default then exists, (c) regularly scheduled payments of interest in respect of Subordinated Indebtedness (in accordance with the terms of the QKD Notes, the Nussdorf Convertible Note and the Nussdorf Sibling Notes as in effect on December 11, 2012), as long as the Subordinated Indebtedness Payment Conditions are satisfied and the QKD Subordination Agreement, the Nussdorf Convertible Note Subordination Agreement and the Nussdorf Sibling Subordination Agreement are in full force and effect, and (d) refinancings and refundings of such Indebtedness in compliance with Section 7.02(e).  Notwithstanding the foregoing, no prepayments of Indebtedness (other than Obligations under the Loan Documents) shall be permitted prior to the first anniversary of the Closing Date.

**7.08    Change in Nature of Business**

(a)    In the case of the Lead Borrower, engage in any business or activity other than (i) the direct or indirect ownership of all outstanding Equity Interests in the other Loan Parties, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the Lead Borrower of the consolidated group of companies, including the Loan Parties, (iv) the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, and (v) activities incidental to the businesses or activities described in clauses (i) through (iv) of this Section 7.08(a).

(b)    In the case of each of the Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the date hereof or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates**.  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than as set forth on Schedule 7.09 or on fair and reasonable terms substantially as favorable, taken as a whole, to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided, that, the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, , (b) a transaction between or among any Subsidiaries of the Lead Borrower that are not Loan Parties, (c) transactions, arrangements, reimbursements and indemnities permitted between or among such parties under this Agreement, (d) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (e) the issuance of Equity Interests in a Loan Party or any Subsidiary thereof to any officer, director, employee or consultant of a Loan Party or any of its Subsidiaries, (f) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Lead Borrower or any of its Subsidiaries or (g) any issuances of securities of the Lead Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Lead Borrower 's board of directors, or (h) non-exclusive, royalty-free licenses of any of the Lead Borrower's or its Subsidiaries' Intellectual Property (including any trademarks, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans, and other source and/or business identifiers) or business systems to Subsidiaries which are not Loan Parties.

**7.10    Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not (i) prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (f) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness, (ii) customary anti-assignment provisions in licenses and other contracts entered into in the ordinary course of business restricting the assignment thereof or in contracts for the Disposition of any assets; provided, that, the restrictions in any such contract shall apply only to the assets that are subject to such contract or to be Disposed of and shall not in any event apply to any assets of the type included in the Borrowing Base, and (iii) provisions in leases of real property that prohibit mortgages or pledges of the lessee's interest under such lease or restricting subletting or assignment of such lease; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds**.  Use the proceeds of the Credit Extensions (a) to finance the acquisition of working capital assets of the Borrowers, including the purchase of inventory and equipment, in each case in the ordinary course of business, (b) to finance Capital Expenditures of the Borrowers, and (c) for general corporate purposes of the Loan Parties, in each case to the extent expressly permitted under applicable Law and the Loan Documents.

**7.12    Amendment of Material Documents**.  Amend, modify or waive any of a Loan Party's rights or obligations under (a) its Organization Documents in a manner materially adverse to the Credit Parties, including electing to treat any Pledged Interests (as defined in the Security Agreement) of such Loan Party as a security under Section 8-103 of the UCC, (b) the QKD Note, the Nussdorf Sibling Notes and the Nussdorf Convertible Note (except as expressly permitted in the QKD Subordination Agreement, the Nussdorf Convertible Note Subordination Agreement and the Nussdorf Sibling Subordination Agreement) or (c) any Material Contract or Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder), in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect.

### 7.13    Fiscal Year.

Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

### 7.14    Deposit Accounts; Credit Card Processors.

Open new DDAs or Blocked Accounts unless the Loan Parties shall have delivered to the Agent, as the case may be, appropriate Blocked Account Agreements consistent with the provisions of <u>Section 6.13</u> and otherwise satisfactory to the Agent.  No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in <u>Section 6.13</u> hereof.

**7.15    Financial Covenants.**  Permit Required Availability at any time to be less than the greater of (a) ten percent (10%) of the Loan Cap or (b) $8,000,000.

### 7.16    Inactive Subsidiaries.

(a)    Except as otherwise provided in <u>Section 7.16(b)</u> below, Borrowers and Guarantors will not permit any Inactive Subsidiary to (i) engage in any business or conduct any operations, (ii) own assets with a book value of more than $100,000 in the aggregate and (iii) incur any obligations or liabilities in respect of any Indebtedness or otherwise in an aggregate amount greater than $100,000.

(b)    In the event that a Borrower or Guarantor intends to have any then Inactive Subsidiary commence any business or operations or own assets with a book value of more than $100,000 in the aggregate or incur any obligations or liabilities in respect of any Indebtedness or otherwise, (i) Borrowers and Guarantors shall give Agent not less than ten (10) Business Days' prior written notice thereof with reasonable detail and specificity and such other information with respect thereto as Agent may request and (ii) at any time thereafter, promptly upon the request of Agent or Agent, Borrowers and Guarantors shall cause such Inactive Subsidiary to execute and deliver to Agent or Agent, as applicable, in form and substance reasonably satisfactory to Agent or Agent, as applicable, a joinder agreement to the Loan Documents in order to, among other things, make such Subsidiary a party to this Agreement as a

"Guarantor" and a party to any guarantee as a "Guarantor" or pledge agreement as a "Pledgor", and without limitation, supplements and amendments hereto and to any of the other Loan Documents, authorization to file UCC financing statements, Collateral Access Agreements (to the extent required hereunder), other agreements, documents or instruments contemplated under the Security Agreement and other consents, waivers, acknowledgments and other agreements from third persons which Agent may deem reasonably necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the assets of such Subsidiary, corporate resolutions and other organization and authorizing documents of such Person, and favorable opinions of counsel to such person and (iii) upon the satisfaction of each of the conditions set forth in this <u>Section 7.16(b)</u>, such Inactive Subsidiary shall cease to be deemed an Inactive Subsidiary for purposes of this Agreement.

> **7.17    Permitted Activities of Parent.**  Parent (a) shall not engage in any operating or business activities (other than to a de minimis extent) or have any material assets or liabilities; provided, that,  the following shall be permitted:  (i) its ownership of the Equity Interests of Lead Borrower and activities incidental thereto, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iv) any offering of its common stock or any other issuance or sale of its Equity Interests (other than Disqualified Equity Interests) so long as such offering does not constitute a Change of Control, (v) participating in tax, accounting and other administrative matters as a member of the consolidated group of Parent and its Subsidiaries, (vi) holding any cash or property (but not operating any property), (viii) providing indemnification to officers and directors, (ix) the holding of any cash received by Parent from the Borrowers pursuant to Section 7.06 and the payment or distribution thereof to any holder of any Equity Interest of the Parent, and (x) any activities incidental to the foregoing; and (b) not incur any Liens on Equity Interests of the Lead Borrower, and shall not own any Equity Interests other than those of the Lead Borrower and the Lead Borrower's Subsidiaries.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

> **8.01    Events of Default**.  Any of the following shall constitute an Event of Default:

> > (a)    <u>Non-Payment</u>.  The Borrowers or any other Loan Party fails to pay (i) when and as required to be paid herein, (A) any amount of principal of any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (B) any interest on any Loan or on any L/C Obligation, or any fee due hereunder, or (ii) within ten (10) days, any other amount payable hereunder or under any other Loan Document; or

> > (b)    <u>Specific Covenants</u>.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section 6.01</u>, <u>6.02</u>, <u>6.03</u>, <u>6.05</u>, <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u> or <u>6.14</u> or <u>Article VII</u>; or (ii) any Guarantor fails to perform or observe any term, covenant or agreement contained in the Facility Guaranty; (iii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in the Security Agreement to which it is a party or (iv) Parent fails to comply with <u>Section 7.17</u>; or

> > (c)    <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for twenty (20) days; or

> > (d)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any

material respect (or, to the extent such representation and warranty contains qualifications as to materiality, it shall prove to be incorrect or misleading in any respect) when made or deemed made; or

(e)    Cross-Default.  (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) or Material Contract, or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or any such Material Contract (other than a failure to deliver conforming goods, so long as the Account or portion thereof arising in respect of such non-conforming goods shall not be included in Eligible Trade Receivables for purpose of the Borrowing Base) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness, or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) or the counterparty to any such Material Contract to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded or to terminate such Material Contract; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined in such Swap Contract) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined in such Swap Contract) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $5,000,000 and such Loan Party or Subsidiary is unable to pay such amount up on such termination and such Loan Party or Subsidiary is unable to pay such amount in full on such termination; or

(f)    Insolvency Proceedings, Etc.  Any Loan Party or any of its Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any part of its property; or a proceeding shall be commenced or a petition filed, without the application or consent of such Person, seeking or requesting the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed and the appointment continues undischarged, undismissed or unstayed for sixty (60) calendar days or an order or decree approving or ordering any of the foregoing shall be entered; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)    Inability to Pay Debts; Attachment.  (i) Any Loan Party or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due in the ordinary course of business, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within fifteen (15) days after its issuance or levy; or

(h)    Judgments.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $1,000,000 (to the extent not covered by independent third-party insurance as to which the applicable insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage) and such judgment(s) or order(s) shall

continue unsatisfied or unstayed for a period of thirty (30) consecutive days, or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not have been satisfied, vacated, discharged, stayed or bonded; or

(i)     ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $1,000,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $1,000,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)     Invalidity of Loan Documents.  (i) Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any Subsidiary thereof contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be (other than pursuant to the terms of the applicable Security Document or the failure of any Credit Party to take any action within its control), or shall be asserted by any Loan Party or any other Subsidiary thereof, not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document; or

(k)     Change of Control.  There occurs any Change of Control; or

(l)     Cessation of Business.  Except as otherwise expressly permitted hereunder, any Loan Party shall take any action to suspend the operation of its business in the ordinary course, liquidate all or a material portion of its assets or Store locations, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of any material portion of its business; or

(m)     Loss of Collateral.  There occurs any uninsured loss to any Collateral having a value equal to or greater than $750,000; or

(n)     Indictment.  The indictment or institution of any legal process or proceeding against, any Loan Party or any Subsidiary thereof, under any federal, state, municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony and such indictment remains unquashed or such legal process remains undismissed for a period of 90 days or more, unless the Lender, in its discretion, determines that such indictment or legal process is not material;

(o)     Guaranty.  The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document;

(p)     Credit Card Agreements.  (i) any Credit Card Issuer or Credit Card Processor shall send notice to any Borrower that it is ceasing to make or suspending payments to such Borrower of

amounts due or to become due to such Borrower or shall cease or suspend such payments, or shall send notice to such Borrower that it is terminating its arrangements with Borrower or such arrangements shall terminate as a result of any event of default under such arrangements, which continues for more than the applicable cure period, if any, with respect thereto, unless such Borrower shall have entered into arrangements with another Credit Card Issuer or Credit Card Processor, as the case may be, within sixty (60) days after the date of any such notice or (ii) any Credit Card Issuer or Credit Card Processor withholds payment of amounts otherwise payable to a Borrower to fund a reserve account or otherwise hold as collateral, or shall require a Borrower to pay funds into a reserve account or for such Credit Card Issuer or Credit Card Processor to otherwise hold as collateral, or any Borrower shall provide a letter of credit, guarantee, indemnity or similar instrument to or in favor of such Credit Card Issuer or Credit Card Processors such that in the aggregate all of such funds in the reserve account, other than amounts held as collateral and the amount of such letters of credit, guarantees, indemnities or similar instruments shall exceed an amount equal to or exceeding ten percent (10%) of the Credit Card Receivables processed by such Credit Card Issuer or Credit Card Processor in the immediately preceding Fiscal Year;

(q)    Subordination.  (i) The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness, including the QKD Subordination Agreement, the Nussdorf Convertible Note Subordination Agreement and the Nussdorf Sibling Subordination Agreement (the "Subordination Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions.

**8.02    Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)    declare the Commitments of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)    require that the Loan Parties Cash Collateralize the L/C Obligations; and

(d)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

provided, however, that upon the entry of an order for relief (or similar order) with respect to any Loan Party or any Subsidiary thereof under any Debtor Relief Laws, the obligation of each Lender to make

Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Loan Parties to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Agent or any Lender.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

Each of the Lenders agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, or other rights to, any of the Collateral.

**8.03    Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order:

First, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent as such;

Second, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and the L/C Issuer (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuer and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fourth, to the extent that Swing Line Loans have not been refinanced by a Committed Loan, payment to the Swing Line Lender of that portion of the Obligations constituting accrued and unpaid interest on the Swing Line Loans;

Fifth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Loans and fees (including Letter of Credit Fees), ratably among the Lenders and L/C Issuer in proportion to the respective amounts described in this clause Fifth payable to them;

Sixth, to the extent that Swing Line Loans have not been refinanced by a Committed Loan, to payment to the Swing Line Lender of that portion of the Obligations constituting unpaid principal of the Swing Line Loans;

Seventh, to payment of that portion of the Obligations constituting unpaid principal of the Committed Loans, ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Seventh held by them;

Eighth, to the Agent for the account of the L/C Issuer, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

Ninth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations as provided in Section 10.04(g), but excluding any Other Liabilities), ratably among the Credit Parties in proportion to the respective amounts described in this clause Ninth held by them;

Tenth, to payment of that portion of the Obligations arising from Cash Management Services to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause Tenth held by them;

Eleventh, to payment of all other Obligations arising from Bank Products and Factored Receivables to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause Eleventh held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Eighth above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

## ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority.**

(a)    Each of the Lenders and the Swing Line Lender, L/C Issuer hereby irrevocably appoints Wells Fargo to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent, the Lenders and the L/C Issuer, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

(b)    Each of the Lenders (in its capacities as a Lender) and the L/C Issuer hereby irrevocably appoints Wells Fargo as Agent and authorizes the Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Agent, as "Agent" and any co-Agent, sub-Agent and attorneys-in-fact appointed by the Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Agent), shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.04(c)), as though such co-Agent, sub-Agent and attorneys-in-fact were the "Agent" under the Loan Documents, as if set forth in full herein with respect thereto.

(c)    Each Lender authorizes and directs the Agent to enter into this Agreement and the other Loan Documents, including the QKD Subordination Agreement, the Nussdorf Convertible Note Subordination Agreement and the Nussdorf Sibling Subordination Agreement.  Each Lender agrees that any action taken by the Agent or Required Lenders in accordance with the terms of this Agreement or the other Loan Documents and the exercise by the Agent or Required Lenders of their respective powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

**9.02    Rights as a Lender**.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent or the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u>, that, Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Agent to liability or that is contrary to any Loan Document or applicable law;

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity;

(d)    shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.01</u> and <u>8.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction;

(e)    The Agent shall not be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by the Loan Parties, a Lender or the L/C Issuer.  Upon the occurrence of an Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to

comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful; and

(f)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

9.04    **Reliance by Agent**.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless the Agent shall have received written notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05    **Delegation of Duties**.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Agent.  The Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent.

9.06    **Resignation of Agent**.  The Agent may at any time give written notice of its resignation to the Lenders and the Lead Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Lead Borrower, to appoint a successor, which shall be a commercial bank or financial institution or a subsidiary of a commercial bank or financial institution if such commercial bank or financial institution is organized under the laws of the United States of America or of any State thereof and has a combined capital and surplus of at least $300,000,000.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuer, appoint a successor Agent or Agent, as applicable, meeting the qualifications set forth above; provided, that, if the Agent or the Agent shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders or the L/C Issuer

under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent or Agent, as applicable, hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent or Agent hereunder.

Any resignation by Wells Fargo as Agent pursuant to this Section shall also constitute its resignation as Swing Line Lender and the resignation of Wells Fargo as L/C Issuer.  Upon the acceptance of a successor's appointment as Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer and Swing Line Lender, (b) the retiring L/C Issuer and Swing Line Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

**9.07    Non-Reliance on Agent and Other Lenders**.  Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Except as provided in Section 9.12, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08    No Other Duties, Etc.**  Anything herein to the contrary notwithstanding, none of the Bookrunners or Arrangers listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Agent, a Lender or the L/C Issuer hereunder.

**9.09    Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the

Lenders, the L/C Issuer, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer, the Agent, such Credit Parties and their respective Agent and counsel and all other amounts due the Lenders, the L/C Issuer the Agent and such Credit Parties under Sections 2.03(i), 2.03(j) and 2.03(k) as applicable, 2.09 and 10.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or the L/C Issuer or to authorize the Agent to vote in respect of the claim of any Lender or the L/C Issuer in any such proceeding.

Except with the prior written consent of Agent, no Lender or L/C Issuer may assert or exercise any enforcement right or remedy in respect of the Loans, Letters of Credit or other Obligations, as against any Borrower or Guarantor or any of the Collateral or other property of any Borrower or Guarantor.

**9.10    Collateral and Guaranty Matters**.  The Credit Parties irrevocably authorize the Agent, at its option and in its discretion,

(a)     to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the expiration, termination or Cash Collateralization of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, including Permitted Dispositions, (iii) having a value in the aggregate in any twelve (12) month period of less than $10,000,000, and to the extent Agent may release its security interest in and lien upon any such Collateral pursuant to the sale or other disposition thereof, such sale or other disposition shall be deemed consented to by Lenders, or (iv) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

(b)     to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(c)     to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.10.  In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the

applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

      **9.11**    **Notice of Transfer**.  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in Section 10.06.

      **9.12**    **Reports and Financial Statements**.  By signing this Agreement, each Lender:

      (a)    agrees to furnish the Agent as soon as possible after the end of each month but in any event within five (5) days after the end of such month (or more frequently as Agent may reasonably request if a Default or an Event of Default shall exist or have occurred and be continuing) with a summary of all Other Liabilities due or to become due to such Lender.  In connection with any distributions to be made hereunder, the Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Agent has received written notice thereof from such Lender within five (5) days after (i) the end of the month most recently ended prior to any such distribution or (ii) the date on which such summary is otherwise reasonably requested by Agent as provided above);

      (b)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Lead Borrower hereunder and all field examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

      (c)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

      (d)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

      (e)    agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

      (f)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender; provided, that, no Lender shall be liable for any portion of such claims, actions, proceedings, damages, costs, expenses or other amounts (including attorney costs) resulting from such Agent's or such other Lender's gross negligence

or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.13    Agency for Perfection**.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States can be perfected only by possession.  Should any Lender (other than the Agent) obtain possession of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14    Indemnification of Agent**.  The Lenders hereby agree to indemnify the Agent, the L/C Issuer and any Related Party, as the case may be (to the extent not reimbursed by the Loan Parties and without limiting the obligations of Loan Parties hereunder), ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, the L/C Issuer or any Related Party in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, the L/C Issuer or any Related Party in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's, L/C Issuer's or other Related Party's gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.  Except for action expressly required of Agent and Agent hereunder and under the other Loan Documents, each of Agent and Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless it shall receive further assurances to its satisfaction from Lenders of their indemnification obligations under this Section 9.14 against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.

**9.15    Relation among Lenders**.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

**9.16    Defaulting Lenders.**

(a)    Notwithstanding the provisions of Section 2.14 hereof, the Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrowers to the Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Agent shall transfer any such payments (i) first, to the Swing Line Lender to the extent of any Swing Line Loans that were made by the Swing Line Lender and that were required to be, but were not, paid by the Defaulting Lender, (ii) second, to the L/C Issuer, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (iii) third, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (iv) to the Cash Collateral Account, the proceeds of which shall be retained by the Agent and may be made available to be re-advanced to or for the benefit of the Borrowers (upon the request of the Lead Borrower and subject to the conditions set forth in Section 4.02) as if such Defaulting Lender had made its portion of the Loans (or other funding obligations) hereunder, and (v) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender.  Subject to the foregoing, the Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Agent for the account of such Defaulting Lender.  Solely for the purposes of voting or consenting to matters with respect to the Loan

Documents (including the calculation of Applicable Percentages in connection therewith) and for the purpose of calculating the fee payable under Section 2.09(a), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 10.01(a) through (c). The provisions of this Section 9.16 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, the Agent, the L/C Issuer, and the Borrowers shall have waived, in writing, the application of this Section 9.16 to such Defaulting Lender, or (z) the date on which such Defaulting Lender pays to the Agent all amounts owing by such Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by the Agent pursuant to Section 9.16(b) shall be released to the Borrowers). The operation of this Section 9.16 shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Agent, the L/C Issuer, the Swing Line Lender, or to the Lenders other than such Defaulting Lender. Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers, at their option, upon written notice to the Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to the Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than any Other Liabilities, but including (1) all interest, fees (except any Commitment Fees or Letter of Credit Fees not due to such Defaulting Lender in accordance with the terms of this Agreement), and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Applicable Percentage of its participation in the Letters of Credit); provided, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Credit Parties' or the Loan Parties' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this Section 9.16 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 9.16 shall control and govern.

(b)    If any Swing Line Loan or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(i)    such Defaulting Lender's participation interest in any Swing Line Loan or Letter of Credit shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent (x) the Outstanding Amount sum of all Non-Defaulting Lenders' Credit Extensions after giving effect to such reallocation does not exceed the total of all Non-Defaulting Lenders' Commitments and (y) the conditions set forth in Section 4.02 are satisfied at such time;

(ii)    if the reallocation described in clause (b)(i) above cannot, or can only partially, be effected, the Borrowers shall within one Business Day following notice by the Agent (x) first, prepay such Defaulting Lender's participation in any outstanding Swing Line Loans (after giving effect to any partial reallocation pursuant to clause (b)(i) above) and (y) second, cash collateralize such Defaulting Lender's participation in Letters of Credit (after giving effect to any partial reallocation pursuant to clause

(b)(i) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Agent, for so long as such L/C Obligations are outstanding; <u>provided</u>, that the Borrowers shall not be obligated to cash collateralize any Defaulting Lender's participations in Letters of Credit if such Defaulting Lender is also the L/C Issuer;

(iii)   if the Borrowers cash collateralize any portion of such Defaulting Lender's participation in Letters of Credit Exposure pursuant to this <u>Section 9.16(b)</u>, the Borrowers shall not be required to pay any Letter of Credit Fees to the Agent for the account of such Defaulting Lender pursuant to <u>Section 2.03</u> with respect to such cash collateralized portion of such Defaulting Lender's participation in Letters of Credit during the period such participation is cash collateralized;

(iv)   to the extent the participation by any Non-Defaulting Lender in the Letters of Credit is reallocated pursuant to this <u>Section 9.16(b)</u>, then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to <u>Section 2.03</u> shall be adjusted in accordance with such reallocation;

(v)   to the extent any Defaulting Lender's participation in Letters of Credit is neither cash collateralized nor reallocated pursuant to this <u>Section 9.16(b)</u>, then, without prejudice to any rights or remedies of the L/C Issuer or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under <u>Section 2.03</u> with respect to such portion of such participation shall instead be payable to the L/C Issuer until such portion of such Defaulting Lender's participation is cash collateralized or reallocated;

(vi)   so long as any Lender is a Defaulting Lender, the Swing Line Lender shall not be required to make any Swing Line Loan and the L/C Issuer shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Applicable Percentage of such Swing Line Loans or Letter of Credit cannot be reallocated pursuant to this <u>Section 9.16(b)</u> or (y) the Swing Line Lender or the L/C Issuer, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Line Lender or the L/C Issuer, as applicable, and the Borrowers to eliminate the Swing Line Lender's or L/C Issuer's risk with respect to the Defaulting Lender's participation in Swing Line Loans or Letters of Credit; and

(vii)   The Agent may release any cash collateral provided by the Borrowers pursuant to this <u>Section 9.16(b)</u> to the L/C Issuer and the L/C Issuer may apply any such cash collateral to the payment of such Defaulting Lender's Applicable Percentage of any Letter of Credit Disbursement that is not reimbursed by the Borrowers pursuant to <u>Section 2.03</u>.

## ARTICLE X
## MISCELLANEOUS

**10.01   Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than Swap Contracts), and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(a)      extend or, increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 8.02</u>) without the written Consent of such Lender;

(b)      as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of

principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Commitments hereunder or under any other Loan Document without the written Consent of such Lender;

(c)      as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (v) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document, without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest or Letter of Credit Fees at the Default Rate or (ii) except as provided in clause (m) below, to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

(d)      as to any Lender, change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(e)      change any provision of this Section or the definition of "Required Lenders" "Supermajority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)      except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)      release all or substantially all of the Collateral (except for (i) Permitted Dispositions, (ii) as expressly required hereunder or under any of the other Loan Documents or applicable law and (iii) as permitted under Section 9.10 hereof) from the Liens of the Security Documents without the written Consent of each Lender;

(h)      except as provided in Section 2.15, increase the Aggregate Commitments without the written Consent of each Lender;

(i)      change the definition of the term "Borrowing Base" (other than as set forth in clause (j) below) or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written Consent of the Supermajority Lenders, provided that the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves;

(j)      increase any advance rate percentage set forth in the definition of "Borrowing Base" without the written Consent of each Lender or otherwise change the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written Consent of each Lender, provided, that, the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves;

(k)      modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender; and

(l)    except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender; and

provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (iii) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; (iv) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document, and (v) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or Consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

(m)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party.

(n)    If any Lender does not Consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the Consent of each Lender and that has been approved by the Required Lenders, the Lead Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided, that, such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph).

**10.02    Notices; Effectiveness; Electronic Communications.**

(a)    Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or other electronic means as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Loan Parties, the Agent, the L/C Issuer or the Swing Line Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    <u>Electronic Communications</u>.  Notices and other communications to the Loan Parties, Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Agent, <u>provided</u>, that, the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to <u>Article II</u> if such Lender or the L/C Issuer, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u>, that, approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u>, that, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    <u>The Platform</u>.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to any Loan Party, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; <u>provided</u>, <u>however</u>, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    <u>Change of Address, Etc</u>.  Each of the Loan Parties, the Agent, the L/C Issuer and the Swing Line Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Lead Borrower, the Agent, the L/C Issuer and the Swing Line Lender.  In addition, each Lender agrees to

notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Agent, L/C Issuer and Lenders.  The Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including, without limitation, all Requests for Credit Extensions) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties (including, without limitation, all Requests for Credit Extensions).  All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03    No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether any Credit Party may have had notice or knowledge of such Default at the time.

**10.04    Expenses; Indemnity; Damage Waiver.**

(a)     Costs and Expenses.  The Borrowers shall pay all Credit Party Expenses.

(b)     Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of a Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts

paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided, that, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or its Related Parties or a material breach of the Loan Documents by an Indemnitee or its Related Parties or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) relate to a dispute solely among Indemnitees and their Related Parties; provided, that, such Credit Parties shall be entitled to indemnification for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

(c)     Reimbursement by Lenders.  Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent), the L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided, that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) or L/C Issuer in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     Payments.  All amounts due under this Section shall be payable on demand therefor.

(f)     Survival.  The agreements in this Section shall survive the resignation of the Agent and the L/C Issuer, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside**.  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and the L/C Issuer severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders and the L/C Issuer under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns.**

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of subsection Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans (including for purposes of this Section 10.06(b), participations in L/C Obligations and in Swing Line Loans) at the time owing to it); provided, that, any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $10,000,000 unless each of the Agent and, so long as no Default has

occurred and is continuing, the Lead Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not apply to the Swing Line Lender's rights and obligations in respect of Swing Line Loans;

(iii)    Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Lead Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) a Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; and

(B)    the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)    the consent of the L/C Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding); and

(D)    the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment in respect of the assignment of any Commitment.

(iv)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the

assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)    Register.  The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Lead Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swing Line Loans) owing to it); provided, that, (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Lead Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, that, no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    Resignation as L/C Issuer or Swing Line Lender after Assignment.  Notwithstanding anything to the contrary contained herein, if at any time Wells Fargo assigns all of its Commitment and Loans pursuant to subsection (b) above, Wells Fargo may, (i) upon thirty (30) days' notice to the Lead Borrower and the Lenders, resign as L/C Issuer and/or (ii) upon thirty (30) days' notice to the Lead Borrower, Wells Fargo may resign as Swing Line Lender.  In the event of any such resignation as L/C Issuer or Swing Line Lender, the Lead Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer or Swing Line Lender hereunder; provided, however, that no failure by the Lead Borrower to appoint any such successor shall affect the resignation of Wells Fargo as L/C Issuer or Swing Line Lender, as the case may be.  If Wells Fargo resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans pursuant to Section 2.03(c)).  If Wells Fargo resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c).  Upon the appointment of a successor L/C Issuer and/or Swing Line Lender, (i)  such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swing Line Lender, as the case may be, and (ii) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Wells Fargo to effectively assume the obligations of Wells Fargo with respect to such Letters of Credit.

**10.07    Treatment of Certain Information; Confidentiality**.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information

and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided, that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a)  the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information, and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08    Right of Setoff**.  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or the L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or the L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Affiliates may have.  Each Lender and the L/C Issuer agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, provided, that, the failure to give such notice shall not affect the validity of such setoff and application.

**10.09    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the

maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

      **10.10    Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

      **10.11    Survival**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding).  Further, the provisions of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u> and <u>10.04</u> and <u>Article IX</u> shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities and (z) any Obligations that may thereafter arise under <u>Section 10.04</u>.

      **10.12    Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

      **10.13    Replacement of Lenders**.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and

subject to the restrictions contained in, and consents required by, <u>Section 10.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u>, that:

(a)     the Borrowers shall have paid to the Agent the assignment fee specified in <u>Section 10.06(b)</u>;

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, together with accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)     such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**10.14    Governing Law; Jurisdiction; Etc.**

(a)     <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW BUT OTHERWISE WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF).

(b)     <u>SUBMISSION TO JURISDICTION</u>.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     WAIVER OF VENUE.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)     ACTIONS COMMENCED BY LOAN PARTIES.  EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION, AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15    Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16    No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (a) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (c) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan

Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17    USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act.  Each Loan Party is in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**10.18    Foreign Asset Control Regulations**.  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19    Time of the Essence.**  Time is of the essence of the Loan Documents.

**10.20    Press Releases.**

(a)    Each Credit Party agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosures using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of Agent unless (and only to the extent that) such Credit

Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b)       Each Loan Party consents to the publication by the Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo or trademark.  The Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof.  The Agent reserves the right to provide to industry trade organizations  and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.21    Additional Waivers.**

(a)       The Obligations are the joint and several obligation of each Loan Party.  To the fullest extent permitted by applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)       The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).

(c)       To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments.  The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)    Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement.  Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitments.  In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers.  As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**10.22    No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.23    Attachments**.  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

## ARTICLE XI
## AMENDMENT AND RESTATEMENT

**11.01    Existing Credit Agreement.**  Each party hereto hereby acknowledge, confirm and agree that: (a) the Existing Credit Agreement has been duly executed and delivered by each party thereto and is in full force and effect as of the date hereof and (b) the agreements and obligations of the parties both thereto and hereto contained in the Existing Credit Agreement (as modified by this Agreement) constitute the legal, valid and binding obligations of such Persons against them in accordance with their respective terms and such Persons have no valid defense to the enforcement of such obligations.

**11.02    Restatement.**

(a)      As of the date hereof, the terms, conditions, agreements, covenants, representations and warranties set forth in the Existing Credit Agreement are hereby amended and restated in their entirety, and as so amended and restated, replaced and superseded, by the terms, conditions, agreements, covenants, representations and warranties set forth in this Agreement, except that nothing herein or in the other Loan Documents shall impair or adversely affect the continuation of the liability of Borrowers and Guarantors for the Obligations evidenced by or arising under the Existing Credit Agreement.  The amendment and restatement contained herein shall not, in any manner, be construed to constitute payment of, or impair, limit, cancel or extinguish, or constitute a novation in respect of, the Obligations and other obligations and liabilities of the Agent, Lenders, L/C Issuer, Swing Line Lender, Borrowers and Guarantors evidenced by or arising under the Existing Credit Agreement, and the Liens securing such Obligations and other obligations and liabilities, which shall not in any manner be impaired, limited, terminated, waived or released.

(b)      All of the outstanding  Loans (as defined in the Existing Credit Agreement) and Letters of Credit (as defined in the Existing Credit Agreement) and all accrued and unpaid interest and fees with respect thereto shall be deemed to be Obligations of Borrowers and Guarantors pursuant to the terms hereof.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWERS**:

PERFUMANIA HOLDINGS, INC.
PERFUMANIA, INC.
MAGNIFIQUE PARFUMES AND COSMETICS, INC.
TEN KESEF II, INC.
PERFUMANIA PUERTO RICO, INC.
QUALITY KING FRAGRANCE, INC.
SCENTS OF WORTH, INC.
FIVE STAR FRAGRANCE COMPANY, INC.
NORTHERN GROUP, INC.
PERFUMANIA.COM, INC.
PARLUX FRAGRANCES, LLC
PARLUX LTD.

By: _____
Michael W. Katz
President and Chief Executive Officer

**GUARANTORS**:

ALADDIN FRAGRANCES, INC.
NICHE MARKETING GROUP, INC.

MODEL REORG ACQUISITION, LLC

By: _____
Michael W. Katz
President and Chief Executive Officer

**[SIGNATURES CONTINUED ON NEXT PAGE]**

[Signature Page to Exit Credit Agreement - Perfumania]

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Agent, L/C Issuer, Swing Line Lender and a Lender

By: _____
Name: _____
Title: _____

SCHEDULE 1(I)

<u>Inactive Subsidiaries</u>

Flowing Velvet, Inc., a New York corporation
Global Duty Free Supply, Inc., a Florida corporation
Jacavi, LLC, a Delaware limited liability company
Northern Amenities, Ltd., a New York corporation
Northern Brands, Inc., a New York corporation
Perfumer's Art, Inc., a New York corporation
Perfumania International Franchising, Inc., a Florida corporation
Distribution Concepts, LLC, a Florida limited liability company

**Schedule 2.01**

**Commitments and Applicable Percentages**

COMMITMENT SCHEDULE

| Lender | Commitment | Applicable Percentage |
|---|---|---|
| Wells Fargo Bank, National Association | $[100,000,000] | 100.00% |
| [other lenders -TBD] | $ | % |
| Total | $[100,000,000.00] | 100% |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                              :    Chapter 11
:
MODEL REORG ACQUISITION, LLC, et al., :    Case No. 17-11794 (___)
:
Debtors.[1]     :    (Joint Administration Pending)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    **Related Docket No. ___**

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") pursuant to §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3), and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Perfumania Holdings, Inc. (7964); Perfumania, Inc. (6340); Magnifique Parfumes and Cosmetics, Inc. (6420); Ten Kesef II, Inc. (1253); Perfumania.com, Inc. (4688); Model Reorg Acquisition, LLC (0318); Northern Group, Inc. (3226); Perfumania Puerto Rico, Inc. (6787); Quality King Fragrance, Inc. (4939); Scents of Worth, Inc. (1732); Jacavi, LLC (6863); Distribution Concepts, LLC (8845); Flowing Velvet, Inc. (7294); Aladdin Fragrances, Inc. (4338); Niche Marketing Group, Inc. (1943); Northern Brands, Inc. (7186); Northern Amenities, Ltd. (5387); Global Duty Free Supply, Inc. (2686); and Perfumers Art, Inc. (6616). The address of the Debtors' corporate headquarters is 35 Sawgrass Drive, Suite 2, Bellport, New York 11713.

[2]     Capitalized terms used but not defined in this Order shall have the same meanings ascribed to such terms in the Ratification Agreement.

Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia* seeking, among other things:

(1)    authorization for Perfumania Holdings, Inc., a Florida corporation and a debtor and debtor-in-possession ("Parent"), Quality King Fragrance, Inc., a Delaware corporation and a debtor and debtor-in-possession ("QKF"), Scents of Worth, Inc., a Florida corporation and a debtor and debtor-in-possession ("SOW"), Northern Group, Inc., a New York corporation and a debtor and debtor-in-possession ("Northern"), Perfumania, Inc., a Florida corporation and a debtor and debtor-in-possession ("Perfumania"), Magnifique Parfumes and Cosmetics, Inc., a Florida corporation and a debtor and debtor-in-possession ("Magnifique"), Ten Kesef II, Inc., a Florida corporation and a debtor and debtor-in-possession ("Ten Kesef"), Perfumania Puerto Rico, Inc., a Puerto Rico corporation and a debtor and debtor-in-possession ("Perfumania PR"), Perfumania.com, Inc., a Florida corporation and a debtor and debtor-in-possession ("Perfumania.com", together with Parent, QKF, SOW, Northern, Perfumania, Magnifique, Ten Kesef, and Perfumania PR, each a "Debtor Borrower" and collectively, "Debtor Borrowers"), Five Star Fragrance Company, Inc., a New York corporation ("Five Star"), Parlux Fragrances, LLC, a New York limited liability company ("Parlux") and Parlux Ltd., a New York corporation ("Parlux Ltd.", and together with Five Star and Parlux each a "Non-Debtor Borrower" and collectively, the "Non-Debtor Borrowers", and together with the Debtor Borrowers, the "Borrowers") to obtain, and for Aladdin Fragrances, Inc., a New York corporation and a debtor and debtor-in-possession ("Aladdin"); Niche Marketing Group, Inc., a New York corporation and a debtor and debtor-in-possession ("Niche"), and Model Reorg Acquisition, LLC,  a Delaware limited liability company and a debtor and debtor-in-possession ("Model Reorg" and together with Aladdin and Niche, the "Guarantors"),  to guarantee, unconditionally, on a joint

and several basis, post-petition financing in the form of a revolving credit and letter of credit facility in accordance with the terms and conditions set forth in the Pre-Petition Credit Agreement (as defined below), as ratified and amended by that certain Ratification and Amendment Agreement, dated as of August 26, 2017 (the "Ratification Agreement") a copy of which is attached hereto as **Exhibit 1** (as amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth herein, the "Credit Agreement"), by and among the Borrowers, the Guarantors, Wells Fargo Bank, National Association, as Administrative Agent and Collateral Agent ("Agent"), and the lenders party thereto (the "DIP Lenders"), and the other Loan Documents (as defined in the Ratification Agreement), and in accordance with this order ("Interim Order"), secured by perfected senior priority security interests in and liens on the Collateral (as defined below) pursuant to §§ 364(c)(2) and 364(c)(3), and 364(d) of the Bankruptcy Code (subject to the Carve-Out and the Permitted Liens (each as defined below));

(2)     authorization for Borrowers and Guarantors to remit all collections, asset proceeds and payments to Agent and Lenders for application, or deemed application, first to all Pre-Petition Obligations (as defined below) until such obligations are fully repaid in accordance with the Credit Agreement and other Loan Documents, and then to the repayment of all Post-Petition Obligations (as defined in the Ratification Agreement) in accordance with the Credit Agreement and the other Loan Documents, and to deem all Pre-Petition Obligations with respect to Letters of Credit to have been issued or provided, as applicable, under the Credit Agreement and the other Loan Documents;

(3)     authorization for the Debtors to grant superpriority administrative claim status, pursuant to § 364(c)(1) of the Bankruptcy Code, to the Agent, for the benefit of itself and the

other DIP Lenders, in respect of all Post-Petition Obligations (subject to the Carve-Out (as defined below));

(4)    as set forth below, approval of certain stipulations by the Debtors as set forth in this Interim Order in connection with the Pre-Petition Credit Agreement and Pre-Petition Loan Documents;

(5)    as set forth below, authorization to provide adequate protection to the Agent and the DIP Lenders;

(6)    effective only upon entry of a Final Order (as defined below), the waiver of the Debtors' right to assert claims to surcharge against the Collateral (as defined below) pursuant to § 506(c) of the Bankruptcy Code;

(7)    the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order to the extent hereinafter set forth;

(8)    the setting of a final hearing on the Motion ("Final Hearing") to consider entry of a final order (the "Final Order") authorizing, among other things, the borrowing under the Loan Documents on a final basis, as set forth in the Motion and the Credit Agreement filed with the Court; and

(9)    related relief.

The initial hearing on the Motion having been held by this Court on August [__], 2017 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the Declaration of Michael W. Katz in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), the Declaration of Robert Warshauer in support of the Motion, and the filings and pleadings in the above-captioned chapter 11 cases (the

"Cases"), the Court having found that the relief requested in the Motion is in the best interests of Debtors, their estates, their creditors and other parties in interest; and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") was appropriate and sufficient under the circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy Rule 4001 on (i) counsel to the Agent; (ii) the office of the United States Trustee (the "U.S. Trustee"), (ii) the holders of the twenty (20) largest unsecured claims, on a consolidated basis, against the Debtors' estates (the "20 Largest Unsecured Creditors"), (iii) the Internal Revenue Service and applicable state taxing authorities, (iv) any party that has asserted or may assert a lien in the Debtors' assets; (v) the Debtors' landlords, (vi) the Non-Debtor Borrowers, (vii) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; and (vii) the United States Securities and Exchange Commission (collectively, the "Noticed Parties") and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and after due deliberation sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    Petition.  On August 26, 2017 (the "Petition Date"), each Debtor filed a voluntary petition (each, a "Petition") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

B.    Disposition.  The Motion is hereby granted in accordance with  and to the extent set forth in this Interim Order.  Any objections to the Motion with respect to the entry of the

Interim Order that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled.

C.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    <u>Notice</u>.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing and the relief granted under this Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001.

E.    <u>Acknowledgments and Agreements of Debtors and Non-Debtor Borrowers</u>.  Without prejudice to the rights of any creditors' committee appointed in these Cases under Section 1102 of the Bankruptcy Code (the "<u>Committee</u>") or other parties-in-interest as and to the extent set forth in Section 4.1 of this Interim Order, the Debtors and Non-Debtor Borrowers admit, stipulate, acknowledge and agree that:

(i)    <u>Pre-Petition Revolving Loan Documents</u>.  Prior to the commencement of the Cases, Agent and the DIP Lenders made loans, advances and provided other financial accommodations to Debtors and the Non-Debtor Borrowers pursuant to the terms and conditions set forth in (1) the Pre-Petition Credit Agreement (as defined in the Ratification Agreement and referred to herein as the "<u>Pre-Petition Credit Agreement</u>"); and (2) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Agent or any DIP Lender in connection with the Pre-Petition Credit Agreement, including, without limitation, all

security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Pre-Petition Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Pre-Petition Revolving Loan Documents").   Copies of the operative Pre-Petition Revolving Loan Documents are on file with counsel to the Debtors and available upon reasonable request.

(ii)        Pre-Petition Revolving Loan Obligations.  As of the Petition Date, the Debtors were indebted to Agent and the DIP Lenders under the Pre-Petition Revolving Loan Documents in respect of Loans, Letters of Credit, Bank Products, and other Obligations (each as defined in the Pre-Petition Credit Agreement) in an aggregate outstanding principal amount of not less than $18,782,647.38, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "Pre-Petition Obligations", as such term is further defined in the Ratification Agreement).  The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors and Non-Debtor Borrowers, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law; Debtors and the Non-Debtor Borrowers do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description, in any such case, arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Interim Order, which would in any way

affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations or liens and security interest securing the same described in clause (E)(iii) below.

       (iii)       <u>Pre-Petition Revolving Loan Collateral</u>.  As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Pre-Petition Revolving Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens granted by Debtors and Non-Debtor Borrowers to Agent, for the benefit of itself and the other DIP Lenders under the Pre-Petition Revolving Loan Documents, upon all of the Pre-Petition Collateral (as defined in the Ratification Agreement and hereinafter referred to as the "<u>Pre-Petition Collateral</u>"), subject only to the liens specifically permitted under Section 7.01 of the Pre-Petition Credit Agreement to the extent that such security interests, liens or encumbrances are (1) valid, perfected, and unavoidable senior priority liens and security interests existing as of the Petition Date securing valid, binding and unavoidable debt permitted under the Pre-Petition Revolving Loan Documents, and (2) senior to and have not been and are not subject to being subordinated to Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral under the Pre-Petition Revolving Loan Documents or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "<u>Permitted Liens</u>").  Neither the Debtors nor the Non-Debtor Borrowers possess or will assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of Agent's and DIP Lenders' liens, claims or security interests in the Pre-Petition Collateral.

       (iv)       <u>Proof of Claim</u>.  The acknowledgment by Debtors of the Pre-Petition Obligations and the liens, rights, priorities and protections granted to or in favor of Agent and

4868303.2

DIP Lenders in respect of the Pre-Petition Collateral as set forth herein and in the Pre-Petition Revolving Loan Documents shall be deemed a timely filed proof of claim on behalf of Agent and the DIP Lenders in each of these Cases.

       (v)       Pre-Petition Subordination Agreements.

       (a)       Agent is party to that certain Subordination Agreement dated as of January 7, 2011, by and among Agent, Stephen Nussdorf and Glenn Nussdorf, (as the same now exists or may hereafter be amended, supplemented or otherwise modified in accordance with the terms thereof, the "Nussdorf Convertible Note Subordination Agreement"), which (x) confirms Stephen Nussdorf and Glenn Nussdorf do not hold any liens or security interests in the assets and properties of Parent, and (y) provides for the subordination of all rights of Stephen Nussdorf and Glenn Nussdorf to receive payments from Parent to the rights of Agent and Lenders to receive repayment of the Obligations.

       (b)       Agent is party to that certain Amended and Restated Subordination Agreement by and among Agent, the Trust under Article 2 of the Trust Agreement dated November 1, 1998 with Glenn Nussdorf as Grantor (successor to the Glenn Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98), Glenn Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98, the Trust under Article 2 of the Trust Agreement dated November 1, 1998 with Stephen Nussdorf as Grantor (successor to the Stephen Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98), Stephen Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98, the Trust under Article 2 of the Trust Agreement dated November 1, 1998 with Arlene Nussdorf as Grantor (successor to Arlene Nussdorf 10-Year Grantor Retained Annuity Trust Dated 11/1/98), Arlene Nussdorf 15-Year Grantor Retained Annuity Trust Dated 11/2/98 (collectively, the "Nussdorf Siblings") dated as of April 18, (as the same now exists or

may hereafter be amended, supplemented or otherwise modified in accordance with the terms thereof, the "Nussdorf Siblings Subordination Agreement"), which (x) confirms the Nussdorf Siblings do not hold any liens or security interests in the assets and properties of Model Reorg, and (y) provides for the subordination of all rights of the Nussdorf Siblings to receive payments from Model Reorg to the rights of Agent and Lenders to receive repayment of the Obligations.

(c)       Agent is party to that certain Subordination Agreement dated as of January 7, 2011, by and between Agent and QKF, (as the same now exists or may hereafter be amended, supplemented or otherwise modified in accordance with the terms thereof, the "Quality King Subordination Agreement", and together with the Nussdorf Convertible Note Subordination Agreement and the Nussdorf Siblings Subordination Agreement, collectively the "Pre-Petition Subordination Agreements"), which (x) confirms the interests of Agent and QKF in the assets and properties of Model Reorg, and (y) provides for the subordination of all rights of QKF to receive payments from Model Reorg to the rights of Agent and Lenders to receive repayment of the Obligations.

F.       Findings Regarding the Post-Petition Financing.

(i)       Post-Petition Financing.  The Debtors and Non-Debtor Borrowers have requested from each of the Agent and the DIP Lenders, and the Agent and DIP Lenders are willing, to extend certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order, the Credit Agreement and the other Loan Documents (as defined in the Ratification Agreement).

(ii)       Need for Post-Petition Financing.  The Debtors do not have sufficient available sources of working capital, including cash collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability

to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates (as defined below) for the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the Agent and DIP Lenders as set forth in this Interim Order, the Credit Agreement, and other Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates (as defined under § 541 of the Bankruptcy Code, the "Estates").

    (iii)  No Credit Available on More Favorable Terms.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, junior liens on encumbered property of the Estates, or liens on property of the Estates not subject to a lien pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of the Bankruptcy Code.  The Debtors have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by each of the Agent and DIP Lenders pursuant to the Loan Documents.

    (iv)  Budget.  The Debtors have prepared and delivered to Agent and DIP Lenders an initial 13-week budget (as defined in the Ratification Agreement, the "Budget").  Such Budget has been thoroughly reviewed by the Debtors and their management and sets forth,

among other things, the projected cash receipts and disbursements of the Debtors for the periods covered thereby. The Debtors represent that the Budget is achievable in accordance with the terms of the Loan Documents and this Interim Order and will allow the Debtors to operate at all times during these Cases. The Agent and DIP Lenders are relying upon the Debtors' compliance with the Budget (subject to the variances permitted under Section 5.3(c) of the Ratification Agreement (the "Permitted Variances") in accordance with Section 5.3 of the Ratification Agreement, the other Loan Documents, and this Interim Order in determining to enter into the post-petition financing arrangements provided for herein.

(v)     Business Judgment and Good Faith Pursuant to § 364(e). The terms of the Credit Agreement and the other Loan Documents and this Interim Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the Credit Agreement and the other Loan Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and Agent, with all parties being represented by counsel. Any credit extended under the terms of this Interim Order shall be deemed to have been extended in good faith by the Agent and DIP Lenders, as that term is used in § 364(e) of the Bankruptcy Code.

(vi)     Good Cause. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the

Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

(vii)    <u>Immediate Entry</u>.    Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).    No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED THAT:

Section 1.    <u>Authorization and Conditions to Financing.</u>

1.1    <u>Motion Granted</u>.    The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.    Except as otherwise expressly provided in this Interim Order, any objection to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

1.2    <u>Authorization to Borrow, Guaranty, and Use Loan Proceeds</u>.    Borrowers are hereby authorized and empowered to immediately borrow and obtain Loans, Letters of Credit and to incur indebtedness and other Post-Petition Obligations (as defined in the Ratification Agreement and hereinafter referred to as the "<u>Post-Petition Obligations</u>"), and the Guarantors are hereby authorized to guaranty such Post-Petition Obligations, up to an aggregate amount equal to the sum of (i) 110% of all disbursements for the Interim Financing Period (as defined below) in the "Total Disbursements / Drawdowns" line item of the Budget, <u>plus</u> (ii) all interest, costs, and fees, accrued or accruing under the Credit Agreement and other Loan Documents, all pursuant to the terms and conditions of this Interim Order, the Credit Agreement, the other Loan Documents during the period commencing on the date of this Interim Order through and including the date

13

of the Final Hearing (the "<u>Interim Financing Period</u>").  Subject to the terms and conditions contained in this Interim Order and the Loan Documents, Borrowers shall use the proceeds of the Loans, Letters of Credit and other credit and financial accommodations provided by Agent and DIP Lenders under the Credit Agreement and the other Loan Documents solely for payment of expenses set forth in the Budget and amounts owing to Agent and DIP Lenders in accordance with the terms and conditions of the Loan Documents and this Interim Order.

> 1.3    <u>Financing Documents</u>

> (a)    <u>Authorization</u>.    Debtors are hereby authorized to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the Credit Agreement and the other Loan Documents.  Upon execution and delivery of the Credit Agreement and the other Loan Documents, such agreements and documents shall constitute valid and binding obligations of the Debtors and the Non-Debtor Borrowers, enforceable against each Debtor and Non-Debtor Borrower party thereto in accordance with the terms of such agreements, documents and this Interim Order.  No obligation, payment, transfer or grant of security under the Credit Agreement, the other Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under § 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or counterclaim.

> (b)    <u>Approval; Evidence of Borrowing Arrangements</u>.    All terms, conditions and covenants set forth in the Loan Documents (including, without limitation, the Credit Agreement) are approved to the extent necessary to implement the terms and provisions of this Interim Order.  All such terms, conditions and covenants shall be sufficient and conclusive evidence of (a) the borrowing arrangements by and among Debtors, the Non-Debtor Borrowers,

14

Agent and DIP Lenders, and (b) each Debtor's and Non-Debtor Borrower's assumption and adoption of all of the terms, conditions, and covenants of the Credit Agreement and the other Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all Obligations arising thereunder, including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of Agent's and DIP Lenders' consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the Loan Documents.

    (c) <u>Amendment</u>. Subject to the terms and conditions of the Credit Agreement and the other Loan Documents, Debtors, the Non-Debtor Borrowers, Agent and DIP Lenders may amend, modify, supplement or waive any provision of the Loan Documents (a "<u>DIP Loan Amendment</u>") without further approval or order of the Court so long as (a) such DIP Loan Amendment is not material (for purposes hereof, a "material" DIP Loan Amendment shall mean any DIP Loan Amendment that operates to increase the interest rate other than as currently provided in the Loan Documents, increase the Maximum Credit (as defined in the Ratification Agreement), increase or add an additional early termination fee, prepayment or repayment premium, add specific new events of default or enlarge the nature and extent of default remedies available to Agent and DIP Lenders following an event of default, or otherwise modify any terms and conditions in any Financing Agreement in a manner materially less favorable to Debtors) and is undertaken in good faith by the Agent, the DIP Lenders, the Debtors and the Non-Debtor Borrowers; (b) the Debtors provide prior written notice of the DIP Loan Amendment (the "<u>DIP Loan Amendment Notice</u>") to (i) the U.S. Trustee, (ii) counsel to any Committee, or in the event no such Committee is appointed at the time of such DIP Loan Amendment, the 20 Largest Unsecured Creditors; and (iii) counsel to MJA Beauty, LLC, Richards, Layton & Finger, P.A.,

One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Zachary I. Shapiro; John H. Knight) (c) the Debtors file the DIP Loan Amendment Notice with the Court; and (d) no objection to the DIP Loan Amendment is filed with the Court within three (3) business days from the date the DIP Loan Amendment Notice is filed with the Court in accordance with this Section. Any material DIP Loan Amendment to the Loan Documents must be approved by the Court to be effective.

   1.4 <u>Payment of Pre-Petition Debt</u>.  The Debtors are authorized to repay all Pre-Petition Obligations in accordance with the Credit Agreement, the other Loan Documents and this Interim Order, including, without limitation, Sections 1.5 and 1.6 of this Interim Order.

   1.5 <u>Application of Payments and Collateral Proceeds; Gradual Roll-Up</u>.  The Debtors are authorized to make all payments and transfers of Estate property to the Agent as provided for, permitted and/or required under the Credit Agreement and the other Loan Documents, which payments and transfers shall not be avoidable or recoverable from the Agent or any DIP Lender under §§ 547, 548, 550, 553 or any other section of the Bankruptcy Code, or by reason of any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  All proceeds of the Collateral (as defined herein) received by the any Debtor, Non-Debtor Borrowers, Agent or any DIP Lender, and any other amounts or payments received by any Debtor, Non-Debtor Borrower, the Agent or any DIP Lender in respect of the Obligations, may be applied or deemed to be applied as and when received by such party, first to the repayment in full of the Pre-Petition Obligations, and then to the repayment of the Post-Petition Obligations, all in accordance with the Credit Agreement, the other Loan Documents and this Interim Order.  Without limiting the generality of the foregoing, the Debtors are authorized without further order of this Court to pay or reimburse Agent and the

DIP Lenders for future costs and expenses, including, without limitation, all professional fees, consultant fees and legal fees and expenses paid or incurred by the Agent and the DIP Lenders in connection with the financing transactions as provided in this Interim Order and the Loan Documents, all of which shall be and are included as part of the principal amount of the Post-Petition Obligations and secured by the Collateral (as defined herein).

1.6     Continuation of Pre-Petition Procedures.  Except to the extent expressly set forth in the Loan Documents, all pre-petition practices and procedures for the payment and collection of proceeds of the Collateral (as defined herein), the turnover of cash, the delivery of property to the Agent and the DIP Lenders, including the Blocked Account Agreements (as such term is defined in the Credit Agreement) and any other similar lockbox or blocked depository bank account arrangements, are hereby approved, ratified and shall continue without interruption after the commencement of the Cases.

Section 2.     Post-Petition Lien; Superpriority Administrative Claim Status.

2.1     Post-Petition Lien.

(a)     Post-Petition Lien Granting.  To secure the prompt payment and performance of any and all Obligations (as defined in  the Credit Agreement) of Debtors to the Agent and DIP Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Agent, for the benefit of itself and the other DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first-priority security interests and liens, superior to all other liens, claims or security interests that any creditor of any of the Debtors' Estates may have (but subject to the Carve-Out (as defined below) and the Permitted Liens), in and upon all of the Collateral (as defined in the Credit Agreement and referred to herein as the "Collateral") provided however, that any lien on property and/or

17

proceeds recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code (the "Avoidance Actions") shall be subject to the entry of the Final Order.

(b)    Lien Priority in Collateral.    The liens and security interests of Agent and DIP Lenders granted under the Loan Documents and this Interim Order in the Collateral securing all Obligations (as defined in the Credit Agreement) shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with §§ 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that Agent's and DIP Lenders' liens on and security interests in the Collateral shall be subject only to (a) Permitted Liens, and (b) the Carve-Out (as defined below).

(c)    Right of Repayment.    The right to repayment of Agent and DIP Lender granted under the Loan Documents and this Interim Order from the sale or other disposition of the Collateral or any proceeds thereof shall be first and senior in priority to all other rights of repayment of every kind, nature and description.

(d)    Post-Petition Lien Perfection.    This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) party to a Blocked Account Agreement or holding a Blocked Account (as defined

in the Credit Agreement) or other depository account consisting of Collateral (a "Perfection Act"). Notwithstanding the foregoing, if Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then Agent is authorized to perform such act, and the Debtors are authorized to perform such act to the extent necessary or required by Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Agent may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law. Should Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

(e)     Nullifying Pre-Petition Restrictions to Post-Petition Financing. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, except as otherwise permitted under the Loan Documents, any provision that restricts, limits or impairs in any way any Debtor from granting Agent security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the Loan Documents or this Interim Order, as applicable, or otherwise entering into

19

and complying with all of the terms, conditions and provisions hereof or of the Loan Documents, shall not (a) be effective and/or enforceable against any such Debtor(s), Agent or DIP Loan Lender(s), as applicable, or (b) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to Agent and DIP Lenders pursuant to this Interim Order or the Loan Documents, in each case, to the maximum extent permitted under the Bankruptcy Code and other applicable law that would not render any unexpired lease or executory contract non-assumable or non-assignable pursuant to section 365 of the Bankruptcy Code.

2.2    <u>Superpriority Administrative Expenses</u>.

(a)    <u>DIP Loans</u>.    For all Post-Petition Obligations now existing or hereafter arising pursuant to this Interim Order, the Loan Documents or otherwise, Agent, for the benefit of itself and the other DIP Lenders, is granted an allowed superpriority administrative claim pursuant to § 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors (other than the Carve-Out), whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, §§ 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code (other than the Carve-Out), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (the "<u>DIP Loan Superpriority Claim</u>").

2.3    <u>Carve-Out</u>.

(a)    <u>Carve-Out</u>.  As used in this Interim Order, the "<u>Carve-Out</u>" means the sum of: (i) all allowed administrative expenses pursuant to 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Bankruptcy Court and pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code, plus interest at the statutory rate, as determined by agreement of the U.S. Trustee or by final order of the Bankruptcy Court (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all Reported Fee Accruals (as defined in the Ratification Agreement), less the amount of any fee retainers received by professionals retained by the Debtors or any Committee pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code (the "<u>Professionals</u>") and not previously applied to the fees and expenses of the Professionals (the "<u>Pre-Trigger Allowed Professional Fees</u>") incurred by such Professionals at any time after the Petition Date and before or on the date of delivery by the Agent of a Carve-Out Trigger Notice (as defined in the Ratification Agreement) (the "<u>Pre-Trigger Date Professional Fee Carve Out</u>"); <u>provided</u>, that the Pre-Trigger Date Professional Fee Carve Out (A) shall not at any time exceed the aggregate amount of the fees and expenses identified in the Budget for each such Professional or category of Professional covering the period of time through (but not after) the date of delivery of a Carve-Out Trigger Notice, les any amounts actually paid to such Professionals in respect of fees and expenses, and (B) shall be permanently reduced by the amount set forth in any Carve Out Escrow Notice (defined below) received by Agent in accordance with Section 2.3(c) of this Interim Order; and

21

(iv) all fees, disbursements, costs and expenses of the Professionals to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order or otherwise,, incurred on and after the first Business Day following delivery by the Agent of a Carve Out Trigger Notice (the "Post-Trigger Allowed Professional Fees"; and together with the Pre-Trigger Allowed Professional Fees, collectively, the "Allowed Professional Fees") in an aggregate amount not to exceed $1.5 million (the "Post-Trigger Date Professional Fee Carve Out"; and together with the Pre-Trigger Date Professional Fee Carve Out, collectively, the "Professional Fee Carve-Out").

For the avoidance of doubt, (i) so long as a Carve-Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code as the same may be due and payable to the extent set forth in the Budget and in accordance with the Credit Agreement and this Interim Order; and (ii) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.

(b)    Excluded Professional Fees.    Notwithstanding anything to the contrary in this Interim Order, neither the Carve-Out nor the proceeds of Collateral or any Loans, Letters of Credit or any other credit or financial accommodations provided under or in connection with the Loan Documents shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following:

(i)    an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity,

22

priority, perfection, or enforceability of (A) the Pre-Petition Obligations or Agent's and any DIP Lender's liens on and security interests in the Pre-Petition Collateral, or (B) the Post-Petition Obligations or Agent's or DIP Lenders' liens on and security interests in the Collateral; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) the Pre-Petition Obligations or the Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral, or (B) the Post-Petition Obligations or Agent's or DIP Lenders' liens on and security interests in the Collateral; or (iii) preventing, hindering or delaying Agent's or DIP Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of the Credit Agreement, the Loan Documents, and this Interim Order;

(ii)    a request to use Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code), without the prior written consent of Agent in accordance with the terms and conditions of this Interim Order;

(iii)    a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or § 364(d) of the Bankruptcy Code, without the prior written consent of Agent;

(iv)    the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Agent or any DIP Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, predecessors, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Agent or any DIP Lender under chapter 5 of the Bankruptcy Code;

4868303.2

(v)    the cost of investigation into any claims against Agent or any DIP Lender arising under or in connection with the Pre-Petition Revolving Loan Documents in excess of $10,000; or

(vi)    any act which has or could directly, materially and adversely modify or compromise the rights and remedies of Agent or any DIP Lender under this Interim Order, or which directly results in the occurrence of an Event of Default under any Loan Documents, or this Interim Order.

(c)    <u>Carve-Out Reserve</u>.  The Debtors are authorized to transfer, on a weekly basis, into a deposit account on terms acceptable to Agent and Debtors (the "<u>Professional Fees Account</u>") cash proceeds from the DIP Facility and/or Cash Collateral in an amount not to exceed the total budgeted weekly Professional Fees for the next unfunded week set forth in the Budget (to the extent such budgeted Professional Fees have not already been funded as part of the Carve Out Advance pursuant to Section 2.4).  Except as expressly contemplated by Section 2.4 and this Section 2.3, no other cash or securities shall be deposited, maintained or credited to the Professional Fees Account.  Subject to Section 2.4, the amounts on deposit or credited to the Professional Fees Account shall be applied first to any Professional Fees required to be paid at any time, prior to the application of any Cash Collateral or other amounts of the Debtors to pay any such Professional Fees.  At the Agent's discretion, Agent may, at any time and in any increment in accordance with the Credit Agreement, establish a Reserve (the "<u>Professional Fee Reserve</u>") against the amount of Revolving Loans and Letters of Credit that would otherwise be available to Borrowers in respect of the Carve-Out; <u>provided</u>, that upon Agent's receipt from Debtors of a written notice certified by Debtors' chief financial officer (the "<u>Carve Out Escrow Notice</u>") that identifies (i) the amount of funds on deposit in the Professional Fees Account, and

(ii) the Professionals and the week set forth in the Budget to which the amounts on deposit in the Professional Fees Account relate, then Agent shall reduce or not increase (as appropriate) the Professional Fee Reserve by the amount equal to the amounts on deposit in the Professional Fees Account; provided further that, the Pre-Trigger Date Professional Fee Carve Out shall be permanently reduced by such amounts transferred by Debtors to the Professional Fees Account on a dollar for dollar basis.

2.4    Funding the Professional Fee Carve Out. Prior to the date of delivery by the Agent of a Carve-Out Trigger Notice (the "Trigger Date"), Debtors shall be authorized to pay Allowed Professional Fees up to the amounts set forth in the Budget and in accordance with the Credit Agreement and this Interim Order. Promptly following the Trigger Date, Agent shall make an advance to the Debtors in an amount equal to $1.5 million (the "Carve Out Advance"), and the Debtors shall use the proceeds of the Carve Out Advance to fund the Allowed Professional Fees covered by the Post-Trigger Date Professional Fee Carve Out, any Allowed Professional Fees covered by the Pre-Trigger Date Professional Fee Carve Out not otherwise paid with the amounts in the Professional Fees Account or the Professional Fees reserve, as applicable, and the other Carve-Out expenses, subject to and in accordance with the terms of this Interim Order. The payment of any obligations arising pursuant to 28 U.S.C. § 1930 shall not be limited by the Carve Out Advance. Immediately upon Agent making the Carve Out Advance, the Collateral shall not be subject to any further carve out for any cost or expenses of the Debtors' Estates, and the Agent's obligation to fund or otherwise ensure the payment of any Carve-Out expenses pursuant to this Interim Order shall be fully and finally satisfied and discharged, and the Agent and the DIP Lenders shall have no obligation or responsibility to fund or otherwise

ensure the payment of any Carve-Out expenses or any other professional fees or expenses of any Debtor or Committee, if any.

2.5 <u>Payment of Carve-Out</u>. Payment from the Carve-Out, whether by or on behalf of the Agent or any DIP Lender, shall not and shall not be deemed to reduce the Post-Petition Obligations, and shall not and shall not be deemed to subordinate any of any of Agent's or any DIP Lender's liens and security interests in the Pre-Petition Collateral, any other Collateral, the Revolving Credit Adequate Protection Superpriority Claim (as defined below), or the DIP Loan Superpriority Claim (as defined below) to any junior pre- or post-petition lien, interest or claim in favor of any other party. Agent and DIP Lenders shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Cases under any chapter of the Bankruptcy Code, and nothing in Section 2.5 of this Interim Order or otherwise shall be construed to obligate the Agent or any DIP Lender in any way, to directly pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

2.6 <u>Limited Use of Cash Collateral; Adequate Protection.</u>

(a) <u>Authorization to Use Cash Collateral</u>. Subject to the terms and conditions of this Interim Order, the Credit Agreement, the Loan Documents, and in accordance with the Budget (subject to the Permitted Variances), Borrowers shall be and are hereby authorized to use the Cash Collateral (as defined in section 363 of the Bankruptcy Code) for the period commencing on the date of this Interim Order and terminating upon the earlier of (i) the date that is the final day of the Interim Financing Period; and (ii) the date on which the Agent delivers an Enforcement Notice (as defined below) to counsel for the Debtors, counsel for the

Committee (if appointed), counsel to MJA Beauty, LLC and the U.S. Trustee, subject to the liens and security interests granted to the Agent and the DIP Lenders. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Borrower's use of Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the Loan Documents and in accordance with the Budget (subject to the Permitted Variances).

(b)      Replacement Liens.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of the Borrowers' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out (collectively, the "Diminution in Value"), the Agent, for the benefit of itself and the DIP Lenders, is hereby granted pursuant to §§ 361 and 363 of the Bankruptcy Code, and solely to the extent of the Diminution in Value, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "Revolving Credit Replacement Lien").  The Revolving Credit Replacement Lien shall be junior and subordinate only to (A) the Carve-Out (B) the Permitted Liens, and (C) Agent's and DIP Lenders' liens on the Collateral to secure the Post-Petition Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

(c)      Section 507(b) Priority Claims.  As adequate protection for the Diminution in Value, the Agent, for the benefit of itself and the DIP Lenders, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and to the extent of the Diminution in Value, an allowed superpriority administrative expense claim in each of the Cases and any successor bankruptcy cases (the "Revolving Credit Adequate Protection Superpriority Claim").  The Revolving Credit Adequate Protection Superpriority Claim shall be junior only to

(A) the Carve-Out, and (B) the DIP Loan Superpriority Claim, and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

Section 3.    Default; Rights and Remedies; Relief from Stay.

3.1    Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" under this Interim Order: (a) any Debtor's failure to perform, in any respect, any of its obligations under this Interim Order; or (b) an "Event of Default" under the Credit Agreement or any of the other Loan Documents other than the Existing Defaults (as defined in Section 3.2 of the Ratification Agreement and referred to herein as the "Existing Defaults").

3.2    Rights and Remedies upon Event of Default.  Upon the occurrence of and during the continuance of an Event of Default other than the Existing Defaults, (a) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order, the Credit Agreement and the other Loan Documents, and (b) the Agent shall be entitled to take any act or exercise any right or remedy (subject to Section 3.4 below) as provided in this Interim Order or any Financing Document, as applicable, including, without limitation, declaring all Obligations immediately due and payable, accelerating the Obligations, ceasing to extend Loans or provide or arrange for Letters of Credit on behalf of Debtors, setting off any Obligations with Collateral or proceeds in Agent's possession, and enforcing any and all rights with respect to the Collateral.  Agent and DIP Lenders shall have no obligation to lend or advance any additional funds to or on behalf of Debtors or the Non-Debtor Borrowers, or provide any other financial accommodations to Debtors or the Non-Debtor Borrowers, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

3.3    <u>Expiration of Loan Commitment</u>.  Upon the earlier of (a) expiration of Borrowers' authority to borrow and obtain other credit accommodations from Agent and DIP Lenders pursuant to the terms of this Interim Order and the Loan Documents (except if such authority shall be extended with the prior written consent of Agent, which consent shall not be implied or construed from any action, inaction or acquiescence by Agent or any DIP Lender), and (b) the occurrence of an Event of Default, other than the Existing Defaults, set forth in Section 3.1, above occurs sooner, all of the Obligations shall immediately become due and payable and Agent and DIP Lenders shall have no obligation whatsoever to make or extend any loans, advances, provide any financial or credit accommodations to Debtors or permit the use of Cash Collateral.

3.4    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit Agent and each DIP Lender to perform, immediately upon entry of this Interim Order and at any time thereafter, any act authorized or permitted under or by virtue of this Interim Order or the Loan Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition Obligations or the Post-Petition Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the Loan Documents (subject to Section 5.12 of this Interim Order) and apply such payments to the Pre-Petition Obligations or Post-Petition

Obligations pursuant to the Loan Documents and/or this Interim Order, as applicable.    In addition, and without limiting the foregoing, upon the occurrence of an Event of Default other than the Existing Defaults and the Agent, acting on behalf of itself and the DIP Lenders providing five (5) business days (the "Default Notice Period") prior written notice (the "Enforcement Notice") to (i) counsel for the Debtors, (ii) counsel for the Committee (if appointed), (iii) counsel to MJA Beauty, LLC and (iv) the U.S. Trustee. Following the giving of the Enforcement Notice, the Debtors, solely for the purposes of determining if an Event of Default has occurred, shall be entitled to an emergency hearing before this Court and the Agent, acting on behalf of itself and the DIP Lenders, shall consent to such expedited hearing. Upon the expiration of such five (5) business day notice period, the Agent, acting on behalf of itself and the DIP Lenders, shall be entitled without further notice, application or order of the Court to take any action and exercise all other rights and remedies provided to it by this Interim Order, the Loan Documents or applicable law that Agent may deem appropriate in its sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the Agent, for the benefit of itself and the DIP Lenders, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Obligations. Notwithstanding anything to the contrary, any action that Agent is otherwise permitted to take pursuant to this Interim Order to (i) terminate the commitments under the Loan Documents, (ii) accelerate the Loans, (iii) send blocking notices or activation notices pursuant to the terms of any Blocked Account Agreement, (iv) repay any amounts owing in respect of the Obligations (including, without limitation, fees, indemnities and expense reimbursements) and (v) cash collateralize Letters of Credit and/or Bank Products issued pursuant to the Loan Documents, in each case, shall not require any advance notice to the Debtors.    In any hearing

regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and neither the Debtors nor the Non-Debtor Borrowers shall be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Interim Order or the Loan Documents.

Section 4.    Representations; Covenants; and Waivers.

4.1    Objections to Pre-Petition Obligations.  Notwithstanding anything to the contrary in this Interim Order, any action, claim, defense, complaint, motion or other written opposition (hereinafter, an "Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition Obligations as of the Petition Date, or (b) the extent, legality, validity, perfection or enforceability of Agent's and DIP Lenders' pre-petition liens and security interests in the Pre-Petition Collateral shall be properly filed with the Court (x) by any Committee on or before the earlier of (i) sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee and (ii) the entry of an order in any of the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code, or (y) if no Committee is appointed, by any party in interest with requisite standing on or before the earlier of (i) seventy-five (75) calendar days from the date of entry of this Interim Order and (ii) the entry of an order in any of the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code; provided, however, that nothing herein shall permit any party to challenge the extent or validity of the Post-Petition Obligations for any disbursements in excess of the Pre-Petition Obligations.

31

If any such Objection is timely and properly filed and a final, non-appealable order is entered by a court of competent jurisdiction sustaining and ordering the relief requested in such Objection, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Obligations or Agent's or DIP Lenders' pre-petition liens on the Pre-Petition Collateral. If no Objection is timely and properly filed, or if an Objection is timely and properly filed but denied, (i) the Pre-Petition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Agent's and DIP Lenders' pre-petition liens on and security interest in the Pre-Petition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Carve-Out and Permitted Liens, and (ii) the Agent and the DIP Lenders, and each of their respective agents, officers, directors, employees, attorneys, professionals, predecessors, successors, and assigns (each in their respective capacities as such) (i) shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Pre-Petition Revolving Loan Documents, in any such case, arising out of, connected with, or relating to any and all acts, omissions or events occurring as of or at any time prior to the entry of this Interim Order, and (ii) shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time. Nothing contained in this Section 4.1 or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to Agent or any DIP Lenders in connection with any post-petition Loans or Letters of Credit, or any other post-petition financial and credit accommodations provided by Agent and the DIP Lenders to Debtors in reliance on

section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the Loan Documents.

4.2    <u>Debtors' Waivers</u>.  At all times during the Cases, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to seek further authority (a) to use Cash Collateral of Agent and DIP Lenders or of Pre-Petition Term Agent and Pre-Petition Term Lenders under section 363 of the Bankruptcy Code, (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order or as may be otherwise expressly permitted pursuant to the Loan Documents, (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, (d) to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all Obligations (other than unmatured indemnity obligations for which claims (i) have not been asserted and (ii) are not reasonably expected to be asserted at any time in the future) on the effective date of such plan in accordance with the terms and conditions set forth in the Credit Agreement, or (e) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent or any DIP Lender as provided in this Interim Order and the Loan Documents or Agent's or any DIP Loan Lender's exercise of such rights or remedies (other than to object to the exercise of the rights and remedies within the Default Notice Period on the grounds set forth in Section 3.4 of this Interim Order); <u>provided</u>, <u>however</u>, that Agent may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by Agent or any DIP

Lender; provided further, however, that nothing herein shall prohibit the Debtors from obtaining post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code if the proceeds of such financing are used to indefeasibly pay all Obligations and the Obligations are satisfied in full in accordance with the terms of the Credit Agreement or the other Loan Documents.

4.3     Section 506(c) Claims.  Subject to entry of the Final Order granting such relief, no costs or expenses of administration which have or may be incurred in the Cases shall be charged against Agent or any DIP Lender, their respective claims or the Collateral pursuant to § 506(c) of the Bankruptcy Code without the prior written consent of Agent, and no such consent shall be implied from any other action, inaction or acquiescence by Agent or any DIP Lender.

4.4     Collateral Rights.  Until all Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the Credit Agreement and the other Loan Documents:

(a)     no other party shall foreclose or otherwise seek to enforce any junior lien or claim in Collateral; and

(b)     upon and after the declaration of the occurrence of an Event of Default, other than the Existing Defaults, and subject to Agent obtaining relief from the automatic stay as provided for herein to enforce its rights and remedies against the Collateral, in connection with a liquidation of any of the Collateral, Agent (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of Debtors, to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtors and (ii) use any and all trademarks, trade names, copyrights,

licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses.  Agent and DIP Lenders will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that Agent actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that Agent actually occupies or uses such assets or properties or for any fees, rentals or other amounts that may become due following the end of Agent's occupation or use).

4.5    <u>Releases</u>.

Upon the earlier of (a) the entry of the Final Order or (b) the entry of an order extending the Interim Financing Period beyond thirty (30) calendar days after the date of this Interim Order, and in each instance, subject to Section 4.1 above, in consideration of Agent, and DIP Lenders permitting Debtors to use the Pre-Petition Collateral (including Cash Collateral) and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Loan Documents and this Interim Order, each Debtor and Non-Debtor Borrower, on behalf of itself and its successors and assigns (collectively, the "<u>Releasors</u>"), shall, forever release, discharge and acquit Agent and each DIP Lender and their respective, successors and assigns, present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives in their respective capacities as such (collectively, the "<u>Pre-Petition Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Pre-Petition

Releasees, or any of them, as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Obligations, the Loan Documents and any Loans, Letters of Credit, Bank Products (as such terms are defined in the Credit Agreement) or other financial accommodations made by Agent and/or the DIP Lenders to any Debtor or Non-Debtor Borrowers pursuant to the Loan Documents.   In addition, notwithstanding anything to the contrary set forth herein, upon the repayment of all Obligations (as defined in the Credit Agreement) owed to the Agent and the DIP Lenders by Debtors and termination of the rights and obligations arising under the Loan Documents (which payment and termination shall be on terms and conditions acceptable to the Agent), the Agent and the DIP Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring, on or prior to the date of such repayment and termination, in connection with or related to the Loan Documents, this Interim Order or the Final Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out and/or the Professional Fee Carve-Out, on terms and conditions acceptable to the Agent).

Section 5.      <u>Other Rights and Post-Petition Obligations</u>.

5.1      <u>No Modification or Stay of This Interim Order</u>.  Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, the Loan Documents or any term hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of one or more of the Cases (each, a "<u>Subject Event</u>"), (x) the acts taken by each of the Agent and the DIP Lenders in accordance with this Interim Order, and (y) the Post-Petition Obligations incurred or arising prior to Agent's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the

36

original provisions of this Interim Order, and the acts taken by Agent and DIP Lenders in accordance with this Interim Order, and the liens granted to Agent and DIP Lenders in the Collateral, and all other rights, remedies, privileges, and benefits in favor of Agent and each DIP Lenders pursuant to this Interim Order and the Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

5.2    Power to Waive Rights; Duties to Third Parties.  Agent shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of Agent and DIP Lenders (the "DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s).  Any waiver by Agent of any DIP Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to Agent or any DIP Lender.

5.3    Disposition of Collateral.  Debtors and Non-Debtor Borrowers shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, other than pursuant to the terms of the Credit Agreement, without the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Agent or any DIP Lenders).

5.4     <u>Inventory</u>.  Debtors and Non-Debtor Borrowers shall not, without the consent of the Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

5.5     <u>Reservation of Rights</u>.   The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of Agent and each DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the Loan Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

5.6     <u>Binding Effect</u>.

(a)     The provisions of this Interim Order and the Loan Documents, the Post-Petition Obligations, the Revolving Credit Adequate Protection Superpriority Claim, the DIP Loan Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of each of the Agent and the DIP Lenders provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any

order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

(b)     Any order dismissing one or more of the Cases under section 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (a) the DIP Loan Superpriority Claim and Agent's and DIP Lenders' liens on and security interests in the Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until the Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

(c)     In the event this Court modifies any of the provisions of this Interim Order or the Loan Documents following a Final Hearing, such modifications shall not affect the rights or priorities of Agent and DIP Lenders pursuant to this Interim Order with respect to the Collateral or any portion of the Obligations which arises or is incurred or is advanced prior to such modifications, and this Interim Order shall otherwise remain in full force and effect to such extent.

(d)     This Interim Order shall be binding upon Debtors, the Non-Debtor borrowers, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This Interim Order shall also inure to the benefit of Debtors, Agent, DIP Lenders, and each of their respective successors and assigns.

4868303.2

5.7     Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment.

(a)      All post-petition advances and other financial accommodations under the Credit Agreement and the other Loan Documents are made in reliance on this Interim Order and there shall not at any time be entered in the Cases, or in any subsequently converted case under chapter 7 of the Bankruptcy Code, any order (other than the Final Order) which  (i) authorizes the use of cash collateral of Debtors in which Agent or DIP Lenders have an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which Agent or DIP Lenders have a lien or security interest, except as expressly permitted hereunder or in the Loan Documents, or (ii) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which Agent or DIP Lenders hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to Agent and DIP Lenders herein; unless, in each instance (x) Agent shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by Agent or any DIP Lender, or (y) such other order requires that all Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the Credit Agreement and the other Loan Documents (other than unmatured indemnity obligations for which claims have not been asserted), including, without limitation, all debts and obligations of Debtors to Agent and DIP Lenders which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to Agent.  The security interests and liens granted to or for the benefit of Agent and DIP Lenders, hereunder and the rights of Agent and DIP Lenders pursuant to this Interim Order

and the Loan Documents with respect to the Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtors and, if Agent shall expressly consent in writing that the Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

      5.8    <u>No Owner/Operator Liability</u>.  Subject to the entry of the Final Order granting such relief, neither the Agent nor any DIP Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

      5.9    <u>Marshalling</u>.  Subject to entry of the Final Order granting such relief, in no event shall Agent or any DIP Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.  Agent and DIP Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to Agent or any DIP Lender with respect to proceeds, products, offspring or profits of any of the Collateral, as applicable.

      5.10    <u>Right of Setoff</u>.  To the extent any funds were on deposit with Agent as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with Agent or any DIP Lender immediately prior to the filing of the Cases (regardless of whether, as of the Petition Date, such funds had been collected or made available for withdrawal by any such Debtor), such funds (the "<u>Deposited Funds</u>") are subject to rights of

setoff.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of Agent or the applicable DIP Lenders pursuant to §§ 506(a) and 553 of the Bankruptcy Code.

5.11    <u>Right to Credit Bid</u>.

(a)    The Agent, on behalf of itself and the DIP Lenders, shall have the right to "credit bid" the amount of its and their claims that are Obligations arising under the terms of the Loan Documents, during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

5.12    <u>Payment and Review of Lender Fees and Expenses</u>.  Each Debtor and Non-Debtor Borrowers shall pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Credit Agreement, including, without limitation, the non-refundable payment to the Agent and the DIP Lenders of the fees and expenses (including without limitations professional fees and legal fees and expenses) set forth in the Loan Documents, whether incurred before or after the Petition Date; <u>provided, that</u> Debtors shall pay all such reasonable fees and expenses within ten (10) business days of delivery of a statement or invoice for such fees and expenses (it being understood that such statements or invoices shall not be required to be maintained in accordance with the U.S. Trustee Guidelines, nor shall any such counsel or other professional be required to file any interim or final fee applications with the Court or otherwise seek Court's approval of any such payments) to the Debtors, the U.S. Trustee and the Committee (if any), unless, within such ten (10) business day period, the Debtors, the U.S. Trustee or the Committee (if any) serves a written objection upon the requesting party detailing the specific fees or expenses to which such party objects along

with an explanation for the basis of such objection, in which case, the Debtors shall immediately pay only such amounts that are not the subject of any objection and only pay the balance of such statements or invoices at such time and in such amount as subsequently agreed to by the requesting party and any objecting party or as otherwise ordered by the Court to be paid.

      5.13   Term; Termination.  Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among Debtors, the Non-Debtor Borrowers, the Agent and the DIP Lenders authorized by this Interim Order may be terminated pursuant to the terms of the Credit Agreement.

      5.14   Limited Effect.   In the event of a conflict between the terms and provisions of any of the Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern, interpreted as most consistent with the terms and provisions of the Loan Documents.

      5.15   Objections Overruled.  All objections to the entry of this Interim Order are (to the extent not withdrawn, waived, resolved, or settled) hereby overruled on the merits.

      5.16   Retention of Jurisdiction.  The Court retains jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the Credit Agreement, and the other Loan Documents.

Section 6.   Final Hearing and Response Dates.

      The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for September ___, 2017, at _____ before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same may be appointed, or any such Committee's counsel, if same shall have filed a request for notice.  The Debtors may serve the Motion and the Interim Order without the exhibits attached thereto as such exhibits are

43

voluminous and available, free of charge, at http://dm.epiq11.com/perfumania, and such notice is deemed good and sufficient and no further notice need be given.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) proposed counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036-6522 (Attn: Lisa Laukitis) and 500 Boylston Street Boston, Massachusetts 02116 (Attn: J. Gregory Milmoe; Raquelle L. Kaye), Fax: (212) 735-3000; (b) counsel for the Agent, Otterbourg P.C., 230 Park Avenue, New York, New York 10169-0075 (Attn: Daniel F. Fiorillo and Chad B. Simon), Fax: (212) 682-6104; (c) counsel to any Committee; and (d) the U.S. Trustee, 844 King Street, Room 2207, Wilmington, Delaware 19801, Attn: Hannah McCollum; Brya Keilson; Fax: (___) _____; and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case, to allow actual receipt of the foregoing no later than _____, prevailing Eastern time, on September ___, 2017.

Dated: Wilmington, Delaware

_____, 2017

_____
UNITED STATES BANKRUPTCY JUDGE

4868303.2

**<u>EXHIBIT 1</u>**

**Ratification Agreement**

## RATIFICATION AND AMENDMENT AGREEMENT

This RATIFICATION AND AMENDMENT AGREEMENT (as amended, modified, supplemented or otherwise modified from time to time, the "**Ratification Agreement**"), dated as of August [ · ], 2017 is by and among Perfumania Holdings, Inc., a Florida corporation and a debtor and debtor-in-possession (sometimes referred to herein as the "**Parent**" or "**Lead Borrower**"), Quality King Fragrance, Inc., a Delaware corporation and a debtor and debtor-in-possession ("**QKF**"), Scents of Worth, Inc., a Florida corporation and a debtor and debtor-in-possession ("**SOW**"), Northern Group, Inc., a New York corporation and a debtor and debtor-in-possession ("**Northern**"), Perfumania, Inc., a Florida corporation and a debtor and debtor-in-possession ("**Perfumania**"), Magnifique Parfumes and Cosmetics, Inc., a Florida corporation and a debtor and debtor-in-possession ("**Magnifique**"), Ten Kesef II, Inc., a Florida corporation and a debtor and debtor-in-possession ("**Ten Kesef**"), Perfumania Puerto Rico, Inc., a Puerto Rico corporation and a debtor and debtor-in-possession ("**Perfumania PR**"), Perfumania.com, Inc., a Florida corporation and a debtor and debtor-in-possession ("**Perfumania.com**", together with Parent, QKF, SOW, Northern, Perfumania, Magnifique, Ten Kesef, and Perfumania PR, each a "**Debtor Borrower**" and collectively, "**Debtor Borrowers**"), Five Star Fragrance Company, Inc., a New York corporation ("**Five Star**"), Parlux Fragrances, LLC, a Delaware limited liability company ("**Parlux**") and Parlux Ltd., a New York corporation ("**Parlux Ltd.**", and together with Five Star and Parlux each a "**Non-Debtor Borrower**" and collectively with the Debtor Borrowers, the "**Borrowers**"), the Guarantors (as hereinafter defined), the lenders party to the Pre-Petition Credit Agreement referred to below ("**Lenders**"), and Wells Fargo Bank, National Association, as Administrative Agent and Collateral Agent for the Lenders and others (in such capacity, the "**Agent**").

W I T N E S S E T H:

WHEREAS, Debtor Borrowers and Guarantors (each a "**Debtor**" and collectively, the "**Debtors**") have commenced cases under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the District of Delaware and each Debtor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Case (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers secured by substantially all assets and properties of Borrowers, and Guarantors as set forth in the Pre-Petition Loan Documents (as defined below);

WHEREAS, the Debtors and Non-Debtor Borrowers are requesting that the Bankruptcy Court enter a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantors as set forth in the Financing Order and the Loan Documents (as defined below);

WHEREAS, Borrowers and Guarantors have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to

Borrowers and make certain amendments to the Pre-Petition Credit Agreement (as defined below) and the other Pre-Petition Loan Documents, and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein; and

WHEREAS, Borrowers and Guarantors desire to reaffirm their obligations to Agent and Lenders pursuant to the Pre-Petition Loan Documents and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantors as set forth in the Financing Order.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders, Borrowers, and Guarantors mutually covenant, warrant and agree as follows:

1.    DEFINITIONS.

   1.1    Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

        (a)    **"Bankruptcy Court"** means the United States Bankruptcy Court or the United States District Court for the District of Delaware

        (b)    **"Bankruptcy Code"** means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

        (c)    **"Bankruptcy Events"** means the commencement of the Chapter 11 Case, the events and conditions disclosed to Agent in writing prior to the date hereof leading up to the commencement of the Chapter 11 Case, the occurrence and existence of any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof, the Store Closing GOB Sales, and any claim or liability that (i) was incurred prior to the Petition Date, (ii) is a general unsecured claim not entitled or eligible to be paid at any time during the pendency of the Chapter 11 Case, and (iii) is junior and subordinate in priority in all respects to the Obligations.

        (d)    **"Budget"** means the thirteen (13) week budget delivered to Agent in accordance with Section 5.3 of the Ratification Agreement (a summary of such initial Budget is attached to the Ratification Agreement as Exhibit A) in form and substance approved by Agent, together with any subsequent or amended budgets thereto delivered to Agent and Lenders, in form and substance satisfactory to Agent (each such subsequent budget, referred to as the "**Budget**"), in accordance with the terms and conditions of the Ratification Agreement.

(e)    "**Carve-Out**" shall have the meaning set forth in the Financing Order.

(f)    "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by Agent to the Debtors, Debtors' lead counsel in the Chapter 11 Case, counsel to any Committee and the U.S. Trustee following the occurrence and during the continuation of an Event of Default, stating that the Post-Trigger Date Professional Fee Carve-Out has been invoked.

(g)    "**Chapter 11 Case**" means the cases under Chapter 11 of the Bankruptcy Code commenced by Debtors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

(h)    "**Committee**" means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

(i)    "**Debtors**" means, collectively, Debtor Borrowers and Guarantors, each as Debtor and Debtor-in-Possession in the Chapter 11 Case.

(j)    "**Financing Order**" means the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Borrowers on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(k)    "**Interim Financing Order**" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, in the form attached hereto as <u>Exhibit B</u> and/or otherwise in form and substance satisfactory to Agent, together with all extension, modifications, and amendments thereto consented to by Agent, which, among other matters but not by way of limitation, authorizing, on an interim basis, the Borrowers to execute and perform under the terms of the Pre-Petition Loan Documents, as amended and supplemented by the terms and conditions of the Ratification Agreement.

(l)    "**Credit Agreement**" means, the Pre-Petition Credit Agreement as ratified, amended, supplemented and otherwise modified by the Ratification Agreement, as the same now exists or may hereafter be amended from time to time.

(m)    "**Licensor Consents**" means, collectively, (i) Licensor Agreement, dated as of August 19, 2013, by and among Parlux and Artistic Brands Development, LLC, Combermere Entertainment Properties, LLC and the Agent, (ii) Licensor Agreement, dated as of December 6, 2012, by and among Parlux Ltd., Kenneth Cole Productions (LIC), LLC and the Administrative Agent, and (iii) Licensor Agreement, dated as of September 28, 2012, by and among Parlux, Parlux Ltd., Paris Hilton Entertainment, Inc., and Administrative Agent, in each case as amended, restated, amended and restated, supplemented or otherwise modified.

(n)    "**Participant Register**" has the meaning specified in Section 10.06(d) of the Credit Agreement.

(o)    **"Permanent Financing Order"** means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing of the Bankruptcy Court, which order shall be in form and substance satisfactory to Agent and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, consented to by the Agent, which among other matters, but not by way of limitation, authorizing the Borrowers to obtain credit, incur the Post-Petition Obligations, and grant Liens therefor and granting super-priority expense claims to Agent and Lenders with respect to all Obligations due Agent and Lenders, subject to no priority claim or administrative expenses of the Chapter 11 Case or any other entity (other than the Carve-Out and Pre-Petition Priority Liens).

(p)    **"Petition Date"** means the date of the commencement of the Chapter 11 Case.

(q)    **"Post-Petition Collateral"** means, collectively, all now existing and hereafter acquired real and personal property of each Borrower and Guarantor, including each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent pursuant to the Loan Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

(i)    all of the Pre-Petition Collateral;

(ii)    all Accounts;

(iii)    all general intangibles, including, without limitation, all Intellectual Property;

(iv)    all goods, including, without limitation, Inventory and Equipment;

(v)    all Real Property and fixtures;

(vi)    all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(vii)    all instruments, including, without limitation, all promissory notes;

(viii)    documents and all credit card sales drafts, credit card sales slips or charge slips or receipts, and other forms of store receipts;

(ix)    deposit accounts;

(x)    all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(xi)    all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(xii)    all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of any Debtor now or hereafter held or received by or in transit to any Lender, the Agent or its Affiliates or at any other depository or other institution from or for the account of any Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiii)    all commercial tort claims, including, without limitation, those identified in the Perfection Certificate;

(xiv)    to the extent not otherwise described above, all Receivables;

(xv)    all Records;

(xvi)    all proceeds of any Excluded Contract;

(xvii)    effective upon entry of a Permanent Financing Order, all claims, rights, interests, assets and properties (recovered by or on behalf of each Borrower and Guarantor or any trustee of such Borrower or Guarantor (whether in the Chapter 11 Case or any subsequent case to which any Chapter 11 Case is converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to (among others) Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code; and

(xviii)    to the extent not covered by the foregoing clauses, all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral;

provided, that, in no event shall "Post-Petition Collateral" include Equity Interests of a Subsidiary which is a CFC in excess of sixty-five percent (65%) of the outstanding voting Equity Interests of such Subsidiary.

(r)    **"Post-Petition Obligations"** means all Obligations (as defined in the Pre-Petition Credit Agreement) of any Borrower arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether

arising under or related to this Ratification Agreement, the Credit Agreement, the other Loan Documents, a Financing Order, by operation of law or otherwise, and whether incurred by such Debtor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and reasonable and documented attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.  For the avoidance of doubt, the Post-Petition Obligations shall include that portion of the outstanding Pre-Petition Obligations, which have been "rolled-up" from time to time as provided in the Financing Order.

(s)    **"Pre-Petition Collateral"** means, collectively, (i) all "Collateral" (as such term is defined in the Pre-Petition Credit Agreement as in effect immediately prior to the Petition Date), (ii) all "Collateral" and "Pledged Collateral" as such terms are defined in each of the other Pre-Petition Loan Documents as in effect immediately prior to the Petition Date, and (iii) all other security for the Pre-Petition Obligations as provided in the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents immediately prior to the Petition Date.

(t)    **"Pre-Petition Loan Documents"** means the Loan Documents (as defined in the Pre-Petition Credit Agreement), as in effect immediately prior to the Petition Date.

(u)    **"Pre-Petition Credit Agreement"** means the Credit Agreement dated January 7, 2011 by and among Wells Fargo, as administrative and collateral agent, the Borrowers and the Guarantors, and the parties from time to time parties thereto as lenders, as amended by Amendment No. 1 to Credit Agreement, dated as of December 23, 2011 and Amendment No. 2 to Credit Agreement, dated as of April 25, 2014, as supplemented by the Joinder Agreement, dated as of April 18. 2012, and otherwise as in effect immediately prior to the Petition Date.

(v)    **"Pre-Petition Obligations"** means all Obligations (as such term is defined in the Pre-Petition Credit Agreement) arising at any time before the Petition Date.

(w)    **"Pre-Petition Priority Liens"** means, collectively, the Liens permitted by the Pre-Petition Loan Documents, to the extent any such permitted Liens are valid, enforceable (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws effecting creditors' rights generally and subject to the general principles of equity, regardless of whether considered in a proceeding in equity or a law), properly perfected, non-avoidable and senior in priority to the Liens securing the Pre-Petition Obligations as of the Petition Date.

(x)    **"Professionals"** has the meaning given in the Financing Order.

(y)    **"Ratification Agreement"** means the Ratification and Amendment Agreement, dated as of the August [ • ], 2017, by and among Borrowers, Guarantors, Agent and Lenders, as the same may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(z)    **"Ratification Closing Date"** means the date on which all of the conditions precedent in Section 9 of the Ratification Agreement have been satisfied (or waived).

(aa) **"Reported Fee Accruals"** means all allowed fees, disbursements, costs and expenses of the Professionals which have been incurred, accrued or invoiced (but remain unpaid) through the date of service of a Carve-Out Trigger Notice up to, but not exceeding, the aggregate amounts under the heading "Professional Fees & Carve Out Funding" in the Budget (reflected on an accrual basis and not on a cash basis) for the line item for each such Professional (or if less, such Professional's actual fees, disbursements, costs and expenses incurred to such time) <u>minus</u> any payments received on account thereof Any Professional's fees, disbursements, costs and expenses which have been incurred, accrued or invoiced (and remain unpaid) but are in excess of the aggregate amounts reflected in the Budget in the line item for each such Professional shall not constitute "*Reported Fee Accruals*", and shall not constitute part of the Carve-Out.

(bb) **"Retention Agreement"** means the Agency Agreement made as of August ___, 2017, by and between Perfumania Holdings, Inc. and a contractual joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, referred herein as "Gordon Brothers"), and acknowledged by the Agent, and any replacement agreement entered into by the Borrowers, and a Third Party Liquidator, on terms and conditions acceptable to Agent.

(cc) **"Special Reserve"** means the Reserve established by Agent against the Borrowing Base in the amount equal to the greater of (i) ten percent (10%) of the Loan Cap or (ii) $8,000,000, for purposes of determining the amount of the Special Reserve, Availability Reserves but not the Special Reserve shall be deducted from the Borrowing Base.

(dd) **"Sanctioned Entity"** means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.  As of the date hereof, Crimea, Cuba, North Korea, Sudan, and Syria are Sanctioned Entities.

(ee) **"Sanctioned Person"** means, at any time, (a) any a Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, or any other Sanctions-related list maintained by any relevant Sanctions authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

(ff) **"Sanctions"** means individually and collectively, respectively, any and all economic, trade, financial or other sanctions laws, regulations or embargoes imposed, administered or enforced from time to time by:  (a) the United States of America, including, without limitation, those administered by the Office of Foreign Assets Control (OFAC) of the U.S. Department of Treasury, the U.S. Department of State, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other governmental authority in any jurisdiction in which any Loan Party or any of its Subsidiaries is located or doing business.

**1.2**    <u>Amendments to Definitions in the Pre-Petition Credit Agreement</u>.

(a)    <u>Aggregate Commitments</u>.  The definition of "Aggregate Commitments" in the Pre-Petition Credit Agreement is hereby amended to include the following sentence at the end of such definition:

"On the Petition Date, the Aggregate Commitments are $83,750,000.

(b)    <u>Applicable Margin</u>.  The definition of "Applicable Margin" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"'<u>Applicable Margin</u>' means   from and after the Closing Date the percentages set forth in the pricing grid below:

| Base Rate Margin | Letter of Credit Fee |
|---|---|
| 3.25% | 4.50% |

(c)    <u>Availability</u>.  The definition of "Availability" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Availability' means, as of any date of determination thereof by the Agent, the result, if a positive number, of: (a) the Loan Cap, minus (b) the aggregate unpaid balance of Credit Extensions to, or for the account of, the Borrowers.  In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all accounts payable, Taxes, and other items included in the Total Operating Disbursements line item of the Budget are being paid on a timely basis.

(d)    <u>Availability Reserves</u>.  The definition of "Availability Reserves" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Availability Reserves' means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as Administrative Agent from time to time determines in its good faith discretion as being appropriate (a) to reflect the impediments to Agents' ability to realize upon the Collateral, (b) to reflect claims and liabilities that Administrative Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists, or (e) to reflect (i) the Carve-Out Expenses (as defined in the Financing Order) and Professional Expense Escrow (as defined in

the Financing Order), (ii) the amount of any senior liens or claims in or against the Collateral that, in Agent's determination, may be found to have priority over the liens or claims of Agent or any other Credit Party or (iii) the amount of priority or administrative expense claims that, in Administrative Agent's determination, may be required to be paid by Debtors or their estates at any time during the Chapter 11 Cases, or (f) to reflect the value of Inventory at leased locations with respect to which the lease therefor has not been assumed commencing on the date that is ten (10) weeks  prior to the end of the one hundred twenty (120) day lease rejection/assumption period, as such period may be extended or shortened by the Bankruptcy Court, or (g) to reflect the value of Inventory held at any leased location as to which there has been filed a landlord's motion to compel the assumption or rejection of the lease, in an amount determined by Agent, and considering the likelihood or unlikelihood of the success of such motion on its merits in the good faith judgment of Agent. Without limiting the generality of the foregoing, Availability Reserves may include, in Administrative Agent's discretion, (but are not limited to) reserves based on: (i) rent; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of Administrative Agent and Lenders in the Collateral; (iv) salaries, wages and benefits due to employees of any Borrower or Guarantor, (v) Customer Credit Liabilities, (vi) Customer Deposits, (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals, (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of Administrative Agent or Lenders in the Collateral, (ix) amounts due to vendors on account of consigned goods, (x) Cash Management Reserves, (xi) Bank Product Reserves; and (xii) royalties payable in respect of licensed merchandise."

(e)    Borrowing Base.  Clause (d) of the definition of "Borrowing Base" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"(d) the amount equal to the sum of (i) the Special Reserve and (ii) all Availability Reserves."

(f)    Change of Control.  The parenthetical at the end of clause (b) of the definition of "Change of Control" is hereby deleted.

(g)    Credit Parties.  The following parenthetical is hereby added to the end of clause (vi) of the definition:

"(including without limitation, all Bank Product Providers)"

(h)    Eligible Credit Card Receivables. Clause (a) of the definition of "Eligible Credit Card Receivables" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"(a) Credit Card Receivables which do not constitute a "payment intangible" (as defined in the UCC) or an Account;"

(i)    Eligible Inventory.

(i)    Clause (c) of the definition of "Eligible Inventory" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"(c)(x) Inventory that is not located in the United States of America (excluding territories or possessions of the United States other than the Commonwealth of Puerto Rico), (y) Inventory that is not located at a location that is owned or leased by a Borrower, except Inventory that is in transit between locations that are owned or leased by a Borrower in the United States of America (excluding territories or possessions other than the Commonwealth of Puerto Rico) and/or locations meeting the criteria in the following clause (z), or (z) to the extent that the Borrowers have furnished Agent with (A) any UCC financing statements or other documents that the Lender may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to Agent; provided, that, the aggregate Cost of all Inventory located at Stores in Puerto Rico eligible for inclusion in the calculation of the Borrowing Base shall not exceed $2,000,000;"

(ii)    Clause (k) of the definition of "Eligible Inventory" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"(k) Inventory subject to any patent or trademark license requiring either (i) the payment of royalties or fees or (ii) which restricts such Borrower's or any Agent's right to freely dispose of such Inventory unless such Agent has, at its option, entered in an acceptable agreement with the owner of such trademark or patent; or made such other arrangements acceptable to Agents (for the avoidance of doubt, so long as the applicable Licensor Consent remains in full force and effect, the Inventory which is the subject of the license referred to in such Licensor Consent, will not be deemed ineligible pursuant to this clause (k));"

(j)    Eligible Trade Receivables. Notwithstanding anything to the contrary set forth in the definition of Eligible Trade Receivables set forth in the Pre-Petition Credit Agreement, (a) Dated Accounts are no longer Eligible Trade Receivables, and (b)

Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity are not Eligible Trade Receivables.

(k)    Interest Payment Date.  The definition of "Interest Payment Date" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

""Interest Payment Date" means the first day after the end of each month and the Maturity Date."

(l)    Letter of Credit Sublimit.  The first two sentences of the definition of "Letter of Credit Sublimit in the Pre-Petition Credit Agreement are hereby deleted and the following substituted therefor:

""Letter of Credit Sublimit" means an amount equal to $10,000,000.  The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Commitments."

(m)    Material Adverse Effect.  The definition of "Material Adverse Effect" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

""Material Adverse Effect' means (a) a material adverse effect on (i) the business, operations, results of operations, assets, liabilities or financial condition of Loan Parties and their Subsidiaries, taken as a whole or (ii) any Agent's or any Lender's material rights and remedies under the Agreement and the other Loan Documents, (b) a material impairment of (i) Loan Parties' and their Subsidiaries' ability, taken as a whole, to perform their obligations under the Loan Documents to which they are parties or (ii) the Agents' and Credit Parties' ability to enforce the Obligations or realize upon the Collateral (other than as a result of an action taken or not taken that is solely in the control of any Agent or another Credit Party, as the case may be), (c) subject to Permitted Liens, a material impairment of the enforceability or priority of Collateral Agent's Liens with respect to the Collateral (other than as a result of an action taken or not taken that is solely in the control of any Agent or another Credit Party, as the case may be) or (d) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party; provided, that, the commencement of the Chapter 11 Cases shall not constitute a Material Adverse Effect."

(n)    Maturity Date.  The definition of "Maturity Date" in the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

""Maturity Date' shall mean the earliest to occur of (a) December 31, 2017, (b) forty-five (45) days after the entry of the Interim Financing

Order if the Permanent Financing Order has not been entered prior to the expiration of such forty-five (45) day period (or such longer period if consented to in writing by the Agent), (c) the effective date of a plan of reorganization filed in the Chapter 11 Case pursuant to an order entered by the Bankruptcy Court, (d) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties, other than, for the avoidance of doubt, the Store Closing GOB Sales (as defined in Section 5.4(a) of the Ratification Agreement), (e) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of any Debtor to a Chapter 7 case, (f) the date this Agreement is otherwise terminated for any reason whatsoever pursuant to the terms of this Agreement, and (g) the acceleration of the Obligations or termination of the Commitments hereunder, including without limitation, as a result of the occurrence of an Event of Default.""

(o)    Permitted Dispositions.   Clause (a) of the definition of Permitted Dispositions is hereby deleted in its entirety and the following substituted therefor:

"(a) bulk sales or other dispositions of the Inventory of a Loan Party not in the ordinary course of business in connection with Store Closing GOB Sales, at arm's length, provided, that (i) such sales are in accordance with the terms of this Agreement, including, without limitation, Sections 5.4 and 5.5 of the Ratification Agreement, and (ii) all Net Proceeds received in connection therewith are applied to the Obligations in accordance with Section 2.05 hereof;

(p)    Agent and Lenders.   All references to the terms "Collateral Agent" "Administrative Agent" "Agent" and "Lenders" shall include their respective successors and permitted assigns.

(q)    Borrowers, Guarantors and Debtors.   All references to the terms "Borrowers", "Guarantors" or "Debtors" in the Loan Documents shall be deemed and each such reference is hereby amended to mean and include (as applicable) the Debtors and Non-Debtor Borrowers (each as defined herein), and their successors and assigns (including any trustee or other fiduciary hereafter appointed as any Debtor's legal representative, as applicable, or with respect to any Debtor the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Debtor, as the case may be).

(r)    Delivery of Borrowing Base Certificates.   Section 6.02(b) of the Pre-Petition Credit Agreement is hereby amended by deleting  the entire clause and substituting the following therefor:

"(b)    on the fourth Business Day of each week, a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding week, each Borrowing Base Certificate to

be certified as complete and correct by a Responsible Officer of the Lead Borrower;"

(s)     Collateral.  All references to the term "Collateral" in the Credit Agreement or the other Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(t)     Credit Agreement.  All references to the term "Agreement" in the Pre-Petition Credit Agreement or the term "Credit Agreement" in the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean the Credit Agreement (as defined in the Ratification Agreement), and as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof and the Financing Order.

(u)     [Reserved].

(v)     Loan Documents.  All references to the term "Loan Documents" in the Credit Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Pre-Petition Loan Documents, as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms of the Ratification Agreement, as amended and supplemented thereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(w)     Material Adverse Effect.  All references to the term "Material Adverse Effect," "material adverse effect" or "material adverse change" in the Credit Agreement, the Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "provided, that, the Bankruptcy Events shall not, individually or collectively, constitute a Material Adverse Effect."

(x)     Obligations.  All references to the term "Obligations" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(y)     Permitted Encumbrances.  The definition of "Permitted Encumbrances" in the Pre-Petition Credit Agreement is hereby amended by (i) deleting the period appearing at the end of clause (p) of such definition and replacing it with a semi-colon, and (ii) adding the following clauses at the end thereof:

"(x) all Liens existing on the Petition Date that constitute Pre-Petition Priority Liens"; and

(y) the Carve-Out."

(z)     Permitted Indebtedness.  The definition of "Indebtedness" in the Pre-Petition Credit Agreement is hereby amended by deleting clause (b)(i) therein and replacing it with the following:

"(i) trade accounts payable or accrued obligations incurred in the ordinary course of business or during the pendency of the Chapter 11 Case and payable in accordance with the Budget,"

(aa)    Permitted Investments.  The definition of "Permitted Investments" in the Pre-Petition Credit Agreement is hereby amended by deleting clause (n) thereof in its entirety.

(bb)    Termination of LIBO Rate Loans.  Notwithstanding anything to the contrary contained in the Pre-Petition Credit Agreement or the other Loan Documents (a) the Borrowers' right to request LIBO Rate Loans in accordance with Section 2 of the Credit Agreement is hereby terminated and of no further force or effect, (b) no Committed Borrowing made on or after the Petition Date shall bear interest at a rate determined by reference to the LIBO Rate, (c) all LIBO Rate Loans shall be converted to Base Rate Loans on the Petition Date, and (d) Borrowers shall not request, and Agent and Lenders shall have no obligation to provide, any LIBO Rate Loans.

**1.3**    Interpretation.

(a)    For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Pre-Petition Credit Agreement, as amended, supplemented or otherwise modified by this Ratification Agreement.

(b)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(c)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

**2.**    ACKNOWLEDGMENTS.

**2.1**    Pre-Petition Obligations.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that, as of August 25, 2017, Borrowers are indebted to Agent and Lenders in respect of all Pre-Petition Obligations in an aggregate principal amount of not less than $18,821,219.59 consisting of (a) Loans to each Borrower made pursuant to the Pre-Petition Loan Documents, together with interest accrued and accruing thereon, and (b) outstanding Obligations arising from or in connection with Letters of Credit issued under the Pre-Petition Credit Agreement together with interest accrued and accruing thereon, and all costs, expenses, and fees (including reasonable documented attorneys' fees and out-of-pocket legal expenses), plus all other charges now or hereafter owed by Borrowers to Agent and Lenders, all of which are unconditionally owing by the Borrowers and to the Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

**2.2**    Guaranteed Obligations.  Each Guarantor hereby acknowledges, confirms and agrees that:

(a)    all obligations of such Guarantors under the Pre-Petition Loan Documents are unconditionally owing by such Guarantor to Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)    the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Guarantor pursuant to the Pre-Petition Loan Documents extends to all Post-Petition Obligations, without duplication.

**2.3**    Acknowledgment of Security Interests.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that Agent, for the benefit of itself and the other Credit Parties, has and shall continue to have (a) valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent pursuant to the Pre-Petition Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, and (b) valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent, for the benefit of itself and the Credit Parties, under the Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Agent and Lenders, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement (including, without limitation, Pre-Petition Priority Liens) and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent.

**2.4**    Binding Effect of Documents.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that: (a) each of the Pre-Petition Loan Documents to which it is a party was duly executed and delivered to Agent and Lenders by such Borrower or Guarantor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Guarantor contained in the Pre-Petition Loan Documents constitute the legal, valid and binding obligations of such Borrower or Guarantor enforceable against it in accordance with the terms thereof, and such Borrower or Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in (i), subject to the entry and terms of the Financing Order, the Loan Documents and (ii) the Financing Order.

**3.**    ADOPTION AND RATIFICATION.

**3.1.**    Each Borrower and Guarantor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Loan Documents to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Pre-Petition Loan Documents, as supplemented and amended by this Ratification Agreement, and in accordance with the Financing Order.  All of the Pre-Petition Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Guarantors, each as Debtor and Debtor-in-Possession (as applicable) and considered as agreements between such Borrowers or Guarantors, on the one hand, and Agent and Lenders, on the other hand.  Each Borrower and Guarantor party hereto hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Pre-Petition Loan

Documents, as amended and supplemented pursuant hereto and the Financing Order, and each Borrower and Guarantor, as Debtor and Debtor-in-Possession (as applicable), agrees to be fully bound by the terms of the Loan Documents to which such Borrower or Guarantor is a party.

3.2.    Notwithstanding anything in Section 3.1 of this Ratification Agreement to the contrary, the Agent and Lenders acknowledge that certain Events of Default, as further described on Exhibit D hereto, have occurred and are continuing under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents, including, but not limited to, as a result of the commencement of the Chapter 11 Case and the other Bankruptcy Events (the "**Existing Defaults**").    Agent and each Lender waive any such Existing Defaults under the Loan Documents.  From and after the Ratification Closing Date, for purposes of determining whether any Default or Event of Default has occurred under the Credit Agreement or any other Loan Document, the Agent and the Lenders hereby agree that all such Existing Defaults shall be excluded from any determination of the existence or continuation of a Default or Event of Default  and only Defaults and Events of Default (as provided  in the Credit Agreement) occurring from and after the Ratification Closing Date shall constitute Defaults and Events of Default under the Credit Agreement.  For the avoidance of doubt, none of the Existing Defaults shall give any right to the Agent or any Lender to exercise or enforce any of their respective rights or remedies under the Credit Agreement or the other Loan Documents on the basis of the occurrence and/or existence of any one or more of the Existing Defaults.

4.    GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), the Debtor Borrowers and the Guarantors, each as Debtor and Debtor-in-Possession, and the Non-Debtor Borrowers each hereby grant, pledge and assign to Agent, for the benefit of itself and the other Credit Parties, and also confirm, reaffirm and restate the prior grant to Agent, for the benefit of itself and the other Credit Parties of, continuing senior priority security interests in and liens upon, and rights of setoff against, all of the Collateral.

5.    ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

In addition to the representations, warranties and covenants made by Borrowers and Guarantors to Agent and Lenders, under the Credit Agreement or the other Loan Documents (in each case, for the avoidance of doubt, as amended by or provided in this Ratification Agreement) each Borrower and Guarantor hereby represents, warrants and covenants to Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition precedent to the making of Loans by Agent and Lenders:

5.1    Financing Order.  No Borrower or Guarantor shall seek to have any Financing Order vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to in writing by Agent).

**5.2**    Use of Proceeds.  All Loans and Letters of Credit provided by Agent or any Lender to Borrowers pursuant to the Financing Order, the Credit Agreement or otherwise, shall only be used by Borrowers to the extent (a) provided for in the Budget, (b) permitted by the Loan Documents, and (c) as authorized by the Bankruptcy Court and consented to by the Agent for: (i) general working capital needs, (ii) the repayment of the Obligations and (iii) the payment of fees, expenses, and costs incurred in connection with this Ratification Agreement and the Chapter 11 Case, including the payment of any adequate protection payments approved in the Financing Order. None of the proceeds of any Loans or the Letters of Credit shall be used to make any payments to a Sanctioned Entity or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any operations of a Sanctioned Entity or a Sanctioned Person), or in any other manner that would result in a violation of Sanctions by any Person.

**5.3**    Budget.

(a)    Borrowers have prepared and delivered to Agent and Lenders a thirteen (13) week post-petition Budget.  The Budget has been thoroughly reviewed by the Borrowers and their management and sets forth, for the periods covered thereby, projected weekly cash receipts and cash disbursements for each week (each such week ending on Saturday) of the thirteen (13) consecutive week period commencing with the week ending September 2, 2017.  Subsequent thirteen (13) week budgets shall be delivered to Agent and Lenders, in form and substance satisfactory to Agent and Lenders, during the tenth week of the Budget for the period commencing on the last date of the then-current Budget through the day that is thirteen weeks following such date.  Upon approval by Agent and Lenders, such budget shall be deemed to be the Budget for the next thirteen (13) week period.

(b)    Not later than 4:00 p.m. (Eastern time) on the Thursday of each week commencing with the Thursday following the first full week ending after the Petition Date, Lead Borrower shall furnish to Agent a weekly report (the "**Budget Compliance Report**") that (i) sets forth as of the preceding Saturday of each such week on a cumulative basis from the Petition Date until the fourth (4th) full week ending on a Saturday after the Petition Date and then on a rolling four (4) week basis at all times thereafter (each such period referred to herein as a "**Measurement Period**"), the actual results for the following line items set forth in the Budget: (A) Total Operating Receipts, and (B) Total Operating Disbursements, noting therein variances from values set forth for such periods in the Budget, and (ii) provides an explanation for all such variances greater than ten percent (10%) in any line items or sub-line items, certified by the chief financial officer of the Borrowers.  Such report/reconciliation shall also note any variances with values set forth in the Budget as of the day of such report/reconciliation.

(c)    Each Borrower and Guarantor acknowledges, confirms and agrees that the following  covenants shall be tested pursuant to the Budget Compliance Report for the applicable Measurement Period ending as of each Sunday, with such testing commencing on the Thursday following the first full three (3) weeks ending after the Petition Date: (i) the actual Total Operating Receipts shall not be less than eighty-five percent (85%) of the projected Total Operating Receipts set forth in the Budget in respect of such Measurement Period, and (ii) Total Operating Disbursements shall not be more than one hundred and ten percent (110%) of the

projected Total Operating Disbursements set forth in the Budget in respect of such Measurement Period.

(d)     Each Borrower and Guarantor hereby confirms, acknowledges and agrees that, unless waived in writing by Agent, (i) a failure to maintain the deviations in the Total Operating Receipts and Total Operating Receipts line items of the Budget in an amount equal to or less than the percentage set forth in Section 5.3(c) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "**Material Budget Deviation**") and (ii)  the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Agent, as provided in Section 5.3(b) hereof shall constitute an Event of Default.  Notwithstanding any approval by Agent or any Lender of the Budget or any subsequent or amended Budget(s), Agent and Lenders will not, and shall not be required to, provide any Loans or Letters of Credit to any Borrower pursuant to the Budget, but shall only provide Loans and Letters of Credit in accordance with the terms and conditions set forth in the Credit Agreement as amended by this Ratification Agreement, the other Loan Documents and the Financing Order.   Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(e)     Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Agent and the other Credit Parties that are reimbursable by Borrowers or any other amounts owing by Borrowers to Agent and the Credit Parties (including, without limitation attorneys and consulting fees and expenses) in accordance with the Credit Agreement and the other Loan Documents, such projections shall not limit, impair, modify or waive the Borrowers' and Guarantors' obligation to pay the actual amounts due to Agent and/or the other Credit Parties in respect of such costs, expenses and other amounts owing to Agent and Lenders in accordance with the Credit Agreement and the other Loan Documents and the actual amounts paid in respect of any such costs, expenses and other amounts other shall not be subject to the variance compliance set forth in Section 5.3(c).

(f)     Notwithstanding anything herein to the contrary, the Budget may be updated, modified or supplemented (with the consent and/or at the request of Agent) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, Agent and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed the Budget; provided, that three weeks prior to the last date set forth in the Budget (as amended, modified, supplemented, or replaced from time to time with Agent's consent), during the tenth (10th) week of the Budget, the Borrowers shall submit a budget for the next successive thirteen week period to Agent, which budget shall be in (A) form substantially similar to the previous initial Budget (or otherwise in form acceptable to Agent) and (B) substance acceptable to Agent; provided, further, that  in the event that Agent and the Borrowers cannot, while acting diligently, reasonably, and in good faith, agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Budget has terminated.  Each Budget delivered to Agent shall be accompanied by such supporting documentation as reasonably requested by Agent.   Each Budget shall be prepared in good faith based upon assumptions which the Borrowers believe to be reasonable and are satisfactory to Agent.

**5.4**    Third Party Liquidator.

(a)    Lead Borrower shall retain, at all times during which the Obligations remain outstanding, on terms and conditions acceptable to Agent and at the sole cost and expense of Borrowers, Gordon Brothers or such other nationally recognized third party liquidator entity reasonably acceptable to Agent (the "**Third Party Liquidator**").  The Third Party Liquidator shall among other things, assist Borrowers in the preparation of and compliance with, on an ongoing basis, the Budget and the liquidation of the store locations identified on Schedule 5.5(1) and Schedule 5.5(2) (collectively, the "**Closed Stores**").  The Third Party Liquidator shall report directly to the Chief Executive Officer and President of Parent.

(b)    The Loan Parties hereby irrevocably authorize and direct the Third Party Liquidator to consult with Agent on all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the Third Party Liquidator relating to the Collateral, or the financial condition or operations of the businesses of each of the Loan Parties.  The Loan Parties agree to provide the Third Party Liquidator with complete access to and supervision over all of the books and records of each Borrower and Guarantor, all of the premises of each Borrower and Guarantor and to all management and employees of Borrowers as and when deemed necessary by the Third Party Liquidator.

(c)    Borrowers shall not amend, modify or terminate the Retention Agreement without the prior written consent of Agent.  Borrowers acknowledge and agree that Borrowers shall authorize, instruct, and direct the Third Party Liquidator to keep Agent (1) fully informed of the progress of the business and operations of Borrowers and respond fully to any inquiries of Agent regarding the business and operations of Borrowers and (2) communicate and fully cooperate with Agent and share all information with Agent regarding Borrowers and Guarantors, and the business and operations of Borrowers and Guarantors.

(d)    If the Third Party Liquidator resigns, Borrowers shall immediately notify Agent in writing and provide Agent with a copy of any notice of resignation immediately upon the sending of such notice by such Third Party Liquidator.  Any replacement or successor Third Party Liquidator shall be reasonably acceptable to Agent and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Lender within five (5) Business Days immediately following the notice of resignation of the resigning Third Party Liquidator, or within such longer period of time as Agent may consent to in writing.

**5.5**    Sale Milestones.  Borrowers and Guarantors covenant and agree to satisfy each of the following conditions:

(a)    On the Petition Date, the Debtors shall file motions, each in form and substance satisfactory to the Lender, requesting approval from the Bankruptcy Court (i) to retain the Third Party Liquidator to conduct Debtors' going out of business sales on terms and conditions acceptable to Agent (the "Store Closing GOB Sales"); and (ii) to conduct the Store Closing GOB Sales at all of the sixty-five (65) store locations identified on Schedule 5.5 hereto with an Applicable Rejection Date of September 30, 2017 (the "Phase 1 GOB Sales") and the store locations to be identified to Lender with an Applicable Rejection Date of October 31, 2017 in accordance with Section 5.5(d) below (the "Phase 2 GOB Sales") on

terms and conditions acceptable to Agent. Prior to conducting the Phase 2 GOB Sales, Debtors must enter into an amendment to the Retention Agreement, or an additional Retention Agreement, in form and substance acceptable to Agent, to conduct the Phase 2 GOB Sales.

(b)    On or before the third (3rd) day following the Petition Date, Debtors shall obtain orders from the Bankruptcy Court, each in form and substance satisfactory to Agent, authorizing (i) the retention of the Third Party Liquidator on terms and conditions acceptable to Agent, and (ii) the Store Closing GOB Sales, which orders shall authorize and direct, among other things, that all proceeds from the Store Closing GOB Sales shall be remitted to Agent for application against the Obligations and otherwise on terms and conditions acceptable to Agent.

(c)    On or before the fifth (5th) day following the Petition Date, Debtors shall file with the Bankruptcy Court a motion seeking approval of a Disclosure Statement and proposed plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "<u>Plan of Reorganization</u>"), each on terms and conditions satisfactory to Agent;

(d)    On or before the thirtieth (30th) day following the Petition Date, Debtors shall provide Lender with the list of store locations at which the Phase 2 GOB Sales shall be conducted; and on the thirty-fifth day following the Petition Date, the Phase 2 GOB Sales shall commence;

(e)    On or before the thirty-fifth (35th) day following the Petition Date, Debtors shall file a proposed order confirming the Plan of Reorganization, in form and substance acceptable to Agent;

(f)    On or before the forty-fifth (45th) day following the Petition Date, Debtors shall accept or reject the lease for each store location set forth on Schedule 5.5 attached hereto with an Applicable Rejection Date of October 31, 2017:

(g)    On or before the fifty-fifth (55th) day following the Petition Date any objections to confirmation of the Plan of Reorganization are due to be filed with, or delivered to, any court-approved noticing agent.

(h)    The official vote tabulation with respect to voting on the Plan of Reorganization, if any, results in all impaired classes of claims and interests under the Plan of Reorganization that are entitled to vote on the Plan of Reorganization voting to accept or being deemed to vote to accept the Plan of Reorganization.

(i)    On or before the sixtieth (60th) day following the Petition Date, the Debtors shall obtain an order from the Bankruptcy Court (i) approving the Disclosure Statement on terms and conditions satisfactory to the Agent, and such order is not thereafter vacated, reversed, modified or altered on appeal or by reconsideration without the prior written consent of the Agent and (ii) confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to Agent (the "<u>Plan of Reorganization Confirmation Order</u>").

(j)    On or before the seventy-fifth (75th) day following the Petition Date, the Plan of Reorganization Confirmation Order shall become a Final Order, not subject to being vacated, reversed, modified or altered on appeal or by reconsideration.

**(k)**    On or before the ninetieth (90th) day following the Petition, the Effective Date under (and as defined in) the Plan of Reorganization shall occur.

**5.6**    Ratification of Blocked Account Agreements.    To the extent Agent deems it necessary in its reasonable discretion and promptly upon Agent's request, Borrowers and Guarantors shall promptly provide Agent with evidence, in form and substance satisfactory to Agent, that the Blocked Account Agreements and other deposit account arrangements provided for in the Pre-Petition Credit Agreement have been ratified and amended by the parties thereto, or their respective successors in interest to reflect the commencement of the Chapter 11 Case, that each Debtor Borrower and each Guarantor, as Debtor and Debtor-in-Possession, is the successor in interest to such Debtor Borrower or Guarantor, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in the Ratification Agreement.

**5.7**    ERISA.    Each Borrower and Guarantor hereby represents and warrants with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower or Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "**PBGC**") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower or Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower or Guarantor.

**6.**    DIP FACILITY FEE.

Borrowers shall pay to Agent, for the account of Lenders on a pro rata basis according to their respective Commitments, a debtor-in-possession financing facility fee, in the amount of one percent (1%) of the Aggregate Commitments, on account of the financing provided by Agent and Lenders to Borrowers in the Chapter 11 Case, which fee shall be fully earned and due and payable on the Ratification Closing Date and which may be charged directly to the loan account of any Borrower maintained by Agent or paid by the Loan Parties concurrently with the of the initial Loans, as provided under Section 9 of this Ratification Agreement.

**7.**    AMENDMENTS TO THE PRE-PETITION CREDIT AGREEMENT.

**7.1**    Increase in Commitments.    Section 2.15 of the Pre-Petition Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"2.15    Reserved."

**7.2**    OFAC.    The following Section 5.27 is added to Article V of the Pre-Petition Credit Agreement:

"5.27    OFAC/Sanctions.    No Loan Party nor any of its Subsidiaries is in violation of any Sanctions.    No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from

investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with the Anti-corruption Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with the Anti-corruption Laws in all material respects.  No proceeds of any loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any applicable sanction by any Person (including any Credit Party or other individual or entity participating in any transaction)."

**7.3**    <u>Delivery of Other Information.</u>    Section 6.02 of the Pre-Petition Credit Agreement is hereby amended by adding the following two additional subsections (j) and (k):

(j) As soon as practicable (and, in any event, at least three (3) Business Days or such shorter period as agreed by Lender in its sole discretion) in advance of filing with the Bankruptcy Court or delivering to any official committee appointed in any of the Cases (or the professionals to any such committee) or to the U.S. Trustee, as the case may be, the proposed Final Financing Order and all other proposed orders and pleadings related to the debtor-in-possession financing, any other financing or any use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto and (ii) substantially simultaneously with the filing with the Bankruptcy Court or delivering to any official committee appointed in any of the Cases (or the professionals to any such committee) or the U.S. Trustee, as the case may be, all other notices, filings, motions, pleadings or other information concerning the financial condition of Borrowers or any of the other Loan Parties or other Indebtedness of the Loan Parties or, to the extent not required to be delivered pursuant to subclause (i) above, any request for relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure that may be filed with the Bankruptcy Court or delivered to any official committee appointed in any of the Cases (or the professional to any such committee); and

(k)    promptly, such additional information regarding the Cases or the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Lender may from time to time reasonably request.

**7.4**    <u>Field Examinations and Appraisals</u>.    Notwithstanding anything to the contrary set forth in Section 6.10(b) and 6.10(c) of the Pre-Petition Credit Agreement, Agent may conduct, at the expense of Borrowers, field examinations and appraisals at Agent's discretion.

**7.5**    <u>Permitted Investments</u>.    Notwithstanding anything to the contrary set forth in Section 7.02 of the Pre-Petition Credit Agreement, no Loan Party or any of its Subsidiaries shall make any Permitted Investments, other than as provided in the Financing Orders and the Budget; provided, that, in any event, Loan Parties nor any of their respective Subsidiaries shall make any Permitted Acquisitions.

**7.6**    <u>Permitted Dispositions</u>.    Notwithstanding anything to the contrary set forth in Section 7.05 of the Pre-Petition Credit Agreement, no Loan Party or any of its Subsidiaries Borrowers shall make any Permitted Dispositions, other than as provided in the Financing Orders and the Budget.

**7.7**    <u>Restricted Payments</u>.    Notwithstanding anything to the contrary set forth in Section 7.06 of the Pre-Petition Credit Agreement, no Loan Party or any of its Subsidiaries shall make any Restricted Payments except (a) with the prior written consent of the Administrative Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Lender), and (b) to the extent specifically set forth in the DIP Budget.

**7.8**    <u>Prepayments of Indebtedness</u>.    Notwithstanding anything to the contrary set forth in Section 7.07 of the Pre-Petition Credit Agreement, no Loan Party or any of its Subsidiaries shall make any prepayments of Indebtedness except as permitted pursuant to the Financing Orders, and shall not make any payments of Subordinated Indebtedness, whether characterized as prepayments of payments of Subordinated Indebtedness.

**7.9**    <u>Financial Covenants</u>.    Section 7.15 of the Pre-Petition Credit Agreement is hereby deleted.

**7.10**    <u>Events of Default</u>.    Section 8.01 of the Pre-Petition Credit Agreement is hereby amended as follows:

(a)    Section 8.01(f) of the Pre-Petition Credit Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:"

"(f)    <u>Insolvency Proceedings, Etc</u>.    Any Non-Debtor Borrower or any Subsidiary thereof (other than a debtor in the Chapter 11 Case) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any part of its property; or a proceeding shall be commenced or a petition filed, without the application or consent of such Person, seeking or requesting the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed and the appointment continues undischarged, undismissed or unstayed for forty-

five (45) calendar days or an order or decree approving or ordering any of the foregoing shall be entered; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any part of its property is instituted without the consent of such Person and continues undismissed or unstayed for forty-five (45) calendar days, or an order for relief is entered in any such proceeding; or

(b)     Section 8.01(g) of the Pre-Petition Credit Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:"

"(g)     <u>Inability to Pay Debts; Attachment</u>.  (i) Any Non Debtor Borrower or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due in the ordinary course of business, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within fifteen (15) days after its issuance or levy; or

(c)     Section 8.01 of the Pre-Petition Credit Agreement is hereby amended by (i) replacing the period appearing at the end of Section 8.01(q) with a semicolon, and (ii) adding the following at the end of such Section:

"(r)     the occurrence of any condition or event which permits Agent and Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in any Financing Order);

(s)     the termination or non-renewal of the Loan Documents as provided for in any Financing Order;

(t)     any Loan Party suspends or discontinues all or any material part of its business (other than with respect to the Store Closing GOB Sales as defined in and permitted by the Ratification Agreement), or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee or examiner with expanded powers is appointed in the Chapter 11 Case or otherwise for any Loan Party, or any of their respective properties;

(u)     any act, condition or event occurring after the Petition Date that has or could reasonably expect to have a Material Adverse Effect;

(v)     conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(w)     dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(x)  grant of a lien on or other interest in any property of any Loan Party, other than a Permitted Encumbrance or a lien or encumbrance permitted by any Financing Order (including the Carve-Out), which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral;

(y) the grant of an administrative expense claim in any Chapter 11 Case which is superior to or ranks in parity with the rights of the Agent (other than administrative expense claims permitted by any Financing Order or the Ratification Agreement, or the Carve-Out);

(z)  the failure of any Borrower or Guarantor to comply with any Financing Order or the Ratification Agreement, or the modification, reversal, revocation, remand, stay, rescinding, vacating or amendment of any Financing Order, in whole or in part, on appeal or by the Bankruptcy Court, without the prior written consent of the Agent;

(aa)  the appointment of a trustee in any Chapter 11 Case pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(bb)  the appointment in any Chapter 11 Case of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(cc)  the filing of a plan of reorganization or liquidation by or on behalf of any Loan Party which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by the Agent;

(dd) the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Loan Party which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by Administrative Agent;

(ee) the filing of a motion by any Borrower or Guarantor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from any Agent or any of the Lenders directly) of any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(ff)  (i) the failure of Borrowers or Guarantors to comply with any material provision of the retention agreement between Borrowers and the Third Party Liquidator, without with the prior consent of the Agent; or (ii) the termination of any such agreements for any reason without the prior written consent of the Agent; and

(gg) any Material Budget Deviation (as defined in Section 5.3(d) of the Ratification Agreement) for any Measurement Period.

**7.11**    Participations. Section 10.06(d) of the Pre-Petition Credit Agreement is hereby amended by adding the following paragraph:

"Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Lead Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register."

**7.12**    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. Section 10.14 of the Pre-Petition Credit Agreement is hereby amended by deleting such Sections in their entirety and replacing them with the following:

"(a)    The validity, interpretation and enforcement of this Agreement and the other Loan Documents (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by (i) the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York and (ii) to the extent applicable, the Bankruptcy Code.

(b)    Each Borrower, each Guarantor, Agent, each Lender, and each L/C Issuer irrevocably consent and submit to the non-exclusive jurisdiction of the Bankruptcy Court and the United States District Court for the Southern District of New York, and any appellate court from any thereof. whichever the Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Loan Documents or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Loan Documents or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Agent shall have the right to bring any action or proceeding against a Borrower or its property in the courts of any other jurisdiction which Agent deems reasonably necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against such Borrower or its property)."

7.13    Schedule of Commitments.    Schedule 2.01 of the Credit Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule 2.01 in the form attached hereto as Schedule 2.01 to this Ratification Agreement.

7.14    Form of Borrowing Base Certificate.    Exhibit G to the Pre-Petition Credit Agreement is hereby amended by deleting the Form of Borrowing Base Certificate in its entirety and replacing it with the Form of Borrowing Base Certificate attached hereto as Exhibit G to this Ratification Agreement.

8.    RELEASE.

8.1    Release of Pre-Petition Claims.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of Agent and Lenders contained herein and the making of any Loans by Agent and Lenders, each of the Loan Parties, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agent, each Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Agent, each Lender and all such other parties being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever but, for the avoidance of doubt, excluding any claims or causes of action for gross negligence or willful misconduct (individually, a "**Pre-Petition Released Claim**" and collectively, "**Pre-Petition Released Claims**") of every name and nature, known or unknown, suspected or

unsuspected, both at law and in equity, which any of the Loan Parties, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the Ratification Closing Date, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Pre-Petition Credit Agreement, as amended and supplemented through the date hereof, and the other Loan Documents.

(b)        Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Borrower and Guarantor pursuant to this Section 8.1.  If any Loan Party violates the foregoing covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all reasonable documented attorneys' fees and out-of-pocket legal costs incurred by any Releasee as a result of such violation.

8.2    Release of Post-Petition Claims. Upon the Payment in Full of all of the Obligations, in consideration of the agreements of Agent and Lenders contained herein and the making of any Loans by Agent and Lenders, each of the Loan Parties hereby covenants and agrees to execute and deliver in favor of Agent and Lenders a valid and binding termination and release agreement, in form and substance satisfactory to Agent.  If any Loan Party violates such covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all reasonable documented attorneys' fees and out-of-pocket legal costs incurred by any Releasee as a result of such violation.

8.3    Releases Generally.

(a)        Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof  may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)        Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

9.    CONDITIONS PRECEDENT.

The amendments, representations and warranties, covenants, defaults and all other agreements and obligations contained in Sections 1 through 8 of this Ratification Agreement shall only become effective upon the satisfaction (or waiver) of all of the following conditions

precedent (the time of such satisfaction (or waiver) referred to herein as the "**Ratification Closing Date**"):

9.1     as of the Petition Date, the Pre-Petition Loan Documents shall not have been terminated;

9.2     Debtors shall have (a) commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware by no later than August 26, 2017; (b) complied in full with the notice and other requirements of the Bankruptcy Code in a manner reasonably acceptable to Agent with respect to the Interim Financing Order; and (c) Agent shall have received such evidence thereof as it shall reasonably require.  All of the first day orders entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Case shall be in form and substance reasonably satisfactory to Agent;

9.3     no trustee or examiner with expanded powers shall have been appointed or designated with respect to any Borrower or Guarantor, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

9.4     the Interim Financing Order has been duly entered, is valid, subsisting and continuing and has not been vacated, reversed, or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal or stay;

9.5     a cash management order amending and ratifying the cash management arrangements of Borrowers and Guarantors on terms acceptable to Agent has been duly entered, is valid, subsisting and continuing and has not been vacated, reversed, or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal or stay;

9.6     the execution and delivery of this Ratification Agreement to be delivered in connection herewith by Borrowers, Guarantors and Lenders in form and substance satisfactory to Agent;

9.7     reserved;

9.8     the receipt by Agent of the Retention Agreement;

9.9     the Excess Availability, as determined by Agent, shall not be less than $40,000,000 after giving effect to initial Loans to be made or the initial Letters of Credit to be issued immediately after the Ratification Closing Date and the payment of the fees and expenses required to be paid;

9.10     each Borrower and Guarantor shall have complied in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules;

9.11    receipt by Agent of the initial Budget in form and substance acceptable to Agent;

9.12    receipt by Agent, of an executed Perfection Certificate with respect to the Borrowers and Guarantors, in the form annexed hereto, as Exhibit C;

9.13    receipt by Agent, of an executed Borrowing Base Certificate with respect to the Borrowers, in the form annexed hereto, as Exhibit G;

9.14    other than the voluntary commencement of the Chapter 11 Case, no material impairment of the priority of Agent's and Lenders' security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent and Lenders to the Petition Date;

9.15    Borrowers shall have (i) engaged the Third Party Liquidator in accordance with Section 5.4 and Section 5.5 of the Ratification Agreement, and (ii) have provided the Third Party Liquidator with such information as they may reasonably require;

9.16    Other than the Bankruptcy Events, no Material Adverse Effect shall have occurred since January 28, 2017;

9.17    None of the materials previously furnished to Agent by Borrowers or Guarantors contain any material misstatements, or omit to state any material facts necessary to make the statements therein, taken as a whole in the light of the circumstances under which they were made, not misleading in any material respect.

9.18    Agent, for the benefit of itself and the other Credit Parties, shall hold perfected, first priority security interests in and liens upon the Collateral (subject to the Permitted Encumbrances and the Carve-Out) and Agent shall have received such evidence thereof as it requires; and

9.19    Other than the Existing Defaults, no Default or Event of Default shall have occurred or be existing under any of the Loan Documents, as modified pursuant hereto, and assumed by Borrowers and Guarantor.

## 10.    ADDITIONAL CONDITIONS PRECEDENT TO ALL LOANS AND LETTERS OF CREDIT.

In addition to the satisfaction of the conditions precedent under Section 9 of this Ratification Agreement with respect to the effectiveness of the noted Sections of this Ratification Agreement and the making of the initial Loans under the Credit Agreement, and the satisfaction of the conditions precedent in Section 4.02 of the Credit Agreement with respect to all Loans and other financial accommodations available to Borrowers (such conditions in Section 4.02, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Credit Agreement:

**10.1**    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered the Permanent Financing Order. Neither Agent nor any Lender shall provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order and the time to appeal to contest such order shall have expired;

**10.2**    requests for further credit shall be for purposes and in amounts in accordance with the Budget;

**10.3**    subject to the Financing Order, all fees and expenses required to be paid to Agent and Lenders pursuant to the Ratification Agreement and the Credit Agreement, as amended thereby, shall have been paid or shall be paid concurrently with the making of the Loans after the Ratification Closing Date; and

**10.4**    other than the Existing Defaults, no Default or Event of Default shall have occurred or be existing under any of the Loan Documents, as amended, supplemented or otherwise modified pursuant this Ratification Agreement and assumed by Borrowers and Guarantor.

**11.**    <u>MISCELLANEOUS</u>.

**11.1**    <u>Amendments and Waivers</u>.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

**11.2**    <u>Further Assurances</u>.  Each Borrower and Guarantor shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Loan Documents or the Financing Order.  Upon the request of Agent, at any time and from time to time, each Borrower and Guarantor shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office, the financing statements, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent.

**11.3**    <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

**11.4**    Counterparts.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

**11.5**    Additional Events of Default.  The parties hereto acknowledge, confirm and agree that the failure of any Borrower or Guarantor to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Borrower or Guarantor in connection herewith shall constitute an Event of Default under the Loan Documents.

**11.6**    Costs and Expenses.    Subject to the terms of the Financing Order, Borrowers shall pay to Agent and any Lender on demand all costs and expenses that Agent or any Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Loan Documents and the Financing Order.  Subject to the terms of the Financing Order, the foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Borrowers.  Subject to the terms of the Financing Order, all sums provided for in this Section 11.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents.  Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Borrower or Guarantor.

**11.7**    Effectiveness.  This Ratification Agreement shall become effective upon the execution hereof by the Borrowers, Guarantors, Agent and Lenders and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

**<u>BORROWERS</u>**:

PERFUMANIA HOLDINGS, INC.
PERFUMANIA, INC.
MAGNIFIQUE PARFUMES AND COSMETICS, INC.
TEN KESEF II, INC.
PERFUMANIA PUERTO RICO, INC.
QUALITY KING FRAGRANCE, INC.
SCENTS OF WORTH, INC.
FIVE STAR FRAGRANCE COMPANY, INC.
NORTHERN GROUP, INC.
PERFUMANIA.COM, INC.
PARLUX, LTD.
PARLUX FRAGRANCES, LLC

By: _____
Michael W. Katz
President and Chief Executive Officer

**<u>GUARANTORS</u>**:

ALADDIN FRAGRANCES, INC.
NICHE MARKETING GROUP, INC.

By: _____
Michael W. Katz
President and Chief Executive Officer

MODEL REORG ACQUISITION, LLC

By PERFUMANIA HOLDINGS, INC.,
as sole member

By: _____
Michael W. Katz
President and Chief Executive Officer

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Agent, Lender and L/C Issuer

By: _____

Name: _____

Title: _____

EXHIBIT A
to
RATIFICATION AND AMENDMENT AGREEMENT

**BUDGET**

(see attached)

**Perfumania Holdings, Inc.**
*Consolidated 13-Week Cash Flow*
*USD in 000s*

| Week # | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Week Ending** | **02-Sep** | **09-Sep** | **16-Sep** | **23-Sep** | **30-Sep** | **07-Oct** | **14-Oct** | **21-Oct** | **28-Oct** | **04-Nov** | **11-Nov** | **18-Nov** | **25-Nov** | **Total** |
| **Year** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **2017** | **13 Weeks** |
| CASH FLOW FROM OPERATIONS | | | | | | | | | | | | | | |
| Total Operating Receipts | $ 5,815 | $ 6,361 | $ 7,046 | $ 8,134 | $ 8,486 | $ 10,053 | $ 6,636 | $ 6,791 | $ 8,064 | $ 8,027 | $ 9,265 | $ 9,395 | $ 9,190 | $ 103,264 |
| Total Operating Disbursements | (10,674) | (14,049) | (12,918) | (12,068) | (16,822) | (10,789) | (9,857) | (9,517) | (9,868) | (8,163) | (5,904) | (3,435) | (5,608) | (129,673) |
| **Net Operating Cash Flow** | **(4,859)** | **(7,689)** | **(5,872)** | **(3,934)** | **(8,335)** | **(736)** | **(3,221)** | **(2,725)** | **(1,804)** | **(136)** | **3,361** | **5,960** | **3,582** | **(26,409)** |
| Net Cash Flow from Investing | (100) | - | (200) | - | - | - | (200) | - | - | - | - | (200) | - | (700) |
| CASH FLOW FROM RESTRUCTURING ACTIVITIES | | | | | | | | | | | | | | |
| Professional Fees & Carve Out Funding | (270) | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (330) | (210) | (210) | (210) | (330) | (3,030) |
| Other Restructuring Costs | (102) | - | - | - | (1,300) | - | - | - | - | (40) | - | - | - | (1,442) |
| Net Cash Flow from Restructuring | (372) | (210) | (210) | (210) | (1,510) | (210) | (210) | (210) | (330) | (250) | (210) | (210) | (330) | (4,472) |
| **Net Cash Flow** | **(5,331)** | **(7,899)** | **(6,282)** | **(4,144)** | **(9,845)** | **(946)** | **(3,631)** | **(2,935)** | **(2,134)** | **(386)** | **3,151** | **5,550** | **3,252** | **(31,581)** |
| Total Non-Cash ABL Activity | (105) | - | - | - | (228) | - | - | - | - | (441) | - | - | - | (774) |
| **Beginning ABL Balance** | **21,631** | **15,816** | **9,455** | **2,408** | - | - | - | - | - | - | - | - | - | **21,631** |
| Total Receipts / Sweeps | (5,815) | (6,361) | (7,046) | (2,408) | - | - | - | - | - | - | - | - | - | (21,631) |
| Total Disbursements / Drawdowns | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending ABL Balance** | **15,816** | **9,455** | **2,408** | - | - | - | - | - | - | - | - | - | - | - |
| **Beginning DIP ABL Balance** | - | **11,251** | **25,510** | **38,839** | **45,391** | **55,464** | **56,411** | **60,042** | **62,977** | **65,111** | **65,938** | **62,788** | **57,237** | - |
| Total Receipts / Sweeps | - | - | - | (5,726) | (8,486) | (10,053) | (6,636) | (6,791) | (8,064) | (8,027) | (9,265) | (9,395) | (9,190) | (81,633) |
| Total Disbursements / Drawdowns | 11,251 | 14,259 | 13,328 | 12,278 | 18,559 | 10,999 | 10,267 | 9,727 | 10,198 | 8,855 | 6,114 | 3,845 | 5,938 | 135,619 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending DIP ABL Balance** | **$ 11,251** | **$ 25,510** | **$ 38,839** | **$ 45,391** | **$ 55,464** | **$ 56,411** | **$ 60,042** | **$ 62,977** | **$ 65,111** | **$ 65,938** | **$ 62,788** | **$ 57,237** | **$ 53,986** | **$ 53,986** |

EXHIBIT B
to
RATIFICATION AND AMENDMENT AGREEMENT

**Form of Interim Financing Order**

(see attached)

EXHIBIT C
to
RATIFICATION AND AMENDMENT AGREEMENT

**Form of Perfection Certificate**

(See attached)

EXHIBIT D
to
RATIFICATION AND AMENDMENT AGREEMENT

**Existing Defaults**

- **8.01(f) Insolvency Proceedings Default** – the Debtors are filing or have filed proceedings under Debtor Relief Laws and orders with respect to such filings have been or are being entered.

- **8.01(l) Cessation of Business Default** – Certain Debtors have taken actions to suspend operations of their respective businesses, liquidate all or a material portion of their assets or Store locations and have engaged a liquidator to perform going-out-of-business sales.

SCHEDULE 2.01
to
RATIFICATION AND AMENDMENT AGREEMENT

**Schedule 2.01**

**Commitments**

| Lender | Address for Notices | Amount of Commitment |
|---|---|---|
| Wells Fargo Bank, National Association | One Boston Place, 18th Floor Boston, Massachusetts 02108 Attention: Portfolio Manager – Perfumania Facsimile No.: (617) 523-4032 | $83,750,000 |
| | | |
| **Total** | | $83,750,000 |

EXHIBIT G
to
RATIFICATION AND AMENDMENT AGREEMENT

**Form of Borrowing Base Certificate**

(see attached)

SCHEDULE 5.5
to
RATIFICATION AND AMENDMENT AGREEMENT

**Phase 1 and Phase 2 Store Closing GOB Sales**

**Schedule 1**
**EXCEPT AS OTHERWISE NOTED BELOW, ALL OF THE FOLLOWING REAL**
**PROPERTY LEASES ARE REJECTED TOGETHER WITH ALL ANCILLARY AND**
**COLLATERAL DOCUMENTS, AMENDMENTS, EXHIBITS, MODIFICATIONS,**
**REVISIONS, SUPPLEMENTS, RIDERS, ATTACHMENTS, SCHEDULES,**
**SIDE LETTERS AND THE LIKE**

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Arkin Associates | Magnifique Parfumes and Cosmetics, Inc. | Lincoln Road Mall 334 Lincoln Road Miami Beach, FL 33139 | 5/8/1998 | 10/31/2017 | $227,445.00 |
| Avison Young | Magnifique Parfumes and Cosmetics, Inc. | Tuscola Outlets 400 Tuscola Boulevard Tuscola, IL 61953 | 3/20/1998 | 9/30/2017 | $8,487.20 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Arbor Place Mall 6700 Douglas Boulevard Douglasville, GA 30135 | 8/10/2006 | 9/30/2017 | $77,447.51 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Imperial Valley Mall 3451 S. Dogwood Avenue El Centro, CA 92243 | 3/9/2005 | 10/31/2017 | $166,269.24 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Mall del Norte 5300 San Dario Laredo, TX 78041 | 12/23/1993 | 10/31/2017 | $158,408.52 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Sunrise Mall 2370 N. Expressway Brownsville, TX 78521 | 1/31/2004 | 10/31/2017 | $116,488.80 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Triangle Town Center 5959 Triangle Town Boulevard Raleigh, NC 27616 | 10/20/2004 | 10/31/2017 | $120,299.04 |
| CBL & Associates | Magnifique Parfumes and Cosmetics, Inc. | Westland Mall 1695 W. 49th Street Hialeah, FL 33012 | 2/4/1998 | 10/31/2017 | $269,360.88 |
| CBRE | Magnifique Parfumes and Cosmetics, Inc. | Oakland Mall 326 West Fourteen Mile Road Troy, MI 48083 | 8/11/2015 | 10/31/2017 | $105,500.99 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Centercal Properties | Magnifique Parfumes and Cosmetics, Inc. | Station Park<br>910 West Forbush Place<br>Farmington, UT 84025 | 11/16/2013 | 9/30/2017 | $76,815.24 |
| Craig Realty Group | Magnifique Parfumes and Cosmetics, Inc. | Outlets at Castle Rock<br>5050 Factory Shops Boulevard<br>Castle Rock, CO 80108 | 11/28/1992 | 10/31/2017 | $30,454.41 |
| Craig Realty Group | Magnifique Parfumes and Cosmetics, Inc. | Outlets at San Clemente<br>101 West Avenida Vista Hermosa<br>San Clemente, CA 92672 | 11/12/2015 | 9/30/2017 | $105,947.04 |
| Craig Realty Group | Magnifique Parfumes and Cosmetics, Inc. | Outlets at Traverse Mountain<br>3700 N. Cabelas Boulevard<br>Lehi, UT 84043 | 11/16/2012 | 10/31/2017 | $6,304.86 |
| Developers Diversified Realty | Perfumania Puerto Rico, Inc. | Plaza del Sol<br>725 Avenida West Main<br>Bayamon, PR 00961 | 11/27/1998 | 9/30/2017 | $66,952.08 |
| Developers Diversified Realty | Perfumania Puerto Rico, Inc. | Plaza Isabela<br>PR #2 Int. PR #4494<br>Isabela, PR 00662 | 5/2/2013 | 9/30/2017 | $54,606.64 |
| Developers Diversified Realty | Perfumania Puerto Rico, Inc. | Plaza Rio Hondo<br>Hwy 22 & Rt 167<br>Bayamon, PR 00961 | 8/3/2013 | 9/30/2017 | $136,579.80 |
| Dimond Group | Magnifique Parfumes and Cosmetics, Inc. | Dimond Center<br>800 East Dimond Boulevard<br>Anchorage, AK 99515 | 10/14/2009 | 10/31/2017 | $122,380.20 |
| EB Development | Magnifique Parfumes and Cosmetics, Inc. | Vero Beach Outlets<br>1876 94th Drive<br>Vero Beach, FL 32966 | 8/26/1995 | 9/30/2017 | $14,631.01 |
| Empresas Fonalledas | Perfumania Puerto Rico, Inc. | Plaza del Caribe<br>Suite 2050 Ponce Bypass<br>Ponce , PR 00716 | 11/16/1998 | 9/30/2017 | $278,864.11 |
| Equity One | Magnifique Parfumes and Cosmetics, Inc. | Serramonte Center<br>36-A Serramonte Drive<br>Daly City, CA 94015 | 7/31/1992 | 9/30/2017 | $100,626.72 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Fanatics, Inc. as Sublessee of Perfumania, Inc. | Perfumania, Inc. | 251 International Parkway, Sunrise, FL 33325 | 8/6/2013 | 8/31/2017 | $0.00 |
| FFO Real Estate Advisors | Magnifique Parfumes and Cosmetics, Inc. | Louisiana Boardwalk Outlets 494 Boardwalk Boulevard Bossier City, LA 71111 | 5/12/2005 | 10/31/2017 | $41,767.74 |
| Forest City Enterprises | Magnifique Parfumes and Cosmetics, Inc. | Town Square 6587 Las Vegas Boulevard Las Vegas, NV 89119 | 11/19/2007 | 9/30/2017 | $23,213.16 |
| FSH Associates LP | Magnifique Parfumes and Cosmetics, Inc. | Rockvale Outlets 35 S. Willowdale Drive Lancaster, PA 17602 | 3/22/1997 | 9/30/2017 | $22,559.00 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Ala Moana Center 1450 Ala Moana Boulevard Honolulu, HI 96814 | 5/19/2015 | 9/30/2017 | $234,385.79 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Altamonte Mall 451 E. Altamonte Drive Altamonte, FL 32701 | 6/22/1994 | 10/31/2017 | $112,145.76 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Bayside Marketplace 401 Biscayne Boulevard Miami , FL 33132 | 9/5/1993 | 10/31/2017 | $339,933.24 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Christiana Mall 704 Christiana Mall Newark, DE 19702 | 11/18/2006 | 10/31/2017 | $165,821.88 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Oglethorpe Mall 7804 Abercorn Extension Savannah, GA 31406 | 3/6/2003 | 10/31/2017 | $137,360.76 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Riverchase Galleria 2000 Riverchase Galleria Hoover, AL 35244 | 5/2/1998 | 9/30/2017 | $139,230.24 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Staten Island Mall 2655 Richmond Avenue Staten Island, NY 10314 | 9/14/1996 | 10/31/2017 | $208,030.36 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | The Shops at La Cantera<br>15900 La Cantera Parkway<br>San Antonio, TX 78256 | 6/16/2005 | 10/31/2017 | $133,450.32 |
| General Growth Properties | Magnifique Parfumes and Cosmetics, Inc. | Tucson Mall<br>4500 N. Oracle Road<br>Tucson, AZ 85705 | 6/4/2004 | 9/30/2017 | $0.00 |
| General Growth Properties (Now JLL) | Magnifique Parfumes and Cosmetics, Inc. | Lakeside Mall<br>14600 Lakeside Circle<br>Sterling Heights, MI 48313 | 4/24/1993 | 10/31/2017 | $180,299.04 |
| Grid Properties | Magnifique Parfumes and Cosmetics, Inc. | DC USA<br>3100 14th Street,  NW<br>Washington, DC 20010 | 7/7/2012 | 10/31/2017 | $86,954.64 |
| Gumberg Asset Management Corp. | Magnifique Parfumes and Cosmetics, Inc. | Southland Mall<br>20505 South Dixie Highway<br>Cutler Bay, FL 33189 | 11/19/2008 | 10/31/2017 | $128,034.24 |
| Harlem Irving Realty, Inc. | Magnifique Parfumes and Cosmetics, Inc. | Harlem Irving Plaza<br>4134 North Harlem<br>Norridge, IL 60706 | 7/12/1998 | 10/31/2017 | $0.00 |
| Horizon Group Properties | Magnifique Parfumes and Cosmetics, Inc. | The Outlet Shoppes of Bluegrass<br>1155 Buck Creek Road<br>Simpsonville, KY 40067 | 7/31/2014 | 9/30/2017 | $74,449.98 |
| Hull Storey Gibson Companies, LLC | Magnifique Parfumes and Cosmetics, Inc. | Victoria Mall<br>7800 North Navarro<br>Victoria, TX 77904 | 10/30/2008 | 9/30/2017 | $53,583.96 |
| Jones Lang LaSalle | Magnifique Parfumes and Cosmetics, Inc. | Westgate Mall<br>7701 Interstate 40<br>Amarillo, TX 79121 | 10/16/2008 | 9/30/2017 | $67,494.24 |
| Kimco Realty | Magnifique Parfumes and Cosmetics, Inc. | Oakwood Plaza North<br>3501 Oakwood Boulevard<br>Hollywood, FL 33020 | 9/27/1996 | 10/31/2017 | $0.00 |
| KTR South Florida LLC | Perfumania, inc. | 251 International Parkway,<br>Sunrise, FL 33325 | 9/1/2002 | 8/31/2017 | $457,750.32 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Chandler Fashion Center<br>3111 W Chandler Boulevard<br>Chandler, AZ 85226 | 8/4/2011 | 9/30/2017 | $119,067.12 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Fashion Outlets of Niagara<br>1951 Fashion Outlet Boulevard<br>Niagara Falls, NY 14304 | 10/24/2014 | 9/30/2017 | $147,390.14 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Kings Plaza<br>5149 Kings Plaza Road<br>Brooklyn, NY 11234 | 10/3/1998 | 10/31/2017 | $438,290.51 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | The Oaks Mall<br>222 W. Hillcrest Drive<br>Thousand Oaks, CA 91360 | 11/25/2008 | 9/30/2017 | $164,106.12 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Paradise Valley Mall<br>4568 E. Cactus Road<br>Phoenix, AZ 85032 | 11/7/2008 | 9/30/2017 | $145,041.96 |
| Macerich | Magnifique Parfumes and Cosmetics, Inc. | Valley River Center<br>G28  Valley River Center<br>Eugene, OR 97401 | 10/8/2004 | 9/30/2017 | $104,804.64 |
| Mohr Affinity, LLC | Magnifique Parfumes and Cosmetics, Inc. | Lake Elsinore Outlets<br>17600 Collier Avenue<br>Lake Elsinore, CA 92530 | 2/24/1992 | 10/31/2017 | $16,483.24 |
| Moonbeam Equities | Magnifique Parfumes and Cosmetics, Inc. | Cortana Mall<br>9843 Cortana Place<br>Baton Rouge, LA 70815 | 1/30/1997 | 10/31/2017 | $15,517.41 |
| New England Development | Magnifique Parfumes and Cosmetics, Inc. | Palm Beach Outlets<br>1801 Palm Beach Lakes Boulevard<br>West Palm Beach, FL 33401 | 2/13/2014 | 10/31/2017 | $141,419.46 |
| Prestige Properties | Magnifique Parfumes and Cosmetics, Inc. | The Mall at Bay Plaza<br>200 Baychester Avenue<br>Bronx, NY 10475 | 8/15/2014 | 10/31/2017 | $210,183.30 |
| Pyramid Company | Magnifique Parfumes and Cosmetics, Inc. | Destiny USA<br>One Destiny USA Drive<br>Syracuse, NY 13290 | 11/7/2008 | 9/30/2017 | $127,414.32 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Rouse Properties | Magnifique Parfumes and Cosmetics, Inc. | Chula Vista Center<br>555 Broadway<br>Chula Vista, CA 91910 | 2/19/2016 | 9/30/2017 | $69,514.05 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Albertville Premium Outlets<br>6415 Labeaux Ave NE<br>Albertville, MN 55301 | 11/14/2014 | 9/30/2017 | $124,077.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Allen Premium Outlets<br>820 West Stacy Road<br>Allen, TX 75013 | 4/23/2004 | 10/31/2017 | $269,318.28 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Anchorage 5th Avenue Mall<br>320 West 5th Avenue<br>Anchorage, AK 99501 | 4/8/2010 | 9/30/2017 | $95,297.16 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Arizona Mills<br>5000 S. Arizona Mills Circle<br>Tempe, AZ 85282 | 11/20/1997 | 10/31/2017 | $28,057.93 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Barton Creek Square<br>2901 S. Capital of Texas Highway<br>Austin, TX 78746 | 11/19/2005 | 10/31/2017 | $22,645.68 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Calhoun Premium Outlets<br>455 Belwood Road<br>Calhoun, GA 30701 | 11/22/1992 | 9/30/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Camarillo Premium Outlets<br>990 Camarillo Center Drive<br>Camarillo, CA 93010 | 9/19/1998 | 10/31/2017 | $254,897.94 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Camarillo Promenade<br>540 West Ventura Boulevard<br>Camarillo, CA 93010 | 4/23/2009 | 9/30/2017 | $234,383.04 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Carolina Premium Outlets<br>1025 Outlet Center Drive<br>Smithfield, NC 27577 | 4/16/2004 | 10/31/2017 | $84,938.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Castleton Square<br>6020 East 82nd Street<br>Indianapolis, IN 46250 | 9/15/2007 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Charlotte Premium Outlets 5512 New Fashion Way Charlotte, NC 28278 | 7/31/2014 | 10/31/2017 | $100,759.59 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Cielo Vista Mall 8401 Gateway Boulevard West El Paso, TX 79925 | 9/5/1997 | 10/31/2017 | $254,509.92 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Cincinnati Premium Outlets 400 Premium Outlets Drive Monroe, OH 45050 | 8/6/2009 | 9/30/2017 | $98,812.44 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Coral Square Mall 9443 West Atlantic Boulevard Coral Springs, FL 33071 | 11/11/1992 | 10/31/2017 | $41,611.05 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Dadeland Mall 7335 N. Kendall Drive Miami, FL 33156 | 10/29/2008 | 9/30/2017 | $295,143.84 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Desert Hills Premium Outlets 48400 Seminole Drive Cabazon, CA 92230 | 7/17/2009 | 9/30/2017 | $317,004.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Edinburgh Premium Outlets 11861 N. Executive Drive Edinburgh, IN 46124 | 2/1/1990 | 10/31/2017 | $73,690.65 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Ellenton Premium Outlets 5299 Factory Shops Boulevard Ellenton, FL 34222 | 8/26/1993 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Florida Mall III 8001 S. Orange Blossom Trail Orlando, FL 32809 | 4/7/2013 | 9/30/2017 | $198,577.56 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Florida Mall 8001 Orange Blossom Trail Orlando, FL 32809 | 7/7/1995 | 10/31/2017 | $356,088.60 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gaffney Premium Outlets 445 Factory Shops Boulevard Gaffney, SC 29341 | 11/6/1996 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gilroy Premium Outlets<br>681 Leavesley Road<br>Gilroy, CA 95020 | 5/9/2009 | 9/30/2017 | $189,161.76 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gilroy Premium Outlets<br>8375-47 Arroya Circle Bldg. A<br>Gilroy, CA 95020 | 9/6/1991 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gloucester Premium Outlets<br>100 Premium Outlets Drive<br>Blackwood, NJ 08012 | 8/13/2015 | 9/30/2017 | $125,048.53 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Grand Prairie Premium Outlets<br>2950 West Interstate 20<br>Grand Prairie, TX 75052 | 8/16/2012 | 10/31/2017 | $157,160.88 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Grapevine Mills<br>3000 Grapevine Mills Pkwy.<br>Grapevine, TX 76051 | 10/30/1997 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Grove City Premium Outlets<br>1191 Leesburg Grove City Road<br>Grove City, PA 16127 | 8/19/1994 | 9/30/2017 | $137,823.48 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Gulfport Premium Outlets<br>10775 Factory Outlet Boulevard<br>Gulfport, MS 39503 | 10/27/1995 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Hagerstown Premium Outlets<br>495 Premium Outlets Boulevard<br>Hagerstown, MD 21740 | 11/27/1998 | 9/30/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Houston Premium Outlets<br>29300 Hempstead Road<br>Cypress, TX 77433 | 3/27/2008 | 10/31/2017 | $61,761.70 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Jackson Premium Outlets<br>537 Monmouth Road<br>Jackson, NJ 08527 | 12/14/2002 | 10/31/2017 | $12,452.84 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Kittery Premium Outlets<br>345 US Route 1<br>Kittery, ME 03904 | 6/14/1991 | 9/30/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Las Americas Premium Outlets 4125 Camino de la Plaza San Diego, CA 92173 | 5/20/2005 | 9/30/2017 | $102,859.44 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Las Vegas Premium Outlets - North 705 S Grand Central Parkway Las Vegas, NV 89106 | 8/1/2003 | 10/31/2017 | $400,353.90 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Las Vegas Premium Outlets - South 7400 S. Las Vegas Boulevard Las Vegas, NV 89123 | 11/26/1993 | 10/31/2017 | $391,398.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Lighthouse Place Premium Outlets 909 Lighthouse Place Michigan City, IN 46360 | 7/26/1991 | 9/30/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Mall at Rockingham Park 99 Rockingham Park Boulevard Salem, NH 03079 | 11/9/2007 | 10/31/2017 | $26,370.60 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Mall of Georgia 3333 Buford Drive Buford, GA 30519 | 11/15/2008 | 10/31/2017 | **$0.00** |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Merrimack Premium Outlets 80 Premium Outlets Boulevard Merrimack, NH 03054 | 6/14/2012 | 10/31/2017 | $84,531.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Miami International Mall 1455 NW 107 Ave. Miami, FL 33172 | 4/11/2007 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Newport Centre 30-112A Mall Drive West Jersey City, NJ 07310 | 4/11/2003 | 10/31/2017 | $144,549.84 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | North Georgia Premium Outlets 800 Hwy 400 South Dawsonville, GA 30534 | 4/25/1997 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Opry Mills Mall 101 Opry Mills Drive Nashville, TN 37214 | 5/10/2000 | 9/30/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Orlando Premium Outlets - International Drive 4951 International Drive Orlando, FL 32819 | 8/14/2008 | 10/31/2017 | $137,588.07 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Orlando Premium Outlets - Vineland Avenue 8200 Vineland Avenue Orlando, FL 32821 | 6/2/2000 | 10/31/2017 | $934,173.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Osage Beach Premium Outlets 4540 Highway 54, Box E-4 Osage Beach, MO 65065 | 4/3/1993 | 10/31/2017 | $129,309.12 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Pheasant Lane Mall 310 Daniel Webster HWY. Nashua, NH 03060 | 7/31/1992 | 9/30/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Philadelphia Premium Outlets 18 West Lightcap Road Limerick, PA 19464 | 11/8/2007 | 10/31/2017 | $9,182.73 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Pismo Beach Premium Outlets 333 Five Cities Drive Pismo Beach, CA 93449 | 11/27/1994 | 10/31/2017 | $155,077.32 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Plaza Carolina Mall Avenida Fragoso Villa Fontana Carolina, PR 00983 | 1/30/1999 | 9/30/2017 | $175,194.18 |
| Simon | Perfumania Puerto Rico, Inc. | Plaza Carolina Mall Avenida Fragoso Villa Fontana Carolina, PR 00983 | 7/26/2011 | 9/30/2017 | $171,601.10 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Pleasant Prairie Premium Outlets 11211 120th Avenue Pleasant Prairie, WI 53158 | 7/7/1990 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Potomac Mills 2700 Potomac Mills Circle Woodbridge, VA 22192 | 9/30/1993 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Rio Grande Valley Premium Outlets 5001 East Expressway 83 Mercedes, TX 78570 | 11/2/2006 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Round Rock Premium Outlets<br>4401 N. IH 35<br>Round Rock, TX 78664 | 8/3/2006 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | San Francisco Premium Outlets<br>400 Livermore Outlets Drive<br>Livermore, CA 94551 | 11/8/2012 | 10/31/2017 | $146,210.40 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | San Marcos Premium Outlets<br>3939 IH-35 South<br>San Marcos, TX 78666 | 8/1/1990 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Sawgrass Depot<br>12801 West Sunrise Blvd<br>Sunrise, FL 33323 | 4/24/2009 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Sawgrass Mills<br>12801 W. Sunrise Boulevard<br>Sunrise, FL 33323 | 10/15/1990 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Seattle Premium Outlets<br>10600 Quil Ceda Boulevard<br>Tulalip, WA 98271 | 5/5/2005 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Silver Sands Premium Outlets<br>10406 W. Emerald Coast Parkway<br>Destin, FL 32550 | 10/5/2001 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | South Shore Plaza<br>250 Granite Street<br>Braintree, MA 02184 | 11/24/2008 | 10/31/2017 | $194,230.08 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | St. Augustine Premium Outlets<br>2700 State Road 16<br>St. Augustine, FL 32092 | 10/26/2012 | 10/31/2017 | $109,080.24 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Sugarloaf Mills<br>5900 Sugarloaf Parkway<br>Lawrenceville, GA 30043 | 10/24/2002 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Tampa Premium Outlets<br>2382 Grand Cypress Drive<br>Lutz, FL 33559 | 10/29/2015 | 10/31/2017 | $173,654.78 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Simon | Magnifique Parfumes and Cosmetics, Inc. | The Crossings Premium Outlets 1000 Premium Outlets Drive Tannersville, PA 18372 | 8/29/1991 | 10/31/2017 | $144,291.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | The Outlets at Orange 20 City Blvd. W. Bldg. B. Orange, CA 92868 | 11/19/1998 | 9/30/2017 | $208,113.84 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Tucson Premium Outlets 6401 West Marana Center Boulevard Tucson, AZ 85742 | 10/1/2015 | 9/30/2017 | $135,767.23 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Twin Cities Premium Outlets 3925 Eagan Outlets Parkway Eagan, MN 55122 | 8/14/2014 | 9/30/2017 | $119,551.21 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Vacaville Premium Outlets 131 Nut Tree Road Vacaville, CA 95687 | 11/13/1992 | 10/31/2017 | $53,837.25 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Waikele Premium Outlets 94-790 Lumiaina Street Waipahu, HI 96797 | 12/3/1999 | 10/31/2017 | $347,390.40 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Waterloo Premium Outlets 655 Route 318 Waterloo, NY 13165 | 4/7/1995 | 10/31/2017 | $39,054.36 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Williamsburg Premium Outlets 5699 Richmond Road Williamsburg, VA 23188 | 10/29/1994 | 9/30/2017 | $135,202.92 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Woodburn Premium Outlets 101 Arney Road Woodburn, OR 97071 | 10/12/2002 | 10/31/2017 | $0.00 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Woodbury Common Premium Outlets 676 Bluebird Ct. Central Valley, NY 10917 | 5/1/1993 | 10/31/2017 | $349,131.72 |
| Simon | Magnifique Parfumes and Cosmetics, Inc. | Wrentham Village Premium Outlets One Premium Outlet Blvd. Wrentham, MA 02093 | 10/8/1997 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Singerman Real Estate | Magnifique Parfumes and Cosmetics, Inc. | Lincoln City Outlets 1500 SE East Devils Lake Road Lincoln City, OR 97367 | 2/1/1990 | 10/31/2017 | $109,828.44 |
| Sobert Realty Corp. | Magnifique Parfumes and Cosmetics, Inc. | The Outlets at Lake George 1415 State Route 9 Lake George, NY 12845 | 1/7/1996 | 9/30/2017 | $88,913.08 |
| Starwood Capital Group | Magnifique Parfumes and Cosmetics, Inc. | Chicago Ridge Mall 671 Chicago Ridge Mall Drive Chicago Ridge, IL 60415 | 6/15/2012 | 10/31/2017 | $86,779.31 |
| Starwood Capital Group | Magnifique Parfumes and Cosmetics, Inc. | Franklin Park Mall 5001 Monroe Street Toledo, OH 43623 | 5/6/2005 | 10/31/2017 | $102,354.96 |
| Starwood Capital Group | Magnifique Parfumes and Cosmetics, Inc. | Plaza West Covina 112 Plaza Drive West Covina, CA 91790 | 11/12/2008 | 9/30/2017 | $80,781.72 |
| Starwood Capital Group | Magnifique Parfumes and Cosmetics, Inc. | The Mall at Wellington Green 10300 W. Forest Hill Boulevard Wellington, FL 33414 | 5/9/2003 | 10/31/2017 | $0.00 |
| Talisman Companies | Magnifique Parfumes and Cosmetics, Inc. | Fashion Outlet of Las Vegas 32100 Las Vegas Blvd. Primm, NV 89019 | 7/12/1998 | 9/30/2017 | $41,055.36 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 104 N. Michigan Avenue Atlantic City, NJ 08401 | 5/27/2005 | 9/30/2017 | $98,766.96 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 1100 Cornerstone Boulevard Daytona, FL 32117 | 11/17/2016 | 10/31/2017 | $137,422.77 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 1645 Parkway Sevierville, TN 37862 | 9/18/1992 | 10/31/2017 | $0.00 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 1770 West Main Street Riverhead, NY 11901 | 7/1/1994 | 10/31/2017 | $0.00 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 300 Tanger Boulevard Branson, MO 65616 | 12/10/1994 | 10/31/2017 | $19,106.90 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 301 Tanger Drive, Suite #227 Terrell, TX 75160 | 10/25/1995 | 10/31/2017 | $86,408.64 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 350 84th Street SW Byron Center, MI 49315 | 7/30/2015 | 9/30/2017 | $82,517.01 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 36484 Seaside Outlet Drive Rehoboth Beach, DE 19971 | 7/17/2015 | 9/30/2017 | $117,744.02 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 400 South Wilson Road Sunbury, OH 43074 | 6/23/2016 | 9/30/2017 | $130,468.43 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 4000 Arrowhead Boulevard Mebane, NC 27302 | 11/5/2010 | 9/30/2017 | $57,227.81 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 4015 IH 35 South San Marcos, TX 78666 | 10/15/1993 | 10/31/2017 | $115,579.20 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 417 The Arches Circle Deer Park , NY 11729 | 10/22/2008 | 10/31/2017 | $192,250.56 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 4840 Tanger Outlet Boulevard N. Charleston, SC 29418 | 5/18/2013 | 9/30/2017 | $79,796.40 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 6699 North Landmark Drive Park City, UT 84098 | 12/16/2011 | 10/31/2017 | $10,013.78 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 6800 N. 95th Avenue Glendale, AZ 85305 | 9/28/2013 | 10/31/2017 | $80,106.36 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 800 Steven B. Tanger Blvd. Commerce, GA 30529 | 7/12/1996 | 10/31/2017 | $85,051.92 |
| Tanger Outlet Centers | Magnifique Parfumes and Cosmetics, Inc. | Tanger Outlet Center 8470 Factory Shops Boulevard Jeffersonville, OH 43128 | 7/22/1993 | 10/31/2017 | $12,827.72 |
| The Feil Organization | Magnifique Parfumes and Cosmetics, Inc. | North Riverside Park Mall 7501 North Cermak Road North Riverside, IL 60546 | 9/25/1992 | 10/31/2017 | $0.00 |
| The Howard Hughes Corporation | Magnifique Parfumes and Cosmetics, Inc. | Downtown Summerlin 2025 Festival Plaza Drive, Suite 120 Las Vegas, NV 89135 | 10/9/2014 | 9/30/2017 | $107,533.54 |
| The Howard Hughes Corporation | Magnifique Parfumes and Cosmetics, Inc. | The Outlet Collection at Riverwalk 1 Poydras Street New Orleans, LA 70130 | 5/22/2014 | 10/31/2017 | $91,711.75 |
| The Taubman Company | Magnifique Parfumes and Cosmetics, Inc. | Great Lakes Crossing 4512 Baldwin Road Auburn Hills, MI 48326 | 11/12/1998 | 10/31/2017 | $47,992.98 |
| The Taubman Company | Magnifique Parfumes and Cosmetics, Inc. | Great Lakes Crossing 4768 Baldwin Road Auburn Hills, MI 48326 | 5/1/2009 | 10/31/2017 | $179,685.24 |
| The Taubman Company | Magnifique Parfumes and Cosmetics, Inc. | Stamford Town Center 100 Greyrock Place Stamford, CT 06901 | 7/7/1993 | 10/31/2017 | $41,260.32 |
| Triple Five | Magnifique Parfumes and Cosmetics, Inc. | Mall of America I 219 North Garden Street Bloomington, MN 55425 | 8/11/1992 | 10/31/2017 | $63,154.11 |
| Vornado Realty | Perfumania Puerto Rico, Inc. | Las Catalinas Mall Carretera Estatal PR-52 Caguas, PR 00725 | 5/2/1998 | 9/30/2017 | $166,876.80 |
| Weingarten Realty Investors | Magnifique Parfumes and Cosmetics, Inc. | Trenton Crossing 7600 North 10th Street McAllen, TX 78504 | 7/24/2006 | 9/30/2017 | $69,779.52 |

| Lessor / Landlord | Debtor Counterparty | Real Property Address | Date of Contract | Applicable Rejection Date | Rejection Damages |
|---|---|---|---|---|---|
| Westfield Corporation | Magnifique Parfumes and Cosmetics, Inc. | Westfield Palm Desert<br>72840 Highway 111<br>Palm Desert, CA 92260 | 4/20/2012 | 9/30/2017 | $76,070.00 |
| Westfield Corporation | Magnifique Parfumes and Cosmetics, Inc. | Westfield San Francisco Centre<br>865 Market Street<br>San Francisco, CA 94103 | 11/27/2013 | 9/30/2017 | $142,608.00 |
| Woodmont Company | Magnifique Parfumes and Cosmetics, Inc. | Columbia Gorge Outlets<br>450 NW 257th Way<br>Troutdale, OR 97060 | 9/25/2009 | 9/30/2017 | $126,461.76 |
| WP Glimcher | Magnifique Parfumes and Cosmetics, Inc. | Edison Mall<br>4125 Cleveland Avenue<br>Ft. Myers, FL 33901 | 10/29/1998 | 10/31/2017 | $203,499.00 |
| WP Glimcher | Magnifique Parfumes and Cosmetics, Inc. | Melbourne Square<br>1700 West New Haven Avenue<br>Melbourne, FL 32904 | 9/26/2008 | 10/31/2017 | $76,444.50 |
| WP Glimcher | Magnifique Parfumes and Cosmetics, Inc. | Outlet Collection - Seattle<br>1101 Outlet Collection Way<br>Auburn, WA 98001 | 8/25/1995 | 9/30/2017 | $106,047.72 |
| Yacht Haven USVI LLC | Magnifique Parfumes and Cosmetics, Inc. | Yacht Haven Grande<br>5316 Yacht Haven Grande<br>St. Thomas, USVI 00802 | 4/11/2012 | 9/30/2017 | $85,104.00 |